FILED

2014 Mar-21  PM 03:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

# GOVERNMENT EXHIBIT A

## PART 3

# DECLARATION OF DAVID ICOVE

which would confirm these facts. Collecting those cigarette butts and conducting even a cursory search for the Styrofoam cup in the debris would have been a very simple exercise.

Several examples document the ***insufficiency of facts and data*** collected and preserved, and subsequently interpreted in this case. For example, Investigator Williams claimed that he examined the electrical circuit breaker panels and electrical wiring circuits, and found them to be in operating order with no life safety violations. Specifically, Investigator Williams' report (EFI Report, p. 5; YEDLA002946) regarding potential electric causes for the fire stated:

> *The electrical panel was not involved. The wiring was affected by the fire at a wall hung light fixture that was exposed to the fire spread on the balcony. As the fire spread away from the area of origin, the wiring was damaged consistent with random exposure damage.*

Investigator Williams missed essential information in doing so and his report shows that the evidence was not properly preserved. The electrical circuit panels examined by Investigator Williams were so poorly photographed by him (YEDLA003133-003141) that the positions of the circuit breakers, as well as the written documentation on the panel for the routing of each branch circuit, were not even discernible. The investigative value of such information cannot be overlooked and needs to be preserved, and *NFPA 921* even provides forms for capturing this information rather than relying only on photographs (NFPA 921, 2014 Edition, Electrical Panel Documentation, Figure A.16.3.2(g)).

A striking example of the major electrical code and fire code violations that both Investigators Wilkerson and Williams missed and failed to document was revealed in the June 3, 2011 inspection of the Country Inn and Suites property by the City of Huntsville's Code Enforcement Division. City codes enforcement officials found such a significant number of

electrical code violations in that inspection that they ordered the immediate vacating and prohibited the use and occupancy of those buildings. These deficiencies included numerous significant electrical code violations, such as improperly sized junction boxes at service panels, improperly installed lighting fixtures, and open electrical splices in walls. In several bathrooms, inspectors found live electrical boxes wallpapered over. These and other electrical, fire, and building code violations caused the City of Huntsville to force the owners to immediately vacate these buildings and prohibit their use as a motel.

Of particular interest was the potential contribution of overlooked exterior lighting fixtures on balconies of each unit. The exterior electrical light fixtures were mounted outside on the wall in proximity to the area of fire origin. Investigator Williams took it upon himself to examine this piece of evidence, described it in his report, yet failed to preserve it (Figure 6). Furthermore, it appears he examined an electrical junction box where the wires appear to have been cut (Figure 7).

 

**Figure 6.** Remains of the exterior electrical lighting fixture on balcony of Room 2207 (left, YEDLA003053) and exemplar placement of these fixtures (right, YEDLA003154).



**Figure 7.** Self-documented destructive examination of electrical evidence of unknown origin from the fire scene (left, YEDLA003053 and right, YEDLA003055).

## 2.  Failure to Notify Interested Parties

A second essential element in maintaining the *sufficiency of facts and data* in a fire investigation is to allow for the participation of all individuals and parties during the comprehensive processing, collection, documentation, and evaluation of information and evidence collected while processing the fire scene. This ensures that fire investigators and experts retained by their respective clients are given equal access and input into the processing of the fire scene and allows all investigators to arrive at accurate determinations related to the origin, cause, fire spread, and responsibility for the incident (NFPA 921, 2011 Edition, Ch. 4.4.3.4).

*NFPA 921* strongly cautions investigators that improper scene documentation can impair the opportunity of other *interested parties* to develop the same evidentiary value from the data (NFPA 921, 2011 Edition, Ch. 4.4.3.4). These interested parties may be in a position to participate in the investigation and provide technical and engineering resources not always readily available to the primary investigators.

*NFPA 921* (2011 Edition, Ch 3.3.105 ) defines an *interested party* as

*3.3.105 Interested Party. Any person, entity, or organization, including their representatives, with statutory obligations or whose legal rights or interests may be affected by the investigation of a specific incident.*

Fire investigators are trained to recognize interested parties, notify their clients of their existence, and suspend the processing of the fire scene until these parties have the opportunity to have an expert and/or representative at the fire scene. The reasoning for this need for recognition is that interested parties may later become the targets of *subrogation* where a lawsuit is filed against that party or other parties with the purpose to collect damages for the entity allegedly responsible for causing or contributing to the fire loss.

In this case, the first mention of the issue of subrogation appears on September 23, 2010 in the letter from Phil Yarbrough, representing Acadia Insurance Company, that assigned the fire loss to Cook Claims Service. Mr. Yarbrough listed Specific File Requirement No. 8 in the assignment letter to Cook Claims to "*Thoroughly address subrogation and salvage*" (Emphasis added, YEDLA000346, YEDLA000351, YEDLA002912).

A second early reference to subrogation is discussed in length in YEDLA Exhibit B, which is a September 27, 2010 four-page report from Jim Gowder, Adjuster with Cook Claims Service, to Phil Yarbrough representing Acadia/Union Standard Insurance (YEDLA000467-000470) including eight pages of photographs (YEDLA000471-000478). In this letter, Mr. Gowder states on page 3 (YEDLA000469):

> **SUBROGATION:** *There appears to be the possibility of subrogation since the origin can reportedly be determined and the individual who was smoking has been identified. We will report further upon receipt of the C & O Report and that of the Fire Marshall. The fire Marshall stated the FBI agent claims governmental immunity. We do not believe this will apply nor will it relieve the agent of personal responsibility.*

Starting on September 23, 2010, Plaintiff Acadia would have been fully aware that a subrogation action would likely be initiated sometime in the near future, as turned out to be the case. Therefore, it became the responsibility of those decision-makers, including but not limited to Mr. Yarbrough, Mr. Jim Gowder, and eventually Investigator Williams and his supervisors at EFI Global, Inc., to ensure that (1) the evidence in this case was properly preserved *in situ*, (2) safeguarded from loss, destruction, or spoliation, and (3) that the appropriate interested parties were notified and invited to all evidence inspections and sharing of data regarding the fire loss.

In this case, interested parties would have included, but were not limited to persons, entities, and organizations who participated in the design, construction, renovation, and general operation of the Country Inn and Suites; the fire, electrical, and other individuals who participated in the design, installation and servicing of those items identified as fire, electrical, and structural violations cited on June 3, 2011 by City of Huntsville code enforcement officials (FBI000118-000119, FBI000126-FBI000127), and the United States named as the Defendant in this action. All such parties should have been provided notice as an interested party and afforded an opportunity to participate in the EFI Global, Inc. evidence inspection and destructive testing at the fire scene.

The ability to provide timely notice in this case to those interested parties is evident, since EFI Global received their assignment from Jim Gower, Cook Claims Company, on September 23, 2010 and did not commence their investigation until September 27, 2010. The issue of subrogation was specifically mentioned in writing on those same dates, before the fire scene investigation even commenced. Moreover, once on the fire scene EFI Global should have surveyed the situation, notified their client of the responsibility to identify and notify other interested parties, and then halted their investigation until these other parties could have a representative on the scene.

*NFPA 921* clearly sets forth the process for notification of interested parties that should have been recognized and initiated by EFI Global, Inc. and Cook Claims Company before proceeding. *NFPA 921* specifically states (2014 Edition, Ch. 12.3.4.4):

> ***12.3.5.4 Notification to Interested Parties***. *Claims of spoliation of evidence can be minimized when notice is given to all known interested parties that an investigation at the site of the incident is going to occur so as to allow all known interested parties the opportunity to retain experts and attend the investigation. Such notice may be made by telephone, letter, or e-mail. Oral notification should be confirmed in writing. Notification should include the date of the incident; the nature of the incident; the incident location; the nature and extent of loss, damage, death, or injury to the extent known; the interested party's potential connection to the incident; next action date; circumstances affecting the scene (such as pending demolition orders or environmental conditions); a request to reply by a certain date; contact information as to whom the notified person is to reply; and the identity of the individual or entity controlling the scene. The notification should also include a roster of all parties to whom notice has been provided. Public sector investigators may have different notification responsibilities than the private sector investigators. Responsibility for notification varies based on jurisdictions, scope, procedures, and the circumstances of the fire. Interested parties should make public officials aware of their interest. A private sector consent to search does not constitute notice unless it conforms with this section.*

In summary, both EFI Global, Inc. and Cook Claims Company, the firm who gave the assignment to conduct the origin and cause investigation of the Country Inn and Suites fire, had ample opportunity and time to recognize their known responsibilities. These included, but were not limited to ensuring that (1) the evidence in this case would be properly preserved *in situ*, (2) safeguarded from loss, destruction, or spoliation, and (2) that the appropriate interested parties would be invited to all evidence inspections and sharing of data regarding the fire loss.

### 3.   Allowing for Spoliation of Evidence

A third essential element in maintaining the s***ufficiency of facts and data*** in a fire investigation concerns the protection from loss, destruction, or alteration of material data and

evidence. The investigation conducted by EFI Global and directed by the Cook Claims Company, based upon both their actions and their failure to act, caused and/or contributed to the spoliation of evidence in this case.

Particularly, EFI Global, in proceeding with their destructive inspection, testing, and subsequent destruction/discarding of material evidence, along with their failure and that of Cook Claims Company to notify interested parties constituted significant spoliation in this case prejudicial to those interested parties. The specific investigator-caused spoliation took place in five forms:

(1) **Recognition**. *Their failure to recognize, with early indications of potential legal actions through subrogation, that physical evidence at the scene needed to be protected and interested parties needed to be identified;*

(2) **Notification**. *Their failure to recognize and instruct their clients on the importance of the notification of interested parties;*

(3) **Protection and Safeguard**. *Their failure to safeguard the fire scene from further damage or alteration until other interested parties could make arrangements to attend the examination of evidence;*

(3) **Destructive Examination**. *Their proceeding, without notification and waiting for the participation of interested parties, with the decision to conduct a destructive scene examination and disassembly of physical evidence; and*

(4) **Failure to Collect and Preserve**. *Their abandonment of crucial evidence during the destructive scene examination which supported their hypothesis as to the cause and responsibility for the fire with disregard for exculpatory evidence that could have supported other viable hypotheses.*

In this case where the Plaintiff claims damages in excess of $1 million, all the evidence, no matter how seemingly inconsequential, should have been properly identified and protected until all potential interested parties received their notification and arranged for participation in the scene

examination. The boarding-up of the section of the building where the fire occurred could have been easily accomplished without impeding the operations of the facility.

Both the public and private fire investigators are trained in the recognition of the concept of spoliation. *NFPA 921* (2011 Edition, Ch. 3.3.162) defines **spoliation** as

> "*Loss, destruction, or material alteration of an object or document that is evidence or potential evidence in a legal proceeding by* **one who has the responsibility for its preservation**." (*emphasis added*).

Fire investigators, since they handle, evaluate, and document evidence at scenes, also bear the ultimate responsibility to recognize and prevent spoliation. *NFPA 921* cautions that this responsibility applies equally to investigators that are public officials and those who are in the private sector, and defines this **responsibility** of investigators and individuals associated with or supervising the investigation, to recognize and protect against spoliation (2014 Edition, Ch. 12.3.5.1)

> *12.3.5.1 Responsibility. The responsibility of the investigator (or anyone who handles or examines evidence) is* **evidence preservation***, and the scope of that responsibility varies according to such factors as the investigator's jurisdiction,* **whether he or she is a public official or private sector investigator***, whether criminal conduct is indicated, and applicable laws and regulations. However, regardless of the scope and responsibility of the investigation, care should be taken to avoid destruction of evidence. (emphasis added)*

*NFPA 921* sets forth clear guidance for fire investigators on the recognition and prevention of spoliation of evidence (2014 Edition, Ch. 11.3.5).

> *11.3.5 Spoliation of Evidence. Spoliation of evidence refers to the loss, destruction, or material alteration of an object or document that is* **evidence or potential evidence** *in a legal proceeding by one who has the responsibility for its preservation.* **Spoliation of evidence may occur when the movement, change, or destruction of evidence, or the alteration of the scene, significantly impairs the**

> *opportunity of other interested parties to obtain the same evidentiary value from the evidence, as did any prior investigator. (emphasis added)*

In order to maintain the sufficiency of facts and data in a fire investigation, there remains a conscious and continuing duty to collect and preserve all information, data, and objects of evidentiary value. As demonstrated previously, in the case of the fire at the Country Inn and Suites, the loss of the evidence, particularly the exterior mounted lighting fixtures on the balconies and the related electrical wiring, deprived all parties, named and unnamed, from an equal access to the evidence at the fire scene.

With the numerous major electrical code violations found by city inspectors, a fire of electrical origin can never be ruled out, especially since critical evidence was never properly documented and preserved. Due to spoliation of evidence in this case, the lack of documentation along with numerous opportunities to collect and preserve essential evidence, the true origin and cause of this fire will never be known.

In evaluating the sufficiency of evidence, fire investigators are trained to recognize that collected data and evidence should not consist of only the data and evidence that support the investigator's initial or assumed hypothesis, but should include all data and evidence to verify and validate (or refute) *alternative hypotheses* (see *NFPA 921*, 2014 Ed., Ch. 12.3.5.2). *NFPA 921* emphasizes that equal efforts should be pursued not only to preserve evidence to support the investigator's hypothesis for the fire's origin and cause, but also to carefully and thoroughly document evidence of all other reasonable alternative hypotheses that can be considered and validated or ruled out.

To ignore the consideration of alternative hypotheses can only serve to undermine objectivity and improperly introduce *expectation bias* into the investigation. *NFPA 921* (2014 Edition, Ch. 4.3.8) discusses the impact of expectation bias as:

> *Expectation bias* is a well-established phenomenon that occurs in scientific analysis when investigator(s) reach a premature conclusion without having examined or considered all of the relevant data. Instead of collecting and examining all of the data in a logical and unbiased manner to reach a scientifically reliable conclusion, the investigator(s) uses the *premature determination to dictate investigative processes, analyses, and, ultimately, conclusions, in a way that is not scientifically valid.* The introduction of expectation bias into the investigation results in the use of only that data that supports this previously formed conclusion and often results in the misinterpretation and/or discarding of data that does not support the original opinion. Investigators are strongly cautioned to avoid expectation bias through proper use of the scientific method. (*emphasis added*)

Considering the case of the Country Inn and Suites, both the public and private investigators concluded prematurely that since the occupant of Room 2207 admitted to smoking on the balcony, the cause of the fire had to be a discarded cigarette. Discussed in a later section are the fire dynamics of cigarette ignition and the fact that fire-safe cigarettes were already in place and widely used before the September 22, 2010 fire.

To engage in an unsupported "jump to a conclusion" in blaming a cigarette for the cause of this fire without a defined ignition sequence supported by documented physical evidence demonstrates that both investigators used a narrowly selected approach by which they employed data and facts that supported their pre-determined conclusions. Absent from any meaningful consideration was the possibility of many other even *more* likely scenarios for viable ignition scenarios, not only on the balcony of Room 2207 but also on higher levels, within the walls, and caused by dangerous electrical wiring so defectively installed and in use that the code enforcement

officials later shut down the entire motel complex for major violations rising to the level of life safety hazards.

This approach fails to maintain a ***sufficiency of facts and data*** in conducting a fire scene investigation and is not scientifically valid and reliable.

### 4. Liability for Spoliation of Evidence

A fourth essential element in maintaining the ***sufficiency of facts and data*** in a fire investigation concerns the need for collecting enough data and evidence that deflects any allegations of spoliation. In applying *NFPA 921*, *NFPA 1033*, and other recognized professional standards in fire and explosion investigations, there is a duty to collect and preserve all information, data, and objects of evidentiary value. There exists a potential that investigators can be held legally liable for spoliation and destruction of evidence[28] at a fire scene; and this topic on losing or destroying evidence on fire scenes is frequently discussed at fire investigation training conferences, seminars, and in fire investigation journals[29].

The recognized liability of a private investigative firm for spoliation of evidence is best exemplified in an affidavit[30] given by Mr. E. Metts Hardy, Regional Vice President of EFI Global, Inc., which is a self-described nationwide engineering and investigation firm that handles fire

---

[28] Clinkinbeard, K. J., & King, G. A. (2008). *Spoliation: Can the Investigator be Sued for Destruction of Evidence?* Paper presented at the International Symposium on Fire Investigation Science and Technology, ISFI 2008, Cincinnati, OH., May 18 -21, 2008.

[29] Lynch, P. A. (1997). *Watch Out for Tort Liability for Spoliation of Evidence. Fire & Arson Investigator, International Association of Arson Investigators*, Volume 47, Number 4. June 1997, pp. 17-19.

[30] The Cincinnati Insurance Company, and Applied Technical Services, Inc. Plaintiffs, United States Liability Insurance Company d/b/a United States Liability Group, Defendant, United States District Court for the Middle District of Tennessee at Nashville, Case# 3:11-Cv-01169, Document 26, Filed June 6, 2012.

investigation matters on a nationwide basis (and is the same firm that conducted the Country Inn and Suites origin and cause investigation by its employee, Mr. Willliams, which is the subject of my peer review and professional opinions in this action). Note that Mr. Hardy signed Investigator Williams' report as his company's designated technical peer reviewer.

In the matter for which he provided a sworn affidavit, Mr. Hardy reviewed two cases of alleged spoliation and rendered an expert opinion in federal court. He stated that there was no doubt that the evidence in question was in the custody and control of a fire investigation firm or its representatives, and the evidence was subsequently lost or discarded during the litigation.

In two specific paragraphs extracted from his affidavit signed May 29, 2012, Mr. Hardy provides his expert opinion regarding the liability of any private investigation firm in a suit or claim against their company for losing evidence:

**Figure 8.** Paragraphs 6 and 7 from an expert opinion affidavit by E. Metts Hardy, Regional Vice President of EFI Global, Inc., regarding the liability of private investigation firms for a spoliation claim or lawsuit against their company for losing evidence.

> 6.   *After reviewing these documents and researching spoliation issues, it is my opinion to a reasonable degree of professional certainty that it would be reasonably foreseeable that the loss of evidence by XXX, a professional fire investigation company, would give rise to a claim or suit for spoliation under a professional liability policy. This is especially true where the evidence spoliated by XXX was a crucial part of the investigation and the litigation.*
>
> 7.   *Based upon my review of the records, there was no doubt that the evidence in question was in the custody and control of XXX or its representatives and was lost or discarded during the course of ongoing litigation. It is clear that XXX knew or should have known, as a professional fire investigation company, that its loss of the evidence would likely give rise to a suit or claim against its professional liability policy. This is clear because the relevant fire investigation texts speak to the issue of spoliation.*

Mr. Hardy confirms that all professional fire investigation companies should know that a loss of evidence would likely give rise to a suit or claim against their professional liability policy and that relevant fire investigation texts such as *NFPA 921* speak to the issue of spoliation.

### 5. Impact of the Untimely Destruction of the Fire Scene

Through documentation provided in discovery, it is indisputable that the fire scene was prematurely destroyed before interested parties were properly notified. The fire scene was altered; fire debris was disturbed; critical evidence was discarded and abandoned; evidence of significant fire and electrical violations was removed, stripped out and repaired; and potential witnesses at the motel left without being interviewed. These actions occurred in September 2010, several *years* before the Defendant in this case was first notified of a claim on August 1, 2012, followed by a civil Complaint filed on May 10, 2013.

The individuals who were directly involved, or who eventually became aware of the destruction of the fire scene, include without limitation Acadia Insurance Company's representatives, adjusters, investigators, and attorneys. Based upon correspondence found in discovery, the names of those individuals include the corporate representative, Phil Yarbrough, of Union Standard Insurance; Jim Gowder, claims adjuster for Cook Claims Service; Roderick Williams and E. Metts Hardy, of EFI Global, Inc.; and Jamie P. Cooper, attorney at Martin, Disiere, Jefferson & Wisdom LLC (YEDLA002032-002040).

Altering and/or destroying a fire scene before all interested parties are properly notified and can participate directly in the investigation adversely impacts their ability to defend themselves, and is by definition a matter which is incurably prejudicial in nearly every instance. The scene destruction, especially the removal and alteration of potentially exculpatory evidence

such as improper and dangerous electrical wiring in this case, only further undermines the opportunity for a potential Defendant to understand and meaningfully participate in the investigation and to develop alternative hypotheses for the fire's origin and cause to defend itself in a subsequent legal action.

The fire occurred on September 22, 2010 and the Plaintiff claims damages in this action exceeding $1 million, which is not a minor claim by any measure. The mere mention of the potential for subrogation by Phil Yarbrough in correspondence to Cook Claims Service on September 23, 2010 (YEDLA002912), the first day after the fire, should have set in motion the notification process among all involved. Mr. Yarbrough should have immediately informed the insurance company, their adjusters, their investigators, and ultimately their attorneys of the responsibility to protect the scene from spoliation and provide immediate notification to interested parties so as to allow them the opportunity to fully participate in the investigation.

Acadia Insurance Company and its representatives had a clear-cut duty to preserve the fire scene since the company was already aware (1) that pending or probable litigation would involve the Defendant and (2) it was readily foreseeable that prematurely processing the scene and discarding the evidence would be substantially prejudicial to the Defendant.

Acadia Insurance Company, its adjusters, investigators, and attorneys should have already been well-versed on the issue of spoliation, as that subject is discussed at many insurance conferences annually and is the subject of publications in insurance trade journals and legal publications on a regular basis. Upon learning of the allegations involving the Defendant as a potentially responsible party, it was in complete control of the fire scene and should have taken

immediate steps to suspend any further investigative activities, preserve the scene, and notify all potential subrogation target defendants both orally and in writing.

If a thorough scene examination involving all interested parties had been allowed, all of the parties (including Plaintiff's own representatives) would have become aware of the numerous fire, building, and electrical code violations that existed and would have considered those factors as potential hypotheses for the fire to be further investigated and tested. The entire fire scene should have been preserved to allow these interested parties to examine all of the evidence and debris in order to confirm for themselves that a proper investigation was conducted. Witnesses could have been identified for interviews; adequate photographic documentation of all evidence and fire debris could have been performed; and all physical evidence could have been properly collected and preserved for further forensic analysis, as appropriate.

Photography alone does not support the notion that a scene could be processed and evaluated later by another expert who could derive the same evidentiary value from those photographs as if they had been physically present at the scene. A thorough scene examination would have required clearly-taken photographs of the investigative process being undertaken; the condition of electrical equipment, wiring and other utilities; and the layered processing (de-layering) of the fire debris down to discrete burn patterns. The Defendant's expert in this case was provided with only a limited number of photographs and those were not clear, nor were they sufficiently comprehensive to even approach the investigative value of having been physically present.

Not all items arguably relevant at a fire scene are worthy of retention, sampling, or documentation. However, when items made unavailable by the offending party through loss or

spoliation are inextricably connected to the evidence which the offending party believes to have caused the fire, it becomes extremely important to the defense. If the item's importance is already known or likely to become known later, such evidence should be retained for inspection until the opposing party has adequate notice and a reasonable opportunity to conduct an examination by its own experts.

The Defendant's expert in this case is plainly hindered in countering the Plaintiff's allegation that the fire was caused by an improperly discarded cigarette by not having available any tangible evidence, exhibits, or definitive photographs. The Defendant's expert has also been prejudiced by the failure of Plaintiff's experts to reasonably document the available evidence of fire origin commensurate with the circumstances and their expected level of expertise and experience as required by *NFPA 1033* and *NFPA 921*.

In summary, the evidence supports my professional conclusion that the Defendant has been deprived of an opportunity to conduct a first-hand investigation of a myriad of possible alternative ignition sources at the scene of the fire and is being forced instead to rely on an unclear and incomplete investigation conducted by Plaintiff Acadia Insurance Company's investigator in order to rebut the Plaintiff's claims in this action. The Defendant has been deprived of any opportunity to examine the original fire scene evidence *in situ*, intact and unspoiled.

### B.     Use of Reliable Principles and Methods by the Investigator

The use of ***reliable principles and methods*** is the central theme in scientific fire origin and cause determination. *NFPA 921* states that reliable fire cause determinations first require the determination of the fire's origin. It specifically states:

*Fire cause determination is the process of identifying the first fuel ignited, the ignition source, the oxidizing agent, and the circumstances that resulted in the fire.* **Fire cause determination generally follows origin determination** *(see Origin Determination chapter). Generally, a fire cause determination can be considered reliable only if the origin has been correctly determined. (NFPA 921, 2014 Edition, Ch. 19.1).* (**emphasis added**)

*NFPA 921* (2014 Edition, Ch. 18.1.2) is very clear in identifying the four factors needed to make the determination of fire origin during an investigation. The determination of the origin of the fire involves the coordination of information derived from one or more of the following:

(1)   **Witness Information**. *The analysis of observations reported by persons who witnessed the fire or were aware of conditions present at the time of the fire.*

(2)   **Fire Patterns**. *The analysis of effects and patterns left by the fire.*

(3)   **Fire Dynamics**. *The analysis of the fire dynamics, that is, the physics and chemistry of fire initiation and growth, and the interaction between the fire and the building's systems.*

(4)   **Arc Mapping**. *The analysis of the locations where electrical arcing has caused damage and the documentation of the involved electrical circuits.*

The following is an analysis of some of the factors leading to the failure of the insurance investigation in this case to properly arrive at a scientifically valid and reliable determination of the origin and cause of the fire at the Country Inn and Suites. These issues as to origin and cause determination are central to my analysis in this case.

## 1.  Lack of Emphasis on Witness Interviews

The first tool useful in determining a fire's origin is witness information. There was a lack of information obtained through witness interviews in this case, in fact they are practically non-existent. The only significant interview was a very short statement from the occupant of Room 2207 taken by Investigator Wilkerson. Of concern is that fact that there are no eyewitness

interviews of residents of the Country Inn and Suites, despite the fact many of them were long-term residents attending a local training school who could have easily been identified and interviewed. For example, even the identity of the person pulling the fire alarm was never determined.

Eyewitnesses to the fire itself and persons who were aware of the conditions present at the time of the fire are among the most important of all witnesses. However, there are serious short-fallings when they attempt to assess the rate of fire growth. *NFPA 921* (2014 Edition, Ch. 5.10.1.4) cautions:

> "*The rate of fire growth as determined by witness statements is highly subjective. Many times witnesses are reporting the fire growth from time of discovery, which cannot be directly correlated to ignition time. The rate of fire growth is dependent on many factors besides fuel load, including fuel configuration, compartment size, compartment properties, ventilation, ignition source, and first fuel ignited. Eyewitnesses reporting a rapid rate of fire growth should not be construed as data supporting an incendiary fire cause.*"

Investigator Wilkerson's short report indicates that he called to the scene the evening of the fire Huntsville Electrical Inspector Doug Smith, who in turn requested Building Inspector Skip Stinson. His report indicated, but does not document the decision that both Inspectors Smith and Stinson arrived at to declare the building unsafe to occupy. Note that it was not until June 3, 2011 that the City of Huntsville declared 4880 University Drive, NW, Building 1, as unsafe due to numerous major building, electrical, and fire code violations.

Failing memories over succeeding months and years, when their information is developed from depositions in subsequent litigation much later on, will inevitably limit the accuracy and reliability of such witness information.

## 2.  Incorrect Interpretations of Fire Patterns and Scene Evidence

The second tool relied upon in determining a fire's origin is the analysis of *fire patterns*. Fire patterns are the thermal effects left by the fire on furnishings, walls, ceilings, floors, and other objects (NFPA 921, 2014 Edition, Ch. 18.4.2). Correctly documenting and interpreting fire patterns is an essential methodology integral to the proper investigation of a fire incident by investigators, and caution must be taken to correctly document and interpret those patterns.

Furthermore, the series of photographs taken by the EFI Global investigator shows that the fire scene debris was moved and some physical evidence examined, such as the external lighting fixture and wiring. However, there appears to be no collection, interpretation, and preservation of the fire scene evidence and fire debris, especially as it relates to fire patterns.

An essential part of analyzing fire patterns is through the use of *heat and flame vector analysis* (NFPA 921, 2014 Edition, Ch. 3.3.96, Ch. 18.4.2) where arrows placed on fire scene drawings/diagrams indicate the direction of heat, smoke, or flame flow. When combined with identifiable and documented fire patterns such as depth of char measurements, the investigator can make interpretations to establish the direction of heat or flame spread integral to determining the area of origin and the path of the fire as it progressed and developed. *NFPA 921* states that the drawings/diagrams should include walls, doorways and doors, windows, and any pertinent furnishings or contents. An example from *NFPA 921* (2014 Edition, Figure 16.4.2(d)) is shown below in Figure 9.



**Figure 9.** NFPA 921's example of using heat and flame vectors to document the direction of fire spread on an exploded room diagram showing damage patterns, sample locations, and photo locations. (2014 Edition, Figure 16.4.2(d)).

The investigation by Investigators Wilkerson and Williams failed to properly use this approach and to identify even the basic fire patterns in this case, let alone a heat and flame vector analysis. Both had the opportunity, yet failed to use this recognized investigative technique to document and correlate their fire patterns with photographs and scene sketches.

Furthermore, Investigators Wilkerson and Williams concentrated their examination of fire patterns to the balcony of Room 2207, while ignoring other viable fire origin and development ignition scenarios, failing to seek information from eyewitnesses, and ignoring potential fire-producing electrical and building code violations. These alternative ignition scenarios could have included a fire originating on the balcony above Room 2207, originating in the walls, or originating in electrical wiring and fixtures—ignition scenarios which easily could have produced the fire

damage seen in this case and which have factual support in the post-fire inspections and code violation citations.

### 3.   Improper Application of Fire Dynamics

The third tool useful in determining a fire's origin and cause is *fire dynamics*, defined as "*The detailed study of how chemistry, fire science, and the engineering disciplines of fluid mechanics and heat transfer interact to influence fire behavior*" (NFPA 921, 2014 Edition, Ch. 3.3.65). This well-founded science is recognized and discussed at length in *NFPA 921's* section on the dynamics of fire (NFPA 921, 2014 Edition, Ch. 6.2).

One of the most widely used considerations in origin and cause analysis is the reliance on sound scientific principles of fire dynamics, which is the analysis of the physics and chemistry of fire initiation and growth, and the interaction between the fire and the building's systems. Fire dynamics includes the evaluation of temporal aspects of heat transfer, flame spread, ignition temperatures, and fire growth.

Investigators Wilkerson and Williams apparently attempted to use fire dynamics to place the fire's area of origin on the balcony of Room 2207, but such attempts were made unreliably and were unsubstantiated. Both Investigators Wilkerson and Williams failed to demonstrate a working knowledge in this area, used simple and misleading observations of fire pattern damage to explain the impact of fire dynamics, and failed to adequately document their findings.

Only individuals adequately trained in that field should undertake the use and interpretation of the principles of fire dynamics. For example, the fire pattern artifacts that Investigators Wilkerson and Williams saw led them to assume that the fire started on the balcony of Room 2207, based upon their assumptions that the greatest concentration of damage occurred on that room's

balcony. This observation is a fundamental oversimplification of the principles of fire dynamics. While this is a valid basis for identifying the area of origin in certain fires, the science shows that maximum fire damage is not always a reliable technique for determining a fire's origin and should not be assumed as such.

In fact, *NFPA 921* cautions about the reliability of basing conclusions wholly on fire pattern generation and maximum damage.

> ***The investigator should not assume that the fire at the origin burned the longest and therefore fire patterns showing the greatest damage must be at the area of origin.*** *Greater damage in one place than in another may be the result of differences in thermal exposure due to differences in fuel loading, the location of the fuel package in the compartment, increased ventilation, or fire-fighting tactics (NFPA 921, 2014 Edition, Ch. 18.4.1.3)* **(emphasis added)**

Fire investigators have long known of this phenomenon and are cautioned that when conducting their fire scene examination from the least-burned to the most-burned area that the greatest damage is not always indicative of the area of fire origin. Shown in Figure 10 is such a case[31] where this expert was involved in the design of a fire test confirming this common phenomenon. . In this controlled fire test, the origin was actually at the floor level of the structure in what was the least damaged area and traveled through the building to the most damaged area in the right foreground.

By way of example, the extreme damage to the corner of the balcony at Room 2207 could have been produced by and influenced by more complex effects than these investigators explored. Fire dynamics can explain other potential reasons for this damage, which should have been

---

[31] Icove, D. J., DeHaan, J. D., & Haynes, G. A. 2013. *Forensic Fire Scene Reconstruction* (3rd Edition). Upper Saddle River, N.J.: Pearson/Prentice Hall.

considered by the investigators and could easily have established that the fire was not started by a carelessly discarded cigarette, but by other equally likely (or more likely) potential causes.

In this case involving the proper interpretation of fire dynamics, both Investigators Wilkerson and Williams should have considered and evaluated all potential ignition scenarios and not speculated without having any supporting evidence. This evidence must be of such quality as to be "on point" and directly relevant to the investigation. Furthermore, the opinions offered by both investigators must have a direct connection to the facts of the case and be tied to their expert conclusions.



**Figure 10.** Example showing that the most damaged area is not always the area of fire origin. In this fire test, the origin was at the floor level of the structure in the least damaged area and traveled through the building to the most damaged area in the right foreground.

Expert fire investigators cannot and should not rely on speculation and must account for alternative causes that are supported by the evidence. *NFPA 921* specifically addresses in the section on spoliation the need for the thorough documentation of evidence that not only supports the investigator's own hypothesis as to the origin and cause of the fire, but also other hypotheses (NPFA 921, Ch. 12.3.5.2).

> 12.3.5.2 **Documentation**. *Efforts to photograph, document, or preserve evidence should apply not only to evidence relevant to an investigator's opinions, **but also to evidence of reasonable alternate hypotheses that were considered and ruled out**. (**emphasis added**)*

Expert opinions in fire cases have been excluded when the fire investigator did not equally consider both favorable and unfavorable data, and simply ignored unfavorable data so as to support the theory or hypothesis being advanced. Likewise, investigators at fire scenes are cautioned not to "cherry-pick" and document only the most favorable evidence, while ignoring and not collecting other evidence that may support alternative hypotheses for the cause of the fire. Furthermore, not spending adequate time examining the fire scene, quickly eliminating causes and discarding physical evidence, and not pursuing consideration of other potential causes is improper and does not meet the job performance requirements set forth by *NFPA 1033* and the peer-reviewed guidance of *NFPA 921*.

In this case, the investigators' methodologies and conclusions are dangerously flawed. The underlying failings include the use of an oversimplified approach to isolate the fire to the balcony of Room 2207, while not considering the fire dynamics evidence of a potential ignition source from a fire above that level, or from nearby electrical fixtures, or from improper wiring within the walls and ceilings, or from other scenarios not considered. In an over $1 million fire loss, it would

be expected that a private fire investigator retained by a major insurance company would spend more time examining the scene than just one day, and that fact alone doubtless contributed to the inadequacy of his investigation.

The hypothetical "discarded cigarette ignition scenario" on the balcony of Room 2207 proposed by both Investigators Wilkerson and Williams (and which is the basis of this action against the United States) is flawed from several forensic viewpoints. Both investigators failed to (1) document the de-layering of the debris found on the balcony, (2) search to secure any evidence of the remains of a cigarette, (3) isolate a burn pattern on the balcony's surface consistent with damage from a lit cigarette, (4) provide an explanation of even the most basic outline of a discarded cigarette as an ignition scenario in this case, and (5) provide the citation to even one peer-reviewed reference authority supporting such a hypothesis.

The underlying science for the ignition scenarios of discarded lit cigarettes is well known and well documented in the research literature. Discarded lit cigarettes, while a "potential" ignition source for easily ignited items such as padded furniture, normally do not have the thermal energy and sustenance to ignite wooden deck flooring by themselves. Furthermore, discarded lit cigarettes often readily self-extinguish. It is well known in the peer-reviewed fire investigation literature[32] that discarded lit cigarettes have a burning duration of about 5 minutes; a small heat release rate of about 5 watts, and a maximum heat flux of 35 to 42 kW/m$^2$ (see Table 6.1, Kirk's Fire Investigation, 7th Edition, p. 170). These combined characteristics make it highly unlikely that a

---

[32] DeHaan, J. D., & Icove, D. J. 2012. *Kirk's Fire Investigation* (7th Edition). Upper Saddle River, NJ: Pearson-Prentice Hall.