FILED

2014 Jun-05  PM 02:41
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## OF THE NORTHERN DISTRICT OF ALABAMA
### HUNTSVILLE DIVISION

| | | |
|---|---|---|
| **ACADIA INSURANCE CO.,** | § | |
| *Plaintiff,* | § | |
| **v.** | § | |
| | § | |
| **UNITED STATES OF** | § | **Cause No.: 5:13-cv-00895-CLS** |
| **AMERICA** | § | |
| *Defendant.* | § | |
| | § | |

### PLAINTIFF'S RESPONSE & BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT RODERICK S. WILLIAMS

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, Acadia Insurance Co., as Subrogee of Yedla Management Co., Inc. & Hospitality Enterprises of Huntsville, Inc. d/b/a Country Inn & Suites (hereinafter referred to as "Plaintiff" or "Acadia"), files this Response Brief to Defendant's Motion and Supporting Brief to Exclude the Testimony of Plaintiff's Expert Roderick S. Williams, and in support thereof would respectfully show the Court the following:

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. II

I.   INTRODUCTION ..........................................................................1

II.  ARGUMENT & AUTHORITIES ......................................................2

   A. Standard of Admissibility Pursuant to *Daubert &*  FED. R. EVID. 702. ..........2

   B. Mr. Williams Is Render an Opinion as to the Cause and Origin of the
      Subject Fire ..........................................................................5

      1. Mr. Williams' Qualifications. ..............................................6

      2. Defendant Misapplies the Law. .............................................7

   C. The Methodology By Which Mr. Williams Reached His Conclusions
      Is Sufficiently Reliable. .........................................................9

      1. Case Law Demonstrates that Mr. Williams Reached His
         Conclusions Using Reliable Methodology. ..............................9

      2. Defendant Again Misapplies the Law. ..................................21

   D. Mr. Williams Testimony Will Assist the Trier of Fact. ...............23

III. CONCLUSION............................................................................25

# I. INTRODUCTION

Roderick Williams is unquestionably qualified, based upon his years of experience, training and certifications to render an opinion as to the origin and cause of the subject fire. The foundation for his opinions is sound. The methodology he utilized to reach his opinions is sound. He used the scientific method called upon by National Fire Protection Association (NFPA) 921, the guide for performing fire origin and cause investigations that is generally accepted in the scientific community. *See* Exhibit A, Declaration of Rod Williams & Attachments 1-2; Doc. #26-1 at Exhibit D; *see* Doc. #21-14;15. Mr. Williams identified the problem, defined the problem, collected data, analyzed the data, developed multiple hypotheses and tested each of them, and reached a final (and overwhelming) conclusion: the fire was started by the careless discarding of cigarettes by the occupant of Room 2207. *Id*.

Mr. Williams tested alternative hypotheses. *See Id*. He based his opinions on his visual examination of the scene, fire patterns, witness interviews, physical evidence, and the City of Huntsville personnel interviews. *Id*. He properly identified the specific area of origin, isolated the only potential source of ignition in that area of origin as discarded cigarettes, and affirmatively excluded electrical failure, arson, or the weather as a cause. *See Id*. Mr. Williams' opinion was peer

reviewed by another certified fire and explosion investigator. *See Id*. Defendant's Motion to exclude should be denied.

## II. ARGUMENT & AUTHORITIES

### A. Standard of Admissibility Pursuant to *Daubert* & FED. R. EVID. 702.

The admissibility of expert testimony "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning and methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993).  Under Fed. R. Civ. P. 702, the trial judge is to act as a gatekeeper to "ensure that any and all scientific testimony…is not only relevant, but reliable." *Id*. at 589. In conducting a *Daubert* analysis, the trial court asks two questions: (1) is the proffered scientific evidence valid and reliable; and (2) will the testimony aid the trier of fact in deciding the ultimate issues of the case. *U.S. v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000).

In *Daubert*, the Court identified several factors that may bear on a judge's determination of the reliability of expert testimony. 509 U.S. at 592-94. These factors include: (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are

standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. *Id*.

Importantly, although *Daubert* provides factors that may be considered by the Court in its evaluation of the expert witness' methodology, the list of factors is not exhaustive, and a court in its discretion may consider different factors to test reliability. *Id*. at 594. The *Daubert* factors are not exclusive and need not be considered in every case—the reliability factors should only be relied upon to the extent that they are relevant and the district court must customize its inquiry to fit the facts of each particular case. *Id*. No single factor is necessarily dispositive of the reliability of a particular expert's testimony. Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702.  "In making its initial determination of whether proffered testimony is sufficiently reliability, the Court has broad latitude to consider whatever factors bearing on validity that the Court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved."  *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).

 "The inquiry to be undertaken by the district court is a "flexible one" focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached." *Id*. (citing *Daubert*, 509 U.S. at 594 – 95). This determination requires a "three part inquiry." *United States v. Frazier,* 387 F.3d

1244, 1260 (11th Cir. 2004). The Court must determine whether: (1) the expert is qualified to testify competently regarding matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Id.*

A party's *Daubert* objection to proffered expert testimony or reports does not convert a trial judge into the finder of fact; expert testimony is subject to scrutiny by the traditional (and appropriate) means of attacking evidence, i.e. "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. "This principle is based on the recognition that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Argonaut Ins. Co. v. Samsung Heavy Indus. Co. Ltd.*, 929 F. Supp. 2d 159, 164-65 (N.D.N.Y. 2013) (citation omitted). **The rejection of expert testimony is the <u>exception</u> rather than the rule.** Advisory Committee Notes, 2000 Amendments, FED. R. EVID. 702; *see also State Farm Fire & Cas. Co. v. Holmes Products*, 165 Fed. Appx. 182, 186 (3d Cir. 2006) ("Where there is a logical basis for an experts opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge."). Using the above as guiding principles, Defendant's Motion to

Exclude Plaintiff's Expert Testimony is rendered devoid of merit and should be denied.

**B. <u>Mr. Williams Is Render an Opinion as to the Cause and Origin of the Subject Fire</u>**

Pursuant to FED. R. EVID. 702, a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Turning first to the qualification of the expert, we observe that experts may be qualified in various ways. *U.S. v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004). While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status. *Id.* In fact, the plain language of Rule 702 makes this clear: expert status may be based on "knowledge, skill, *experience,* training, or education." *Id.* (emphasis added). The Committee Note to the 2000 Amendments of Rule 702 also explains that "[n]othing in this amendment is intended to suggest that experience alone ... may

not provide a sufficient foundation for expert testimony." *Id. citing* FED. R. EVID. 702 Advisory Committee's Note (2000 amends.). The fact that expert does not have degree or license in his or her professed specialty goes to weight of testimony rather than its admissibility. *Dickerson v. Cushman, Inc.*, 909 F.Supp. 1467 (M.D. Ala. 1995); *see also Smith v. Hobart Mfg. Co.*, 185 F. Supp. 751 (E.D. Pa. 1960) (holding that expert witness need not be registered or the holder of degrees or certificates in order to become qualified).

### 1. Mr. Williams' Qualifications.

First, Williams has over 35 years experience in fire service and investigation. *See* Exhibit A, Declaration of Rod Williams ¶ 1 & Attachments 1-2; Doc. #26-1 at Exhibit D. Mr. Williams began his career in the fire service in 1978 as a firefighter/paramedic and worked his way through the ranks to Captain. *Id*. He retired from the Hoover Fire Department in 2006. *Id*. Mr. Williams' position at the time of his retirement was Deputy Fire Marshal and he was performing fire investigations, business inspections and also working with many governmental agencies such as ATF, FBI, state and local law enforcement, and other agencies. *Id*. Mr. Williams held this position for five years. *Id*. Mr. Williams left the fire service in 2006 and began his employment with EFI Global where he is currently employed. *Id*. EFI Global is a national multi-disciplined forensic engineering firm offering engineering, fire investigation, environmental, failure analysis, accident

reconstruction and laboratory testing services. *Id.* Mr. Williams is certified by the International Association of Arson Investigators as a Certified Fire Investigator and a Certified Vehicle Fire Investigator, by the National Association of Fire Investigators as a Certified Fire and Explosion Investigator, and is certified as a Fire Investigator as having met the qualifications of NFPA 1033 by the National Board of Fire Service Professional Qualifications. *Id.* Clearly, the above demonstrates that Mr. Williams has the knowledge, skill, experience, training, or education to opine on the case and origin of the subject fire in the present matter. *Id.*; *see also* FED. R. EVID. 702.

### 2. *Defendant Misapplies the Law.*

In support of its theory that Mr. Williams is not qualified, Defendant cites the unpublished opinion in *Talking Walls, Inc. v. Hartford Casualty Ins*. Co. opinion. 102-CV-00041-MP-AK, 2005 WL 6011243 (N.D. Fla. July 5, 2005); *see* Doc. #30 at p. 11. In *Talking Walls*, the court ruled the plaintiff's expert was not qualified because the proffered expert **was not certified as a fire Officer.** 2005 WL 6011243 at *2. Defendant erroneously focuses on the expert's other qualifications, when the court plainly reasoned the expert lacked certification and experience as a fire Officer.  *Id.* ("Notably, none of these certification titles signifies an ability to determine the cause and origin of fires. That certification, which Wagner does not possess, is for a fire Officer."). As discussed above, Mr.

Williams holds no less than four (4) certifications as a fire investigator. *See* Doc. #26-1 at Exhibit D. He is clearly qualified. *Id.*

Defendant next asserts, without any citation or legal authority, that "a major test of qualification for an expert witness is their past experiences in major cases and in qualifying and testifying in court." Doc. #30 at p. 13. Qualification by prior expert testimony experience is *not* a consideration for the qualification of experts as expressly stated in FED. R. EVID. 702, *Daubert*, or any other case. Nonetheless, Mr. Williams has testified four times dating back to 2009, twice in Alabama state court and twice in federal court. *See* Exhibit A & Attachments 1-2.

Defendant also asserts that Mr. Williams' opinions are not peer –reviewed. Doc. #30 at p. 13. The test is whether a theory or technique has been subjected to peer review and publication. *Daubert*, 509 U.S. at 594 – 95. The technique Mr. Williams used to reach his conclusion, including the scientific method, is included in NFPA 921, a peer-reviewed and published document. Doc. #30-1 at § 4.6.3.1; *See* Exhibit A & Attachments 1-2. The NFPA explains that the methodologies used and the fire science relied on by an investigator are subject to peer review. *Id.* Therefore, since Mr. Williams followed the guidelines of NFPA 921 in determining the cause and origin of the subject fire, Mr. Williams' investigation was peer-reviewed. *Id.*; Doc. #26-1 at Exhibit D.

Finally, Defendant asserts *ad nauseum* that Mr. Williams is unqualified as a fire cause and origin investigation expert because his investigation did not comply with the guidelines of NFPA 921. Doc. #30 at pp. 11 – 15. Defendant confuses the issues. Compliance with any investigative protocol might be germane to the foundation of an expert's opinion, but is not relevant to his qualification. To be clear, compliance with the guidelines of any specific protocol is not a consideration in the specific analysis of whether a person has the knowledge, skill, experience, training, or education to testify as an expert. FED. R. EVID. 702. Indeed, as detailed extensively in Plaintiff's Response to Defendant's Motion to Dismiss Pursuant to FED. R. CIV. P. 37 (Doc.#26), any allegations concerning perceived shortcomings in Mr. Williams' fire investigation are to be determined by the fact-finder concerning the weight and credibility to lend to Mr. Williams' testimony, and do not render Williams an unqualified fire cause and origin expert. Doc. # 26; *Vesta Fire Ins. Corp. v. Milam & Co. Const., Inc.*, 901 So.2d 84 (Ala. 2004); *S.E.C. v. Goble*, 682 F.3d 934, 947-48 (11th Cir. 2012).

C. **The Methodology By Which Mr. Williams Reached His Conclusions Is Sufficiently Reliable.**

   1. ***Case Law Demonstrates that Mr. Williams Reached His Conclusions Using Reliable Methodology.***

   *Gaskin v. Sharp Elecs. Corp.*, cited by Defendant, is particularly instructive in this matter. No.  2:05-CV-303, 2007 WL 2572397 (N.D. Ind. Aug. 31, 007)

*clarified on denial of reconsideration,* 2:05-CV-303, 2007 WL 2746876 (N.D. Ind.

Sept. 18, 2007) (**citation incorrect in Defendant's brief).** In *Gaskin,* Defendant

argued that Plaintiff's designated cause and origin expert, Steven Shand, was

unqualified to render an opinion based on unreliable methodology and failure to

follow NFPA protocol. *Id.* at *4-*5. However, the district court held Shand's

opinions (and his methodology used in reaching his ultimate conclusion) were

reliable, stating:

> Shand testified about the method of fire investigation that he trained in which comports with the National Fire Protection Association ("NFPA") standards and procedures. Shand follows this same method during every investigation he has conducted during his lengthy career, and he used the method in this case. Shand collected data by visiting the house three days after the fire,[1] taking photographs, and conducting an on-site investigation by moving through the house from the area of least amount of fire damage to the most amount of damage. In using this method, Shand was able to pinpoint the cause of origin of the fire to the northwest bedroom (a conclusion that Sharp does not seem to dispute). Once inside the bedroom, Shand analyzed fire movement, the lowest level of the fire, and burn patterns, noting a "V pattern" on the wall extending upward and outward from the entertainment center. This burn pattern is clearly visible in the photographs taken by Shand. (*Id.*)

*Id.* at *5 (internal citations omitted). Shand's methodology exactly parallels the

investigation and methodology of Mr. Williams in the present matter. *Id. c.f.*

Exhibit A & Attachments 1-2; Doc. #21 at Exhibits 9 & 12; Doc. #26-1 at Exhibit

D. As in the present matter, Defendant Sharp criticized expert Shand for not

thoroughly considering and eliminating other possible causes of the fire. 2007 WL

2572397 at *5. However, Shand testified that, among other causes, he considered

and eliminated the 2 electrical outlets in the bedroom, the wall light switch, the electrical wiring in the wall, and the over head light. *Id*. Similarly, Williams has demonstrated that other alleged causes of the subject fire, including electrical components, were considered and ruled out. *See* Exhibit A & Attachments 1-2; Doc. #26-1 at Exhibit D; Doc. #21 at Exhibits 9 and 12. Defendant Sharp finally argued that "Shand's methodology is fatally devoid of testing and analysis." 2007 WL 2572397 at *6. However, the district court reasoned that "the mere fact that no testing was done is not an automatic bar to the admissibility of an expert's opinion." *Id*. The district court further analyzed that:

> …[H]ands-on testing is not "an absolute prerequisite to the admissibility of expert testimony." *Cummins v. Lyle Indus.,* 93 F.3d 362, 369 (7th Cir.1996). In this case, the Court is unsure what type of physical testing, if any, Shand, a cause and origin expert, could have conducted. Determining the general origin of a fire, as Shand has done, is not susceptible to testing, and yet, it does constitute generally accepted practice as a method for fire investigators to analyze the origin of a fire. The key inquiry is, whether testing is done or not, whether the expert is testifying with the "same standards of intellectual rigor that are demanded in their professional work." *Id.* Shand testified that the method he followed in determining the cause of the fire should be used by every fire investigator, regardless of whether litigation may be involved. This Court believes that Shand's opinion in this case is consistent with the level of intellectual rigor demanded in his professional work.

*Id*. at *6; *see also Desert Falcon-Special Mar. Enter. v. E. Coast Terminal Co.*, 4:02-CV-00156-BAE, 2004 WL 5612966 (S.D. Ga. Jan. 5, 2004). Just like Shand's investigation in *Gaskin*, Mr. Williams was able to use fire pattern analysis to determine the origin of the fire. *See* Exhibit A & Attachments 1-2; Doc. #26-1 at

Exhibit D. Further, Mr. Williams states that the scene examination and analysis in first determining the origin of the fire and then the subsequent case was consistent with the guidelines of NFPA 921; Mr. Williams also asserts that NFPA 921 is a recognized standard in the fire investigation industry which recommends using a basic methodology called the scientific method. *See* Exhibit A & Attachments 1-2. Doc. #26-1 at Exhibit D; Doc. #21 at Exhibit 12, YEDLA003164 -3165. Further, to clarify Defendant's errant citation, the expert that was disqualified in the *Gaskin* case was Dyl, Plaintiff's electrical engineering expert. 2007 WL 2572397 at *2-*4. The court clarified this exclusion by allowing Dyl to testify on general principles of electrical engineering as well as his observations and data collection.  2007 WL 2746876, *2 (N.D. Ind. Sept. 18, 2007). Similarly, in the *Colony Ins. Co. v The Coca Cola Co.,* case cited by Defendant, the court **did not exclude Plaintiff's fire cause and origin expert**; indeed the district court found that expert Yeremian **was qualified to** give opinions on the cause and origin of the subject fire, but that he could not state the crimp problem in the soda machine line likely occurred during the manufacturing process because of an improperly sized tool. 239 F.R.D. 666, 675-676 (N.D. Ga. 2007).

Defendant relies on the opinions of its expert, Dr. David Icove, to assert that Mr. Williams methods, and therefore his opinions, are unreliable. *See* Doc. #21. However, this kind of disagreement between experts ordinarily goes to the

credibility of expert testimony, not its admissibility. *See Rosenfeld v. Oceania Cruises, Inc.,* 654 F.3d 1190, 1193 (11th Cir. 2011) ( "[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." (internal quotation marks omitted)); *see also Tampa Bay Water v. HDR Engineering, Inc.*, 731 F.3d 1171 (11th Cir. 2013) (holding that expert Bromwell's opinion testimony was admissible *despite* opposing party's expert's affidavit stating his methods were unreliable).

In *Quiet Technology DC–8, Inc. v. HurelDubois UK Ltd.,* for example, one objection to the expert's testimony was that his modeling failed to include all variables and therefore could not produce a "meaningful correlation of flight test results with computer results." 326 F.3d 1333, 1346 (11th Cir. 2003). Quoting the Supreme Court, the Eleventh Circuit stated, "'[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility.'" *Id.* (alteration in original) (quoting *Bazemore v. Friday,* 478 U.S. 385, 400 (1986)). The same applies here: Dr. Icove's and Williams' disagreements should be aired out in front of the jury and tested by the crucible of cross-examination. *See Tampa Bay Water*, 731 F.3d at 1171; *see also* 326 F.3d 1333 at 1345 ("The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination.").

**1. *Mr. Williams' Investigation Utilized a Methodology That is Sufficiently Reliable.***

According to the NFPA, "with few exceptions, the proper methodology for a fire or explosion investigation is to first determine and establish the origin(s), then investigate the cause, circumstances, or agencies that brought the ignition source, fuel, and oxidant together. Doc. #30-1 at p. 19, § 4.1. Further, the "systematic approach recommended is based on the scientific method, which is used in the physical sciences." *Id*. at § 4.2; § 4.4. Using the scientific method as its foundation, the NFPA states to use identify the problem, define the problem, collect data, analyze data, develop a hypotheses using inductive reasoning, test the hypotheses using deductive reasoning, and then finally, select a final hypothesis (conclusion). *Id*. at §§ 4.3.1 – 4.3.9.

Importantly, in the collecting data stage, "facts about the fire incident are now collected **by observation, experiment, _or_ other direct data-gathering means.**" *Id*. at § 4.3.3. Thus, data collection can be properly performed by a fire investigator by using any singular or combination of the afore-mentioned tools. *Id*. A fire explosion investigation may include **all or some** of the following tasks: a scene inspection or review of previous scene documentation done by others; scene documentation through photography and diagramming; evidence recognition, documentation, and preservation; witness interviews; review and analysis of the investigations of others; and identification and collection of data from appropriate

sources. *Id.* at p. 20, § 4.4.3.2. When testing a hypothesis, one is using deductive reasoning, "in which the investigator compares the hypothesis to all known facts as well as the body of scientific knowledge associated with the phenomena relevant to the specific incident." *Id*. at § 4.3.6. "A hypothesis can be tested by physically conducting experiments, **analytically by applying accepted scientific principles, or by referring to scientific research."** *Id*. (emphasis added).

The use of previously collected data from a properly documented scene can be used successfully in an analysis of the incident to reach valid conclusions through the appropriate use of the scientific method; "the reliance on previously collected data and scene documentation should *not* inherently be considered a limitation in the ability to successfully investigate the scene. *Id*. at p. 21, § 4.4.3.3.

In conducting his fire cause and origin investigation, Williams followed the guidelines of the scientific method as detailed by the NFPA. *See* Exhibit A & Attachments 1-2; Doc. #26-1 at Exhibit D; Doc. #30-1 at pp. 19 – 22, § 4 et seq. Williams interviewed local fire officials and learned the Huntsville Fire Department responded to the alarm at 10:40 pm on September 22, 2010 and arrived on the scene at 10:45 pm. *See* Exhibit A at ¶ 16 & Attachments 1-2. Doc. # 26-1 at Exhibit D. The first unit on the scene was Engine 12. *Id*. The weather was clear. *Id*. Smoke was visible upon arrival from the courtyard of the hotel. *Id*. After making entry into the courtyard, the fire was fully involved on the second and third

floor balconies. *Id*. The fire was most concentrated to the east side of the building. *Id*. Structural collapse had not occurred in the east quadrants of the building. *Id*.

Williams reviewed the report of Electrical Inspector Smith, where Inspector Smith determined that the fire made the basis of the subject lawsuit was not by any electrical malfunction and/or electrical component. *See Id*. Mr. Williams himself inspected the electrical panel, electrical wiring connected to a wall hung light fixture, and the heat plant and determined that none of these electrical components caused the fire made the basis of the present lawsuit. *See* Exhibit A at ¶¶ 21 – 32 & Attachments 1-2; Doc. #26-1 at Exhibit D. He noted in his report that there were no electrical features within the area of origin. *Id*. Williams reviewed Lieutenant Daniel Wilkerson's interrogation of Michael Siegling on the date of the incident, September 22, 2010. *See Id*.  Marlboro brand cigarettes were found in the area below the balcony of room 2207.  *Id*.  Upon Lieutenant Wilkerson's interview of Michael Siegling, Mr. Siegling confirmed that he used Marlboro brand cigarettes. *Id*.

Mr. Williams investigated the scene and prepared a report regarding the cause and origin of the subject fire.  *See* Exhibit A and Attachments 1-2; Doc. #26-1 at Exhibit D; *see* Doc. #21 at Exhibit 9 & Exhibit 12. To preliminarily identify and define the problem (the cause and origin of the said fire, Williams took twenty-five (25) photographs documenting the fire scene in addition to reviewing case file

by the City of Huntsville Fire Marshall's Department, which included a multitude of photographs, transcripts of witness interviews conducted, and the report of Electrical Inspector Doug Smith. *Id.*; *see also* Doc. # 30-1 at p. 19 (NFPA § 4.3).

Williams then collected data relevant to determine the origin of the subject fire per the NFPA. *See* Exhibit A and Attachments 1-2; Doc. #26-1 at Exhibit D; Doc. #31 at p. 19, § 4.1. Exterior fire pattern analysis indicates the fire was most concentrated to the east side of building #2, on the second and third floors. *See* Exhibit A at ¶ 10 and Attachments 1-2; Doc. #26-1 at Exhibit D.  The roof structure had been compromised by fire breaching from the underside. *Id.* Wood trusses compromising the roof structure were most damaged in the east portion of the building, above the area of origin. *Id.*  Smoke and heat patterns emanated from the balconies of rooms 2207, 2209, 2307 and 2309. *Id.*  The lowest fire patterns were located at ground level below the balcony of room 2207.  *Id.* at ¶ 11. This was attributed to fall-down of fire debris from the balconies above. *Id.* Preliminary interior inspection, working from the area of least damage to the area of the most damage, revealed the fire was concentrated to the exterior balcony of room 2207 and traveled upward onto the balcony of 2307 above.  *Id.* at ¶ 15. There was no evidence of an outward overpressure from within the building. *Id.*

Fire pattern analysis indicated the fire had breached the north wide wall of the balcony of room 2207 and traveled upward and spread to the balcony of the

room above. *Id.* Vinyl siding on the exterior of the structure helped to spread the fire upward and outward from the area of origin. *Id.* Fire patterns increased upward and outward from the northwest corner of the balcony of room 2207 and were normal for the building and/or avenues of ventilation. *Id.* Fire movement patterns included heavy charring of exterior building components in a V-pattern beginning on the balcony of room 2207. *Id.*

Based on the collected evidence, Williams was able to determine that the fire patterns include a V pattern(s) on vertical surface of the north and west walls of the northwest corner of the balcony of room 2207, and therefore the physical evidence and witness statements indicate the origin of the fire to be in this location. *See* Exhibit A at ¶ 19 and Attachments 1-2; Doc. #26-1 at Exhibit D; Doc. #30-1 at p. 19, § 4.1.

An investigation including exterior fire pattern analysis indicated the fire originated exterior to the balcony of room 2207. *See* Exhibit A at ¶ 10 and Attachments 1-2; Doc. #26-1 at Exhibit B, FBI000037. Williams then analyzed the data to determine possible causes of the subject fire. *Id.*; Doc. #30-1 at pp.19 – 22. Natural forces were ruled out as the cause of the fire as the weather was clear. *See* Exhibit A at ¶ 16 and Attachments 1-2; *see also* Doc. #30-1 at pp.19 – 22. Williams reviewed the report of Electrical Inspector Smith, where Inspector Smith determined that the fire made the basis of the subject lawsuit was not by any

electrical malfunction and/or electrical component. *See Id*.; *see also* Doc. #26-1 at Exhibits B-D. This includes the inspection of the electrical panel, electrical wiring connected to a wall hung light fixture, and the heat plant and determination that none of these electrical components caused the fire made the basis of the present lawsuit. *See* Exhibit A at ¶¶ 21-32 and Attachments 1-2. Thus, electrical failure was ruled out as the cause of the fire. *Id*.; Doc. #26-1 at Exhibits C-D; Doc. #30-1 at pp.19 – 22. Further, electrical components, wiring, and/or equipment were not collected as none were found in the area of origin of the fire, and therefore were not relevant to the cause and origin investigation of the subject fire. *Id*. (*see also* § 4.4.4, noting the "valuable" evidence, and not *every* piece of evidence as Defendant asserts, should be properly collected and preserved for further testing).

Another hypothesis was that the fire started from the occupant of Room 2207 (Siegling) negligently discarded a cigarette. *See* Exhibit A and Attachments 1-2; *see* Doc. #30-1 at p. 19, § 4.3. Siegling confirmed that when he opened his balcony door and looked to the left, he observed flames to the left of his balcony. *Id.; see also* Doc. #26-1 at Exhibits B, D. Siegling also confirmed that he smoked cigarettes on the balcony of Room 2207, and that he extinguished his used cigarettes in a Styrofoam cup. *Id*. Williams reviewed Lieutenant Daniel Wilkerson's interrogation of Michael Siegling on the date of the incident, September 22, 2010. *Id*. Marlboro brand cigarettes were found in the area below

the balcony of room 2207.  *Id.*  Upon Lieutenant Wilkerson's interview of Michael Siegling, Mr. Siegling confirmed that he used Marlboro brand cigarettes. *Id.*

Using deductive reasoning to test the above-described hypothesis, the evidence indicates ignition resulted from improperly discarded smoking materials, with the evidence indicating first fuel ignited consisted of ordinary combustibles on or associated with the balcony outside of Room 2207.  *Id.*; Doc. #26-1 at Exhibits C-D; Doc. #30-1 at pp.19 – 22. As all other hypotheses were physically and scientifically improbable and/or impossible, Plaintiff's experts opine in their final conclusion that the events bringing ignition and fuel together include human involvement, which would include improperly discarded smoking materials by the occupant of Room 2207, Michael Siegling. *Id.*

Defendant points to a "red herring" in that an alleged code violation could have started the subject fire. Doc. #30.  This simply did not happen. As explained by Officer Wilkerson:

Q.  Okay.  There's been some discussion in this lawsuit counsel may want to ask you about with respect to some code violations that were identified by the City of Huntsville after -- some time after the fire in September of 2010.  The documents I've seen relate to buildings one and three, not to building two.  But let me ask you this question specifically with respect to your investigation:  When you identified the area of origin of the fire and you identified the cause, did you see any building code violations in that area that led you to believe that they were a potential cause of this fire?

MR. HOOD:  Object to form, foundation.

A.  In the -- in respect to referencing the balcony area on Room 2207 and 2307, I did not note any -- any violations that were seen on those balconies.

*See* Exhibit B, Deposition Testimony of Officer Daniel Wilkerson at p. 62:12 -

63:5. The above testimony is confirmed by City of Huntsville Electrical Inspector

Doug Smith:

Q.  At the fire scene of the Country Inn & Suites in September of 2010, out there on the balcony of 2207, did you identify any electrical code violations?

A.  No.

*See* Exhibit C, Deposition Testimony of Inspector Doug Smith at p. 18:2-6.

### 2. *Defendant Again Misapplies the Law.*

Defendant misconstrues and misapplies unpublished opinions with no

precedential authority in this Circuit. First, Defendant points to the *Bo Zhou*

opinion (unpublished) to "bolster" its position that Mr. Williams has applied an

unreliable methodology in his fire cause and origin investigation. *U.S.v. Bo Zhou*,

No. 06-CR-286 (JAP), 2008 WL 4067103 (D. N.J. Aug. 25, 2008). In *Bo Zhou*,

Defendant is correct in asserting that the district court held that expert Fleury's

opinions were unreliable because he failed to establish a reliable methodology. *Id.*

at *5-6. However, the district court came to such conclusion because:

 Apart from reviewing and criticizing the investigations of the JCFDAU and ATF, Fleury does not appear to offer his own independent examination or testing. Rather, Fleury's report consists mostly of opinions as to the credibility of the reports drafted from the JCFDAU and ATF investigations, in addition to a few general observations to support his theory.

*Id*. at *5. The district court found that Fleury did not attempt to establish his own methodology concerning how the fire on the sea vessel occurred, but instead continuously focused on critiquing the investigations of outside agencies. *Id*. In fact, the critiques the district court found with the methodologies employed by Fleury in his expert report parallel the misgivings in Defendant's expert, Dr. David J. Icove, report in the present matter. *Id*; *see* Doc. #21. As explained in great detail in the paragraphs above, Mr. Williams utilized the scientific method as prescribed in NFPA 921 and NFPA 1033 when conducting the fire cause and origin investigation in the present matter. *See* Exhibit A and Attachments 1-2; Doc. #26-1 at Exhibit D; Doc. #21 at Exhibits 9 & 12.

Defendant next contends that Mr. Williams' opinions are based on speculation, and are therefore unreliable. *See* Doc. #30 at p. 21. In support of this position, Defendant cites the following: *Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915 (11th Cir. 1998); *Gaskin v. Sharp Elecs Corp.,* No. 2:05-CV-303, 2007 WL 2819660 (N.D. Ind. Aug. 31, 2007); and *Colony Ins. Co. v. The Coca-Cola Co.*, 239 F.R.D. 666 (N.D. Ga. 2007). All three cases are misconstrued by Defendant and easily distinguishable from the present matter. In *Benfield*, the district court held that the Millers' expert, Buckley, was disqualified because "[e]ssentially, the testimony of Buckley reveals that he came to his opinion that the fire was incendiary largely because he was unable to identify the source of the

ignition of the fire." 140 F.3d at 921. Further, "[a]fter telling the jury on direct that [Buckley] believed someone poured lamp oil from the lamp oil bottle over the clothes and set the clothes ablaze, on cross-examination Buckley admitted that he did not know even if the lamp oil bottle had contained lamp oil before the fire and that there was no scientific basis for such an opinion." *Id*.

Buckley's opinions could not be farther from those administered by Mr. Williams in the present matter. Mr. Williams conducted an investigation, including exterior fire pattern analysis that indicated the fire originated exterior to the balcony of room 2207. *See* Exhibit A at ¶ 10and Attachments 1-2; Doc. #26-1 at Exhibit B, FBI000037. Williams then analyzed the data to determine possible causes of the subject fire. *Id*.; Doc. #30-1 at pp.19 – 22. Mr. Williams, unlike Buckley, was able to rule out several possible causes of the subject fire and determine that the cause of the fire (which began on the balcony with no electrical components present at the area of origin) was due to improperly discarded smoking materials by the occupant of Room 2207, Michael Siegling.  *See* Exhibit A and Attachments 1-2; Doc. #26 at Exhibits C-D; Doc. #30-1 at pp.19 – 22.

### D. Mr. Williams' Testimony Will Assist the Trier of Fact.

According to the Advisory Committee's Note, the test for determining whether expert testimony would assist the trier of fact is whether the untrained layman would be qualified to determine intelligently and to the best possible

degree the particular issue without enlightenment from those having specialized understanding of the subject, and the fields of knowledge that may be drawn on extend to all "specialized" knowledge. *See* 28 App. U.S.C.A., Federal Rules of Evidence, Appendix 6, Rule 702. The "helpfulness" standard of FED. R. EVID. 702, which requires that scientific evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue—a condition that goes primarily to relevance—requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility; for purposes of Rule 702, expert testimony which does not relate to any issue in the case at hand is not relevant and thus is not helpful. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Fire cause and origin investigation is a topic that is not in the general knowledge of a layperson. *See generally* U.S. v. Marler, 614 F.2d 47 (5th Cir. 1980); *see also generally U.S. v. Aman*, 748 F.Supp.2d 531 (E.D. Va. 2010). Williams has met the reliability and credibility standards as required by the inquiry stated in this Circuit's opinion in *Frazier*. 387 F.3d at 1260 ("The Court must determine whether: (1) the expert is qualified to testify competently regarding matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to

understand the evidence or to determine a fact in issue.)" *Id*. As such, Williams' testimony relating to the cause and origin of the subject fire will assist the trier of fact, and Defendant's Motion to Exclude Williams testimony should be denied.

## III.   CONCLUSION

The above clearly demonstrates that Mr. Williams is qualified to express ultimate opinions as to the cause and origin of the subject fire.  FED. R. EVID. 702. Further, Mr. Williams' declaration and expert reports reveal the methodology used by Mr. Williams is consistent with fire cause and origin investigation protocol and FED. R. CIV. P. 26, and thus Mr. Williams' ultimate opinion as to the origin of the fire is based on the appropriate foundation.  Defendant's Motion to Exclude the Testimony of Plaintiff's Expert Roderick S. Williams should be summarily denied.

Respectfully submitted,

**MCCATHERN, P.L.L.C**

By: /s/ *Paul A. Grinke*
     Carl L. Evans
     Alabama State Bar No. 6823-A35C
     Texas State Bar No. 24056989
     cevans@mccathernlaw.com
     Paul A. Grinke
     Texas State Bar No. 24032255
     pgrinke@mccathernlaw.com
     Regency Plaza
     3710 Rawlins Street, Suite 1600
     Dallas, TX 75219
     (214) 741-2662 Telephone
     (214) 741-4717 Facsimile

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2014, a true and correct copy of the foregoing was served upon the following counsel via e-service:

Jack Hood
Assistant United States Attorney
Attorney for Defendant United States
US Attorney's Office
State Bar No. D41J
1801 Fourth Avenue North
Birmingham, AL 35203
205-244-2103
205-244-2181 – Fax
Email: Jack.hood@usdoj.gov

Jayme Kantor, Esq.
Assistant General Counsel
Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Suite 10140
Washington, DC 20535
Phone: 202/324-7194
Email: Jayme.Kantor@ic.fbi.gov

**ATTORNEYS FOR DEFENDANT UNITED STATES OF AMERICA**

/s/ *Paul A. Grinke*
Paul A. Grinke