FILED

2014 Jun-05 PM 02:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
OF THE NORTHERN DISTRICT OF ALABAMA
HUNTSVILLE DIVISION**

| | | |
|---|---|---|
| **ACADIA INSURANCE CO.,** | § | |
| *Plaintiff,* | § | |
| **v.** | § | |
| | § | |
| **UNITED STATES OF AMERICA** | § | |
| *Defendant.* | § | **Cause No.: 5:13-cv-00895-CLS** |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

**PLAINTIFF'S EVIDENTIARY MATERIALS IN SUPPORT OF PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANT'S MOTIONS TO EXCLUDE THE TESTIMONY OF RODERICK S. WILLIAMS**

TO THE HONORABLE JUDUGE OF SAID COURT:

Plaintiff, Acadia Insurance Co., as Subrogee of Yedla Management Co., Inc. & Hospitality Enterprises of Huntsville, Inc. d/b/a Country Inn & Suites (hereinafter referred to as "Plaintiff" or "Yedla"), files its Evidentiary Materials in Support of Plaintiff's Response And Brief In Opposition to Defendant's Motions to Exclude the Testimony of Roderick S. Williams, and in support thereof would respectfully show the Court the following:

## I. Evidentiary Materials

1. Exhibit A: Declaration of Roderick S. Williams

   Attachment 1: October 12, 2010 Report of Roderick S. Williams

   Attachment 2: February 18, 2014 Report of Roderick S. Williams

2. Exhibit B: Deposition Testimony of Officer Daniel Wilkerson.

3. Exhibit C: Deposition Testimony of Inspector Doug Smith.

# Exhibit A: Declaration of

# Roderick S. Williams

Evidentiary Materials in Support of Plaintiff's Response And Brief In Opposition to Defendant's Motions to Exclude the Testimony of Roderick Williams
L:\00760\0064 (Yedla)\Pleadings\Drafts\P's Evidentiary Materials in Support of Response to Strike Expert Williams.docx

IN THE UNITED STATES DISTRICT COURT
OF THE NORTHERN DISTRICT OF ALABAMA
HUNTSVILLE DIVISION

ACADIA INSURANCE CO., §
     *Plaintiff,* §
v. §
  §
UNITED STATES OF AMERICA §
     *Defendant.* §       Cause No.: 5:13-cv-00895-CLS
  §
  §
  §
  §
  §

## DECLARATION OF ROD WILLIAMS

I, Rod Williams, am over the age of 21 years, of sound mind, fully competent to make this Declaration, and the facts hereinafter stated are within my personal knowledge and true and correct.

1. My name is Rod Williams and I reside in Hoover, Alabama. I am employed by EFI Global, Inc. as a Senior Fire Investigator domiciled in Birmingham, Alabama. I began my career in the fire service in 1978 as a firefighter/paramedic and worked my way through the ranks to Captain. I retired from the Hoover Fire Department in 2006. My position at the time of my retirement was Deputy Fire Marshal performing fire investigations, business inspections and also working with many governmental agencies such as ATF, FBI, state and local law enforcement, and other agencies. I held this position for five years. I left the fire service in 2006 and began my employment with EFI

Global where I am currently employed. EFI Global is a national multi-disciplined forensic engineering firm offering engineering, fire investigation, environmental, failure analysis, accident reconstruction and laboratory testing services. I am certified by the International Association of Arson Investigators as a Certified Fire Investigator and a Certified Vehicle Fire Investigator, the National Association of Fire Investigators as a Certified Fire and Explosion Investigator, and certified as a Fire Investigator as having met the qualifications of NFPA 1033 by the National Board of Fire Service Professional Qualifications.

2. On September 23, 2010, I was contacted by Jim Gowder of Cook Claims Services to conduct and origin and cause investigation concerning a fire at the business of Country Inn & Suites located at 4880 University Drive Huntsville, AL 35816, and to provide my professional opinions in that regard. My investigation commenced on September 27, 2010.

3. The scene examination was conducted using a systematic scene examination consistent with the guidelines of NFPA 921, which is a document developed by the National Fire Protection Association to assist in improving the fire investigation process and the quality of information on fires resulting from the investigation process and is a recognized standard in the fire investigation industry. NFPA 921 recommends using a basic methodology called the

scientific method where the compilation of factual data, as well as an analysis of those facts, should be accomplished objectively, truthfully, and without expectation bias, preconception, or prejudice. NFPA 921 also states that with few exceptions, the proper methodology for a fire or explosion investigation is to first determine and establish the origin or origins, then investigate the cause: circumstances, conditions, or agencies that brought the ignition source, fuel, and oxidant together. The scientific method consists of a seven step methodology to develop a hypothesis or hypotheses as to the cause of the fire and is an ongoing process throughout the entire investigation.

4. Other guidelines relied upon were NFPA 1033 which is National Fire Protection Association document for the qualifications for a fire investigator, previous knowledge gained through over 37 combined years of firefighting, fire investigations, and training, and input from other fire investigation professionals and agencies. The final written report was also technically reviewed by my immediate supervisor Metts Hardy who is also a certified fire and explosion investigator through the National Association of Fire Investigators and is also the Southeastern District Manager and Vice President of Fire Investigations for EFI Global.

5. The fire scene examination was conducted on September 27, 2010. Access to the property was provided by the hotel manager, Hoss Kazeroonian. He

provided assistance by having one of the hotel maintenance personnel stay with me during the examination.

6. The scene was cordoned off with caution tape at the time of the inspection. Alterations to the scene included the maintenance personnel hanging a large tarp over the roof and down the front of the balcony area of the burned building. The scene had also been examined by the fire marshal to determine cause. The conditions/alterations did not preclude determining the origin or the cause.

7. The surrounding property was maintained consistent with the commercial area. There were detached outbuildings located on the property. Building #3 of this same complex exhibited radiant heat damage to vinyl siding on the side facing the fire building. No structural damage to that building was noted. Adjacent property was not damaged during the incident. There was nothing remarkable in the surrounding area.

8. The structure was a multi-story, wood-framed hotel constructed on a concrete slab foundation. The roof was composition shingle and the exterior finish was wood slat, with vinyl siding added at some time later. The front of the building faces south, although the side of the fire area faces east. The preexisting conditions were unremarkable. Life safety devices were found. The building was provided with local hard wired with battery backup smoke detector(s), as well as an automatic fire alarm system. The alarm system functioned properly.

A unknown patron of the hotel pulled a fire alarm pull station in the hallway to activate the fire alarm, which functioned properly by alerting guests and the main desk. There was no safety code violations noted.

9. Electric service was connected to the building at the time of loss. The three phase electric utility enters on the west side of the building. Delivery cables were intact. The meter was present at the time of inspection. The meter base was grounded. The powers supply for the fire building was terminated at one of the breaker panels.

10. Exterior fire pattern analysis indicates the fire was most concentrated to the east side of building #2, on the second and third floors. The roof structure had been compromised by fire breaching from the underside. Wood trusses compromising the roof structure were most damaged in the east portion of the building, above the area of origin. Smoke and heat patterns emanated from the balconies of rooms 2207, 2209, 2307 and 2309.

11. The fire had breached the exterior walls at the east side of the building of room 2307, which is the room directly above the room of origin. The lowest fire patterns were located at ground level below the balcony of room 2207. This was attributed to fall-down of fire debris from the balconies above. There was no evidence of an outward overpressure from within the building.

12. Exterior fire pattern analysis indicated the fire originated exterior to the balcony of room 2207. Security of the building at the time of loss is not an issue. This is a 24 hour facility and was occupied by patrons of the hotel at the inception of the fire.

13. The patron staying in the room of origin was not present in the room at the inception of the fire. There was evidence of forced entry at the door to room 2207, which is the room of origin. Forced entry evidence includes physical damage to the wooden door jamb on the interior portion of the room. The damage is consistent with fire suppression operations. The windows to the room of origin were secured at the time of loss, and exhibited thermal breakage and light to moderate smoke damage on the exterior of the windows in the area of the balcony.

14. The contents were consistent with the occupancy. The contents in the room of origin exhibited light to moderate smoke damage. The location of the fire on the exterior balcony allowed most of the fire products to remain on the exterior of the building, at least on the balcony of origin. Personal property located in the room above the room of origin had sustained the most severe damage, consistent with direct flame impingement. This was due to the inherent upward and outward heat and fire products from the fire on the balcony below at room 2207.

15. Preliminary interior inspection, working from the area of least damage to the area of the most damage, revealed the fire was concentrated to the exterior balcony of room 2207 and traveled upward onto the balcony of 2307 above. The least affected area of the room of origin was noted in the bathroom. This area exhibited a slight odor of smoke. The interior portion of room 2207 was slightly damaged. The majority of the fire damage was on the exterior balcony and traveled upward on an exterior wall onto the balcony of the room above. Rooms remote to the area of origin were affected by the fire. The fire breached the window on the balcony of room 2207, causing slight burn damage to the curtains on the interior of the room. Fire pattern analysis indicated the fire had breached the north wide wall of the balcony of room 2207 and traveled upward and spread to the balcony of the room above. Vinyl siding on the exterior of the structure helped to spread the fire upward and outward from the area of origin. Fire patterns increased upward and outward from the northwest corner of the balcony of room 2207 and were normal for the building and/or avenues of ventilation. Fire movement patterns included heavy charring of exterior building components in a V-pattern beginning on the balcony of room 2207.

16. Physical evidence and witness statements indicate the fire originated on the exterior balcony of room 2207. Exterior construction of the area consisted of wood stud walls covered with wood planks, and at some point in time, vinyl

siding was applied over the wood planks. The flooring of the area of origin consists of wood planks. Contents providing the fuel load include combustible wood construction of the balcony floor, as well as the combustible wood exterior wall construction and the vinyl siding. Fire patterns indicate flashover did not occur within the area of origin.

17. The ceiling area above the balcony of room 2207 had been compromised by the fire. The ceiling consisted of wood plank construction of the floor of the balcony above the area of origin. Exposed floor joists and wood plank decking were heavily charred above the area of origin. The exterior walls had been compromised. Fire patterns are most prominent along the north wall of the balcony area. Patters include a V pattern(s) on vertical surfaces with the lowest point noted along the northwest corner of the north wall of the balcony for room 2207. The apex of the pattern is at floor level.

18. Systematic debris removal began with the fire department during their investigation. Some of the fire debris had been removed from the area of origin, in search for the ignition source. The lowest fire damage was noted at floor level in the northwest corner of the balcony of room 2207. The floor decking was damaged. The exposed decking was heavily charred from direct flame impingement consistent with exposure. Charring of the corresponding side(s) of the wooden decking and the wooden exterior wall covering and vinyl siding

demonstrated the area of origin was in the northwest corner of the balcony of room 2207.

19. Fire patterns include a V pattern(s) on vertical surface of the north and west walls of the northwest corner of the balcony of room 2207. Physical evidence and witness statements indicate the origin of the fire to be in this location.

20. There were no items collected during the investigation of this fire. Electrical components, wiring, and/or equipment were not collected as none were found in the area of origin of the fire, and therefore were not relevant to the cause and origin investigation of the subject fire.

21. Potential heat/ignition sources identified in the area below the balcony of room 2207 include improperly discarded cigarettes. It was also determined by the local fire marshal that the occupant of the room of origin used Marlboro brand cigarettes. During this investigation, it was determined that this same brand of cigarettes was discarded to the ground below the balcony of room 2207. No other potential heat/ignition sources were found in the area of origin.

22. The electrical panel was not involved. The wiring was affected by the fire at a wall hung light fixture that was exposed to the fire spread on the balcony. As the fire spread away from the area of origin, the wiring was damaged consistent with random exposure damage.

23. The heat plant was not involved.

24. Fire pattern analysis indicates that the fire originated in the northwest corner of the balcony of room 2207. The evidence indicates ignition from improperly discarded cigarettes. The evidence indicates the first fuel ignited was ordinary combustibles on or associated with the balcony of room 2207. Events bringing ignition and fuel together include combustibles too close to an ignition source, consistent with improperly discarded smoking materials.

25. During my follow-up investigation, I determined the discovery witness was not known but pulled a fire alarm pull station, which activated the automatic fire alarm system for the building after discovery of the fire.

26. I also interviewed local fire officials and learned the Huntsville Fire Department responded to the alarm at 10:40 pm on September 22, 2010 and arrived on the scene at 10:45 pm. The first unit on the scene was Engine 12. The weather was clear. Smoke was visible upon arrival from the courtyard of the hotel. After making entry into the courtyard, the fire was fully involved on the second and third floor balconies. The fire was most concentrated to the east side of the building. Structural collapse had not occurred in the east quadrants of the building.

27. The fire was concentrated to the balconies on the second and third floor and had spread into the attic above the third floor balcony. The fire was burning from floor to ceiling. There were no unusual odors detected. The fire did react

normally to the application of water. Contents were consistent with the occupancy.

28. An investigation by a fire investigator was requested due to unknown causation. The origin and cause of the fire were undetermined at that time. I spoke with Lt. Dan Wilkerson of the Huntsville Fire Marshall's Office is investigation the incident due to unknown causation. His investigation began September 22, 2010. After interviews with the occupant of room 2207, as well as others, it was determined that the fire originated on the balcony of room 2207 and the potential ignition source was identified as improperly discarded smoking materials.

29. Lt. Wilkerson noticed a pack of Marlboro brand cigarettes and al lighter on top of the TV just inside the door from the balcony. Lt. Wilkerson asked Mr. Michael Siegling, the room's occupant, when was the last time he smoked cigarettes' on the balcony, and Mr. Siegling replied that he did not remember, yesterday or day before. He was also asked how he extinguishes the cigarettes and he replied that he used a Styrofoam cup with water. He stated that he was last on the balcony at around 5 or 6 pm prior to the fire and that there was a beer can on the balcony.

30. In a written statement, Mr. Siegling stated that he was awakened by the fire alarm of the hotel at approximately 10:40 p.m. He went to the hallway and did

not smell smoke nor see anyone vacating the building. Approximately five minutes later, another hotel guest knocked on his door and told him there was a fire in the building. Mr. Siegling then went out onto the balcony and looked to his left and saw flames on his balcony. Mr. Siegling is an employee of the FBI and was attending a specialized training class at this location, sponsored by the FBI. Mr. Siegling arrived at the hotel on August 14, 2010 for his 40 day training session.

31. During the time of my investigation, Michael Siegling resided at 180 Grand Avenue, Oakland, CA 94612 and had telephone number 510-251-4022. Lt. Wilkerson classified the fire as accidental and was caused by the careless use of smoking materials.

32. Fire pattern analysis indicates that the fire originated in the northwest corner of the balcony of room 2207. The evidence indicates ignition resulted from improperly discarded smoking materials. Evidence indicates first fuel ignited consisted of ordinary combustibles on or associated with the balcony. Events bringing ignition and fuel together include human involvement, which would include improperly discarded smoking materials.

33. Additionally, I am the custodian of records of EFI Global. Attached hereto are true and correct copies of reports, dated October 12, 2010 and February 18,

2014, that I created during my investigation of the subject fire made the basis of the present lawsuit.

34. The attached reports are my own work product, and are a fair and accurate depiction of my fire cause and origin investigation on the date of the alleged incident, and a fair and accurate depiction of my fire cause and origin investigation regarding the subject fire made the basis of the present lawsuit.

35. The attached reports is kept by EFI Global in the regular course of business, and it was in the regular course of business of EFI Global for an employee or representative of EFI Global, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the recording or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The reports attached hereto are the originals or an exact duplicate of the originals."

I declare under penalty of perjury under the laws of United States of America that the foregoing is true and correct and within my personal knowledge.

Signed June 7, 2014

Rod Williams

# Attachment 1: October 12, 2010 Report of Roderick S. Williams

EVIDENTIARY MATERIALS IN SUPPORT OF PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANT'S MOTIONS TO EXCLUDE THE TESTIMONY OF RODERICK WILLIAMS
L:\00760\0064 (Yedla)\Pleadings\Drafts\P's Evidentiary Materials in Support of Response to Strike Expert Williams.docx



**EFI Global**

Nashville Service Center
1880 Gen. George Patton Drive
Building B, Suite 293
Franklin, TN 37067
Tel. 877.812.4326
Fax  615.778.0170
www.efiglobal.com

SCAN AS 1 DOCUMENT 

# FIRE INVESTIGATION
## Report One and Final

INSURED:              Country Inn & Suites
LOSS LOCATION:        4880 University Drive
                      Huntsville, AL 35816
DATE OF LOSS:         September 22, 2010
CLAIM NUMBER:         not given
EFI FILE NO:          94216-08709

Report Date:      October 12, 2010

Prepared For:     UNION STANDARD INSURANCE CO
                  239 Azalea Drive
                  Florence, AL 35631

Attention:        c/o Jim Gowder, Cook Claims

*THIS REPORT FURNISHED AS PRIVILEGED AND CONFIDENTIAL TO ADDRESSEE.
RELEASE TO ANY OTHER COMPANY, CONCERN OR INDIVIDUAL IS SOLELY THE
RESPONSIBILITY OF ADDRESSEE.*

11/19/2010 15:17

## ASSIGNMENT

The assignment to conduct an origin and cause investigation was received from Jim Gowder/Cook Claims Services on September 23, 2010 and the investigation commenced on September 27, 2010.

## ENCLOSURES

1) Photos: 28
2) Scene Diagram
3) Fire Report
4) Additional Materials Packet containing:Unmounted Photos

## SCENE EXAMINATION

The fire scene examination was conducted on September 27, 2010. Access to the property was provided by the property management. The hotel manager is Hoss Kazeroonian and can be reached by telephone at 256-837-4070. Mr. Kazeroonian provided assistance by having one of the hotel maintenance personnel to stay with me during the examination.

The scene was cordoned off with tape at the time of inspection. Alterations to the scene included the maintenance personnel hanging a large tarp over the roof and down the front of the balcony area of the burned building. The scene was also examined by the fire marshal to determine cause. The conditions/alterations did not preclude determining the origin or the cause.

The surrounding property was maintained consistent with the commercial area. There were detached outbuildings located on the property. Building #3 of this same complex exhibited radiant heat damage to vinyl siding on the side facing the fire building. No structural damage to that building was noted. Adjacent property was not damaged during the incident. There was nothing remarkable in the surrounding area.

The structure was a multi-story, wood-framed, hotel constructed on concrete slab foundation. The roof was composition shingle and the exterior finish was wood slat, with vinyl siding added at some time later. The front of the building faces south, although the side of the fire area faces east. The pre-existing conditions were unremarkable.

Life safety devices were found. The building was provided with local hard wired with battery backup smoke detector(s), as well as an automatic fire alarm system. The alarm system functioned properly. A patron of the hotel pulled a fire

---

File No: 94216-08709       2       October 12, 2010
Insured: Country Inn & Suites       Claim No: not given

alarm pull station in the hallway to activate the fire alarm, which functioned properly by alerting guests and the main desk. There were no safety code violations noted.

Electric service was connected to the building at the time of loss. The three phase electric utility enters on the west side of the building. Delivery cables were intact. The meter was present at the time of inspection. The meter base was properly grounded. The power supply for the fire building was terminated at one of the breaker panels.

Exterior fire pattern analysis indicates the fire was most concentrated to the east side of building #2, on the second and third floors. The roof structure had been compromised by fire breaching from the underside. Wood trusses comprising the roof structure were most damaged in the east portion of the building, above the area of origin. Smoke and heat patterns emanated from the balconies of rooms 2207, 2209, 2307, and 2309. The fire had breached the exterior walls at the east side of the building of room 2307, which is the room directly above the room of origin. The lowest fire patterns were located at ground level below the balcony of room 2207. This was attributed to fall-down of fire debris from the balconies above. There was no evidence of an outward overpressure from within the building. Exterior fire pattern analysis indicated the fire originated exterior to the balcony of room 2207.

Security of the building at the time of loss is not an issue. This is a 24 hour facility and was occupied by patrons of the hotel at the inception of the fire. The patron staying in the room of origin was not present in the room at the inception of the fire. There was evidence of forced entry at the door to room 2207, which is the room of origin. Forced entry evidence includes physical damage to the wooden door jamb on the interior portion of the room. The damage is consistent with fire suppression operations. The windows to the room of origin were secured at the time of loss, and exhibited thermal breakage and light to moderate smoke damage on the exterior of the windows in the area of the balcony.

The contents were consistent with the occupancy. The contents in the room of origin exhibited light to moderate smoke damage. The location of the fire on the exterior balcony allowed most of the fire products to remain on the exterior of the building, at least on the balcony of origin. Personal property located in the room above the room of origin had sustained the most severe damage, consistent with direct flame impingement. This was due to the inherent upward and outward heat and fire products from the fire on the balcony below at room 2207.

Preliminary interior inspection, working from the area of least damage to the area of the most damage, revealed the fire was concentrated to the exterior balcony of room 2207 and traveled upward onto the balcony of 2307 above. The least affected area of the room of origin was noted in the bathroom. This area

| File No: 94216-08709 | 3 | October 12, 2010 |
|---|---|---|
| Insured: Country Inn & Suites | | Claim No: not given |

exhibited a slight odor of smoke. The interior portion of room 2207 was slightly damaged. The majority of the fire damage was on the exterior balcony and traveled upward on an exterior wall onto the balcony of the room above. Rooms remote to the area of origin were affected by the fire. The fire breached the window on the balcony of room 2207, causing slight burn damage to the curtains on the interior of the room. Fire pattern analysis indicated the fire had breached the north side wall of the balcony of room 2207 and traveled upward and spread to the balcony of the room above. Vinyl siding on the exterior of the structure helped to spread the fire upward and outward from the area of origin. Fire patterns increased upward and outward from the northwest corner of the balcony of room 2207 and were normal for the building and/or avenues of ventilation. Fire movement patterns included heavy charring of exterior building components in a V-pattern beginning on the balcony of room 2207.

Physical evidence and witness statements indicate the fire originated on the exterior balcony of room 2207. Exterior construction of the area consisted of wood stud walls covered with wood planks, and at some point in time, vinyl siding was applied over the wood planks. The flooring of the area of origin consists of wood planks. Contents providing the fuel load include combustible wood construction of the balcony floor, as well as the combustible wood exterior wall construction and the vinyl siding. Fire patterns indicate flashover did not occur within the area of origin.

The ceiling area above the balcony of room 2207 had been compromised by the fire. The ceiling consisted of wood plank construction of the floor of the balcony above the area of origin. Exposed floor joists and wood plank decking were heavily charred above the area of origin. The exterior walls had been compromised. Fire patterns are most prominent along the north wall of the balcony area. Patterns include a V pattern(s) on vertical surfaces with the lowest point noted along the northwest corner of the north wall of the balcony for room 2207. The apex of the pattern is at floor level.

Systematic debris removal began with the fire department during their investigation. Some of the fire debris had been removed from the area of origin, in search for the ignition source. The lowest fire damage was noted at floor level in the northwest corner of the balcony of room 2207. The floor decking was damaged. The exposed decking was heavily charred from direct flame impingement consistent with exposure. Charring of the corresponding side(s) of the wooden decking and the wooden exterior wall covering and vinyl siding demonstrated the area of origin was in the northwest corner of the balcony of room 2207. Fire patterns include a V pattern(s) on vertical surfaces of the north and west walls of the northwest corner of the balcony of room 2207. Physical evidence and witness statements indicate the origin of the fire to be in this location.

| File No: 94216-08709 | 4 | October 12, 2010 |
|---|---|---|
| Insured: Country Inn & Suites | | Claim No: not given |

11/19/2010 15:17

There were no items collected during the investigation of this fire.

Potential heat/ignition sources identified in the area below the balcony of room 2207 include improperly discarded cigarettes. It was also determined by the local fire marshal that the occupant of the room of origin used Marlboro brand cigarettes. During this investigation, it was determined that this same brand of cigarettes was discarded to the ground below the balcony of room 2207. No other potential heat/ignition sources were found in the area of origin.

The electrical panel was not involved. The wiring was affected by the fire at a wall hung light fixture that was exposed to the fire spread on the balcony. As the fire spread away from the area of origin, the wiring was damaged consistent with random exposure damage.

The heat plant was not involved in the fire.

Fire pattern analysis indicates that the fire originated in the northwest corner of the balcony of room 2207. The evidence indicates ignition from improperly discarded cigarettes. The evidence indicates the first fuel ignited was ordinary combustibles on or associated with the balcony of room 2207. Events bringing ignition and fuel together include combustibles too close to an ignition source, consistent with improperly discarded smoking materials.

## INVESTIGATION

The discovery witness was unknown. The discovery witness also pulled a fire alarm pull station, which activated the automatic fire alarm system for the building, after discovery of the fire.

The Huntsville Fire Department responded to the alarm at 10:40 pm on September 22, 2010 and arrived on the scene at 10:45 pm. The first unit on the scene was Engine 12. The weather was clear.

Smoke was visible upon arrival from the courtyard of the hotel. After making entry into the courtyard, the fire was fully involved on the second and third floor balconies. The fire was most concentrated to the east side of the building. Structural collapse had not occurred in the east quadrants of the building.

The fire was concentrated to the balconies on the second and third floor and had spread into the attic above the third floor balcony. The fire was burning from floor to ceiling. There were no unusual odors detected. The fire did react normally to the application of water. Contents were consistent with the occupancy.

Investigation by a fire investigator was requested due to unknown causation. The origin and cause of the fire were undetermined at that time.

| File No: 94216-08709 | 5 | October 12, 2010 |
|---|---|---|
| Insured: Country Inn & Suites | | Claim No: not given |

11/19/2010 15:17

Lt. Dan Wilkerson of the Huntsville Fire Marshal's Office is investigating the incident due to unknown causation. The investigation began September 22, 2010. After interviews with the occupant of room 2207, as well as others, it was determined that the fire originated on the balcony of room 2207 and the potential ignition source was identified as improperly discarded smoking materials.

Lt. Wilkerson noticed a pack of Marlboro brand cigarettes and a lighter on top of the TV just inside the door from the balcony. Lt. Wilkerson asked Mr. Siegling, the room's occupant, when was the last time he smoked cigarettes on the balcony, and Mr. Siegling replied that he did not remember, yesterday or day before. He was also asked how he extinguishes the cigarettes and he replied that he used a styrofoam cup with water. He stated that he was last on the balcony at around 5 or 6 pm prior to the fire and that there was a beer can on the balcony.

In a written statement, Mr. Siegling stated that he was awakened by the fire alarm of the hotel at approximately 10:40 pm. He went to the hallway and did not smell smoke nor see anyone vacating the building. Approximately 5 minutes later, another hotel guest knocked on his door and told him there was a fire in the building. Mr. Siegling then went out onto the balcony and looked to the left and saw flames on his balcony. Mr. Siegling is an employee of the FBI and was attending a specialized training class at this location, sponsored by the FBI. Mr. Siegling arrived at the hotel on August 14, 2010 for this 40 day training session.

Michael Siegling resides at 180 Grand Ave, Oakland, CA 94612 and can be reached by telephone at 510-251-4022. Lt. Wilkerson classified this fire as accidental and was caused by the careless use of smoking materials. The investigation is closed. An incident report is enclosed.

The owner/insured of the building is Hospitality Enterprises, Inc. located at Radisson Suites Hotel, South Memorial Pkwy, Huntsville, AL 35802 and can be reached by telephone at 256-882-9400. This building is approximately 25 years old.

## DETERMINATION

Fire pattern analysis indicates that the fire originated in the northwest corner of the balcony of room 2207. The evidence indicates ignition resulted from improperly discarded smoking materials. Evidence indicates first fuel ignited consisted of ordinary combustibles on or associated with the balcony. Events bringing ignition and fuel together include human involvement, which would include improperly discarded smoking materials.

The classification of the fire is accidental.

## COMMENTS

The instructions in this assignment have been completed. No further activities are anticipated and the file is being closed.

The conclusions drawn in this report are based on an analysis of the information collected during the site visit and investigation. Information or data that becomes available at a later date may justify the modification of the results and/or conclusions at that time.

EFI Global, Inc.                                    Reviewed by:

Rod Williams, CFI, CFEI, CVFI                 Metts Hardy, CFEI, CHMT
*Senior Fire Investigator*                         *Regional Vice President*

---

File No: 94216-08709                    7            October 12, 2010
Insured: Country Inn & Suites                     Claim No: not given

# EFI Global

## Diagram Sheet

| Name (Property Owner) | Location | File No. |
|---|---|---|
| Country Inn & Suites | 4880 University Dr. Huntsville, AL 35816 | 94216-08709 |



RM 2207 DIAGRAM

***NO ELECTRICAL IGNITION SOURCE IN AREA OF ORIGIN IMPROPERLY DISCARDED CIGARETTES COULD NOT BE RULED OUT***

***THIS IS A NON-SMOKING FACILITY***

FIRE ORIGIN HERE ON BALCONY

DISCARDED CIGARETTE BUTTS ALL BELOW BALCONY ON GROUND LEVEL

MW SINK   P9

BATH

DESK   L

P15   P10

P11-14 P16   P17  P18   L

L   P19-20

CIGARETTE BURN ON FLOOR

CL

X

P21-26 BALCONY   X

BEER CAN

P2   COURTYARD   P8

P4-7 TAKEN FROM UNDER BALCONY

***P27-28 TAKEN OF BALCONY ABOVE ROOM OF ORIGIN***   P3

| Prepared by | Date | Scale |
|---|---|---|
| Rod Williams | October 11, 2010 | Conceptual |

This diagram is for illustrative purposes only and may not accurately represent the structure's dimensions, entrances, partitions or room usage.

**A** | 04701 | AL | MM 09 | DD 22 | YYYY 2010 | 12 | 10-0026882 | 000 | ☐ Delete ☐ Change ☐ No Activity | NFIRS -1 Basic
FDID | State | Incident Date | | | Station | Incident Number | Exposure

**B  Location***

☐ Check this box to indicate that the address for this incident is provided on the Wildland Fire Module in Section P "Alternative Location Specification". Use only for wildland fires    Census Tract ☐ - ☐

☒ Street address
☐ Intersection
☐ In front of
☐ Rear of
☐ Adjacent to
☐ Directions

| 4880 | | UNIVERSITY | | DR | NW |
Number/Milepost | Prefix | Street or Highway | | Street Type | Suffix

| | HUNTSVILLE | | AL | 35816 |
Apt./Suite/Room | City | | State | Zip Code

Cross street or directions, as applicable

**C  Incident Type ***

| 111 | Building fire
Incident Type

**D  Aid Given or Received***

1 ☐ Mutual aid received
2 ☐ Automatic aid recv.
3 ☐ Mutual aid given
4 ☐ Automatic aid given
5 ☐ Other aid given
N ☒ None

Their FDID | Their State
Their Incident Number

**E1  Date & Times**        Midnight is 0000

Check boxes if dates are the same as Alarm Date

| | Month | Day | Year | Hr Min Sec |
Alarm ALARM always required | 09 | 22 | 2010 | 22:40:57 |
ARRIVAL required, unless canceled or did not arrive
☒ Arrival* | 09 | 22 | 2010 | 23:45:45 |
CONTROLLED Optional, Except for wildland fires
☐ Controlled | | | |
LAST UNIT CLEARED, required except for wildland fires
Last Unit Cleared | 09 | 23 | 2010 | 02:44:15 |

**E2  Shift & Alarms**    Local Option

| 2 | | WEST |
Shift or Platoon | Alarms | District

**E3  Special Studies**    Local Option

| | |
Special Study ID# | Special Study Value

**F  Actions Taken***

| 11 | Extinguishment by fire
Primary Action Taken (1)

| 86 | Investigate
Additional Action Taken (2)

| |
Additional Action Taken (3)

**G1  Resources***

☒ Check this box and skip this section if an Apparatus or personnel form is used

| | Apparatus | Personnel |
Suppression | 0009 | 0031 |
EMS | | |
Other | 0005 | 0009 |

☐ Check box if resource counts include aid received resources.

**G2  Estimated Dollar Losses & Values**

LOSSES: Required for all fires if known (Optional for non fires) | None
Property $ |___|,|000|,|000| ☐
Contents $ |___|,|000|,|000| ☐
PRE-INCIDENT VALUE: Optional
Property $ |___|,|000|,|000| ☐
Contents $ |___|,|000|,|000| ☐

**Completed Modules**
☒ Fire-2
☐ Structure-3
☐ Civil Fire Cas.-4
☐ Fire Serv. Cas.-5
☐ EMS-6
☐ HazMat-7
☐ Wildland Fire-8
☒ Apparatus-9
☒ Personnel-10
☒ Arson-11

**H1* Casualties** ☐ None
    Deaths   Injuries
Fire Service | |
Civilian | |

**H2  Detector**
Required for Confined Fires.
1 ☒ Detector alerted occupants
2 ☐ Detector did not alert them
U ☐ Unknown

**H3  Hazardous Materials Release**

N ☒ None
1 ☐ Natural Gas: slow leak, no evacuation or HazMat actions
2 ☐ Propane gas: >21 lb tank (as in home BBQ grill)
3 ☐ Gasoline: vehicle fuel tank or portable container
4 ☐ Kerosene: fuel burning equipment or portable storage
5 ☐ Diesel fuel/fuel oil: vehicle fuel tank or portable
6 ☐ Household solvents: home/office spill, cleanup only
7 ☐ Motor oil: from engine or portable container
8 ☐ Paint: from paint cans totaling < 55 gallons
0 ☐ Other: Special HazMat actions required or spill > 55gal., Please complete the HazMat form

**I  Mixed Use Property**
NN ☐ Not Mixed
10 ☐ Assembly use
20 ☐ Education use
33 ☐ Medical use
40 ☐ Residential use
51 ☐ Row of stores
53 ☐ Enclosed mall
58 ☐ Bus. & Residential
59 ☐ Office use
60 ☐ Industrial use
63 ☐ Military use
65 ☐ Farm use
00 ☐ Other mixed use

**J  Property Use***  Structures

131 ☐ Church, place of worship
161 ☐ Restaurant or cafeteria
162 ☐ Bar/Tavern or nightclub
213 ☐ Elementary school or kindergarten
215 ☐ High school or junior high
241 ☐ College, adult education
311 ☐ Care facility for the aged
331 ☐ Hospital

341 ☐ Clinic, clinic type infirmary
342 ☐ Doctor/dentist office
361 ☐ Prison or jail, not juvenile
419 ☐ 1- or 2-family dwelling
429 ☐ Multi-family dwelling
439 ☐ Rooming/boarding house
449 ☒ Commercial hotel or motel
459 ☐ Residential, board and care
464 ☐ Dormitory/barracks
519 ☐ Food and beverage sales

539 ☐ Household goods, sales, repairs
579 ☐ Motor vehicle/boat sales/repair
571 ☐ Gas or service station
599 ☐ Business office
615 ☐ Electric generating plant
629 ☐ Laboratory/science lab
700 ☐ Manufacturing plant
819 ☐ Livestock/poultry storage (barn)
882 ☐ Non-residential parking garage
891 ☐ Warehouse

**Outside**
124 ☐ Playground or park
655 ☐ Crops or orchard
669 ☐ Forest (timberland)
807 ☐ Outdoor storage area
919 ☐ Dump or sanitary landfill
931 ☐ Open land or field

936 ☐ Vacant lot
938 ☐ Graded/care for plot of land
946 ☐ Lake, river, stream
951 ☐ Railroad right of way
960 ☐ Other street
961 ☐ Highway/divided highway
962 ☐ Residential street/driveway

981 ☐ Construction site
984 ☐ Industrial plant yard

Lookup and enter a Property Use code only if you have NOT checked a Property Use box.
Property Use | 449 |

| Hotel/motel, commercial |
NFIRS-1 Revision 03/11/99

11/19/2010 15:17

**K1  Person/Entity Involved**
Local Option

510 - 251 - 4022
Area Code   Phone Number

Business name (if applicable)

☐ Check This Box if
same address as
Incident Location.
Then skip the three
duplicate address
lines.

Michael
Mr.,Ms., Mrs. First Name

Siegling
MI   Last Name   Suffix

180
Number

Grand
Prefix  Street or Highway

AVE
Street Type   Suffix

Post Office Box

Apt./Suite/Room   Oakland
City

CA   94612   -
State   Zip Code

☐ More people involved? Check this box and attach Supplemental Forms (NFIRS-1B) as necessary

**K2 Owner**   ☐ Same as person involved?
Then check this box and skip
the rest of this section.
Local Option

- - -
Area Code   Phone Number

Business name (if Applicable)

☐ Check this box if
same address as
incident location.
Then skip the three
duplicate address
lines.

Mr.,Ms., Mrs. First Name

MI   Last Name   Suffix

Number

Prefix  Street or Highway

Street Type   Suffix

Post Office Box

Apt./Suite/Room   City

State   Zip Code

**L  Remarks**
Local Option
09/23/2010 02:08:10 AM MDD

E12 arrived on scene to find smoke billowing from the courtyard of the Country Inn Suites.
After making entry into the courtyard, we saw that the balcony on the 2nd floor and the
balcony on the 3rd floor were completely engulfed with flame.  We advanced a charged 1 3/4"
line into the courtyard and knocked down the fire at that point.  Additional crews were then
advanced to the fire floor.  Complete salvage and overhaul efforts were then completed by
crews on the fire floor.  Ladder 12 was then set up to check for fire extension on the roof
level.  Investigator Dan Wilkerson was dispatched and scene was eventually turned over to
him.

Hose used by E12 crew :    2 ea.    1 3/4" preconnects    (400 ft)
                                        1          300 ft of 3" hose then wyed off to
sections of 1 3/4"

See Investigators report for further.
-----------------------------------------------------------------------
09/23/2010 07:35:34 AM HVS

E5B crew approached from south end of building. We advanced 150' of 2 1/2" line with 100' of
1 3/4" line from hi-rise pack attached via reducer, to fire floor and into room. 225' of
supply line from the hydrant south of building on University Dr. to E5B.
09/23/2010 07:35:23 AM HVS

**L  Authorization**

| 03594 | KAY, JAMES M | DTC | 206 | 09 | 23 | 2010 |
| Officer in charge ID | Signature | Position or rank | Assignment | Month | Day | Year |

☐ Check
Box if
same
as Officer Member making report ID
in charge.

| 10469 | DODSON, MICHAEL D | CAPT | E12 | 09 | 23 | 2010 |
| | Signature | Position or rank | Assignment | Month | Day | Year |

COH/AL                              04701   09/22/2010   10-0026882



11/19/2010 15:17

| 04701 | AL | MM 9 | DD 22 | YYYY 2010 | 12 | 10-0026882 | 000 | Complete Narrative |
|---|---|---|---|---|---|---|---|---|
| FDID ★ | State ★ | Incident Date ★ | | | Station | Incident Number ★ | Exposure ★ | |

**Narrative:**
09/23/2010 02:08:10 AM MDD

E12 arrived on scene to find smoke billowing from the courtyard of the Country Inn Suites.
After making entry into the courtyard, we saw that the balcony on the 2nd floor and the
balcony on the 3rd floor were completely engulfed with flame.  We advanced a charged 1 3/4"
line into the courtyard and knocked down the fire at that point.  Additional crews were then
advanced to the fire floor.  Complete salvage and overhaul efforts were then completed by
crews on the fire floor.  Ladder 12 was then set up to check for fire extension on the roof
level.  Investigator Dan Wilkerson was dispatched and scene was eventually turned over to
him.

Hose used by E12 crew :   2 ea.    1 3/4" preconnecte    (400 ft)
                                   1          300 ft of 3" hose then wyed off to
sections of 1 3/4"

See Investigators report for further.
-----------------------------------------------------------------------------------
09/23/2010 07:35:34 AM HVS

E5B crew approached from south end of building. We advanced 150' of 2 1/2" line with 100' of
1 3/4" line from hi-rise pack attached via reducer, to fire floor and into room. 225' of
supply line from the hydrant south of building on University Dr. to E5B.
09/23/2010 07:35:23 AM HVS

11/19/2010 15:17

**A** | 04701 | AL | 09 | 22 | 2010 | 12 | 10-0026882 | 000 | ☐ Delete  ☐ Change  ☐ No Activity | NFIRS -2 Fire

FDID *   State *   Incident Date *   Station   Incident Number *   Exposure *

**B Property Details**

**B1** ___0003___ ☐ Not Residential
Estimated Number of residential living units in building of origin whether or not all units became involved

**B2** ___001___ ☐ Buildings not involved
Number of buildings involved

**B3** _____ ☐ None
Acres burned
(outside fires)   ☐ Less than one acre

**C On-Site Materials** ☐ None
**or Products**
Complete if there were any significant amounts of commercial,industrial, energy or agricultural products or materials on the property, whether or not they became involved

Enter up to three codes.  Check one
or more boxes for each code entered.

On-site material (1)

On-site material (2)

On-site material (3)

| | |
|---|---|
| 1 ☐ | Bulk storage or warehousing |
| 2 ☐ | Processing or manufacturing |
| 3 ☐ | Packaged goods for sale |
| 4 ☐ | Repair or service |
| 1 ☐ | Bulk storage or warehousing |
| 2 ☐ | Processing or manufacturing |
| 3 ☐ | Packaged goods for sale |
| 4 ☐ | Repair or service |
| 1 ☐ | Bulk storage or warehousing |
| 2 ☐ | Processing or manufacturing |
| 3 ☐ | Packaged goods for sale |
| 4 ☐ | Repair or service |

**D Ignition**

**D1** |001 | See Investigators
Area of fire origin *

**D2** |001 | See Investigators
Heat source *

**D3** |001 | See Investigators
Item first ignited * ☐ 1 Check Box if fire spread
was confined to object
of origin

**D4** |001 | See Investigators
Type of material   Required only if item first
first ignited   ignited code is 60 or 70

**E1** **Cause of Ignition**

☐ Check box if this is an exposure report.
Skip to section G

1 ☐ Intentional
2 ☐ Unintentional
3 ☐ Failure of equipment or heat source
4 ☐ Act of nature
5 ☒ Cause under investigation
U ☐ Cause undetermined after investigation

**Factors Contributing To Ignition**

|UU1 | Undetermined/See   ☒ None
Factor Contributing To Ignition (1)

Factor Contributing To Ignition (2)

**E3** **Human Factors**
Contributing To Ignition
Check all applicable boxes

1 ☐ Asleep                    ☒ None
2 ☐ Possibly impaired by
alcohol or drugs
3 ☐ Unattended person
4 ☐ Possibly mental disabled
5 ☐ Physically Disabled
6 ☐ Multiple persons involved

7 ☐ Age was a factor

Estimated age of
person envolved

1 ☐ Male.          2 ☐ Female

**F1 Equipment Involved In Ignition**

☐ None If Equipment was not involved,Skip to
Section G

Equipment Involved

Brand
Model
Serial #
Year

**F2  Equipment Power**

Equipment Power Source

**F3 Equipment Portability**

1 ☐ Portable

2 ☐ Stationary

Portable equipment normally can be
moved by one person. is designed to
be use in multiple locations, and
requires no tools to install.

**G  Fire Suppression Factors**

Enter up to three codes.    ☐ None

Fire suppression factor (1)

Fire suppression factor (2)

Fire suppression factor (3)

**H1 Mobile Property Involved**

☐ None

1 ☐ Not involved in ignition, but burned
2 ☐ Involved in ignition, but did not burn
3 ☐ Involved in ignition and burned

**H2 Mobile Property Type & Make**

Mobile property type

Mobile property make

Moblie property model          Year

License Plate Number    State   VIN Number

**Local Use**

☐ Pre-Fire Plan Available
Some of the information presented in
this report may be based upon reports
from other Agencies

☐ Arson report attached
☐ Police report attached
☐ Coroner report attached
☐ Other reports attached

NFIRS-2 Revision 01/19/99

11/19/2010 15:17

**A** | FDID ★ 04701 | State ★ AL | Incident Date ★ MM 9 DD 22 YYYY 2010 | Station 12 | Incident Number ★ 10-0026882 | Exposure ★ 000 | ☐ Delete  ☐ Change | NFIRS-9 Apparatus or Resources

| # | Apparatus or ★ Resource | Date and Times (Check if same as alarm date) | | | | Sent [X] | Number of ★ People | Use (Check ONE box for each apparatus to indicate its main use at the incident.) | Actions Taken |
|---|---|---|---|---|---|---|---|---|---|
| | | | Month Day | Year | Hour Min | | | | |
| 1 | ID 102 / Type 92 | Dispatch [X] / Arrival [X] / Clear [ ] | 9 22 / 9 22 / 9 23 | 2010 / 2010 / 2010 | 22:56 / 23:27 / 00:51 | [X] | 1 | ☐ Suppression / ☐ EMS / [X] Other | ⌷ ⌷ |
| 2 | ID 120 / Type 921 | Dispatch [X] / Arrival [X] / Clear [ ] | 9 22 / 9 22 / 9 23 | 2010 / 2010 / 2010 | 22:50 / 23:11 / 02:44 | [X] | 1 | ☐ Suppression / ☐ EMS / [X] Other | ⌷ ⌷ |
| 3 | ID 203 / Type 92 | Dispatch [X] / Arrival [X] / Clear [ ] | 9 22 / 9 22 / 9 23 | 2010 / 2010 / 2010 | 22:49 / 22:58 / 00:37 | [X] | 1 | ☐ Suppression / ☐ EMS / [X] Other | ⌷ ⌷ |
| 4 | ID 204 / Type 92 | Dispatch [X] / Arrival [X] / Clear [X] | 9 22 / 9 22 / 9 22 | 2010 / 2010 / 2010 | 23:00 / 23:01 / 23:51 | [X] | 1 | ☐ Suppression / ☐ EMS / [X] Other | ⌷ ⌷ |
| 5 | ID 206 / Type 92 | Dispatch [X] / Arrival [X] / Clear [ ] | 9 22 / 9 22 / 9 23 | 2010 / 2010 / 2010 | 22:42 / 22:47 / 01:04 | [X] | 1 | ☐ Suppression / ☐ EMS / [X] Other | ⌷ ⌷ |
| 6 | ID E12 / Type 11 | Dispatch [X] / Arrival [X] / Clear [ ] | 9 22 / 9 22 / 9 23 | 2010 / 2010 / 2010 | 22:42 / 22:45 / 00:29 | [X] | 3 | [X] Suppression / ☐ EMS / ☐ Other | ⌷ ⌷ |
| 7 | ID E15 / Type 11 | Dispatch [X] / Arrival [X] / Clear [ ] | 9 22 / 9 22 / 9 23 | 2010 / 2010 / 2010 | 22:42 / 22:48 / 00:38 | [X] | 5 | [X] Suppression / ☐ EMS / ☐ Other | ⌷ ⌷ |
| 8 | ID E16 / Type 11 | Dispatch [X] / Arrival [X] / Clear [ ] | 9 22 / 9 22 / 9 23 | 2010 / 2010 / 2010 | 22:42 / 22:48 / 00:28 | [X] | 5 | [X] Suppression / ☐ EMS / ☐ Other | ⌷ ⌷ |
| 9 | ID E1A / Type 11 | Dispatch [X] / Arrival [X] / Clear [X] | 9 22 / 9 22 / 9 22 | 2010 / 2010 / 2010 | 22:53 / 22:59 / 23:27 | [X] | 4 | [X] Suppression / ☐ EMS / ☐ Other | ⌷ ⌷ |

**A**

| FDID | State | MM Incident Date | DD | YYYY | Station | Incident Number | Exposure | |
|---|---|---|---|---|---|---|---|---|
| 04701 | AL | 9 | 22 | 2010 | 12 | 10-0026882 | 000 | ☐ Delete ☐ Change |

NFIRS-9
Apparatus or Resources

**B**

| Apparatus or ★ Resource | Date and Times (Check if same as alarm date) | | | | | Sent ★ | Number of ★ People | Use (Check ONE box for each apparatus to indicate its main use at the incident) | Actions Taken |
|---|---|---|---|---|---|---|---|---|---|
| | | Month | Day | Year | Hour Min | ☒ | | | |

| 1 | ID E1B | Dispatch | ☒ | 9 | 22 | 2010 | 22:49 | | | ☒ Suppression | |
| | | Arrival | ☐ | 9 | 22 | 2010 | 22:58 | ☒ | 5 | ☐ EMS | |
| | Type 11 | Clear | ☐ | 9 | 23 | 2010 | 00:25 | | | ☐ Other | |

| 2 | ID E5A | Dispatch | ☒ | 9 | 22 | 2010 | 22:49 | | | ☒ Suppression | |
| | | Arrival | ☐ | 9 | 22 | 2010 | 22:55 | ☒ | 4 | ☐ EMS | |
| | Type 11 | Clear | ☐ | 9 | 22 | 2010 | 23:18 | | | ☐ Other | |

| 3 | ID E5B | Dispatch | ☒ | 9 | 22 | 2010 | 22:43 | | | ☒ Suppression | |
| | | Arrival | ☐ | 9 | 22 | 2010 | 22:49 | ☒ | 5 | ☐ EMS | |
| | Type 11 | Clear | ☐ | 9 | 23 | 2010 | 00:40 | | | ☐ Other | |

| 4 | ID L12 | Dispatch | ☒ | 9 | 22 | 2010 | 22:42 | | | ☒ Suppression | |
| | | Arrival | ☐ | 9 | 22 | 2010 | 22:46 | ☒ | 2 | ☐ EMS | |
| | Type 12 | Clear | ☐ | 9 | 23 | 2010 | 00:35 | | | ☐ Other | |

| 5 | ID SR15 | Dispatch | ☒ | 9 | 22 | 2010 | 22:42 | | | ☒ Suppression | |
| | | Arrival | ☐ | 9 | 22 | 2010 | 22:49 | ☒ | 2 | ☐ EMS | |
| | Type 60 | Clear | ☐ | 9 | 23 | 2010 | 00:51 | | | ☐ Other | |

| 6 | ID | Dispatch | ☐ | | | | | | | ☐ Suppression | |
| | | Arrival | ☐ | | | | | ☐ | | ☐ EMS | |
| | Type | Clear | ☐ | | | | | | | ☐ Other | |

| 7 | ID | Dispatch | ☐ | | | | | | | ☐ Suppression | |
| | | Arrival | ☐ | | | | | ☐ | | ☐ EMS | |
| | Type | Clear | ☐ | | | | | | | ☐ Other | |

| 8 | ID | Dispatch | ☐ | | | | | | | ☐ Suppression | |
| | | Arrival | ☐ | | | | | ☐ | | ☐ EMS | |
| | Type | Clear | ☐ | | | | | | | ☐ Other | |

| 9 | ID | Dispatch | ☐ | | | | | | | ☐ Suppression | |
| | | Arrival | ☐ | | | | | ☐ | | ☐ EMS | |
| | Type | Clear | ☐ | | | | | | | ☐ Other | |

## Type of Apparatus or Resources

**Ground Fire Suppression**
11 Engine
12 Truck or aerial
13 Quint
14 Tanker & pumper combination
16 Brush truck
17 ARF (Aircraft Rescue and Firefighting)
10 Ground fire suppression, other
**Heavy Ground Equipment**
21 Dozer or plow
22 Tractor
24 Tanker or tender
20 Heavy equipment, other
**Aircraft**
41 Aircraft: fixed wing tanker
42 Helitanker
43 Helicopter
40 Aircraft, other

**Marine Equipment**
51 Fire boat with pump
52 Boat, no pump
50 Marine apparatus, other
**Support Equipment**
61 Breathing apparatus support
62 Light and air unit
60 Support apparatus, other
**Medical & Rescue**
71 Rescue unit
72 Urban Search & rescue unit
73 High angle rescue unit
75 BLS unit
76 ALS unit
70 Medical and rescue unit,other

More Apparatus?
Use Additional
Sheets

**Other**
91 Mobile command post
92 Chief officer car
93 HazMat unit
94 Type 1 hand crew
95 Type 2 hand crew
99 Privately owned vehicle
00 Other apparatus/resource

NN None
UU Undetermined

NFIRS-9 Revision 11/17/98

11/19/2010 15:17

| A | 04701 | AL | MM 9 | DD 22 | YYYY 2010 | 12 | 10-0026882 | 000 | ☐ Delete | NFIRS - 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| | FDID ★ | State ★ | Incident Date ★ | | | Station | Incident Number ★ | Exposure ★ | ☐ Change | Personnel |

**B** Apparatus or Resource ★
Use codes listed below

Date and Times
Check if same as alarm date
Month Day Year    Hours/mins

Sent
☒

Number of People ★

Use
Check ONE box for each apparatus to indicate its main use at the incident.

Actions Taken
List up to 4 actions for each apparatus and each personnel.

| 1 | ID 102 | Dispatch ☒ 9 22 2010 22:56 | Sent | 1 | ☐ Suppression | ☐ ☐ |
|---|---|---|---|---|---|---|
| | Type 92 | Arrival ☒ 9 22 2010 23:27 | ☒ | | ☐ EMS | |
| | | Clear ☐ 9 23 2010 00:38 | | | ☒ Other | ☐ ☐ |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 07257 | MCFARLEN, HOWARD | DC | X | | | | |

| 2 | ID 120 | Dispatch ☒ 9 22 2010 22:50 | Sent | 1 | ☐ Suppression | ☐ ☐ |
|---|---|---|---|---|---|---|
| | Type 921 | Arrival ☒ 9 22 2010 23:11 | ☒ | | ☐ EMS | |
| | | Clear ☐ 9 23 2010 02:44 | | | ☒ Other | ☐ ☐ |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 12234 | WILKERSON, DANIEL | FPI | X | | | | |

| 3 | ID 203 | Dispatch ☒ 9 22 2010 22:49 | Sent | 1 | ☐ Suppression | ☐ ☐ |
|---|---|---|---|---|---|---|
| | Type 92 | Arrival ☒ 9 22 2010 22:58 | ☒ | | ☐ EMS | |
| | | Clear ☐ 9 23 2010 00:27 | | | ☒ Other | ☐ ☐ |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 09901 | LOVE, THERRON | DTC | X | | | | |

COH/AL

NFIRS-10 Revision 11/17/98
04701    09/22/2010    10-0026882

11/19/2010 15:17

| A | | MM 9 | DD 22 | YYYY 2010 | 12 | 10-0026882 | 000 | ☐ Delete | NFIRS - 10 |
|---|---|---|---|---|---|---|---|---|---|
| | 04701 FDID ★ | AL State ★ | Incident Date ★ | | Station | Incident Number ★ | Exposure ★ | ☐ Change | Personnel |

**B  Apparatus or Resource** ★
Use codes listed below

| **Date and Times** Check if same as alarm date | **Sent** | **Number of People** ★ | **Use** Check ONE box for each apparatus to indicate its main use at the incident. | **Actions Taken** List up to 4 actions for each apparatus and each personnel. |
|---|---|---|---|---|

| | Month Day Year | Hours/mins | | | | |
|---|---|---|---|---|---|---|
| **1** ID 204 Type 92 | Dispatch ☒ 9 22 2010 Arrival ☒ 9 22 2010 Clear ☒ 9 22 2010 | 23:00 23:01 23:42 | Sent ☒ | 1 | ☐ Suppression ☐ EMS ☒ Other | ☐ ☐ ☐ ☐ |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 07649 | OLIVER, STEPHEN | DTC | X | | | | |

| | Month Day Year | Hours/mins | | | | |
|---|---|---|---|---|---|---|
| **2** ID 206 Type 92 | Dispatch ☒ 9 22 2010 Arrival ☒ 9 22 2010 Clear ☐ 9 23 2010 | 22:42 22:47 00:34 | Sent ☒ | 1 | ☐ Suppression ☐ EMS ☒ Other | ☐ ☐ ☐ ☐ |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 03594 | KAY, JAMES | DTC | X | | | | |

| | Month Day Year | Hours/mins | | | | |
|---|---|---|---|---|---|---|
| **3** ID E12 Type 11 | Dispatch ☒ 9 22 2010 Arrival ☒ 9 22 2010 Clear ☐ 9 23 2010 | 22:42 22:45 00:27 | Sent ☒ | 3 | ☒ Suppression ☐ EMS ☐ Other | ☐ ☐ ☐ ☐ |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 09900 | HELMS, TERRY | DR | X | | | | |
| 10469 | DODSON, MICHAEL | CAPT | X | | | | |
| 14194 | CRUMBLEY, PAUL | FF | X | | | | |

**A**

| 04701 | AL | 9 | 22 | 2010 | 12 | 10-0026882 | 000 | ☐ Delete | NFIRS - 10 |
|---|---|---|---|---|---|---|---|---|---|
| FDID ★ | State ★ | MM Incident Date | DD ★ | YYYY | Station | Incident Number ★ | Exposure ★ | ☐ Change | Personnel |

**B** Apparatus or Resource

Use codes listed below.

| Date and Times | | | | Sent | Number of People | Use | Actions Taken |
|---|---|---|---|---|---|---|---|
| Check if same as alarm date | | | | | | Check ONE box for each apparatus to indicate its main use at the incident. | List up to 4 actions for each apparatus and each personnel |
| | Month | Day | Year | Hours/mins | | | |

**1** ID E15

| | | Month | Day | Year | Hours/mins |
|---|---|---|---|---|---|
| Dispatch | ☒ | 9 | 22 | 2010 | 22:42 |
| Arrival | ☒ | 9 | 22 | 2010 | 22:48 |
| Clear | ☐ | 9 | 23 | 2010 | 00:30 |

Type 11

Sent ☒   5   ☒ Suppression  ☐ EMS  ☐ Other

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 09378 | ROBINSON, MARTY | CAPT-RV | X | | | | |
| 11328 | PEARSON, AARON | DR-RV | X | | | | |
| 13349 | MEDLEY, SEAN | FF | X | | | | |
| 13867 | MCMONIGLE, ROBERT | FF | X | | | | |
| 14202 | BREWER, TYLER | FF | X | | | | |

**2** ID E16

| | | Month | Day | Year | Hours/mins |
|---|---|---|---|---|---|
| Dispatch | ☒ | 9 | 22 | 2010 | 22:42 |
| Arrival | ☒ | 9 | 22 | 2010 | 22:48 |
| Clear | ☐ | 9 | 23 | 2010 | 00:22 |

Type 11

Sent ☒   5   ☒ Suppression  ☐ EMS  ☐ Other

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 06475 | ADCOCK, JOSEPH | DR | X | | | | |
| 07312 | ATCHLEY, MICHAEL | CAPT | X | | | | |
| 09150 | HORNBUCKLE, GARY | FF | X | | | | |
| 14762 | MAPLES, BRIAN | FF | X | | | | |
| 14781 | CLEMONS, SCOTT | FF | X | | | | |

**3** ID E1A

| | | Month | Day | Year | Hours/mins |
|---|---|---|---|---|---|
| Dispatch | ☒ | 9 | 22 | 2010 | 22:53 |
| Arrival | ☒ | 9 | 22 | 2010 | 22:59 |
| Clear | ☒ | 9 | 22 | 2010 | 23:16 |

Type 11

Sent ☒   4   ☒ Suppression  ☐ EMS  ☐ Other

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 10470 | DRAKE, DENNIS | DR | X | | | | |
| 10854 | WHITMAN, DAVID | CAPT-RV | X | | | | |
| 13481 | CASTEEL, KEITH | FF | X | | | | |
| 14776 | ANDREWS, CURTIS | FF | X | | | | |

11/19/2010 15:17

**A**

| FDID | State ★ | MM DD YYYY Incident Date ★ | Station | Incident Number ★ | Exposure ★ | | NFIRS - 10 Personnel |
|---|---|---|---|---|---|---|---|
| 04701 | AL | 9 22 2010 | 12 | 10-0026882 | 000 | ☐Delete ☐Change | |

**B Apparatus or Resource** — use codes listed below

**Date and Times** — Check if same as alarm date

**Sent** ☒ | **Number of People** ★ | **Use** — Check ONE box for each apparatus to indicate its main use at the incident. | **Actions Taken** — List up to 4 actions for each apparatus and each personnel.

### 1  ID E1B   Type 11

| | Month | Day | Year | Hours/mins |
|---|---|---|---|---|
| Dispatch ☒ | 9 | 22 | 2010 | 22:49 |
| Arrival ☒ | 9 | 22 | 2010 | 22:58 |
| Clear ☐ | 9 | 23 | 2010 | 00:25 |

Sent ☒ | 5 | ☒Suppression ☐EMS ☐Other

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 09141 | FRY, DAVID | CAPT | X | | | | |
| 09667 | GRAVES, WILLIAM | DR | X | | | | |
| 11321 | COCKRELL, JOHNNY | DR-RV | X | | | | |
| 14192 | PFEIFFER, JACOB | FF | X | | | | |
| 14772 | REED, MICHAEL | FF | X | | | | |

### 2  ID E5A   Type 11

| | Month | Day | Year | Hours/mins |
|---|---|---|---|---|
| Dispatch ☒ | 9 | 22 | 2010 | 22:49 |
| Arrival ☒ | 9 | 22 | 2010 | 22:55 |
| Clear ☒ | 9 | 22 | 2010 | 23:18 |

Sent ☒ | 4 | ☒Suppression ☐EMS ☐Other

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 07666 | WALTERS, JAMES | DR | X | | | | |
| 09905 | ROBINSON, DAVID | CAPT | X | | | | |
| 13107 | COFFMAN, JAMES | FF | X | | | | |
| 13352 | LIMA, SANTIAGO | FF | X | | | | |

### 3  ID E5B   Type 11

| | Month | Day | Year | Hours/mins |
|---|---|---|---|---|
| Dispatch ☒ | 9 | 22 | 2010 | 22:43 |
| Arrival ☒ | 9 | 22 | 2010 | 22:49 |
| Clear ☐ | 9 | 23 | 2010 | 00:33 |

Sent ☒ | 5 | ☒Suppression ☐EMS ☐Other

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 03599 | SMITH, HENRY | CAPT | X | | | | |
| 11335 | GAITHER, TERRY | DR | X | | | | |
| 12228 | SHELTON, JONATHAN | DR-RV | X | | | | |
| 14763 | MILLS, JIMMY | FF | X | | | | |
| 14784 | EAKIN, TODD | FF | X | | | | |

11/19/2010 15:17

**A**

| 04701 | AL | MM 9 | DD 22 | YYYY 2010 | 12 | 10-0026882 | 000 | ☐ Delete | NFIRS - 10 |
|---|---|---|---|---|---|---|---|---|---|
| FDID ★ | State ★ | Incident Date ★ | | | Station | Incident Number ★ | Exposure ★ | ☐ Change | Personnel |

**B** Apparatus or Resource

Use codes listed below

Date and Times — Check if same as alarm date

| | Month | Day | Year | Hours/mins |
|---|---|---|---|---|

Sent ☒

Number of People ★

Use — Check ONE box for each apparatus to indicate its main use at the incident.

Actions Taken — List up to 4 actions for each apparatus and each personnel.

| **1** ID L12 | Dispatch ☒ | 9 | 22 | 2010 | 22:42 | Sent ☒ | 2 | ☒ Suppression | ☐ | ☐ | ☐ | ☐ |
| Type 12 | Arrival ☒ | 9 | 22 | 2010 | 22:46 | | | ☐ EMS ☐ Other | | | | |
| | Clear ☐ | 9 | 23 | 2010 | 00:31 | | | | | | | |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 09140 | GRAY, DENNIS | DR | X | | | | |
| 10846 | PHILLIPS, JASON | DR-RV | X | | | | |

| **2** ID SR15 | Dispatch ☒ | 9 | 22 | 2010 | 22:42 | Sent ☒ | 2 | ☒ Suppression | ☐ | ☐ | ☐ | ☐ |
| Type 60 | Arrival ☒ | 9 | 22 | 2010 | 22:49 | | | ☐ EMS ☐ Other | | | | |
| | Clear ☐ | 9 | 23 | 2010 | 00:30 | | | | | | | |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 12230 | SUMMITT, SCOTT | DR | X | | | | |
| 12936 | HILL, MATTHEW | DR-RV | X | | | | |

| **3** ID | Dispatch ☐ | | | | | Sent | | ☐ Suppression | ☐ | ☐ | ☐ | ☐ |
| Type | Arrival ☐ | | | | | | | ☐ EMS ☐ Other | | | | |
| | Clear ☐ | | | | | | | | | | | |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |

COH/AL

11/19/2010 15:17

| 04701 | AL | 9 | 22 | 2010 | 12 | 10-0026882 | 000 | Responding Units/Personnel |
|---|---|---|---|---|---|---|---|---|
| FDID | State | Incident Date | | | Station | Incident Number | Exposure | |

| Unit | Notify Time | Enroute Time | Arrival Time | Cleared Time |
|---|---|---|---|---|
| 102 102 | 22:56:43 | 23:04:31 | 23:27:04 | 00:38:12 |

| Staff ID\Staff Name | Activity | Rank | Position | Role |
|---|---|---|---|---|
| 07257   MCFARLEN, HOWARD W | Fire At Scene | Deputy Chie | | |

| Unit | Notify Time | Enroute Time | Arrival Time | Cleared Time |
|---|---|---|---|---|
| 120 120 | 22:50:22 | 22:58:55 | 23:11:58 | 02:44:15 |

| Staff ID\Staff Name | Activity | Rank | Position | Role |
|---|---|---|---|---|
| 12234   WILKERSON, DANIEL R | Fire At Scene | Fire Preven | | |

| Unit | Notify Time | Enroute Time | Arrival Time | Cleared Time |
|---|---|---|---|---|
| 203 203 | 22:49:43 | 22:49:44 | 22:58:43 | 00:27:21 |

| Staff ID\Staff Name | Activity | Rank | Position | Role |
|---|---|---|---|---|
| 09901   LOVE, THERRON | Fire At Scene | District Ch | | |

| Unit | Notify Time | Enroute Time | Arrival Time | Cleared Time |
|---|---|---|---|---|
| 204 204 | 23:00:16 | 23:00:17 | 23:01:20 | 23:42:58 |

| Staff ID\Staff Name | Activity | Rank | Position | Role |
|---|---|---|---|---|
| 07649   OLIVER, STEPHEN J | Fire At Scene | District Ch | | |

| Unit | Notify Time | Enroute Time | Arrival Time | Cleared Time |
|---|---|---|---|---|
| 206 206 | 22:42:02 | 22:45:42 | 22:47:34 | 00:34:37 |

| Staff ID\Staff Name | Activity | Rank | Position | Role |
|---|---|---|---|---|
| 03594   KAY, JAMES M | Fire At Scene | District Ch | | |

| Unit | Notify Time | Enroute Time | Arrival Time | Cleared Time |
|---|---|---|---|---|
| E12 Engine 12 | 22:42:02 | 22:43:20 | 22:45:45 | 00:27:16 |

| Staff ID\Staff Name | Activity | Rank | Position | Role |
|---|---|---|---|---|
| 09900   HELMS, TERRY N | Fire At Scene | Driver/Engi | | |
| 10469   DODSON, MICHAEL D | Fire At Scene | Captain | | |
| 14194   CRUMBLEY, PAUL ANTHONY | Fire At Scene | Firefighter | | |

| Unit | Notify Time | Enroute Time | Arrival Time | Cleared Time |
|---|---|---|---|---|
| E15 Engine 15 | 22:42:02 | 22:43:50 | 22:48:11 | 00:30:39 |

| Staff ID\Staff Name | Activity | Rank | Position | Role |
|---|---|---|---|---|
| 09378   ROBINSON, MARTY L | Fire At Scene | Roving Capt | | |
| 11328   PEARSON, AARON E | Fire At Scene | Roving Driv | | |
| 13349   MEDLEY, SEAN MICHAEL | Fire At Scene | Firefighter | | |
| 13867   MCMONIGLE, ROBERT W | Fire At Scene | Firefighter | | |
| 14202   BREWER, TYLER MATTHEW | Fire At Scene | Firefighter | | |

11/19/2010 15:17

| 04701 | AL | 9 | 22 | 2010 | 12 | 10-0026882 | 000 | Responding Units/Personnel |
|---|---|---|---|---|---|---|---|---|
| FDID | State | Incident Date | | | Station | Incident Number | Exposure | |

---

**E16 Engine 16**          22:42:02          22:43:57          22:48:06          00:22:53

| Staff ID\Staff Name | | Activity | Rank | Position | Role |
|---|---|---|---|---|---|
| 06475 | ADCOCK, JOSEPH MARK | Fire At Scene | Driver/Engi | | |
| 07312 | ATCHLEY, MICHAEL D | Fire At Scene | Captain | | |
| 09150 | HORNBUCKLE, GARY L | Fire At Scene | Firefighter | | |
| 14762 | MAPLES, BRIAN D | Fire At Scene | Firefighter | | |
| 14781 | CLEMONS, SCOTT A | Fire At Scene | Firefighter | | |

---

**E1A Engine 1A**          22:53:13          22:53:14          22:59:58          23:16:47

| Staff ID\Staff Name | | Activity | Rank | Position | Role |
|---|---|---|---|---|---|
| 10470 | DRAKE, DENNIS E | Fire At Scene | Driver/Engi | | |
| 10854 | WHITMAN, DAVID A | Fire At Scene | Roving Capt | | |
| 13481 | CASTEEL, KEITH A. | Fire At Scene | Firefighter | | |
| 14776 | ANDREWS, CURTIS B | Fire At Scene | Firefighter | | |

**Unit Narrative**

Stood by as RIT team. Was released by 204.

---

**E1B Engine 1B**          22:49:47          22:51:11          22:58:29          00:25:37

| Staff ID\Staff Name | | Activity | Rank | Position | Role |
|---|---|---|---|---|---|
| 09341 | FRY, DAVID M | Fire At Scene | Captain | | |
| 09667 | GRAVES, WILLIAM T | Fire At Scene | Driver/Engi | | |
| 11321 | COCKRELL, JOHNNY L | Fire At Scene | Roving Driv | | |
| 14192 | PFEIFFER, JACOB ANDREW | Fire At Scene | Firefighter | | |
| 14772 | REED, MICHAEL B | Fire At Scene | Firefighter | | |

---

**E5A Engine 5A**          22:49:47          22:51:37          22:55:42          23:18:37

| Staff ID\Staff Name | | Activity | Rank | Position | Role |
|---|---|---|---|---|---|
| 07666 | WALTERS, JAMES R | Fire At Scene | Driver/Engi | | |
| 09905 | ROBINSON, DAVID T | Fire At Scene | Captain | | |
| 13107 | COFFMAN, JAMES A. | Fire At Scene | Firefighter | | |
| 13352 | LIMA, SANTIAGO BARTOLOME' | Fire At Scene | Firefighter | | |

---

**E5B Engine 5B**          22:43:26          22:45:18          22:49:34          00:33:56

| Staff ID\Staff Name | | Activity | Rank | Position | Role |
|---|---|---|---|---|---|
| 03599 | SMITH, HENRY V | Fire At Scene | Captain | | |
| 11335 | GAITHER, TERRY B | Fire At Scene | Driver/Engi | | |
| 12228 | SHELTON, JONATHAN SCOTT | Fire At Scene | Roving Driv | | |

---

11/19/2010 15:17

| 04701 | AL | 9 22 | 2010 | 12 | 10-0026882 | · 000 | Responding Units/Personnel |
|---|---|---|---|---|---|---|---|
| FDID | State | Incident Date | | Station | Incident Number | Exposure | |

| Unit | Notify Time | Enroute Time | Arrival Time | Cleared Time |
|---|---|---|---|---|
| E5B Engine 5B | 22:43:26 | 22:45:18 | 22:49:34 | 00:33:56 |

| Staff ID\Staff Name | | Activity | Rank | Position | Role |
|---|---|---|---|---|---|
| 14763 | MILLS, JIMMY E | Fire At Scene | Firefighter | | |
| 14784 | EAKIN, TODD D | Fire At Scene | Firefighter | | |

| Unit | Notify Time | Enroute Time | Arrival Time | Cleared Time |
|---|---|---|---|---|
| L12 Ladder 12 | 22:42:02 | 22:44:33 | 22:46:05 | 00:31:18 |

| Staff ID\Staff Name | | Activity | Rank | Position | Role |
|---|---|---|---|---|---|
| 09140 | GRAY, DENNIS P | Fire At Scene | Driver/Engi | | |
| 10846 | PHILLIPS, JASON B | Fire At Scene | Roving Driv | | |

| Unit | Notify Time | Enroute Time | Arrival Time | Cleared Time |
|---|---|---|---|---|
| SR15 Special Response 15 | 22:42:02 | 22:45:53 | 22:49:07 | 00:30:54 |

| Staff ID\Staff Name | | Activity | Rank | Position | Role |
|---|---|---|---|---|---|
| 12230 | SUMMITT, SCOTT MICHAEL | Fire At Scene | Driver/Engi | | |
| 12936 | HILL, MATTHEW A | Fire At Scene | Roving Driv | | |

11/19/2010  15:17

| | | MM | DD | YYYY | | | | | | Responding Personnel | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 04701 | AL | 9 | 22 | 2010 | 12 | 10-0026882 | 000 | | | | | |
| FDID | State | | Incident Date | | Station | Incident Number | Exposure | | | | | |

| Staff ID\Staff Name | Unit | Activity | Position | Rank | PayScl | Hrs | HrsPd | Pts |
|---|---|---|---|---|---|---|---|---|
| 07257 MCFARLEN, HOWARD W | 102 | FX Fire At Scene | | DC | | 0.17 | 0.17 | 0.00 |
| 12234 WILKERSON, DANIEL R | 120 | FX Fire At Scene | | PPI | | 0.26 | 0.26 | 0.00 |
| 09901 LOVE, THERRON | 203 | FX Fire At Scene | | DTC | | 0.19 | 0.19 | 0.00 |
| 07649 OLIVER, STEPHEN J | 204 | FX Fire At Scene | | DTC | | 0.03 | 0.03 | 0.00 |
| 03594 KAY, JAMES M | 206 | FX Fire At Scene | | DTC | | 0.00 | 0.00 | 0.00 |
| 09900 HELMS, TERRY N | E12 | FX Fire At Scene | | DR | | 1.78 | 1.78 | 0.00 |
| 10469 DODSON, MICHAEL D | E12 | FX Fire At Scene | | CAPT | | 1.78 | 1.78 | 0.00 |
| 14194 CRUMBLEY, PAUL | E12 | FX Fire At Scene | | FF | | 1.78 | 1.78 | 0.00 |
| 09378 ROBINSON, MARTY L | E15 | FX Fire At Scene | | CAPT-R | | 1.94 | 1.94 | 0.00 |
| 11328 PEARSON, AARON E | E15 | FX Fire At Scene | | DR-RV | | 1.94 | 1.94 | 0.00 |
| 13349 MEDLEY, SEAN | E15 | FX Fire At Scene | | FF | | 1.94 | 1.94 | 0.00 |
| 13867 MCMONIGLE, ROBERT W | E15 | FX Fire At Scene | | FF | | 1.94 | 1.94 | 0.00 |
| 14202 BREWER, TYLER | E15 | FX Fire At Scene | | FF | | 1.94 | 1.94 | 0.00 |
| 06475 ADCOCK, JOSEPH MARK | E16 | FX Fire At Scene | | DR | | 1.78 | 1.78 | 0.00 |
| 07312 ATCHLEY, MICHAEL D | E16 | FX Fire At Scene | | CAPT | | 1.78 | 1.78 | 0.00 |
| 09150 HORNBUCKLE, GARY L | E16 | FX Fire At Scene | | FF | | 1.78 | 1.78 | 0.00 |
| 14762 MAPLES, BRIAN D | E16 | FX Fire At Scene | | FF | | 1.78 | 1.78 | 0.00 |
| 14781 CLEMONS, SCOTT A | E16 | FX Fire At Scene | | FF | | 1.78 | 1.78 | 0.00 |
| 10470 DRAKE, DENNIS E | E1A | FX Fire At Scene | | DR | | 0.57 | 0.57 | 0.00 |
| 10854 WHITMAN, DAVID A | E1A | FX Fire At Scene | | CAPT-R | | 0.57 | 0.57 | 0.00 |
| 13481 CASTEEL, KEITH A. | E1A | FX Fire At Scene | | FF | | 0.57 | 0.57 | 0.00 |
| 14776 ANDREWS, CURTIS B | E1A | FX Fire At Scene | | FF | | 0.57 | 0.57 | 0.00 |
| 09141 FRY, DAVID M | E1B | FX Fire At Scene | | CAPT | | 1.60 | 1.60 | 0.00 |
| 09667 GRAVES, WILLIAM T | E1B | FX Fire At Scene | | DR | | 1.60 | 1.60 | 0.00 |
| 11321 COCKRELL, JOHNNY L | E1B | FX Fire At Scene | | DR-RV | | 1.60 | 1.60 | 0.00 |
| 14192 PFEIFFER, JACOB | E1B | FX Fire At Scene | | FF | | 1.60 | 1.60 | 0.00 |
| 14772 REED, MICHAEL S | E1B | FX Fire At Scene | | FF | | 1.60 | 1.60 | 0.00 |
| 07666 WALTERS, JAMES R | E5A | FX Fire At Scene | | DR | | 0.00 | 0.00 | 0.00 |
| 09905 ROBINSON, DAVID T | E5A | FX Fire At Scene | | CAPT | | 0.00 | 0.00 | 0.00 |
| 13107 COFFMAN, JAMES A. | E5A | FX Fire At Scene | | FF | | 0.00 | 0.00 | 0.00 |
| 13352 LIMA, SANTIAGO | E5A | FX Fire At Scene | | FF | | 0.00 | 0.00 | 0.00 |
| 03599 SMITH, HENRY V | E5B | FX Fire At Scene | | CAPT | | 1.95 | 1.95 | 0.00 |
| 11335 GAITHER, TERRY B | E5B | FX Fire At Scene | | DR | | 1.95 | 1.95 | 0.00 |
| 12228 SHELTON, JONATHAN | E5B | FX Fire At Scene | | DR-RV | | 1.95 | 1.95 | 0.00 |
| 14763 MILLS, JIMMY E | E5B | FX Fire At Scene | | FF | | 1.95 | 1.95 | 0.00 |
| 14784 EAKIN, TODD D | E5B | FX Fire At Scene | | FF | | 1.95 | 1.95 | 0.00 |
| 09140 GRAY, DENNIS P | L12 | FX Fire At Scene | | DR | | 1.89 | 1.89 | 0.00 |
| 10846 PHILLIPS, JASON B | L12 | FX Fire At Scene | | DR-RV | | 1.89 | 1.89 | 0.00 |
| 12230 SUMMITT, SCOTT | SR15 | FX Fire At Scene | | DR | | 2.15 | 2.15 | 0.00 |
| 12936 HILL, MATTHEW A | SR15 | FX Fire At Scene | | DR-RV | | 2.15 | 2.15 | 0.00 |

Total Participants: 40                              Total Personnel Hours:  52.70


An 'X' next to the unit denotes driver.

COH/AL                                      04701    09/22/2010    10-0026882

11/19/2010 15:17

**A** | 04701 | AL | MM 9 DD 22 YYYY 2010 | 12 | 10-0026882 | 000 | ☐ Delete ☐ Change | NFIRS - 11 Arson
FDID ★   State ★   Incident Date ★   Station ★   Incident Number ★   Exposure ★

**B** Agency Referred To ☐ None
Street Address ____   Their Case Number ____
Agency Name ____   City ____   Their ORI ____
Agency Phone Number __ - __ - __   State   Zip Code   __ - __   Their Federal Identifier (FID)   Their FDID

**C** Case Status
1 ☐ Investigation open
2 ☒ Investigation closed
3 ☐ Investigation inactive
4 ☐ Closed with arrest
5 ☐ Closed with exceptional clearance

**D** Availability of Material First Ignited
1 ☐ Transport to scene
2 ☐ Available at scene
U ☐ Unknown

**E** Suspected Motivation Factors          Check up to three factors
11 ☐ Extortion
12 ☐ Labor unrest
13 ☐ Insurance fraud
14 ☐ Intimidation
15 ☐ Void contract/lease
21 ☐ Personal
22 ☐ Hate crime
23 ☐ Institutional
24 ☐ Societal
31 ☐ Protest
32 ☐ Civil unrest
41 ☐ Fireplay/curiosity
42 ☐ Vanity/recognition
43 ☐ Thrills
44 ☐ Attention/sympathy
45 ☐ Sexual excitement
51 ☐ Homicide
52 ☐ Suicide
53 ☐ Domestic violence
54 ☐ Burglary
61 ☐ Homicide concealment
62 ☐ Burglary concealment
63 ☐ Auto theft concealment
64 ☐ Destroy records/evidence
00 ☐ Other motivation
UU ☐ Unknown motivation

**F** Apparent Group Involvement          Check up to three factors
1 ☐ Terrorist group
2 ☐ Gang
3 ☐ Anti-government group
4 ☐ Outlaw motorcycle organization
5 ☐ Organized crime
6 ☐ Racial/ethnic hate group
7 ☐ Religious hate group
8 ☐ Sexual preference hate group
0 ☐ Other group
N ☐ No Group involvement, acted alone
U ☐ Unknown

**G₁** Entry Method
Entry Method ____

**G₂** Extent of Fire Involvement on Arrival
Extent of Fire Involvement ____

**H** Incendiary Devices          Select one from each category

CONTAINER          NN ☐ None
11 ☐ Bottle (Glass)
12 ☐ Bottle (Plastic)
13 ☐ Jug
14 ☐ Pressurized Container
15 ☐ Can
16 ☐ Gasoline or fuel can
17 ☐ Box
00 ☐ Other Container
UU ☐ Unknown

IGNITION/DELAY DEVICE          NN ☐ None
11 ☐ Wick or Fuse
12 ☐ Candle
13 ☐ Cigarette & Matchbook
14 ☐ Electronic Component
15 ☐ Mechanical Device
16 ☐ Remote Control
17 ☐ Road flare/fuse
18 ☐ Chemical Component
19 ☐ Trailer/Streamer
20 ☐ Open flame source
00 ☐ Other delay device
UU ☐ Unknown

FUEL          NN ☐ None
11 ☐ Ordinary Combustibles
12 ☐ Flammable gas
14 ☐ Ignitable liquid
15 ☐ Ignitable solid
16 ☐ Pyrotechnic material
17 ☐ Explosive material
00 ☐ Other material
UU ☐ Unknown

**I** Other Investigative Information
Check all that apply
1 ☐ Code violations
2 ☐ Structure for sale
3 ☐ Structure vacant
4 ☐ Other crimes involved
5 ☐ Illicit drug activity
6 ☐ Change in insurance
7 ☐ Financial problem
8 ☐ Criminal/Civil actions pending

**J** Property Ownership
1 ☒ Private
2 ☐ City, town, village, local
3 ☐ County or parish
4 ☐ State or province
5 ☐ Federal
6 ☐ Foreign
7 ☐ Military
0 ☐ Other

**K** Initial Observations
Check all that apply
1 ☐ Windows ajar
2 ☐ Doors ajar
3 ☐ Doors locked
4 ☒ Doors unlocked
5 ☐ Fire department forced entry
6 ☐ Forced entry prior to FD arrival
7 ☐ Security system activated
8 ☐ Security present, (didn't activate)

**L** Laboratory Used          Check all that apply
1 ☐ Local
2 ☐ State
3 ☐ ATF
4 ☐ FBI
5 ☐ Other Federal
6 ☐ Private
N ☐ None

NFIRS-11 Revision 11/17/99

COH/AL          04701          09/22/2010          10-0026882

| | MM | DD | YYYY | | | | Arson |
|---|---|---|---|---|---|---|---|
| 04701 | AL | 9 | 22 | 2010 | 12 | 10-0026882 | 0 | Narrative |
| FDID ★ | State ★ | Incident Date ★ | | | Station | Incident Number ★ | Exposure ★ | |

**Arson Narrative:**
I was requested on scene by District Chief Kay. When I arrived on scene, I was told that there had been a fire.

During my exterior examination, I noted a hotel building that had fire damage to the one balcony on the second floor 2207 and two balconies on the third floor 2307 and 2309. The building had been evacuated.

During my interior examination, I noted heavy fire/smoke/heat damage to a room on the third floor 2307 that extended to the attic. In the second floor apartment 2207, there was a pack of cigarettes and a lighter on the tv table just inside the door. I requested Electrical Inspector Doug Smith. See Doug Smith's report. Building Inspector Skip Stinson, also, responded to the scene per Doug Smith's request. Due to the fire damage Doug Smith and Skip Stinson stated that the building was unsafe to occupy.

I interviewed the occupant of room 2207, Michal Siegling.

In conclusion, the point of origin was on the second floor balcony. The cause of the fire was careless use of smoking materials.

10/05/2010 12:42:22 PM DRW

11/19/2010 15:17

| A | | MM DD YYYY | | | | NFIRS - 11 |
|---|---|---|---|---|---|---|
| 04701 | AL | 9 22 2010 | 12 | 10-0026882 | 00000 | Juvenile |
| FDID ★ | State ★ | Incident Date ★ | Station | Incident Number ★ | Exposure ★ | Firesetter |

☐ Delete ☐ Change

**M2 Age or Date of Birth**

Complete this section if the person involved in the ignition of the fire was a child or Juvenile under the age of 18

Age (in years) ___ OR

Month ___ Day ___ Year ___

**M4 Race**

1 ☐ White
2 ☐ Black
3 ☐ Am. Indian, Eskimo
4 ☐ Asian
0 ☐ Other, multi-racial
U ☐ Undetermined

**M6 Family Type**

1 ☐ Single parent
2 ☐ Foster parent(s)
3 ☐ Two parent family
4 ☐ Extended family
N ☐ No family unit
0 ☐ Other family type
U ☐ Unknown

**M1 Subject Number**

_____ 1
Subject Number

**M3 Gender**

1 ☐ Male   2 ☐ Female

**M5 Ethnicity**

1 ☐ Hispanic

**M7 Motivation/Risk Factors** Check only one of codes 1-3 and then all other that apply

1 ☐ Mild curiousity about fire
2 ☐ Moderate curiousity about fire
3 ☐ Extreme curiousity about fire

4 ☐ Diagnosed (or suspected) ADD/ADHD
5 ☐ History of trouble outside school
6 ☐ History of stealing or shoplifting
7 ☐ History of physically assulting others
8 ☐ History of fireplay or firesetting
9 ☐ Transiency
0 ☐ Other
U ☐ Unknown

**M8 Disposition of Person Under 18**

1 ☐ Handled within department
2 ☐ Released to parent/guardian
3 ☐ Referred to other authority
4 ☐ Referred to treatment program
5 ☐ Arrested, charged as adult
6 ☐ Referred to firesetter intervention program
0 ☐ Other
U ☐ Unknown

**N Remarks (local use)**

COH/AL

04701   09/22/2010   10-0026882

**A**

| 04701 | AL | MM 9 | DD 22 | YYYY 2010 | 12 | 10-0026882 | 00000 | ☐ Delete | Arson Involvement |
|---|---|---|---|---|---|---|---|---|---|
| FDAC ★ | State ★ | Incident Date ★ | | | Station | Incident Number ★ | Exposure ★ | ☐ Change | |

**Name**

Siegling
*Last*

Michael
*First*

*Middle*

*Alias*

**M2  Age or Date of Birth**

[ ]——[ ]  **OR**
Age (in years)

[ ]—[ ]—[ ]
Month  Day  Year

**M4  Race**

1 ☐ White
2 ☐ Black
3 ☐ Am. Indian, Eskimo
4 ☐ Asian
0 ☐ Other, multi-racial
U ☐ Undetermined

**M6  Family Type**

1 ☐ Single parent
2 ☐ Foster parent(s)
3 ☐ Two parent family
4 ☐ Extended family
N ☐ No family unit
0 ☐ Other family type
U ☐ Unknown

**M1  Subject Number**

[        1]
Subject Number

**M3  Gender**

1 ☐ Male    2 ☐ Female

**M5  Ethnicity**

1 ☐ Hispanic

**M7  Motivation/Risk Factors** Check only one of codes 1-3 and then all other that apply

1 ☐ Mild curiosity about fire
2 ☐ Moderate curiosity about fire
3 ☐ Extreme curiosity about fire

4 ☐ Diagnosed (or suspected) ADD/ADHD
5 ☐ History of trouble outside school
6 ☐ History of stealing or shoplifting
7 ☐ History of physically assulting others
8 ☐ History of fireplay or firesetting
9 ☐ Transiency
0 ☐ Other
U ☐ Unknown

**M8  Disposition of Person Under 18**

1 ☐ Handled within department
2 ☐ Released to parent/guardian
3 ☐ Referred to other authority
4 ☐ Referred to treatment program
5 ☐ Arrested, charged as adult
6 ☐ Referred to firesetter intervention program
0 ☐ Other
U ☐ Unknown

**Additional Information**

[                    ]
Social Security Number

[      ]-[   ]
Height

[     ]
Weight

[     ]
Marital Status

[     ]
Arrests

[     ]
Convictions

**Hair Color**

☐ Bald
☐ Black
☐ Blonde
☐ Brown
☐ Gray
☐ Red
☐ White

**Eye Color**

☐ Black
☐ Blue
☐ Brown
☐ Green
☐ Grey
☐ Hazel
☐ Pink

**Arrested**

[   ]—[   ]—[   ]
Month  Day  Year

**Convicted**

[   ]—[   ]—[   ]
Month  Day  Year

**N  Remarks (local use)**

11/19/2010 15:17

| 04701 | AL | MM 9 | DD 22 | YYYY 2010 | 12 | 10-0026882 | 000 | NFIRS - Involvement User Fields |
|---|---|---|---|---|---|---|---|---|
| FDID | State | Incident Date | | | Station | Incident Number | Exposure | |

| Involvement Name: | Involvement Type: | Owner: | Occupant: |
|---|---|---|---|
| Siegling, Michael | Occupant | | X |

11/19/2010 15:17

| | | MM DD YYYY | | | | |
|---|---|---|---|---|---|---|
| 04701 | AL | 9 22 2010 | 12 | 10-0026882 | 000 | Completion Status |
| FDID ★ | State ★ | Incident Date ★ | Station | Incident Number ★ | Exposure ★ | |

Completion Status:
Structure fire report is required and incomplete.

11/19/2010 15:17

| . 04701 | AL | MM 9 | DD 22 | YYYY 2010 | 12 | 10-0026882 | 000 | Completion Status |
|---------|-----|------|-------|-----------|-----|-----------|-----|-------------------|
| FDID ★ | State ★ | Incident Date | | ★ | Station | Incident Number ★ | Exposure ★ | |

Completion Status:
Structure fire report is required and incomplete.



Photo No. 1:    Front view of loss



Photo No. 2:    View into courtyard where fire occurred

**File No.:** 94216-08709          Page 1 of 14

**Insured:** Country Inn & Suites          **Jim Gowder/Cook Claims**



EFI
Global



Photo No. 3:    View of fire area covered with tarp



Photo No. 4:    View from underside of area of origin. Corner of balcony of Rm 2207

**File No.:** 94216-08709          Page 2 of 14

**Insured:** Country Inn & Suites          **Jim Gowder/Cook Claims**



EFI
Global



Photo No. 5:    View of numerous cigarette butts found below area of origin



Photo No. 6:    Closer view of cigarette butt on ground below balcony of origin

**File No.:** 94216-08709          Page 3 of 14

**Insured:** Country Inn & Suites          **Jim Gowder/Cook Claims**


EFI
Global



Photo No. 7:   View from ground below balcony of origin



Photo No. 8:   View of beer can on balcony of origin



EFI
Global



Photo No. 9:    View into room of origin 2207



Photo No. 10:    View of kitchen area in room of origin

---

**File No.:** 94216-08709

Page 5 of 14

**Insured:** Country Inn & Suites

**Jim Gowder/Cook Claims**



EFI
Global



Photo No. 11:   View into bedroom of room of origin



Photo No. 12:   East side of bedroom in room of origin

| | | |
|---|---|---|
| **File No.:** 94216-08709 | Page 6 of 14 |  |
| **Insured:** Country Inn & Suites | **Jim Gowder/Cook Claims** | EFI Global |



Photo No. 13:   Cigarette burn on floor between beds in room of origin



Photo No. 14:   Closer view of cigarette burn on carpet between beds

**File No.:** 94216-08709          Page 7 of 14

**Insured:** Country Inn & Suites          **Jim Gowder/Cook Claims**



EFI
Global



Photo No. 15:   View toward closet area in bedroom



Photo No. 16:   View from bedroom toward front door

**File No.:** 94216-08709          Page 8 of 14

**Insured:** Country Inn & Suites          **Jim Gowder/Cook Claims**



EFI
Global



Photo No. 17:   View shows heat damage to curtains near area of origin



Photo No. 18:   View from inside room toward balcony at line of heat demarcation

**File No.:** 94216-08709                Page 9 of 14

**Insured:** Country Inn & Suites        **Jim Gowder/Cook Claims**


EFI
Global



Photo No. 19:   View from inside room at damage to corner of window



Photo No. 20:   Extra view of damage to window from outside

**File No.:**  94216-08709          **Page 10 of 14**



**Insured:** Country Inn & Suites          **Jim Gowder/Cook Claims**



Photo No. 21:   View of floor on balcony of room 2207



Photo No. 22:   Area of origin in corner of balcony





Photo No. 23:    View of area of origin after debris removal



Photo No. 24:    Closer view of area of origin on balcony of room 2207

**File No.:** 94216-08709          Page 12 of 14

**Insured:** Country Inn & Suites          **Jim Gowder/Cook Claims**



EFI
Global



Photo No. 25:   Area of origin on balcony



Photo No. 26:   View of damage above area of origin

**File No.:** 94216-08709            Page 13 of 14

**Insured:** Country Inn & Suites          **Jim Gowder/Cook Claims**



EFI
Global



Photo No. 27:   Damage to balcony and room above area of origin



Photo No. 28:   Damage to roof area on upper balcony. Fire spread into attic from here.

---

**File No.:** 94216-08709                **Page 14 of 14**

**Insured:** Country Inn & Suites        **Jim Gowder/Cook Claims**



EFI
Global



# Diagram Sheet

| Name (Property Owner) | Location | File No. |
|---|---|---|
| Country Inn & Suites | 4880 University Dr. Huntsville, AL 35816 | 94216-08709 |



| Prepared by | Date | Scale |
|---|---|---|
| Rod Williams | October 11, 2010 | Conceptual |

This diagram is for illustrative purposes only and may not accurately represent the structure's dimensions, entrances, partitions or room usage.

# Attachment 2: February 18,

# 2014 Report of Roderick S.

# Williams



1880 Gen. George Patton Drive
Building B, Suite 203
Franklin, TN 37067
Tel: 615-778-0160
Tel: 877-812-4328
Fax: 615-778-0170
www.efiglobal.com

# Federal Rule 26 Statement of Rod Williams

February 18, 2014

| | |
|---|---|
| Insured: | Country Inn & Suites |
| Loss Location: | 4880 University Drive |
| | Huntsville, AL 35816 |
| Date of Loss: | September 22, 2010 |
| Claim Number: | not given |
| EFI File No: | 94216-08709 |

My name is Rod Williams and I reside in Hoover, Alabama. I am employed by EFI Global, Inc. as a Sr. Fire Investigator domiciled in Birmingham, Alabama. I began my career in the fire service in 1978 as a firefighter/paramedic and worked my way through the ranks to Captain. I retired from the Hoover Fire Department in 2006. My position at the time of my retirement was Deputy Fire Marshal performing fire investigations, business inspections and also working with many governmental agencies such as ATF, FBI, state and local law enforcement, and other agencies. I held this position for five years. I left the fire service in 2006 and began my employment with EFI Global where I am currently employed. EFI Global is a national multi-disciplined forensic engineering firm offering engineering, fire investigation, environmental, failure analysis, accident reconstruction and laboratory testing services. I am certified by the International Association of Arson Investigators as a Certified Fire Investigator and a Certified Vehicle Fire Investigator, the National Association of Fire Investigators as a Certified Fire and Explosion Investigator, and certified as a Fire Investigator as having met the qualifications of NFPA 1033 by the National Board of Fire Service Professional Qualifications.

On September 23, 2010, I was contacted by Jim Gowder of Cook Claims Services to conduct and origin and cause investigation concerning a fire at the business of Country Inn & Suites located at 4880 University Drive Huntsville, AL 35816, and to provide my professional opinions in that regard. My investigation commenced on September 27, 2010.

The scene examination was conducted using a systematic scene examination consistent with the guidelines of NFPA 921, which is a document developed by the National Fire Protection Association to assist in improving the fire investigation process and the quality of information on fires resulting from the investigation process and is a recognized standard in the fire investigation

industry. NFPA 921 recommends using a basic methodology called the scientific method where the compilation of factual data, as well as an analysis of those facts, should be accomplished objectively, truthfully, and without expectation bias, preconception, or prejudice. NFPA 921 also states that with few exceptions, the proper methodology for a fire or explosion investigation is to first determine and establish the origin or origins, then investigate the cause: circumstances, conditions, or agencies that brought the ignition source, fuel, and oxidant together. The scientific method consists of a seven step methodology to develop a hypothesis or hypotheses as to the cause of the fire and is an ongoing process throughout the entire investigation.

Other guidelines relied upon were NFPA 1033 which is National Fire Protection Association document for the qualifications for a fire investigator, previous knowledge gained through over 37 combined years of firefighting, fire investigations, and training, and input from other fire investigation professionals and agencies. The final written report was also technically reviewed by my immediate supervisor Metts Hardy who is also a certified fire and explosion investigator through the National Association of Fire Investigators and is also the Southeastern District Manager and Vice President of Fire Investigations for EFI Global.

The fire scene examination was conducted on September 27, 2010. Access to the property was provided by the hotel manager, Hoss Kazeroonian. He provided assistance by having one of the hotel maintenance personnel stay with me during the examination.

The scene was cordoned off with caution tape at the time of the inspection. Alterations to the scene included the maintenance personnel hanging a large tarp over the roof and down the front of the balcony area of the burned building. The scene had also been examined by the fire marshal to determine cause. The conditions/alterations did not precluded determining the origin or the cause.

The surrounding property was maintained consistent with the commercial area. There were detached outbuildings located on the property. Building #3 of this same complex exhibited radiant heat damage to vinyl siding on the side facing the fire building. No structural damage to that building was noted. Adjacent property was not damaged during the incident. There was nothing remarkable in the surrounding area.

The structure was a multi-story, wood-framed hotel constructed on a concrete slab foundation. The roof was composition shingle and the exterior finish was wood slat, with vinyl siding added at some time later. The front of the building faces south, although the side of the fire area faces east. The preexisting conditions were unremarkable.

Life safety devices were found. The building was provided with local hard wired with battery backup smoke detector(s), as well as an automatic fire alarm system. The alarm system functioned properly. A unknown patron of the hotel pulled a fire alarm pull station in the hallway to activate the fire alarm, which functioned properly by alerting guests and the main desk. There were no safety code violations noted.

Electric service was connected to the building at the time of loss. The three phase electric utility enters on the west side of the building. Delivery cables were intact. The meter was present at the time of inspection. The meter base was grounded. The powers supply for the fire building was terminated at one of the breaker panels.

Exterior fire pattern analysis indicates the fire was most concentrated to the east side of building #2, on the second and third floors.  The roof structure had been compromised by fire breaching from the underside.  Wood trusses compromising the roof structure were most damaged in the east portion of the building, above the area of origin.  Smoke and heat patterns emanated from the balconies of rooms 2207, 2209, 2307 and 2309. The fire had breached the exterior walls at the east side of the building of room 2307, which is the room directly above the room of origin. The lowest fire patterns were located at ground level below the balcony of room 2207. This was attributed to fall-down of fire debris from the balconies above. There was no evidence of an outward overpressure from within the building. Exterior fire pattern analysis indicated the fire originated exterior to the balcony of room 2207.

Security of the building at the time of loss is not an issue. This is a 24 hour facility and was occupied by patrons of the hotel at the inception of the fire. The patron staying in the room of origin was not present in the room at the inception of the fire. There was evidence of forced entry at the door to room 2207, which is the room of origin. Forced entry evidence includes physical damage to the wooden door jamb on the interior portion of the room. The damage is consistent with fire suppression operations. The windows to the room of origin were secured at the time of loss, and exhibited thermal breakage and light to moderate smoke damage on the exterior of the windows in the area of the balcony.

The contents were consistent with the occupancy. The contents in the room of origin exhibited light to moderate smoke damage. The location of the fire on the exterior balcony allowed most of the fire products to remain on the exterior of the building, at least on the balcony of origin. Personal property located in the room above the room of origin had sustained the most severe damage, consistent with direct flame impingement. This was due to the inherent upward and outward heat and fire products from the fire on the balcony below at room 2207.

Preliminary interior inspection, working from the area of least damage to the area of the most damage, revealed the fire was concentrated to the exterior balcony of room 2207 and traveled upward onto the balcony of 2307 above.  The least affected area of the room of origin was noted in the bathroom.  This area exhibited a slight odor of smoke.  The interior portion of room 2207 was slightly damaged.  The majority of the fire damage was on the exterior balcony and traveled upward on an exterior wall onto the balcony of the room above.  Rooms remote to the area of origin were affected by the fire.  The fire breached the window on the balcony of room 2207, causing slight burn damage to the curtains on the interior of the room.  Fire pattern analysis indicated the fire had breached the north wide wall of the balcony of room 2207 and traveled upward and spread to the balcony of the room above.  Vinyl siding on the exterior of the structure helped to spread the fire upward and outward from the area of origin.  Fire patterns increased upward and outward from the northwest corner of the balcony of room 2207 and were normal for the building and/or avenues of ventilation.  Fire movement patterns included heavy charring of exterior building components in a V-pattern beginning on the balcony of room 2207.

Physical evidence and witness statements indicate the fire originated on the exterior balcony of room 2207. Exterior construction of the area consisted of wood stud walls covered with wood planks, and at some point in time, vinyl siding was applied over the wood planks. The flooring of the area of origin consists of wood planks. Contents providing the fuel load include combustible wood construction of the balcony floor, as well as the combustible wood exterior wall construction and the vinyl siding. Fire patterns indicate flashover did not occur within the area of origin.

The ceiling area above the balcony of room 2207 had been compromised by the fire. The ceiling consisted of wood plank construction of the floor of the balcony above the area of origin. Exposed floor joists and wood plank decking were heavily charred above the area of origin. The exterior walls had been compromised. Fire patterns are most prominent along the north wall of the balcony area. Patters include a V pattern(s) on vertical surfaces with the lowest point noted along the northwest corner of the north wall of the balcony for room 2207. The apex of the pattern is at floor level.

Systematic debris removal began with the fire department during their investigation. Some of the fire debris had been removed from the area of origin, in search for the ignition source. The lowest fire damage was noted at floor level in the northwest corner of the balcony of room 2207. The floor decking was damaged. The exposed decking was heavily charred from direct flame impingement consistent with exposure. Charring of the corresponding side(s) of the wooden decking and the wooden exterior wall covering and vinyl siding demonstrated the area of origin was in the northwest corner of the balcony of room 2207. Fire patterns include a V pattern(s) on vertical surface of the north and west walls of the northwest corner of the balcony of room 2207. Physical evidence and witness statements indicate the origin of the fire to be in this location.

There were no items collected during the investigation of this fire.

Potential heat/ignition sources identified in the area below the balcony of room 2207 include improperly discarded cigarettes. It was also determined by the local fire marshal that the occupant of the room of origin used Marlboro brand cigarettes. During this investigation, it was determined that this same brand of cigarettes was discarded to the ground below the balcony of room 2207. No other potential heat/ignition sources were found in the area of origin.

The electrical panel was not involved. The wiring was affected by the fire at a wall hung light fixture that was exposed to the fire spread on the balcony. As the fire spread away from the area of origin, the wiring was damaged consistent with random exposure damage.

The heat plant was not involved.

Fire pattern analysis indicates that the fire originated in the northwest corner of the balcony of room 2207. The evidence indicates ignition from improperly discarded cigarettes. The evidence indicates the first fuel ignited was ordinary combustibles on or

associated with the balcony of room 2207. Events bringing ignition and fuel together include combustibles too close to an ignition source, consistent with improperly discarded smoking materials.

During my follow-up investigation, I determined the discovery witness was not known but pulled a fire alarm pull station, which activated the automatic fire alarm system for the building after discovery of the fire.

I also interviewed local fire officials and learned the Huntsville Fire Department responded to the alarm at 10:40 pm on September 22, 2010 and arrived on the scene at 10:45 pm. The first unit on the scene was Engine 12. The weather was clear.

Smoke was visible upon arrival from the courtyard of the hotel. After making entry into the courtyard, the fire was fully involved on the second and third floor balconies. The fire was most concentrated to the east side of the building. Structural collapse had not occurred in the east quadrants of the building.

The fire was concentrated to the balconies on the second and third floor and had spread into the attic above the third floor balcony. The fire was burning from floor to ceiling. There were no unusual odors detected. The fire did react normally to the application of water. Contents were consistent with the occupancy.

An investigation by a fire investigator was requested due to unknown causation. The origin and cause of the fire were undetermined at that time.

I spoke with Lt. Dan Wilkerson of the Huntsville Fire Marshal's Office is investigation the incident due to unknown causation. His investigation began September 22, 2010. After interviews with the occupant of room 2207, as well as others, it was determined that the fire originated on the balcony of room 2207 and the potential ignition source was identified as improperly discarded smoking materials.

Lt. Wilkerson noticed a pack of Marlboro brand cigarettes and al lighter on top of the TV just inside the door from the balcony. Lt. Wilkerson asked Mr. Michael Siegling, the room's occupant, when was the last time he smoked cigarettes' on the balcony, and Mr. Siegling replied that he did not remember, yesterday or day before. He was also asked how he extinguishes the cigarettes and he replied that he used a Styrofoam cup with water. He stated that he was last on the balcony at around 5 or 6 pm prior to the fire and that there was a beer can on the balcony.

In a written statement, Mr. Siegling stated that he was awakened by the fire alarm of the hotel at approximately 10:40 p.m. He went to the hallway and did not smell smoke nor see anyone vacating the building. Approximately five minutes later, another hotel guest knocked on his door and told him there was a fire in the building. Mr. Siegling then went out onto the balcony and looked to his left and saw flames on his balcony. Mr. Siegling is an employee of the FBI and was attending a specialized training class at this location, sponsored by the FBI. Mr. Siegling arrived at the hotel on August 14, 2010 for his 40 day training session.

Michael Siegling resides at 180 Grand Avenue, Oakland, CA 94612 and can be reached by telephone at 510-251-4022. Lt. Wilkerson classified the fire as accidental and was

caused by the careless use of smoking materials.  The investigation is closed.  An incident report is enclosed.

The owner/insured of the building is Hospitality Enterprises, Inc., located at Radisson Suites Hotel, South Memorial Pkwy, Huntsville, AL 35802 and can be reached by telephone at 256-882-9400.

Fire pattern analysis indicates that the fire originated in the northwest corner of the balcony of room 2207.  The evidence indicates ignition resulted from improperly discarded smoking materials. Evidence indicates first fuel ignited consisted of ordinary combustibles on or associated with the balcony.  Events bringing ignition and fuel together include human involvement, which would include improperly discarded smoking materials.
The classification of the fire is accidental.

During the investigation numerous photographs and a diagram was complete to illustrate the examination and foundation for my opinions.


Rod Williams CFI, CFEI, CFVI
EFI Global, Inc



EFI
Global
Complex Issues • Solid Solutions

## *Roderick S. Williams, IAAI-CFI, CFEI, CVFI*
*Fire Investigator*

*1880 Gen. George Patton Drive, Suite B203, Franklin, TN  37067*                 *615-778-0160*
Rod_Williams@efiglobal.com

## Years' Experience:  35

## Professional Summary:

Mr. Williams has 35 years' experience in the fire service and investigation. Mr. Williams' career began as a firefighter and progressed through the ranks to Deputy Fire Marshal where he has worked for more than five years conducting origin and cause investigations and assisting police, ATF, FBI, and insurance companies with fire/explosion investigations. He has also worked in the area of new and existing building inspections, plan review of new construction sites and building to insure proper code compliance, public education on fire safety, permitting and inspecting commercial explosives storage and transportation, and use as well as seismic affects of blasting. Duties have included permitting of inspections of fireworks displays for proper setup and fallout distances, responding with EOD as liaison between police and fire department to ensure property safety.  Mr. Williams has also completed training as a hazardous materials technician, and is a Certified Fire Investigator through the IAAI as well as a Certified Fire and Explosion Investigator and Certified Vehicle Fire Investigator through the NAFI.

## Licenses and Certifications:

IAAI-CFI, #06-020

CFEI, NAFI, #10452-6434

CFFI, NAFI, #10452-6434V8

## Project Experience:

**Confidential client, Alabama**
**Fire Investigation**
Conducted origin and cause investigation in regards to a fire at a two story hotel that resulted in the death of four young women.

**Confidential client, Alabama**
**Fire/explosion investigation**
Large plant assembly still in the commissioning phase had an explosion in an oil pump room that caused severe burns to four workers. This investigation involved a large magnitude of interested parties.

**Confidential client, Alabama**
**Fire Investigation**
Conducted an origin and cause investigation into a natural gas leak from a main supply line into a cul-de-sac of a neighborhood. This leak eventually caused a fire in a large townhouse complex.

## Court Qualifications/ Depositions:

George Geolas v. State Farm Fire and Casualty, Deposition Date 11/24/2009
George Geolas v. State Farm Fire and Casualty, Case No. 31-CV-2009-900195.00, Trial
Date 10/11/2011

Civil Case, Circuit Court, Jefferson County, Alabama, Lee Lucas v. Four Seasons
Condominium Association, Inc., et al., Case No. CV-2007-9022, Deposition Date
7/8/2009.

USDC for the Middle District of Alabama, Allstate v. Kenneth Richardson, et al., Case No.
CV-10-00277-WHA-SRW, District of Alabama, Northern Division, Deposition Date
9/9/2010.

USDC for the Middle District of Alabama, Eastern Division, Bennie McPherson, et al. v.
Allstate Indemnity Company, Case No. 3:11-CV-00638-WHA – Deposition Date 1/27/12.

## Professional Experience:

EFI Global, Inc., CFEI/Fire Investigator, Nashville, TN, 2005 – Present
Hoover Fire Department, Deputy Fire Marshall-Captain, Hoover, AL, 1985 – 2006
Center Point Fire Department, Firefighter, Birmingham, AL, 1978 – 1985
U. S. Navy, United States, 1972 – 1976

## Specialized Education:

EMT Paramedic – University of Alabama, Birmingham, August 1978
Hazardous Materials: Incident Analysis - National Fire Academy, March 1989
Fire Instructor I – Alabama Fire College, July 1998
Fire Investigator – Alabama Fire College, August 2001
Fire Inspector I - Alabama Fire College, January 2001
Fire Inspector II – Alabama Fire College, July 2002
Hazardous Material Technician – Alabama Fire College
Fire Inspector I – International Code Council, September 2002
Structural Post Blast Investigator – Hoover Police Department, May 2002
Fire Marshals Professional Development Program – Alabama Fire College, February 002
Fire Inspector II – International Code Council, February 2003
Fire/Arson Investigator – National Fire Academy, Emmitsburg, MD, February 2003
Plans Review for Inspectors – National Fire Academy, Emmitsburg, MD, October 2003
Fire Code Management – National Fire Academy, August 2005
Expert Witness Testimony – IAAI Conference, October 2006

## Education:

University of Alabama-Birmingham Paramedic, 1978

Associates Degree, Fire Science, Jefferson State Junior College, Birmingham, AL, 2006

## Affiliations:

International Association of Arson Investigators, (IAAI), Alabama Chapter

National Association of Fire Investigators

Roderick S. Williams • 615-778-0160 • Rod_Williams@efiglobal.com
Page 3 of 3



**ROD WILLIAMS**
**FIRE INVESTIGATOR**
**EFI GLOBAL, INC.**

| Case Styled | Case Number | Court | Deposition date | Trial Date |
|---|---|---|---|---|
| George Geolas v. State Farm Fire and Casualty | 31-CV-2009-900195.00 | Circuit Court of Etowah County Alabama | 11-24-2009 | 2-7-2011 |
| Lee Lucas v. Four Seasons Condominium Assoc., Inc. et al | CV-2007-902267-00 | Circuit Court of Jefferson County Alabama | 7-8-2009 | |
| Allstate v. Kenneth Richardson, et al. | CV-10-00277-WHA-SRW | United States District Court for the Middle District of Alabama, Northern Division | 9-9-2010 | |
| Bennie McPherson, et al. v. Allstate Indemnity Company | 3:11-CV-00638-WHA | United States District Court for the Middle District of Alabama, Eastern Division | 1-27-12 | |

3-28-06

# Exhibit B: Deposition

# Testimony of Officer Daniel

# Wilkerson

EVIDENTIARY MATERIALS IN SUPPORT OF PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANT'S MOTIONS TO EXCLUDE THE TESTIMONY OF RODERICK WILLIAMS
L:\00760\0064 (Yedla)\Pleadings\Drafts\P's Evidentiary Materials in Support of Response to Strike Expert Williams.docx

DAN WILKERSON

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

HUNTSVILLE DIVISION


ACADIA INSURANCE COMPANY,  )

AS SUBROGEE OF YEDLA       )

MANAGEMENT COMPANY, INC. & )

HOSPITALITY ENTERPRISES OF )

HUNTSVILLE, INC., d/b/a    ) CASE NO.:

COUNTRY INN & SUITES,      ) 5:13-CV-00895-CLS

     Plaintiff,           )

V.                         )

UNITED STATES OF AMERICA,  )

     Defendants.          )



VIDEOTAPED DEPOSITION OF

DAN WILKERSON

April 21, 2014

1:38 p.m.

DAN WILKERSON

2 (Pages 2 to 5)

| Page 2 |
|---|
| 1        S T I P U L A T I O N S |
| 2 |
| 3        IT IS STIPULATED AND AGREED, by and between |
| 4   the parties through their respective counsel, that |
| 5   the deposition of DAN WILKERSON may be taken before |
| 6   Elaine Scott, Notary Public, State at Large, at the |
| 7   Municipal Building, 815 Wheeler Avenue, Huntsville, |
| 8   Alabama, on April 21, 2014, commencing at |
| 9   approximately 1:38 p.m. |
| 10 |
| 11        IT IS FURTHER STIPULATED AND AGREED that the |
| 12   signature to and reading of the deposition by the |
| 13   witness is NOT waived, the deposition to have the |
| 14   same force and effect as if full compliance had been |
| 15   had with all laws and rules of Court relating to the |
| 16   taking of depositions. |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 3 |
|---|
| 1        A P P E A R A N C E S |
| 2 |
| 3        FOR THE PLAINTIFF: |
| 4        McCATHERN LAW |
| 5        Paul A. Grinke |
| 6        Regency Plaza |
| 7        3710 Rawlins Street |
| 8        Suite 1600 |
| 9        Dallas, Texas |
| 10 |
| 11 |
| 12        FOR THE DEFENDANT: |
| 13   UNITED STATES DEPARTMENT OF JUSTICE |
| 14        Jack B. Hood |
| 15        1801 4th Avenue North |
| 16        Birmingham, Alabama 35203 |
| 17 |
| 18 |
| 19   FEDERAL BUREAU OF INVESTIGATIONS |
| 20        Jayme Kantor |
| 21        935 Pennsylvania Avenue, NW |
| 22        Suite 10140 |
| 23        Washington, DC 20535 |
| 24 |
| 25 |

| Page 4 |
|---|
| 1        A P P E A R A N C E S (continued) |
| 2        FOR THE DEPONENT: |
| 3        OFFICE OF CITY ATTORNEY |
| 4        Jeffrey K. Grimes |
| 5        308 Fountain Circle |
| 6        Huntsville, Alabama 35804 |
| 7 |
| 8        ALSO PRESENT: |
| 9        Gary Brown |
| 10        David J. Icove, P.E. |
| 11 |
| 12        VIDEOGRAPHER: |
| 13   HENJUM GOUCHER REPORTING SERVICES LP |
| 14        Stephen R. Edmondson |
| 15        2501 Oak Lawn Avenue |
| 16        Dallas, Texas 75219 |
| 17 |
| 18        COURT REPORTER: |
| 19   HENJUM GOUCHER REPORTING SERVICES LP |
| 20        Elaine Scott |
| 21        2501 Oak Lawn Avenue |
| 22        Dallas, Texas 75219 |
| 23 |
| 24 |
| 25 |

| Page 5 |
|---|
| 1        EXAMINATION INDEX |
| 2 |
| 3   DAN WILKERSON |
| 4        BY MR. GRINKE . . . . . . . . . .  8 |
| 5        BY MR. HOOD . . . . . . . . . .  74 |
| 6        BY MR. GRINKE . . . . . . . . . .  93 |
| 7 |
| 8   REPORTER'S CERTIFICATE . . . . . . . .  99 |
| 9 |
| 10 |
| 11        EXHIBIT INDEX |
| 12   Plaintiff's |
| 13   1     Complete Investigative File      29 |
| 14   Defendant's |
| 15   1     Photograph                  86 |
| 16   2     Diagram                    87 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

DAN WILKERSON

Page 6

1     I, Elaine Scott, a court reporter and Notary
2 Public for the State of Alabama, acting as
3 commissioner, certify that there came before me at
4 815 Wheeler Avenue, Huntsville, Alabama, on April 21,
5 2014, beginning at 1:38 p.m., DAN WILKERSON, in the
6 above cause, for oral examination, whereupon the
7 following proceedings were had:
8
9     THE VIDEOGRAPHER: Good afternoon.
10 We're on the record. Today is April 21, 2014. The
11 time is approximately 1:39 p.m. The location is 815
12 Wheeler Avenue, Second Floor, Conference Room B,
13 Municipal Building, Huntsville, Alabama. I'm Stephen
14 R. Edmondson, Videographer, representing HG
15 Litigation Services. The Civil Action Number is
16 5:13-CV-00895-CLS, in the matter of Acadia Insurance
17 Company, et al., versus the United States of America.
18 The deponent is Mr. Dan Wilkerson.
19     The video deposition is requested by
20 plaintiff's counsel, McCathern, PLCC, Dallas, Texas.
21     Would counsel please identify themselves
22 on the record?
23     MR. GRINKE: My name is Paul Grinke here
24 on behalf of plaintiff, Acadia Insurance Company.
25     MR. HOOD: Jack Hood, Assistant United

Page 7

1 States Attorney, on behalf of the defendant, United
2 States of America.
3     MR. GRIMES: I'm Jeff Grimes, here with
4 the City of Huntsville.
5     MR. HOOD: And we would also identify for
6 the record Jayme Cantor, who is with the FBI General
7 Counsel's office out of Washington, D.C., who is
8 listening in by telephone.
9     Also present are Mr. Gary Brown of my
10 office, who is our paralegal, and also present is
11 Mr. Dave Icove, who is with the government also for
12 the purposes of this deposition.
13     THE VIDEOGRAPHER: Thank you. Administer
14 the oath.
15     THE COURT REPORTER: Would you raise your
16 right hand to be sworn?
17
18     DAN WILKERSON,
19     being first duly sworn,
20     was examined and testified as follows:
21
22     THE VIDEOGRAPHER: Any stipulations you'd
23 like to state on the record?
24     MR. HOOD: This deposition is being taken
25 on notice pursuant to the Federal Rules of Civil

Page 8

1 Procedure. There are no usual stipulations.
2     MR. GRINKE: Agreed.
3     MR. HOOD: And I would ask the witness
4 read and sign.
5     MR. GRIMES: I don't have an objection to
6 it.
7     Read and sign means that when you get
8 the deposition, you will read through. You can't
9 change your substantive testimony, but if you do
10 think there were any errors where the court reporter
11 took something down wrong, you would mark that on an
12 errata sheet for that.
13     THE WITNESS: I will follow it up.
14     THE VIDEOGRAPHER: Proceed.
15
16     EXAMINATION
17 BY MR. GRINKE:
18     Q. State your name, sir.
19     A. Daniel Wilkerson.
20     Q. Mr. Wilkerson, how are you currently
21 employed?
22     A. How am I currently employed?
23     Q. Yes.
24     A. I'm a fire prevention
25 officer/investigator for the City of Huntsville.

Page 9

1     Q. Do you have a specific title?
2     A. That is my -- that's my official title,
3 fire prevention officer/investigator.
4     Q. And how do folks in the department
5 address you, officer, fire marshal or --
6     A. Officer. Most people just say Dan.
7     Q. Fair enough. How long have you held this
8 position?
9     A. Since '07, 2007.
10     Q. Do you recall what month you took that
11 position?
12     A. It was about -- I believe it was May.
13     Q. Where are you from?
14     A. I'm from here, Huntsville, Alabama.
15     Q. I'd like to talk just a little bit about
16 your background. You don't have to have specific
17 dates or anything, but I guess you graduated from
18 high school here in Huntsville?
19     A. Yes. I graduated in 1990 from Lee High
20 School.
21     Q. What did you do right after you
22 graduated?
23     A. While I was going to high school, I was
24 working for AutoZone, and I maintained that career
25 after high school.

DAN WILKERSON

## Page 10

1       In '94, I went from AutoZone to Advanced
2   Auto Parts.  I worked there for a number of years at
3   Advanced Auto Parts.
4       I entered that company as an assistant
5   manager, got promoted to store manager.  I opened a
6   new store in Lawrenceburg, Tennessee, ran that store
7   for awhile.
8       We had a store in Scottsboro that was
9   having some trouble due to a store manager being
10  ill.  So I went over there and took over that store,
11  turned it around, and then part of my reward for that
12  was they opened a new store in Huntsville where I
13  could come back to Huntsville.
14      I worked for Advanced, I think, until
15  about '99, 2000.  I got hired by the City of
16  Huntsville as a firefighter in 2001.
17      At the time I got hired as a firefighter,
18  I had went back to AutoZone.  I was in a management
19  program there to take over a store.  And then I hired
20  in as a firefighter for the City of Huntsville.
21      A requirement at that time was you had to
22  ride a fire truck for five years before you could put
23  in to be a fire prevention officer/investigator.
24  After five years, I took the promotional test and
25  then got promoted in '07.

## Page 11

1       Q.  When you came into the fire department in
2   2001, what was your position?  Did you have a title
3   then?
4       A.  Into the fire department?
5       Q.  Yes.
6       A.  I was a firefighter.  About the only
7   thing that I left out that might be relevant is,
8   while I worked for Advanced, after I managed the
9   three stores, I got promoted into their loss
10  prevention department and served as a retail
11  investigator for them where I did sexual harassment,
12  theft, different investigations within the stores.
13  And they certified me by two companies for interview
14  and interrogations, which has kind of benefited me on
15  my current job.
16      Q.  Sure.  When you came into the fire
17  department in 2001, did you have to have any type of
18  education or training in order to become a
19  firefighter?
20      A.  You had to have a high school diploma.
21      Q.  And have you taken any college courses or
22  post high school classes anywhere?
23      A.  Before I hired with the fire department,
24  I had some college classes.  After I got hired with
25  the fire department, I finished my associate's degree

## Page 12

1   with Calhoun Community College in Decatur.  They have
2   a remote branch in Huntsville.
3       And then after I got promoted into the
4   fire marshal's office in '07, I went and got my
5   bachelor's degree from Columbia Southern in Orange
6   Beach, Alabama.
7       Q.  And what was your associate's degree in?
8       A.  Fire science management.
9       Q.  What types of courses do you take at
10  Calhoun in order to obtain an associate's degree in
11  fire science?
12      A.  You have your basic core classes, you
13  know, English, math, history, and then there was a
14  series of fire classes that you had to take.  And
15  it's been awhile since -- since that's happened.
16      It seems like there was about eight fire
17  classes that you had to take on campus in Decatur.
18  They didn't offer those in Huntsville -- that you had
19  to take as well.
20      Q.  And did you take those?
21      A.  I did.
22      Q.  And you completed them?
23      A.  Yes.
24      Q.  What did you obtain your bachelor's
25  degree in?  Was it Columbia?

## Page 13

1       A.  Yeah, Columbia Southern in Orange Beach,
2   Alabama.  It's a -- at the time, it was a more
3   internet-based program.  They've expanded their
4   campus since I went there, but it was also in fire
5   science.
6       Q.  Okay.
7       A.  I can't remember the exact name.  I think
8   it was Bachelor of Science and Fire Service or
9   something to that -- but you're required -- also
10  there they had two sets of classes.
11      They list numerous classes, and you had
12  to take so many out of each group, and there was a
13  lot of fire service classes in that, too.  I remember
14  I took a fire inspection class.  There was some
15  instant command classes.
16      There was a -- there was one class that
17  dealt with kind of like a political class.  But there
18  was several fire classes I took there, but I believe
19  I graduated in '08.  So it's been six years.  I'd
20  have to look at my transcript to get the exact
21  classes, but --
22      Q.  To your recollection -- and I'll back up
23  to the associate's degree at Calhoun -- is it fair to
24  say that some of the classes that you took would deal
25  with fire fighting while other classes that you took

DAN WILKERSON

Page 14

1  might deal with fire investigation?
2      A. I don't recall any classes that dealt
3  with fire investigation. Most of them dealt with
4  just the fire service in general.
5      Q. Now, what do you mean by fire service in
6  general?
7      A. Well, there was one class on building
8  construction. I remember a class on building
9  construction, which just about anything you do in
10  fire service, you need to have knowledge of building
11  construction.
12      You know, I can't remember the specific
13  classes, but I do know when I came into the fire
14  marshal's office in '07, I didn't really have much
15  exposure at all to investigations. It was kind of
16  new to me at that point.
17      Q. And that was in '07?
18      A. Uh-huh.
19      Q. So I'll ask the same question, then, just
20  to make sure the question is clear.
21      With respect to your bachelor's degree at
22  Columbia Southern, do you recall taking any courses
23  that dealt specifically with fire investigation
24  techniques?
25      A. That, I don't recall. I may have, but I

Page 15

1  don't recall because part of my job duties as
2  inspection is to -- I do know while I was taking
3  classes at Columbia Southern, is relative to the
4  job I was doing at that time, but I really can't
5  answer whether it was the inspection part of the
6  investigation.
7      I know it benefited me on inspections,
8  but I can't really recall an investigation because
9  around that time, I was also -- right after I got
10  promoted, I had went to the state school for
11  investigation, too. So that kind of runs together
12  for me a little bit.
13      Q. Tell the Court, if you would, about the
14  state school for investigation.
15      A. The State of Alabama has an Alabama Fire
16  College and, at the time, they -- they was in
17  conjunction with Shelton State in Tuscaloosa. And
18  when we get promoted into the fire marshal's office,
19  we're required to take fire inspector one, fire
20  inspector two, and fire investigator at the state
21  college. And at that time, they didn't offer -- the
22  fire investigator was the only class they offered in
23  regards to investigator.
24      Today I believe they have split that
25  class up to an investigator one class and an

Page 16

1  investigator two class. So when I went there, it was
2  one certification was just fire investigator.
3      So within eighteen months of being
4  promoted, we have to have those three
5  certifications. So those were taken in the summer of
6  '07.
7      Q. And so within eighteen months of taking
8  the position, did you indeed complete the
9  certification to the Alabama Fire College?
10      A. Yes.
11      Q. And that education was with respect to
12  fire scene investigations?
13      A. Right. It was listed as fire
14  investigator, but yes.
15      Q. Okay. Aside from the certification you
16  received through the Alabama Fire College, do you
17  hold any other licenses or certifications with
18  respect to fire scene or cause of origin and
19  investigation?
20      A. No. I did attend a class in 2011 -- I
21  believe it was 2011. I believe it was December of
22  2011.
23      Around that time frame, I did attend the
24  National Fire Academy in Emmitsburg, Maryland, and
25  that was a fire cause and origin class, and it was a

Page 17

1  two-week class. But I believe, if I'm not mistaken,
2  that may not be a certified class. I think you get a
3  certificate of completion, but I don't know that you
4  actually get a certification for that.
5      I've been to a couple classes up there,
6  so that date may be wrong, but it was generally that
7  time frame.
8      Q. When you joined the fire marshal's office
9  in 2007, I understand that you obtained certification
10  through the Alabama Fire College. Did you also
11  obtain any type of training on the job?
12      A. Yeah. To get promoted in the office, our
13  promotional procedure, you know, you've got to have
14  five years on a truck to be able to apply. But once
15  you apply, they give you a certain amount of time to
16  study for the promotional exam. And there's -- the
17  exam covers -- when I took it, it covers the life
18  safety NAP 101 code, like the first three chapters,
19  the Kirk's Fire Investigation book, the building
20  construction book, and I believe -- the fire -- fire
21  investigation book.
22      So you went and you took an exam. I
23  believe it was a hundred questions. And then once
24  you -- they create a roster of the test scores, then
25  they interview for the position.

DAN WILKERSON

Page 18

1    Then at the time I was promoted, three
2  people had passed the test, and me and Mike Jaco got
3  promoted and the other guy, from my knowledge, may
4  have withdrawn his name. I'm not sure. I don't have
5  knowledge of why, if we was picked over him or if he
6  turned down the job. I don't know that knowledge.
7    But me and Mike Jaco was promoted. Then
8  once you get promoted, we have a two-week training
9  program in office. It's a lot of code study, and we
10 watch videos on fires -- about fires, and then you
11 learn a lot about the different codes that we've
12 adopted and how to enforce them.
13    After that two weeks, they start sending
14 you out to do inspections with other inspectors, but
15 after the two weeks when you come out of the office,
16 we go on 24/7 on call for fire investigations.
17    So I want to say we was on call 24/7 from
18 May until late August, that any fires in the City of
19 Huntsville, we was required to respond to, to train.
20   Q. That's May to mid August of 2007?
21   A. Yes.
22   Q. So, say, a fire occurred -- let me ask
23 you this: During the time period of May to mid
24 August of 2007, did you respond to any fire scenes?
25   A. From May to August?

Page 19

1    Q. Yes.
2   A. Yes. There was a lot of them, yeah.
3   Q. A lot of them. And then you would
4  respond to them, and then what would you do?
5   A. We would kind of shadow the fire
6  investigator that we was with. In Huntsville, we
7  rotate our call schedule. You're on call for twenty-
8  four hours unless your call falls on Friday. If its
9  on Friday, you're on call Friday, Saturday, and
10 Sunday.
11    So whoever was on call, when they got
12 paged out to a fire scene, then they paged me and
13 Mike Jaco with them, and then we would respond to the
14 scene with them.
15    They wouldn't do anything until we got
16 there. Then once we got there, we would pretty much
17 shadow them. And it was their job to kind of train
18 us or teach us on the job on what to do.
19    And in some cases -- there was some cases
20 where we interviewed suspects. There was some cases
21 we took evidence samples. You know, we learned how
22 to interview people. We learned how to, you know,
23 document certain things. We learned how to take
24 evidence.
25    And then once they feel like -- the fire

Page 20

1  marshal feels like you've had enough exposure to
2  fires -- and during that time frame, we were also
3  getting our certifications. Once you get your
4  certifications and you've had enough exposure, then
5  they turn you loose on your own to do your own
6  investigations. And then we get put in the rotation
7  with the other guys, and then we go on -- we start
8  doing investigations ourselves.
9   Q. Do you recall -- I know you've slept
10 since then, but do you recall about when you were
11 first cut loose on your own to conduct your own
12 investigation?
13   A. I believe it was towards the end of
14 August. I remember -- I remember some fires during
15 July and the first part of August.
16    I could go back and look because I
17 have -- I've kept track of all my fires since then.
18 So all I've got to do is go back and look at when my
19 fires started on my own and I would have an idea of
20 when that was.
21    But it was -- it was some time, you know,
22 late summer of '07.
23   Q. Do you have any idea on average how many
24 fires -- since August of 2007 how many fires a year
25 you investigated?

Page 21

1   A. Well, up to two weeks ago, it was 274
2  fires since August of '07. I've worked some since
3  then. So I haven't updated that number, but it
4  was -- it was 274 when I counted.
5   Q. You understand that we're taking your
6  deposition today with respect to a fire that occurred
7  on September 22nd, 2010, at the Country Inn & Suites
8  here in Huntsville?
9   A. Yes.
10   Q. I think you stated that you have a record
11 of all the fires. Would you be able to go back and
12 look at your records and identify how many fires you
13 investigated between August of 2007 and September of
14 2010, that three-year period?
15   A. Would I be able to, yes.
16   Q. As you sit here today, without looking at
17 your records, do you have a ballpark idea of how many
18 fires you would have investigated in that three-year
19 period?
20   A. No. I've been doing -- I've been doing
21 investigations for seven years. That's close to the
22 halfway mark. I mean -- so there's no way for me to
23 provide you an accurate number, but, you know, I
24 would say it's probably thirty to forty percent of
25 that number.

DAN WILKERSON

Page 22

1    Q. Okay.
2    A. From '07 to 2010, you're talking three
3  years. And then from 2010 to now, it's, you know,
4  four years. So, you know --
5    Q. From the time that you were allowed to
6  investigate fires on your own until the present, have
7  you come into a position where you might train others
8  coming after you on fire investigations?
9    A. I have.
10    Q. When did that occur?
11    A. It occurs every time we promote somebody.
12  You know, they're -- when I'm on call and we get a
13  fire, then they -- they come shadow me. And since --
14  since I came into the office, we've promoted at least
15  four.
16    Q. What are your duties and responsibilities
17  as a fire prevention officer and investigator with
18  the City of Huntsville?
19    A. It's kind of a four-part of job duties.
20  We do plans review in our office. We look at new and
21  existing building plans before they build the
22  building or do the renovation. We also review
23  sprinkler plans and fire alarm drawings before they
24  are allowed to do work in the City of Huntsville.
25    We do public education classes, fire

Page 23

1  extinguisher training, or if a civic association
2  wants a safety class for home safety, we go and do
3  it. We do the actual inspections. Once the building
4  is being renovated or rebuilt, we go out and do the
5  inspections.
6    And then like I previously said, we
7  rotate the call schedule. So I'm also responsible
8  for fire investigations as well.
9    Q. Is it fair to say that the primary cause
10  of the fire investigations that you perform on behalf
11  of the City of Huntsville are for the purpose of
12  public safety?
13    A. Can you state that again?
14    Q. Is it fair to say that the fire
15  investigation -- the purpose of the fire
16  investigations that you perform on behalf of the City
17  of Huntsville Fire Department would be for public
18  safety?
19    A. Yeah, I believe that's an accurate
20  statement. I mean, we go out there and, you know --
21  our primary reason for being there on a fire scene
22  is to determine cause and origin. And in determining
23  cause and origin, we would be able to identify if it
24  was a possible arson case that would need to be
25  further investigated or we would gather knowledge to

Page 24

1  be able to prevent fires in the future.
2    And obviously if there's a trend of fires
3  that we're experiencing within a community, then we
4  would transfer that over to our public education
5  classes and try to educate the public on what they
6  could do to prevent those types of fires.
7    Q. And I didn't say this at the beginning --
8  well, I guess I did say it before we began, but I
9  represent Acadia Insurance Company who insured the
10  Country Inn & Suites Hotel that's the subject of this
11  lawsuit at the time of the fire on September 22nd,
12  2010.
13    You and I met on the telephone for the
14  first time -- I can't remember if it was Thursday or
15  Friday of last week. Do you recall that?
16    A. I did speak to you on the phone last
17  Thursday.
18    Q. Last Thursday. Do you recall about how
19  long we spoke?
20    A. No. I would say maybe twenty, twenty-
21  five minutes. I don't know.
22    Q. Did I ask you some questions about this
23  fire and your findings?
24    A. No. Most -- not that I recall. Most of
25  your questions was, you know, some about my

Page 25

1  background, you know, where I got certified and, you
2  know, nothing specific to my findings that I recall.
3    Q. Okay. Did I ask you to testify one way
4  or another in your deposition today?
5    A. No. Actually the only thing you did was
6  ask questions. You didn't really tell me what to say
7  at all.
8    Q. I want to get to your fire scene
9  investigation at the Country Inn & Suites in
10  September of 2010 pretty quickly here, but I wanted
11  to ask you first if you could walk the Court through
12  briefly just -- when you do a fire investigation in
13  your capacity with the City of Huntsville Fire
14  Department, walk the Court through, if you would,
15  just the steps that you take to conduct the
16  investigation.
17    A. Typically I'm notified by pager. When I
18  receive my page, I usually contact communications to
19  let them know my status. If I'm at home, I get
20  ready.
21    Once I start going to the scene, I go
22  10-8 on the radio. When I get to the scene, I go
23  10-10 at the scene or 10-97 at the scene. I check in
24  with command, find out any information they have in
25  regards to the fire.

DAN WILKERSON

## Page 26

1      **Q. If I could interrupt you real quick,**
2 **could you tell me what you mean by 10-8 and 10-9?**
3      A. Yeah, 10-8 is en route.
4      **Q. Okay.**
5      A. And 10-97 is on scene. I check in with
6 command when I get there. You know, if suppression
7 efforts are still ongoing, then, you know, I want --
8 the reason we check in with command is to find out
9 any information that they may already have and also
10 to find out when it's safe to enter the structure to
11 start my investigation.
12      Obviously our primary goal in Huntsville
13 is to save life and property. So I don't want to
14 hinder any kind of suppression efforts. So -- and
15 our suppression guys are pretty -- they work well
16 with us. If they're going to -- if they've got to
17 tear something out or something, usually they will
18 let us get in and take some pictures before they
19 start tearing stuff out if we're on the scene at that
20 time, provided, you know -- you know, if it's burning
21 and they need to put it out, they're going to put it
22 out. But if it's something where it's just hot spots
23 and they don't need to tear it out right away, then
24 they will work on us about that.
25      But I check in with instant command. I

## Page 27

1 try to size up the building from the outside, make
2 sure that it's structurally safe for me to go into
3 and not just take the instant commander's word at it.
4      I usually get my tools out of my car,
5 which usually is a notepad, a pen, a camera, gloves.
6 And then once I get into the scene, I do my fire
7 investigation.
8      And then once I finish my investigation,
9 I try to find a manager or a property owner, let them
10 know that I'm releasing the building back under their
11 control.
12      And then -- I can't say I do it every
13 time, but the majority of times, especially when it's
14 commercial property, I tell them that they need to
15 preserve as much evidence as possible because their
16 insurance company is going to want to look at it.
17      And then -- then once I check in with the
18 management staff or the owners and let them know that
19 it's now under their control, then I go 10-98, which
20 is I'm leaving the scene.
21      And then once I go back to the office, we
22 try to have our fire reports done within twenty-four
23 hours. And sometimes we have a cause and origin by
24 then; sometimes we don't.
25      If we have a cause and origin, we go

## Page 28

1 ahead and type up the report. If we don't, then we
2 usually type information up and then we'll put
3 pending further investigation and we update it later.
4      And then once the report is complete, we
5 print a copy of it and then put it in the file.
6      **Q. Okay.**
7      A. You know, if it's -- if it's an arson
8 case and we have suspects, then we will assist HPD on
9 doing interviews and stuff. And, you know, the arson
10 cases are more prolonged when you're doing interviews
11 and interrogations. So --
12      **Q. Okay. Were you called upon to conduct an**
13 **investigation into the origin and cause of the fire**
14 **at the Country Inn & Suites here in Huntsville,**
15 **Alabama on September 22nd, 2010?**
16      A. Do you have my report?
17      **Q. Yes.**
18      A. If you can just give me that first page,
19 is all I need.
20      MR. HOOD: Can we identify what we're
21 identifying?
22      **Q. I've handed him the page. It's Bates**
23 **labeled FBI 000021. The witness can tell us what**
24 **we're looking at.**
25      MR. HOOD: But you're going to label the

## Page 29

1 entire stack of documents as an exhibit, right?
2      MR. GRINKE: I think I've changed my mind
3 on that. I'm going to mark his report and his
4 photographs as two separate exhibits and then just
5 not attach all these other documents.
6      Let's do this --
7      MR. HOOD: Well, I would be a little bit
8 more comfortable if you would do as you said you had
9 planned. Those are the documents I subpoenaed and I
10 also Bates-stamped. I thought we were going to use
11 those for all three depositions we were going to
12 take. If we're not --
13      MR. GRINKE: I had changed my mind, but
14 I'm happy to do it that way.
15      MR. HOOD: Please. I would feel more
16 comfortable knowing that we've got complete records
17 on each one. But you -- never mind.
18      MR. GRINKE: Madame Court Reporter, I'd
19 like to mark this stack of documents as Exhibit 1.
20      (Plaintiff's Exhibit Number 1 was marked
21      for identification. A copy is attached.)
22
23      **Q. Okay. Officer Wilkerson, I'm going to**
24 **hand you a document that's been marked as deposition**
25 **Exhibit Number 1, and it's binder clipped. It's a**

DAN WILKERSON

## Page 30

1  stack of documents that is binder clipped now.
2  You're free to take the binder clip off for ease of
3  going through them as long as we keep them in order,
4  please.
5        I'll represent to you that these are
6  documents the US government subpoenaed from the City
7  of Huntsville.  Said documents are relevant to the
8  Country Inn & Suites, which is the subject of this
9  lawsuit.
10       If I could ask you to turn to -- at the
11 bottom of the documents, there's a Bates labeled FBI
12 and a series of numbers behind them.  If I could ask
13 you to turn to the document Bates numbered FBI
14 000021.  I'll ask you to take a look at that page and
15 see if you can identify it for us.
16       A. That's the first page of my fire report.
17       Q. Okay.  And you had asked to see the first
18 page of the report.  Does this confirm for you that
19 the fire at the Country Inn & Suites did occur on
20 September 22nd, 2010?
21       A. That's correct.
22       Q. And were you called upon to conduct an
23 investigation into the origin and cause of this fire?
24       A. I was.
25       Q. Did you reach conclusions after your

## Page 31

1  investigation as to the origin and cause of this
2  fire?
3        A. I did.
4        Q. And are your basic conclusions documented
5  in this report?
6        A. They are.
7        Q. And you've completed a narrative within
8  this report that kind of outlines what you saw and
9  what you found, correct?
10       A. That is correct.  It's number 37.
11       Q. I'd like to kind of talk a little bit
12 about your investigation.
13       When you arrived on the scene -- can you
14 tell from the report what time you arrived on the
15 scene?
16       Let me ask it this way:  Do you recall if
17 you visited the fire scene on the evening of the
18 fire, or did you do it the next day or a couple of
19 days later?
20       A. It was that evening.  Actually, if you --
21 if you go to document number 32 -- am I addressing
22 that correctly if I say 32?
23       Q. Yes.
24       A. The second staff on scene there is my
25 name listed.  120 is my unit number.  It says I was

## Page 32

1  notified at 22:50.  I was en route at 22:58.  I
2  arrived at 23:11.  And then I cleared the scene at
3  2:44, which would have been on September 23rd.
4        Q. Okay.  When you arrived at the scene -- I
5  think you've testified generally when you arrive at
6  the scene, you will check in with command.  Do you
7  recall checking in with command on the evening of
8  September 22nd?
9        A. Not specifically, no.
10       Q. What do you recall doing when you arrived
11 at the scene?  You're free to refer to your report if
12 you wish.
13       A. Well, it's been -- it's been some time
14 since this fire.  So I can't -- let's see.
15       On page thirty-seven, my narrative says I
16 was requested on scene by District Chief Kay.  And
17 when I arrived, I was told there had been a fire.  So
18 I would have checked in with Chief Kay.
19       Q. And would Chief Kay be part of the
20 command?
21       A. He would have been the instant commander.
22       Q. All right.  The narrative outlined on
23 document FBI 37, have you had a chance to review this
24 narrative recently?
25       A. I have.

## Page 33

1        Q. Is there anything about this narrative
2  that sticks out to you as being incorrect or
3  inconsistent with your recollection of your
4  investigation?
5        A. The only thing that I don't see in my
6  narrative is it doesn't look like I -- no, I did -- I
7  did list it, yeah.  It looks like it's correct.
8        Q. Walk the Court, if you would, then
9  through your investigation on the evening of
10 September 22nd and the morning of September 23rd,
11 2010, of the Country Inn & Suites.
12       A. Okay.  It says I was requested on scene
13 by District Chief Kay.  When I arrived on scene, I
14 was told that there had been a fire.
15       During my exterior examination, I noted a
16 hotel building that had fire damage to one balcony on
17 the second floor, 2207, which would have been the
18 room number, and two balconies on the third floor,
19 2307 and 2309.  The building had been evacuated.
20       During my interior examination, I noted
21 heavy fire, smoke, and heat damage to a room on the
22 third floor, which is Room 2307, that extended to the
23 attic.
24       In the second floor Apartment 2207 was a
25 pack of cigarettes and a lighter on the TV table just

DAN WILKERSON

Page 34

1  inside the door. I requested Electrical Inspector
2  Doug Smith and referred in my narrative to see Doug
3  Smith's report and Building Inspector Skip -- Skip
4  Stinson also responded to the scene per Doug Smith's
5  request.
6         Due to the fire damage, Doug Smith and
7  Skip Stinson stated the building was unsafe to
8  occupy. I interviewed the occupant of Room 2207,
9  Michael Siegling and my -- in conclusion, I've ruled
10 that the point of origin was on the second floor
11 balcony and that the cause of fire was careless use
12 of smoking materials.
13        When I arrived on scene, it was kind of a
14 -- it was kind of a little bit of a hectic scene
15 because there was a lot of people that had been
16 evacuated out of that building. Some of them had
17 gathered in the lobby area. Some of them were
18 standing outside of the building.
19        A lot of them wanted to know when they
20 was going to be able to go back in the building.
21 Obviously this was late at night. Several of them
22 was staying at the hotel.
23        And it was brought to my attention that
24 several of the occupants was attending a -- I believe
25 a bomb school out on Redstone Arsenal. And I'd had

Page 35

1  different people that came up to me during my
2  investigation and stated that they knew who was
3  staying in the room, but -- and when I asked could
4  they locate him, they could not.
5         But several people had made comments that
6  he was an FBI agent and that their rules he's not
7  smoke -- not supposed to work within ten foot of the
8  building, and he probably would not talk to me
9  because he knows he did something wrong.
10        It was a little bit later in the
11 investigation is when I finally made contact with the
12 person that was staying in Room 2207. And that's
13 when I was able to interview him and take his
14 statement.
15    Q. Now -- go on.
16    A. Now, after -- after -- I'm sorry. One
17 thing that was peculiar about this was a day or so
18 after the fire, I was contacted by the hotel staff,
19 and I was told that somebody had called up there
20 impersonating me. And then when they called back,
21 they asked specifically who they were. And they had
22 said that because I was up all night, that they had
23 taken my investigation over and they needed to get
24 information from the hotel staff.
25        Well, they contacted me, and I went out

Page 36

1  there took a statement from them. And I included
2  that as part of my investigation as well.
3         But I thought that was peculiar. That
4  had never happened to me on any of my other fires to
5  where somebody had actually impersonated their self
6  as part of our division. And, you know, I reported
7  it to my supervisor, and they advised me to go out
8  there and take a -- take a statement of what happened
9  and just include it with my file.
10    Q. Okay. And had you indeed passed off the
11 investigation off to someone else at that time?
12    A. No. No. That's not a practice we do in
13 the City of Huntsville. Even when we get HPD
14 involved in arson cases, we still are involved in
15 that case until completion.
16    Q. The statement that you are referring
17 to -- could you turn to page FBI 43?
18    A. Yes.
19    Q. Can you tell the Court whether or not
20 this is the statement you're referring to with
21 respect to someone calling the hotel impersonating
22 you?
23    A. Yes, page 43 and 44.
24    Q. On page 44, there is a phone number. The
25 statement says that this person gave you the phone

Page 37

1  number 678-615-7705. Did you ever try to call that
2  number?
3     A. I did and was unable to make contact with
4  anybody at that number.
5     Q. Do you recall whether or not when you
6  called that number there was -- was there a voice
7  mail that identified a person's name or anything like
8  that?
9     A. I do not recall. No, it did not identify
10 anybody's name. It -- I don't know if it was a
11 generic voice mail or if there was even a voice mail
12 set up. But if it -- if I could have identified the
13 person's name, I would have put it in the report.
14    Q. As part of your investigation, did you
15 take a series of photographs of the fire scene?
16    A. I did.
17    Q. As you're reviewing that statement again,
18 was there anything you wanted to add with respect to
19 the statement you took?
20    A. Well, she had listed a name that was
21 given when the caller had called, a Mike LaGrange,
22 but, you know, my answer was still the same. I never
23 could verify that that was truly Mike LaGrange's
24 number or not, if that was an accurate name, but she
25 had put in the statement that he said he was with our

DAN WILKERSON

Page 38

1   office, which was incorrect.
2        Q.  Do you know a Mike LaGrange?
3        A.  No.
4        Q.  With respect to photographs, could you
5   turn to FBI 1143?  I'm sorry. 143.  I got up really
6   early this morning.
7        A.  Okay.
8        Q.  Documents FBI 143 through the end of this
9   stack, which is FBI 186, are these -- do these appear
10  to be a true and correct copy of the photographs that
11  you took with respect to the fire at the Country Inn
12  & Suites in September 2010?
13       A.  That's correct.
14       Q.  You've walked us through your actions
15  with respect to the evening hours of September 22nd
16  and the morning hours of September 23rd, 2010 --
17  2010.  But I wanted to ask you about, I guess, your
18  mental processes with respect to coming up with your
19  opinion that the fire originated on the balcony of
20  Room 2207 and was caused by a carelessly discarded
21  cigarette.  I would like to ask you about that.
22       How did you reach that conclusion
23  specifically through your mental processes?  And feel
24  free to refer to the photographs if they help assist
25  us in understanding.

Page 39

1        A.  When I got there and I sized up the
2   scene, doing my exterior examination, as I stated in
3   my report, I could see the damage to the second floor
4   balcony and the two balconies above it.
5        When I went up to the building and looked
6   at the fire damage --
7        You know, typically I work from least
8   damage to greater damage, and mentally what you're
9   doing is you're assessing the damage.  You're looking
10  for burn patterns.  This was an exterior fire, but
11  you're also looking for how the fire could have been
12  ventilated.
13       The ventilation wasn't really an issue on
14  this one because it was an outside fire, so you had
15  plenty of ventilation.  But also you have to take in
16  the fact how wind may contribute to the fire
17  patterns.  You know, you look at the amount of damage
18  and the location of it.  You look for V patterns.
19  And typically you try to narrow it down to an area of
20  origin.
21       And then you look at -- within that area,
22  what could the heat source have been to have started
23  that fire?
24       Q.  And let me interrupt you real quick.
25  This is a good point to ask you.

Page 40

1        Just in general, when a fire ignites, how
2   generally will it spread?  Will it go sideways?  Will
3   it go down?  Will it go up?
4        A.  Generally it goes upward.  You know, if
5   it's a ventilated controlled fire and you have a
6   window open away from the fire, it can spread towards
7   that opening.
8        But generally when you have a fire, the
9   heat and the smoke rises and usually goes upwards.
10       Now, you could have -- generally
11  speaking, you could have curtains hanging that could
12  fall and cause -- fall down and cause another
13  pattern.
14       So you have to take into consideration a
15  fall down, too, when you're looking at patterns.  But
16  you try to take a cumulation of several things into
17  account before you narrow it down to a specific area
18  of origin.
19       And then once you identify the area of
20  origin, then you start looking at, well, what could
21  have caused this fire?  Where is my heat source
22  coming from?
23       Q.  I want to talk about that, but first I
24  want to ask you:  What led you to believe that the
25  area of origin of this fire was -- I think you said

Page 41

1   it was an exterior fire.  What led you to believe the
2   level of origin was exterior to the facility?
3        A.  Well, one thing is, the fire, except for
4   the attic, was mainly on the outside of the building.
5   You typically don't have fires on the inside of the
6   building that -- well, you generally don't have this
7   type of fire damage when a fire starts inside of a
8   building.
9        You know, usually when you have a fire,
10  especially when it's -- you need the ventilation.
11  Usually it's going to vent out to the outside.  It's
12  usually in the upper part of the building.  But you
13  had no damage inside of Room 2207.  And then I
14  believe that the damage that was inside 2307 was
15  caused when the window fell.
16       Q.  Is 2307 directly above 2207 in the
17  layout?
18       A.  It is.
19       Q.  If I could ask you to take a look at
20  photograph FBI 144.  Can you identify where on this
21  picture you believe the -- as specifically as you can
22  where the origin of the fire was, the area of origin?
23       A.  It's my belief that their origin was on
24  the right-hand side of the balcony on 2207 as we're
25  looking at it in the photograph.

DAN WILKERSON

Page 42

1    Q. Can you hold up this photograph and
2    perhaps point with a --
3    A. I've got a pen.
4    Q. A pen?
5    A. This is the balcony of 2207, and on the
6    right-hand side there in the corner (indicating).
7    Q. And -- okay. Thank you. And so the part
8    you were pointing at was the balcony to Room 2207,
9    correct?
10   A. Correct.
11   Q. As we face the balcony of 2207, to our
12   left, is there another balcony?
13   A. Looking at the photograph to the left,
14   There appears not to be a balcony.
15   Q. Okay. To the right of the balcony to
16   Room 2207, is there another balcony?
17   A. Yes.
18   Q. And what separates the balcony of 2207
19   and the balcony next to it?
20   A. There's a divider there for -- I imagine
21   it's for privacy. But it was a divider wall between
22   the balconies, and it appeared that the wall was
23   constructed of a wood material, and it had a siding
24   covering it.
25   Q. So is it a solid wall, or are there

Page 43

1    openings in the wall?
2    A. Well, I would have to refer to another
3    photograph. If you'll go to photograph -- photograph
4    number 166. That's a picture of the wall on -- that
5    would have been on the north side of the balcony, and
6    it appears as -- was your question what kind of
7    material was constructed --
8    Q. Was it a solid wall, or were there
9    openings?
10   A. Yeah. It looks like it was a solid
11   wall. It looks like in these photographs that it may
12   have had a wood covering at one time and that they
13   went over later and covered it with some kind of a
14   siding material.
15   Q. In photograph FBI 166 that we're looking
16   at, are you able -- can you identify for the Court
17   where you believe the area of origin of the fire is
18   located?
19   A. Yes. I believe the area of the origin
20   was at the bottom of that wall in the photograph.
21   Q. Okay. One more time, could you hold it
22   up and point with your pen where you believe the area
23   of origin is?
24   A. This area right here (indicating).
25   MR. GRINKE: Okay. I think we're running

Page 44

1    out of tape. This is a good spot for a break and
2    then start again.
3    THE VIDEOGRAPHER: Off the record at
4    2:34 p.m., end of cassette one.
5    (Break taken.)
6
7    THE VIDEOGRAPHER: Back on the record at
8    2:46 p.m., beginning of cassette two.
9    Q. Officer Wilkerson, before we took a
10   break, we were discussing where you place the area of
11   origin of this fire, and I believe you testified it
12   was on the balcony of Room 2207.
13   A couple of times you had started to say
14   that the next thing you do after you place the area
15   of origin is -- I believe you said that you look for
16   potential ignition sources in that area?
17   A. That's correct.
18   Q. Did you identify potential ignition
19   sources within the area of origin on the balcony of
20   2207?
21   A. Well, looking for potential ignition
22   sources, you know, we always look for electrical
23   wiring or electrical appliances, which I had none in
24   my area of origin here. We also take into
25   consideration the weather, which we had no adverse

Page 45

1    weather conditions at the time of the fire.
2    You look at -- you know, Molotov
3    cocktails is a popular thing. If somebody would have
4    lit a glass bottle on fire and threw it up on the
5    balcony, we would have had glass fragments. And I
6    had none of that.
7    So to answer your question, there wasn't
8    anything in the area of origin that was identified,
9    but where my area of origin was, there was gaps in
10   the boards on the floor. And when you go under that
11   balcony, there was numerous cigarette butts that I
12   believe had fallen through the boards and was laying
13   on the ground beneath.
14   Q. Okay. I think -- did you take a picture
15   of that?
16   A. I did. If you want to go to picture 174,
17   it shows the gaps in the floor in that corner. And
18   then if you want to go to picture 176 -- if I need to
19   slow down, just let me know -- but 176 shows you the
20   construction of that balcony and how it extends over
21   the exterior wall of the first floor.
22   The first floor doesn't have kind of like
23   a balcony structure. It doesn't have the wall
24   dividing the outside spaces. But if you then go to
25   177, you'll see the bushes that are on the outside of

DAN WILKERSON

Page 46

1   that building.  You'll see some fire debris that has
2   fallen down either during the fire or during
3   suppression efforts and there's numerous bushes
4   there.
5       Q.  Is 177 to your recollection a photograph
6   of the area of the bushes that are directly below the
7   balcony to Room 2207?
8       A.  Correct.  When you go to 178, that is a
9   picture looking up at that corner where you can see
10  the gaps between the boards.
11          And then 179 is another picture of the
12  ground there.  And basically what I'm doing here is,
13  I'm taking a picture from a far -- further distance
14  and I'm getting closer and closer.
15          You see a bush there in that picture.
16  You see what looks like maybe some aluminum, may have
17  been an aluminum can, and then you see some burn
18  marks up against the bottom of the wall.
19          And if you go to the next picture, you'll
20  see where that fall down debris and you'll see
21  several cigarettes that are laying there.
22          And then as I further zoom in on picture
23  181, there's some more debris, and you see a
24  cigarette butt that's also laying there.
25          And it's hard to make out on this

Page 47

1   picture, but when you have -- one of these pictures,
2   when you have it on the computer, you can zoom into
3   it and see that the cigarette butt is actually a
4   Marlboro brand cigarette.
5       Q.  Okay.  I believe in the photographs that
6   you took there is a photograph of a pack of unsmoked
7   cigarettes or partial pack of unsmoked cigarettes
8   that are interior to the room.  Can you locate that?
9       A.  162.
10      Q.  Okay.  I've also got something in 149,
11  but there's multiple.  Yeah, 162 and 149.
12      A.  Yeah.  149 is a closer look at it.  That
13  was on a stand that was just inside the doorway to
14  the balcony on Apartment 2207.
15      Q.  Okay.  As far as you could tell, were the
16  cigarette butts you found down in the bushes below
17  the balcony of 2207 consistent with being these
18  Marlboro Light cigarettes?
19          MR. HOOD:  Object to the form.  Lack of
20  foundation.
21      Q.  You can answer.
22      A.  Yes.  They look like Marlboro cigarettes.
23  I don't believe that is a Marlboro Light package, but
24  I believe it was a Marlboro cigarette, yes.
25      Q.  Fair enough.  Let me reask the question

Page 48

1   then.  I think you testified that if you zoomed in on
2   these photographs, you could tell they were Marlboro
3   cigarettes.  Is that what you said?
4       A.  Correct.
5       Q.  And are those cigarette butts that you
6   found in the bushes below the balcony of 2207
7   consistent with the package of photographs (sic) that
8   you photographed in 149 and 162?
9       A.  Correct.
10          MR. HOOD:  Object to the form, foundation
11  and leading.
12      Q.  Okay.  So you testified that you
13  identified the area of origin on the balcony of 2207
14  down low, and as we face the balcony, I guess it
15  would have been to the far right.  And you testified
16  that you did not identify any electrical wiring in
17  that area of origin?
18      A.  Correct.
19      Q.  You did not identify any electrical
20  appliances, products within your area of origin?
21      A.  That's correct.
22      Q.  You did not identify any affects of
23  weather, lightning, things like that, within your
24  area of origin?
25      A.  That's correct.

Page 49

1       Q.  You did not see anything that led you to
2   believe that this should be a criminal investigation
3   due to arson?
4       A.  Correct.
5       Q.  Bear with me here.  I've got to go
6   through my photographs.  If you'll look at page 144.
7       A.  Okay.
8       Q.  A couple of things:  Is there anything
9   with respect to the burn pattern that you can see on
10  page 144 on this balcony that helps you narrow down
11  the area of origin?
12      A.  Yeah.  If you'll notice where I place my
13  area of origin -- and I'll reference it for the
14  video -- there appears to be a V pattern that goes up
15  this way (indicating).  Obviously with the wall here,
16  it's obstructed on that side, but you can also see it
17  extends upward towards balcony 2309.
18          Also, you had heavy fire damage on this
19  balcony, and when you have a fire in the corner, heat
20  tends to radiate back and forth, and it increases the
21  amount of damage within an amount of time period.
22          You also had heavy fire damage on the
23  underneath of the balcony above it, and then I
24  believe that once the balcony above it become
25  involved in the fire, you get a secondary V pattern

DAN WILKERSON

## Page 50

1  coming off that fire, but it's more wider there
2  because I believe that that ceiling floor area was --
3  had heated up to the point that it had started to
4  burn as well.
5       And then with the more materials involved
6  in the fire there that it created enough heat for the
7  window to fail and for the fire to penetrate into the
8  Apartment 2307, and then that's when the fire become
9  more involved with the interior of the building and
10  the attic.
11       **Q. Okay. Looking at 144 and the balcony of**
12  **Room 2207, you can see the doorway to the room of**
13  **2207. It looks like the doorway is open; is that**
14  **correct --**
15       A. It is.
16       **Q. -- as we face the left side of the**
17  **balcony?  At the right-top corner of the door as**
18  **we're facing it, there appears to be an exterior**
19  **light fixture?**
20       A. That's correct.
21       **Q. Did you consider that exterior light**
22  **fixture as a potential source of ignition of this**
23  **fire?**
24       A. That was discussed.  You know, the --
25  where I place the area of origin, that light fixture

## Page 51

1  was not in the area of origin.  If you'll look at the
2  area around that light fixture, it doesn't look like
3  it had been involved in the fire.
4       If you go to photograph 148, you can see
5  the damage on the underside of that ceiling floor
6  from 2207 to 2307, but you also see that light
7  fixture in that photograph, and it still appears to
8  be intact.
9       And, you know, I didn't see that it was a
10  plausible source of ignition with not having the
11  damage around the light fixture and also with the
12  light fixture being intact.
13       When I requested the electrical
14  inspector, you know, he -- he didn't see any reason
15  to take down the light fixture to examine it because
16  it wasn't in the area of origin.
17       And like we stated before, my purpose for
18  being there is for -- to identify it's not an arson
19  or it's not a potential arson case and also for
20  public education and fire safety in our community.
21       Once I get to a point in an investigation
22  that I've ruled out arson or it doesn't appear to be
23  arson, then I'm usually pretty cautious on what I
24  disassemble and destroy, because if it's not a
25  criminal case, then I try to leave the scene as

## Page 52

1  intact as possible for whoever is coming after me.
2       Sometimes insurance companies will hire
3  an investigator that will show up a couple of days
4  after we do our investigation, and typically they're
5  more -- they have more interest in it than the City
6  of Huntsville does.
7       **Q. Sure.**
8       A. So if it doesn't look like I need to take
9  it apart or possibly damage it, because it's probably
10  suffered some damage from the heat -- from the
11  photograph, it looks like there's some cracks in the
12  glass.  I could have possibly destroyed that.  And
13  so, you know, I believe I brought it up to the
14  electrical inspector, but he didn't see a need in
15  disassembling it.
16       **Q. And so for a layman like me -- correct me**
17  **if I'm wrong -- what I hear you saying is that the**
18  **burn patterns to the exterior balcony of 2207 and**
19  **specifically around that lamp itself allowed you to**
20  **eliminate the lamp as a potential cause of the fire?**
21       A. Correct.
22       MR. HOOD:  Object to the form,
23  foundation.
24       **Q. That's correct?**
25       A. Yes.

## Page 53

1       MR. HOOD:  Same objection.
2       **Q. And, likewise, is it fair to say that the**
3  **lack of damage to the lamp itself, the exterior lamp**
4  **itself, allowed you to eliminate the lamp as a**
5  **potential cause of ignition?**
6       MR. HOOD:  Object to the form,
7  foundation.
8       A. Correct.
9       **Q. Aside from that lamp above the door of**
10  **the balcony on 2207, was there anything else that was**
11  **electrical located out there?**
12       A. No.
13       **Q. And I think you testified there was no**
14  **significant burn damage inside the room of 2207?**
15       A. That's correct.
16       **Q. Did you consider -- let me back up.  When**
17  **I'm asking you about did you consider the light --**
18  **and I'm going to ask you some other things that you**
19  **considered.  You're familiar with NFPA 921?**
20       A. I am.
21       **Q. And what is that briefly?**
22       A. NFPA 921 is a guide for fire
23  investigations.
24       **Q. And do you -- are you familiar with it, I**
25  **guess, the guidelines that are set forth therein?**

DAN WILKERSON

Page 54

1   A. I am. Pretty much any class that you
2   take involving fire investigations, they reference
3   921.
4       You know, when I was promoted in '07, I
5   was given a copy that the City purchased me. And I
6   keep that in my vehicle for reference at times. And
7   I've taken it to classes as well.
8   **Q. Does NFPA 921 call for you to utilize a**
9   **scientific method in your investigations?**
10  A. It does.
11  **Q. And explain that to the Court.**
12  A. Okay. The scientific method is you
13  define a problem, collect data, analyze the data,
14  create hypothesis, test the hypothesis and then come
15  to a conclusion.
16      And basically what we've discussed in
17  reference to this fire, when I get there and, you
18  know, I'm observing the scene -- you know, when I go
19  to a fire scene, I've already defined the problem.
20  You know, I have to determine cause and origin.
21  That's my problem.
22      When I get there and I'm visually looking
23  at the scene, talking to witnesses, talking to
24  suppression crews, I'm collecting data. And then as
25  we talk to -- when I get area of origin, then I

Page 55

1   create hypotheses on -- excuse me -- on what could
2   have caused this fire, you know. And, you know,
3   electrical was one of the hypotheses, and then when I
4   tested that, I had no electrical in the area. So I
5   ruled that one out.
6       You know, lightning -- on every scene
7   that I go to, I take into consideration lightning
8   could be a possible cause. But when there's no
9   adverse weather, then I rule that out.
10      The -- you know, when I found the
11  cigarette butts that was laying on the ground, that
12  was a possible hypothesis. And that was one that I
13  couldn't rule out because not only was -- did
14  witnesses state that they had saw the occupant
15  smoking on the balcony, but when I did interview the
16  occupant of 2207, he confirmed that he had also
17  smoked on the balcony.
18      So that was one of the ones that when it
19  was tested, you know, it was -- when it was all said
20  and done, that was the only one that I had left that
21  was a probable cause of ignition.
22  **Q. Thank you, sir. And then let me ask you**
23  **about another potential hypothesis: Did you consider**
24  **the possibility that the fire actually originated on**
25  **the third floor, either inside the room or outside on**

Page 56

1   the balcony, and that fall down or drop down created
2   the burn patterns on the balcony to Room 2207?
3   A. I did. One of the things about the
4   balcony on 2207 is the amount of damage to the
5   underside of that balcony. But also when I
6   interviewed the occupant of Room 2207, he stated that
7   when the fire alarm went off and when he went out on
8   his balcony, he saw fire to the lower left. He
9   didn't mention any fire above him.
10      So, you know, to me that kind of ruled
11  that out. I would -- if that was fall down that come
12  from above him, then if he had went out there, I
13  would imagine that he would have seen the fire above
14  him.
15  **Q. Okay. And the person that you**
16  **interviewed who was the occupant of Room 2207, do you**
17  **recall that being Mr. Michael Siegling?**
18  A. That's correct. And there was nobody
19  staying in 2307.
20  **Q. Okay. Thank you. So the room directly**
21  **above 2207 was vacant at the time of the fire?**
22  A. Correct.
23  **Q. Did you have any difficulty with respect**
24  **to your interview of Michael Siegling and getting him**
25  **to put his words down into writing?**

Page 57

1   A. Well, initially I had difficulty finding
2   him. Like I said, some of his classmates had, you
3   know, stated that that's who was staying in the
4   room.
5       Once I did find him and sat down and
6   talked to him -- I don't know if I mentioned it
7   before, but I was prewarned that because he worked
8   for the FBI, that they had a rule that you wouldn't
9   smoke ten foot from a building, that it would be
10  difficult for him to admit that he was out there
11  smoking because of fear of losing his job. From what
12  I understood, it was a terminational offense.
13      So when I did sit down and talk to him
14  and obtained his statement, he did tell me that he
15  had smoked out on the balcony -- and if I could refer
16  to his statement.
17  **Q. Sure.**
18  A. It's document 45. This was the statement
19  that he wrote me after I interviewed him verbally.
20  He told me quit -- he told me a bit more verbally
21  than he wrote down, but when I did ask for his
22  statement, he wrote down: I, Michael K. Siegling,
23  was awaken by a fire alarm at the hotel at
24  approximately 10:40 p.m. I went to the hallway and
25  did not smell smoke nor see anyone vacating the

DAN WILKERSON

## Page 58

1    building.
2           Approximately five minutes later, another
3    hotel guest knocked on my door and informed me there
4    was a fire in our building.  I then opened my balcony
5    door, looked to the left and observed flames to the
6    left of my balcony, end of statement.
7           Now, in document 46, I attempted to ask
8    him questions and have him answer them, but he
9    refused to write anything down.
10          **Q.  Let me ask you real quick then:  If you**
11   **had a written statement from him, as outlined in**
12   **document 45, why did you need -- feel like you needed**
13   **to do an additional question and answer on document**
14   **46?**
15          A.  Because when I verbally interviewed him,
16   he gave me more information than what he had wrote
17   down.
18          **Q.  Okay.**
19          A.  And so when I wrote out questions for him
20   to answer, he refused to write anything else down.
21   So I verbally asked him the questions, and then the
22   answers on page 46 that you see is what he verbally
23   told me.  That is my handwriting.
24          **Q.  Okay.**
25          A.  And then to verify that he was the one

## Page 59

1    giving me that information, I asked for his name,
2    address and phone number.  Then I signed the
3    statement at the bottom.  He would not sign that
4    piece of paper.
5           And again, my question for him was not to
6    lay blame or liability or anything like that.  The
7    reason I took his statement is for cause and origin.
8           I believe in his statement he verifies
9    what I believed as being the area of origin, and also
10   I believe his statement backs up my hypothesis as far
11   as smoking was being -- the useless -- the careless
12   use of smoking materials as being a cause of the
13   fire.
14          Now, when I -- when I questioned him, I
15   had already been on the scene for awhile.  So he
16   dates his statement the 22nd, but it was actually
17   taken on the 23rd.  It was the night of the 22nd.
18          But you could -- you could tell -- I
19   mean, he was experienced in interview and
20   interrogations to my belief because he was very
21   guarded on what he said and what he wrote down.  Like
22   I said, at one point he just said -- he said:  I'm
23   not writing anything else.
24          **Q.  Thank you.  So for the verbal answers**
25   **that he gave you that you wrote down on document 46**

## Page 60

1    was that he did not recall the last time that he
2    smoked cigarettes on the balcony?
3           A.  Yeah.  When I asked -- I asked the
4    question:  When was the last time that you smoked
5    cigarettes on the balcony.  And he said, I don't
6    remember.
7           And I had asked him:  Well, was it today?
8    Was it yesterday?  You know, was it a week ago?  He
9    said yesterday or the day before yesterday.
10          **Q.  Okay.**
11          A.  And then I asked:  How did you extinguish
12   the cigarettes when you were done?
13          And he said, A Styrofoam cup with water.
14          And I stated:  Before the fire, when was
15   the last time you was on the balcony?
16          He said, Around 5:00 or 6:00 today.
17          Then I said:  What was on the balcony
18   when you was last on the balcony?
19          And the only thing he stated was:  A beer
20   can.
21          **Q.  Let me ask you:  In your opinion, is it a**
22   **safe manner to extinguish cigarettes by placing them**
23   **in a Styrofoam cup of water?**
24          MR. HOOD:  Object to the form,
25   foundation.

## Page 61

1           **Q.  You can answer.**
2           A.  Restate your question.
3           **Q.  Is it a safe manner to discard a**
4    **cigarette by putting them in a Styrofoam cup with**
5    **water?**
6           MR. HOOD:  Same objection.
7           A.  I believe the safest method of
8    extinguishing a cigarette is to make sure that it's
9    extinguished fully and not to throw it in any
10   container not knowing if it was extinguished or not.
11          **Q.  Back to document 46, the questions and**
12   **answers that you wrote down yourself, you asked him**
13   **before the fire when was the last time he was on the**
14   **balcony.  And he stated, It was around 5:00 or 6:00**
15   **today?**
16          A.  Correct.
17          **Q.  And then you asked him:  What was on the**
18   **balcony when he last was on there, and he said a beer**
19   **can?**
20          A.  Correct.
21          **Q.  These were -- just to be clear --**
22   **question and answers that you wrote down.  He refused**
23   **to sign or write anything else down at this point?**
24          A.  These were verbal questions that I asked
25   that he answered, and he refused to write the answer

DAN WILKERSON

## Page 62

1  down. So I documented the answer.
2      Q. There are more than one buildings to this
3  hotel complex. Is that --
4      A. That is correct.
5      Q. And if I tell you that the fire occurred
6  in building two to the hotel complex, would that
7  sound consistent with your recollection?
8      A. I believe after meeting with the building
9  inspector and electrical inspector and my counsel,
10  Jeff Grimes, that we determined building two was
11  where the fire was.
12      Q. Okay. There's been some discussion in
13  this lawsuit counsel may want to ask you about with
14  respect to some code violations that were identified
15  by the City of Huntsville after -- some time after
16  the fire in September of 2010. The documents I've
17  seen relate to buildings one and three, not to
18  building two.
19      But let me ask you this question
20  specifically with respect to your investigation:
21  When you identified the area of origin of the fire
22  and you identified the cause, did you see any
23  building code violations in that area that led you to
24  believe that they were a potential cause of this
25  fire?

## Page 63

1      MR. HOOD: Object to form, foundation.
2      A. In the -- in respect to referencing the
3  balcony area on Room 2207 and 2307, I did not note
4  any -- any violations that were seen on those
5  balconies.
6      When I initially called Doug Smith out,
7  it was to assist me in the investigations. Our
8  electrical inspectors are a tool for us to use in
9  investigations because of their knowledge that they
10  have in regards to electrical wiring and electrical
11  appliances.
12      So when Doug Smith came out and we
13  processed our scene, there was areas in the hallway
14  during suppression that was identified because the
15  ceiling either fell, had been taken down to check for
16  extension. And at that point, we had noted that
17  there was existing violations within the building.
18      But in respect to why we couldn't allow
19  the building to be occupied, it was because of the
20  damage that the building had suffered.
21      And that's why Skip was brought in.
22  Because usually when we have a building where the
23  roof system is involved, we try to get a building
24  inspector on scene to assess the damage and to give
25  us an opinion on whether or not the building would be

## Page 64

1  safe to occupy or not.
2      And that evening it was my opinion, Doug
3  Smith's opinion and Skip Stinson's opinion that the
4  building was unsafe to occupy due to the fire.
5      Q. I believe you testified part of your job
6  responsibility as a fire prevention officer with the
7  City of Huntsville was to perform inspections and
8  look for code violations that might cause a fire; is
9  that fair?
10      A. To look for code violations, not
11  necessarily just violations that will cause a fire.
12      There are code violations that can be a
13  -- put life safety in jeopardy. Say, overcrowding of
14  a nightclub. That's not necessarily a fire hazard,
15  but could be a life safety hazard.
16      Q. Fair enough.
17      A. You could have an active shooter in a
18  night club and then people stampeding to get to the
19  door. If it's overcrowded, you have more chances of
20  people getting trampled, not enough exits to get out,
21  you know, to that point.
22      Q. Is it fair to say that you're versed in
23  the city codes with respect to fire safety issues and
24  would have been able to identify one had you seen one
25  on the balcony of Room 2207?

## Page 65

1      A. Correct.
2      Q. Are you familiar with the term arc
3  mapping?
4      A. I am.
5      Q. Based upon your investigation of the fire
6  scene and the determination that the fire originated
7  on the exterior of the building, that there were no
8  electrical components within that area of origin,
9  would you deem it necessary to have arc mapping
10  performed?
11      MR. HOOD: Object to form and foundation.
12      Q. You can answer.
13      A. I did not.
14      Q. What is arc mapping, to your knowledge?
15      A. Arc mapping is where you diagram the
16  electrical wiring. If you've got energized wiring at
17  the time of the fire, you could analyze the damage to
18  the wiring, and it can assist you in determining the
19  area of origin, because usually where you have heat
20  exposed to wires -- and it's where you trace the
21  wires from all the way back to the panel diagram
22  where -- where there's any signs of damage, and it
23  can -- like I said, it can assist you in placing the
24  area of origin.
25      Occasionally you can look at damage on

DAN WILKERSON

Page 66

1 wiring and determine whether or not it caused the
2 fire if it's in your area of origin, but that's not
3 always conclusive.
4      Q.  Okay.  So it's a tool that you can use to
5 assist you in your investigation, but it's not always
6 necessary to perform?
7      A.  That's correct.
8           MR. HOOD:  Object to the form and
9 foundation.
10      A.  I didn't believe that in this case that
11 it was necessary to do arc mapping because --
12 especially when you're dealing with the -- you know,
13 that's usually on a bigger scale of fire where you
14 don't have a lot of wall coverings.
15           In reference to Apartment 2207 where
16 there was no damage in the apartment, you know, I
17 didn't -- I didn't see that that was necessary and,
18 you know -- you know, on this particular case, it was
19 a tool that I felt was unnecessary.
20      Q.  Let me ask you a question about the
21 balcony of Room 2307.  I know you testified that Room
22 2307 was vacant at the time of the fire, correct?
23      A.  Correct.
24      Q.  Did you look at the balcony or the
25 remains of the balcony of 2307 during your

Page 67

1 investigation?
2      A.  I did.  If you look at photograph -- go
3 back to photograph 143.  If you'll look at the damage
4 to the ceiling area of balcony 2307 --
5      Q.  And that's the balcony at the top of the
6 photograph, correct?
7      A.  Correct.
8      Q.  Okay.
9      A.  The damage to those wooden members was
10 not as severe as what was 2207.  And like I said, I
11 know the fire eventually broke through the window and
12 damaged 2307, but just looking at the damage -- the
13 amount of damage to the ceiling area of the balcony
14 on 2207, 2307 did not have that severity of damage.
15      Q.  Okay.  With respect to the balcony of
16 2307, I'll ask you the same questions.  Did you find
17 any electrical wiring on the exterior balcony of Room
18 2307?
19      A.  Of just the light fixture that we
20 identified on 2207.
21      Q.  And did you find any electrical
22 appliances in the exterior balcony of 2307?
23      A.  Just that light fixture.  There was
24 nothing -- nothing down low on 2307.
25      Q.  Okay.  And based upon the burn patterns,

Page 68

1 I guess, did you likewise eliminate the exterior
2 lights on the balcony of 2307 as a cause of the fire?
3      A.  Not the -- not the burn damage, but just
4 the fact that it wasn't in my area of origin.
5      Q.  Okay.
6      A.  I believe that the balcony of 2307 was
7 damaged from fire extension and not the initial
8 phases of the fire.
9      Q.  All right.  Okay.  So again, I'm going to
10 put on my laymen's hat.
11           For someone who is not a fire scientist,
12 but your opinion is -- tell me if I'm wrong -- that
13 the fire originated down low to the bottom right-hand
14 corner of the balcony of 2207, spread up -- I guess
15 up and out, up to the balcony and attic area of Room
16 2307 and above it and then out into that room; is
17 that fair to say?
18           MR. HOOD:  Object to the form and
19 foundation.
20      A.  Yeah.  My belief was that the fire
21 originated on the balcony of 2207, extended upward
22 along the wall that was covered with the siding
23 material.  The heat and everything was -- that was
24 generating was at the ceiling of the balcony 2207,
25 and that the fire extended upward to the balcony of

Page 69

1 2307, and then once it got to 2307, that it breached
2 the window and actually rolled inside the building in
3 the attic at 2307.
4      Q.  Okay.  So in your mind, the fire
5 originated on the balcony of 2207 and burned up and
6 out.
7           Let me ask you this question:  Is there
8 any scenario in your mind where it would be
9 reasonable to believe that the fire started on the
10 interior of 2307, in the room, and burned out and
11 down?
12           MR. HOOD:  Object to the form.
13      Q.  Is that reasonable in your mind?
14           MR. HOOD:  Object to the form and
15 foundation.
16      A.  When we do our fire investigations, we do
17 take into consideration the possibility of fall down.
18 But as I previously stated, when I initially assessed
19 the scene, because of the damage that was done to the
20 undersiding of the ceiling area of balcony 2207, I
21 did not believe that fall down had fallen down and
22 extended -- and created the patterns that I had.
23           And you did have a greater amount of
24 damage on the underside of 2207 than 2307, but
25 typically the only way for it to have started, as

DAN WILKERSON

## Page 70

1  you're saying, inside 2307 and extend downward, it
2  would have had to roll out that window. And then you
3  would have had to have some form of fall down fall
4  down on 2207 and start a secondary fire.
5       And even the witness statements stated
6  that the fire was on his balcony and not the balcony
7  above him.
8       I would think if you had that great a
9  damage to the fire, that when he came out of his
10  door, that he would have been able to see the fire
11  above him. But looking at picture 154, if you look
12  at that picture, that's actually the inside of 2307.
13  That's Captain Dotson and Chief Kay.
14       And if you look at the window area where
15  the window used to be and your damage there, there's
16  no damage below the window on 2307 on the inside.
17  And it looks like the fire is on the -- above the
18  window and the sides, which will be consistent of the
19  fire going out to in instead of in to out.
20       You can also see the demarcation line on
21  the right-hand side of that video which is where you
22  have black fire damage and then you get to the
23  lighter more color of the wall covering where the
24  door is there. And it's consistent that the fire is
25  coming from the outside to the inside.

## Page 71

1       Q. I apologize. I forget we're on video.
2  Could you hold the photograph up for the camera and
3  walk us through that quickly?
4       A. You can see the undamaged area below the
5  window inside Apartment 2307. You have fire or smoke
6  and heat damage around the window. You have more
7  damage on the upper -- the top of the window than the
8  sides of the window and the line that I'm talking
9  about right here where you go from heavier damage to
10  lighter damage. And then it is my belief that the
11  fire reached that window and came into the room and
12  eventually penetrated the attic area.
13       I'm unclear if the Sheetrock stayed
14  intact until my crews got there or if the attic was
15  penetrated on the outside of the balcony. But at
16  some point, the heat got up into the attic enough to
17  char some of the attic members inside the attic.
18       Q. Do you see the roof trusses -- what I
19  call roof trusses in FB1 154 above the ceiling --
20       A. I do.
21       Q. -- where the ceiling would have been? Is
22  there anything regarding the, I guess, amount of
23  physical burn or damage or lack thereof to these roof
24  trusses that meant anything to you in your
25  investigation?

## Page 72

1       A. Yeah. When you look at the ceiling
2  trusses in that you don't really have any smoke or
3  heat damage that you can see on these lower trusses.
4  It's usually signified that the Sheetrock was intact
5  at the time of the fire.
6       Typically when the Sheetrock fails during
7  a fire, you'll have at least smoke damage on those
8  ceiling joists.
9       And if you look at the -- you can barely
10  see it in the photographs, but the underside of the
11  roof has more smoke and heat damage than what these
12  had. So I would say that the ceiling -- the
13  Sheetrock was intact at the time of the fire.
14       Q. Okay. If a fire had originated in that
15  attic space and above the ceiling joists, would you
16  have expected to see more burn damage to the ceiling
17  joists themselves?
18       A. If the Sheetrock would have fell during
19  the fire, I would believe that. I mean, you know,
20  the -- during a fire, heat, smoke, everything rises
21  and goes upward.
22       So typically -- you know, in some cases,
23  you would have the Sheetrock fail before you would
24  have the window fail unless the fire was directly
25  below that window, which on -- on this photograph,

## Page 73

1  you can see that there's hardly any smoke damage at
2  the bottom side of that window.
3       Q. Okay.
4       A. You can also see in that photograph the
5  door was closed at the time of the fire, too, because
6  you can see the surface of that door had kind of
7  blistered off about halfway up.
8       Q. Okay. Thank you. Now, when you do a
9  fire investigation, I take it unless you've to an
10  eyewitness who literally eyewitnesses the fire
11  ignite, it's very difficult to a hundred percent
12  conclusively determine the origin and cause of a
13  fire?
14       A. I would say that's an accurate statement.
15       Q. Can you tell the Court whether or not the
16  opinions that you've rendered in your report and here
17  today in this deposition are based to a reasonable
18  degree of probability?
19       MR. HOOD: Object to the form and
20  foundation.
21       A. Yes. One of the things that -- if I'm
22  not mistaken, one of the things that 921 refers to is
23  that if it's less than fifty percent, it's possible;
24  if it's greater than fifty percent, it's probable. I
25  would say that the most probable cause of this fire

DAN WILKERSON

Page 74

1  was the cigarette.
2       Q. Okay. I think I'm about finished. Let
3  me run through my notes here.
4       Did Mr. Michael Siegling, in your
5  conversations with him, ever make any reference that
6  he believed that he was protected by governmental
7  immunity?
8       MR. HOOD: Object to the form and
9  foundation.
10      A. He never made that statement to me.
11      Q. Okay.
12      A. Not that I recall.
13      MR. GRINKE: Thank you for your time.
14 I'll pass the witness.
15      THE WITNESS: Thank you.
16
17      EXAMINATION
18 BY MR. HOOD:
19      Q. Officer Wilkerson, my name is Jack Hood.
20 we've never met before, have we?
21      A. No, sir.
22      Q. And I've never talked to you, correct?
23      A. Not that I'm aware of.
24      Q. Okay.  Look, if you will, in Plaintiff's
25 Exhibit Number 1, that stack, FBI 119.  Plaintiff's

Page 75

1  counsel had indicated that there was no post fire
2  inspection problems with Room 2.  And if you'll look
3  at that document, I believe you'll find that on June
4  3rd, 2011, the Huntsville city inspection department
5  issued an investigation report specifically about
6  building number two.
7       A. Okay.  Your question -- at first you
8  referred to room two and then building two.
9       Q. I'm sorry if I said room two.
10      A. We're discussing building two?
11      Q. Right.  And that's the building where the
12 fire occurred.
13      A. And you're on report 119?
14      Q. Yes.
15      A. Okay.  This is actually a report from the
16 inspection department, and I actually work in the
17 fire marshal's office.
18      Q. I understand that.  Do you recognize
19 those kind of code violations as the type of thing
20 you would normally look for when you're investigating
21 a fire scene?
22      A. Let's see.  Well, typically when I'm
23 investigating a fire scene, I usually don't look for
24 code violations.  I usually look for code violations
25 when I'm in -- kind of got my inspector's hat on,

Page 76

1  unless it's a code violation that would have directly
2  been involved somewhat with the fire.  But if you'll
3  give me just a minute to read this over --
4       Q. Sure.  Absolutely.
5       A. -- because I've never seen this document
6  here.
7       Q. I apologize.  I thought you had.
8       A. Okay.  In reference to your question --
9  like I said, the inspectors that was involved with
10 this report -- it looks like it was Inspectors Bruce
11 Owens, James Campbell, and Eric Webber -- they was
12 not there the night of the fire.
13      But due to us not allowing the building
14 to be occupied, my guess would be that they went out
15 at a later date -- later date, probably by the
16 request of somebody with the apartment complex, to
17 identify issues that they have to correct to get
18 power turned back on to the building, because usually
19 when a building is unsafe to occupy, they disconnect
20 the power.
21      Now, I'm unaware that they did that.  I
22 don't -- I didn't note it in my report.  So it may
23 have been something that was done at a later time.
24      Sometimes the electrical inspector will
25 order the power to be shut off.  The utility company

Page 77

1  may come at a later time to shut it off.
2       But when -- as I previously stated in the
3  question, we did note because of the ceiling being
4  displaced in the corridor, whether it was through
5  suppression efforts or checking for extension or how
6  be it, we did notice one of the things that's listed
7  on here is the holes in the rated ceiling.
8       We did notice that that was a violation
9  at the time of the fire.  We did identify that that
10 night.  And the other thing that we identified was
11 that they had existing light fixtures that was on the
12 ceiling, and they added a ceiling below that ceiling,
13 like a drop ceiling, and that they wired -- they fed
14 the wires, I believe, off those fixtures and had the
15 open splices.
16      So we identified the holes in the ceiling
17 and the open splices.  The rest of these violations I
18 had no knowledge of that night.
19      Q. These fifteen items are fairly serious,
20 are they not?
21      A. To the degree --
22      MR. GRINKE: Object to the form and
23 foundation.
24      A. To the degree of seriousness, you know,
25 the storage and the electrical rooms, it's my

DAN WILKERSON

## Page 78

1  understanding that's more that service can be
2  disconnected or maintenance can be done on panels,
3  not necessarily -- I don't -- I don't know of any
4  cases that I've ever worked where storage and
5  electrical rooms have caused fires. But the
6  telephone cable running under carpet from wall to
7  wall, I mean, a lot of these are electrical problems
8  and in the City of Huntsville, outside of just
9  routine yearly inspections we do, most of the time
10  when I do a new construction or renovation project, I
11  have an electrical inspector with me. So some of
12  this stuff I defer to him on what's code and what's
13  not code.
14        But I would say any time you have a rated
15  corridor that's penetrated and not sealed properly,
16  you know, that's supposed to be rated X in the case
17  of emergency, but also the open splices in the
18  ceiling, I would consider significant.
19        You know, the improper size junction
20  boxes that service panels, I'd have to defer that to
21  an electrical inspector. But as far as my
22  investigation was concerned, I didn't see where any
23  of these had contributed to my fire. So they were
24  not documented by me.
25        I mean, I did -- I did write an

## Page 79

1  inspection report. And if you don't mind, I would
2  like to reference that, because I did write a report
3  that night. I'll have to find it.
4        MR. HOOD: Let's go off the record
5  because we're running out of tape. Now would be a
6  good time to take a break and you can look for it.
7        THE VIDEOGRAPHER: Off the record at
8  3:42 p.m., end of cassette two.
9        (Break taken.)
10
11        THE VIDEOGRAPHER: Back on the record at
12  3:57 p.m., cassette three.
13        Q. I want to make sure I know a little bit
14  more about your background, too.
15        You're not certified by IA -- IAAI, The
16  International Association of Arson Investigators?
17        A. No. No, sir, I'm not.
18        Q. And you're not certified by the National
19  Association of Fire Investigators?
20        A. No, sir. I was a member of the NAFI up
21  until this year, and we joined the -- I believe the
22  AAAI, which is an affiliate of the IAAI.
23        Q. But you're not a -- what's called a
24  certified fire investigator by either one of those
25  two organizations?

## Page 80

1        A. That's correct.
2        Q. Okay. Does the NFPA 921 require you to
3  not only consider other hypotheses for the cause and
4  origin of a fire, but also to document each
5  hypothesis in your report?
6        A. Well, I don't have a -- I would have to
7  have a 921 to verify what it says, but as I stated
8  before, 921 is a guide for investigators. And --
9        Q. But your report, you didn't -- you talked
10  about some of the hypotheses you had today, but you
11  did not mention in your report the weather, the drop
12  down from the third floor possibility, an electrical
13  malfunction of an external light fixture or a Molotov
14  cocktail?
15        A. That's correct.
16        Q. Would you have considered the electrical
17  failures more -- or studied the possibility of
18  electrical events if you had known that evening of
19  the different fifteen code violations in that
20  building?
21        A. No, I don't think I would have done my
22  investigation any differently. You know, when I'm
23  looking for origin and cause, you know, I would have
24  looked at electrical differently if I had more
25  electrical or electrical in the area of origin.

## Page 81

1        The reason I didn't look at electrical as
2  being more of a possibility of being a cause is
3  because of the absence of electrical in my area of
4  origin.
5        Q. You indicated that you thought that the
6  cigarettes had fallen between the gaps in the balcony
7  floor. Would you show me in the picture where that
8  would be?
9        A. Sure. There's two pictures that I want
10  to reference.
11        Q. Okay.
12        A. The first picture is number 174.
13        Q. Hang on. Let me check over here. Okay.
14        A. And if you'll look at these boards here,
15  these three boards from the exterior wall of the
16  balcony, there's considerable gaps between those
17  boards.
18        Q. Okay.
19        A. And also I want to reference picture 178,
20  and this is the underside of those boards. And you
21  can see from the fire damage that the gaps in that
22  corner are considerably -- appear to be larger than
23  the other gaps that are not affected by the fire.
24        But also, if you look as well, it appears
25  that there's water damage on the underside of this.

DAN WILKERSON

Page 82

1       Q. Uh-huh.
2       A. We take into consideration, too, of
3   runoff water during suppression efforts.
4       Q. Have a look, if you will, at -- the pack
5   of Marlboro cigarettes is -- Marlboro Lights, it
6   looks like -- what's the number of this thing?
7       A. One of them is page 162, and I believe
8   there's another one.
9       Q. Yeah, 162.
10      A. And 149.
11      Q. And 149.
12      A. I believe 149 is the better picture.
13      Q. Look at 181. In the bottom right-hand
14  corner -- I guess it depends --
15      A. Yes.
16      Q. Right towards those numbers down at the
17  bottom?
18      A. Correct.
19      Q. That appears to be a different type of
20  cigarette than a Marlboro Light?
21      A. That's correct.
22      Q. Do you know what type of cigarette that
23  was? Winston maybe?
24      A. If I had this on an electronic, I could
25  probably zoom in, but I'm not sure.

Page 83

1       Q. My question is: Did you interview any
2   other smokers or identify any other smokers in the
3   people staying at that hotel?
4       A. No.
5       Q. Did you make an attempt?
6       A. No.
7       Q. Did you collect any of these cigarette
8   butts or try to match them up?
9       A. I did not collect any cigarette butts. I
10  didn't collect any evidence from the scene.
11      Q. At all?
12      A. At all. The -- I will tell you that the
13  people that I talked to that was in the class with
14  him said they had witnessed him smoking on his
15  balcony. And I can't recall or not. It seems like
16  they may have partaked as well.
17          But the reason I didn't seek out other
18  people is because of -- my belief was the fire
19  started on his balcony and he's the one that's got
20  access to his balcony.
21          If I had believed that the fire started
22  elsewhere, I would have looked at more the occupant
23  of that location.
24      Q. But you indicated that other people were,
25  what, partaking of cigarettes with him?

Page 84

1       A. I think -- I think his classmates said
2   that they was -- they had been out drinking on his
3   balcony, and that's when they had witnessed him
4   smoking cigarettes.
5       Q. Where are these interviews with these
6   persons?
7       A. It was just verbal interviews.
8       Q. You didn't record it --
9       A. No.
10      Q. -- in any sense? Did you identify any of
11  them? Do you remember any names?
12      A. The only thing I can tell you is they was
13  in his class on the arsenal and they were staying at
14  that hotel.
15          You know, the reason I was there was for
16  the origin and the cause, and I didn't see it
17  pertinent to the origin and cause to document their
18  interviews.
19      Q. Have a look, if you will, at page thirty-
20  six.
21      A. Okay.
22      Q. There's no indication of any kind of code
23  violations here, is there?
24      A. That's correct.
25      Q. Why not?

Page 85

1       A. Well, again, you know, I was there to do
2   cause and origin. I wasn't there referencing doing
3   an inspection. But that's not something we typically
4   mark on our investigation forms.
5          I think if I pool all my investigations
6   I've done, that's never been checked on any of my
7   forms.
8       Q. Have a look, if you will, at photograph
9   154.
10      A. Okay.
11      Q. That's, again, a picture of two gentlemen
12  there in the Room 2307, right?
13      A. That's correct.
14      Q. And the Sheetrock failure there is really
15  from the fire department pulling down the ceiling to
16  check for fire extension, right?
17      A. Correct.
18      Q. And did you --
19      A. Well, I mean, that's an assumption, yes.
20  I've testified that it doesn't look like the ceiling
21  -- doesn't look like the ceiling joists has smoke or
22  heat damage, but, you know, it could have fell from,
23  you know, water weight or other things and not
24  necessarily the fire department pulling it down.
25      Q. Well, did you examine the electrical

DAN WILKERSON

Page 86

1 wiring in the ceiling of 2307, which is -- we can see
2 in this picture?
3      A. We visually looked at it, didn't find any
4 significant damage on it.
5      Q. Have a look, if you will, at what I'm
6 going to label and mark as Defendant's Exhibit Number
7 1.
8          (Defendant's Exhibit Number 1 was marked
9          for identification. A copy is attached.)
10
11      MR. HOOD: I'll show this to opposing
12 counsel. Sorry I don't have an extra copy with me.
13      Q. Have a look, if you will, at those
14 photographs. If I global photograph these items, I
15 believe, the next day or the day thereafter, some
16 time close to the fire, do you recognize those items?
17      A. I recognize the light fixture.
18      Q. Does that fairly and accurately depict
19 what you recall it looked like after the fire?
20      A. Yes.
21      Q. What --
22      A. It looks like the glass is broken on it.
23 I can't say that the glass -- I know the glass was
24 cracked. I don't know if it was broken. But it
25 looks like it's laying on the ground there. When I

Page 87

1 was there, it was still on the wall.
2      Q. And the photograph to the upper -- your
3 upper right --
4      A. I don't recognize that.
5      Q. You do not? Okay.
6      A. I mean, it says here that -- I don't know
7 if that's an example of where the light fixture was,
8 but that doesn't look like the balcony at 2207.
9      Q. Okay. And in the two bottom pictures, do
10 you recognize that?
11      A. I do not.
12      Q. Did you remove or did anybody in your
13 group remove that light fixture from the wall and
14 leave it where it seems to be?
15      A. No, sir. Where I documented the light
16 fixture being is where it was when we left the scene
17 that evening.
18      MR. HOOD: I'd like to label and mark
19 this as Defendant's Exhibit Number 2.
20          (Defendant's Exhibit Number 2 was marked
21          for identification. A copy is attached.)
22
23      MR. GRINKE: Counsel, is this a copy of a
24 page out of a book or is it --
25      MR. HOOD: Yes. I believe it's out of

Page 88

1 NFPA 921, or Kirk's book here.
2      MR. GRINKE: This is not a recreation of
3 the hotel room?
4      MR. HOOD: No. No. No. No. No.
5      Q. Defendant's Exhibit Number 2 is an
6 example of NFPA 921, technique of heat and flame
7 vectoring. And it's a simple method to document fire
8 spread. Are you familiar with that?
9      A. I am.
10      Q. Why did you not use this documentation
11 technique in your investigation report?
12      MR. GRINKE: Objection to form and
13 foundation.
14      A. I didn't feel it was necessary for the
15 cause and origin. I will note that this is
16 referencing, it looks like, 2014 edition. The book
17 that I own is a 2004 edition. I don't know if this
18 is in my book or not.
19      Q. Are you aware that your testimony today
20 should comply with the 2014 edition because that's
21 what 2014 edition says?
22      MR. GRINKE: Objection to form and
23 foundation. I also believe that's a misapplication
24 of the law or misstatement of the law.
25      A. I don't have a knowledge of what the 2014

Page 89

1 NFPA 921 says.
2      Q. Okay. I'm trying to find a picture to
3 simplify this.
4          Show me the better -- the best picture
5 that we have of Room 2207 from the outside.
6      A. It would either be 143 or 144.
7      Q. Okay. Let's look at 144. I'm holding up
8 mine so you can see it. So I'm pointing at something
9 for you to look at.
10          This is 144, and that light fixture is
11 right here (indicating). Do you see that -- is that
12 correct?
13      A. Correct.
14      Q. Okay. Right above the window, I'd say,
15 to the left top of the window, would that be fair?
16      A. That's correct.
17      Q. Okay. Isn't it possible that a fire
18 could have originated with that light fixture going
19 across here and then drop down?
20      A. I don't believe so. No, sir, not in my
21 opinion.
22      Q. But it's possible, isn't it?
23      A. Not in my opinion, it's not.
24      Q. Why not?
25      A. Well, what material would you have had

DAN WILKERSON

## Page 90

1  that would have dropped down?  You know, with the
2  damage that you see around that light fixture, it's
3  my belief if that was the origin of the fire, it
4  would mean more damage on the wall there at the light
5  fixture, and then you would have had to have a
6  material that would have sustained that combustion
7  across that ceiling and would have fallen down.  And
8  I just didn't see any evidence of something that had
9  fallen down there.
10      Q.  In your theory of what happened here, how
11  would a discarded cigarette cause fire on what is
12  essentially two by fours or wood?
13      MR. GRINKE:  Objection to form and
14  foundation.
15      A.  My belief is that there was -- in the
16  investigations that I've done involving cigarettes,
17  that usually you have a less dense material there,
18  whether it be trash that was discarded in that cup
19  that he claimed he was using or some kind of dry
20  vegetation that may have fallen on the balcony
21  itself.  But we showed no evidence of a dry
22  vegetation on any of the other balconies.
23      But since there was discarded beer cans,
24  my hypothesis was that there was some trash there and
25  he discarded his cigarette into some trash.

## Page 91

1      Q.  That's speculation, isn't it?
2      A.  Well, I mean, that's -- it's my opinion,
3  yes, sir.
4      You know, there's times that the first
5  fuel ignited may get consumed by the fire and you may
6  not have it -- may not have any evidence of the first
7  fuel ignited when you do your investigation.
8      Q.  If you light a cigarette and just leave
9  it on the floor, how long will it take to go out?
10      A.  I don't know.
11      Q.  Have you published any kind of articles
12  or technical papers or anything in the area of fire
13  investigations or cause and origin?
14      A.  No, sir.
15      Q.  Have you ever given cause and origin
16  testimony in state or federal court?
17      A.  Not in court, no.
18      MR. HOOD:  Believe it or not, that's
19  about all the questions I have, but I need to check
20  some notes.  Can we take a break?
21      THE WITNESS:  Sure.
22      THE VIDEOGRAPHER:  Off the record at
23  4:17 p.m.
24      (Break taken.)
25

## Page 92

1      THE VIDEOGRAPHER:  Back on the record at
2  4:23 p.m.
3      Q.  Have you seen the inspection reports from
4  EFI Global --
5      A.  I have not.
6      Q.  -- in this case?
7      A.  No, sir.
8      Q.  Have you seen the Rule 26 report filed in
9  this case by Mr. David Icove here, the government's
10  expert?
11      A.  No, sir.  The only thing that I think
12  I've reviewed is my investigations, my photographs,
13  witness statements, and I briefly saw some of the
14  inspection reports from our city inspection
15  department, but that's all I've reviewed from this --
16  for this case.
17      Q.  What edition of Kirk's do you have?  Do
18  you have this one?
19      A.  The one I have was in '07.  So if that's
20  a newer edition, I don't believe I have that one.
21      Q.  Okay.  And this is the seventh edition
22  I'm holding up written by John DeHaan and David J.
23  Icove, who is here present.
24      MR. HOOD:  That's all I have.
25

## Page 93

1      EXAMINATION
2  BY MR. GRINKE:
3      Q.  Just a few follow-up questions, Officer
4  Wilkerson.
5      You were questioned about document FBI
6  119.  Get that back in front of you.
7      A.  Okay.
8      Q.  Hold on.  You beat me there.  Wait.
9  Document 119 has a bullet point list of code
10  violations that the City of Huntsville documented a
11  couple of months after the fire in question; is that
12  fair?
13      A.  That's correct.  It looks like it was
14  June of '11, and I believe the fire happened on
15  September of 2010.
16      Q.  And you took some time a few moments ago
17  to read through these fifteen items, and I think I
18  heard your testimony, but I want to make sure I'm
19  very clear about it.
20      And if you need to read through them
21  again, please do so.  But are there any of these
22  items, one through fifteen, that you've now seen that
23  you think would be relevant to determining the origin
24  and cause of the fire in question?
25      A.  Out of these fifteen items, I don't think

DAN WILKERSON

## Page 94

1 any of them was directly involved with the fire on
2 September of 2010.
3         The only -- the only thing in respect to
4 that is the fact that some of the violations was
5 identified that evening and was brought to
6 management's attention that -- and if I could, before
7 we took our break earlier, I was trying to reference
8 document 78, which is the report that I filled out
9 that night for the hotel.
10        And on this document, I hand wrote -- and
11 you can see it's September 23rd because it was after
12 midnight when I left the scene. But it says Building
13 fire -- due to water and fire damage, building cannot
14 be occupied due to life safety concerns. Schedule
15 inspections before occupying the building.
16        So we rendered the building being unsafe
17 because of the fire and the water damage to the
18 building, and it was documented -- and I got somebody
19 there to sign it to document that.
20        But in the process of repairing that
21 building, they're required to pull permits to fix the
22 damage, and it's our -- our policy for our inspection
23 department is that anything that doesn't meet the
24 code has to be fixed before they'll allow you to
25 occupy the building again.

## Page 95

1         So if we tell them that they can't occupy
2 the building, then before they are allowed to occupy
3 the building, not only do they have to fix the fire
4 damage, but they have to fix any other violations
5 that may be existent that we're aware of.
6         And my belief is that when this form was
7 created, it was when they went back out there to
8 identify the violations that the hotel was going to
9 have to fix to be able to occupy that building again,
10 outside the fire and the water damage.
11        Q. The report that you prepared as a result
12 of this fire was not prepared for litigation
13 purposes, was it?
14        A. No, sir.
15        Q. You were not asked by any private party
16 to prepare a report to satisfy federal rule
17 requirements?
18        A. No, sir.
19        Q. The report that you prepared was just
20 based upon your duties and responsibilities with the
21 City of Huntsville Fire Department?
22        A. Yes, from my understanding that when I'm
23 called to do a fire investigation, that my primary
24 responsibility is cause and -- origin and cause and
25 that we document it in our report of our findings.

## Page 96

1         Q. Last area. If you could, go back to
2 document FBI 144.
3         A. Okay.
4         Q. You were asked questions about the
5 possibility that a fire could have originated at that
6 exterior light that is to the above right as we face
7 the balcony. And you're pointing at it there.
8         Okay. The question was: Was it possible
9 the fire started at that lamp and then spread
10 horizontally to the right and then there was drop
11 down.
12        I want to ask you this: There is a white
13 border that goes around the windows. Do you see what
14 I'm talking about?
15        A. I do.
16        Q. What would you call that? And it doesn't
17 matter what you call it. I just want to make sure
18 I'm calling it what you call it.
19        A. It just looks like trim that goes around
20 the window and the door frame.
21        Q. Okay. Is the trim immediately to the
22 right of that exterior light consumed or burned by
23 the fire?
24        A. Looking at the picture, it looks like
25 there is heat damage, but there is more heat damage

## Page 97

1 on the right-hand side of the window -- or heat and
2 fire damage on the right-hand side of the window, and
3 as you get closer to the light, it looks like it's
4 less damage.
5         Q. Okay. In fact, if you're looking about
6 halfway across that window, it looks from this
7 photograph, at least, like that trim became
8 completely consumed?
9         A. It actually looks like it may have come
10 loose from the wall and may be hanging there because
11 it almost looks like there's a piece hanging there.
12        Q. Okay.
13        A. But it's not -- it's not very clear in
14 the photograph, but that's what it appears to be. It
15 appears that something is hanging there in front of
16 that window.
17        MR. GRINKE: Thank you, sir. I'll pass
18 the witness.
19        MR. HOOD: I have no further questions.
20 I will just state for the record that under Rule 702
21 of the Federal Rules of evidence in Daubert the
22 Supreme Court case and Kumho Tire and it's prodigy, I
23 move to exclude this witness's testimony as
24 unreliable.
25        MR. GRINKE: Then file the appropriate

DAN WILKERSON

26 (Pages 98 to 99)

Page 98

1    motion with the Court.
2          MR. HOOD:  Thank you, Investigator
3    Wilkerson.
4          THE VIDEOGRAPHER:  This concludes the
5    deposition of Dan Wilkerson.  The deposition is
6    complete on three tapes.  The time is 4:31 p.m. on
7    April 21st, 2014.  We're off the record.
8
9          Deposition of DAN WILKERSON
10             Concluded at 4:31 p.m.
11                April 21, 2014
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 99

1          C E R T I F I C A T E
2
3
4    STATE OF ALABAMA  )
5    JEFFERSON COUNTY  )
6
7          I hereby certify that the above and
8    foregoing deposition was taken down by me in
9    stenotype, and the questions and answers thereto were
10   reduced to computer print under my supervision, and
11   that the foregoing represents a true and correct
12   transcript of the deposition given by said witness
13   upon said hearing.
14
15         I further certify that I am neither of
16   counsel nor of kin to any of the parties to the above
17   mentioned action, nor am I in any way interested in
18   the outcome of said cause.
19
20
21
22   _____
23      Elaine Scott, ABCR 354
24   Commission Expires October 16, 2015
25

# Exhibit C: Deposition Testimony of Inspector Doug Smith

EVIDENTIARY MATERIALS IN SUPPORT OF PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANT'S MOTIONS TO EXCLUDE THE TESTIMONY OF RODERICK WILLIAMS
L:\00760\0064  (Yedla)\Pleadings\Drafts\P's  Evidentiary  Materials  in  Support  of  Response  to  Strike  Expert Williams.docx

DOUG SMITH

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

HUNTSVILLE DIVISION


ACADIA INSURANCE COMPANY,   )

AS SUBROGEE OF YEDLA        )

MANAGEMENT COMPANY, INC. &  )

HOSPITALITY ENTERPRISES OF  )

HUNTSVILLE, INC., d/b/a     )  CIVIL ACTION NO.:

COUNTRY INN & SUITES,       )  5:13-CV-00895-CLS

     Plaintiff,          )

V.                          )

UNITED STATES OF AMERICA,   )

     Defendants.         )



VIDEOTAPED DEPOSITION OF

DOUG SMITH

April 22, 2014

10:02 a.m.

DOUG SMITH

| | Page 2 |
|---|---|
| 1 | S T I P U L A T I O N S |
| 2 | |
| 3 | IT IS STIPULATED AND AGREED, by and between |
| 4 | the parties through their respective counsel, that |
| 5 | the deposition of DOUG SMITH, may be taken before |
| 6 | Elaine Scott, Notary Public, State at Large, at the |
| 7 | Municipal Building, 815 Wheeler Avenue, Huntsville, |
| 8 | Alabama, on April 22, 2014, commencing at |
| 9 | approximately 10:01 a.m. |
| 10 | |
| 11 | IT IS FURTHER STIPULATED AND AGREED that the |
| 12 | signature to and reading of the deposition by the |
| 13 | witness is not waived, the deposition to have the |
| 14 | same force and effect as if full compliance had been |
| 15 | had with all laws and rules of Court relating to the |
| 16 | taking of depositions. |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 4 |
|---|---|
| 1 | A P P E A R A N C E S (continued) |
| 2 | |
| 3 | ALSO PRESENT: |
| 4 | Gary Brown |
| 5 | David J. Icove, P.E. |
| 6 | |
| 7 | |
| 8 | VIDEOGRAPHER: |
| 9 | HENJUM GOUCHER REPORTING SERVICES LP |
| 10 | Stephen R. Edmondson |
| 11 | 2501 Oak Lawn Avenue |
| 12 | Dallas, Texas 75219 |
| 13 | |
| 14 | COURT REPORTER: |
| 15 | HENJUM GOUCHER REPORTING SERVICES LP |
| 16 | Elaine Scott |
| 17 | 2501 Oak Lawn Avenue |
| 18 | Dallas, Texas 75219 |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 3 |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | FOR THE PLAINTIFF: |
| 4 | McCATHERN LAW |
| 5 | Paul A. Grinke |
| 6 | Regency Plaza |
| 7 | 3710 Rawlins Street |
| 8 | Suite 1600 |
| 9 | Dallas, Texas |
| 10 | |
| 11 | FOR THE DEFENDANT: |
| 12 | UNITED STATES DEPARTMENT OF JUSTICE |
| 13 | Jack B. Hood |
| 14 | 1801 4th Avenue North |
| 15 | Birmingham, Alabama 35203 |
| 16 | |
| 17 | FOR THE DEPONENT: |
| 18 | OFFICE OF CITY ATTORNEY |
| 19 | Jeffrey K. Grimes |
| 20 | 308 Fountain Circle |
| 21 | Huntsville, Alabama 35804 |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 5 |
|---|---|
| 1 | EXAMINATION INDEX |
| 2 | |
| 3 | DOUG SMITH |
| 4 | BY MR. GRINKE . . . . . . . . . .  8 |
| 5 | BY MR. HOOD . . . . . . . . . . .  19 |
| 6 | FURTHER BY MR. GRINKE . . . . . .  21 |
| 7 | |
| 8 | REPORTER'S CERTIFICATE . . . . . . . .  23 |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

DOUG SMITH

## Page 6

1      I, Elaine Scott, a court reporter and Notary
2  Public for the State of Alabama, acting as
3  commissioner, certify that there came before me at
4  815 Wheeler Avenue, Huntsville, Alabama, on April 22,
5  2014, beginning at 10:02 a.m., DOUG SMITH, in the
6  above cause, for oral examination, whereupon the
7  following proceedings were had:
8
9      THE VIDEOGRAPHER: Good morning. We're
10 now going on the video record. Today is April 22nd,
11 2014. The time is approximately 10:02 a.m.
12      We're at the Municipal Building, 815
13 Wheeler Avenue, Huntsville, Alabama. I'm Steve
14 Edmondson, video specialist, representing HG
15 Litigation Services.
16      This civil action number is 5:13-CV-
17 00895-CLS, in the matter of Acadia Insurance, et al,.
18 versus United States of America.
19      The deponent today is Mr. Doug Smith.
20 The video deposition is requested by the plaintiff's
21 counsel, McCathern, PLLC, of Dallas, Texas.
22      Would counsel please identify themselves
23 and their representation?
24      MR. GRINKE: Paul Grinke, counsel on
25 behalf of the plaintiff, Acadia Insurance Company.

## Page 7

1      MR. HOOD: Jeff Hood, assistant United
2  States attorney, and I represent the defendant,
3  United States of America. Also present with me from
4  my office is Mr. Gary Brown, and also present with me
5  is Mr. Dave Icove.
6      MR. GRIMES: Jeff Grimes with the City of
7  Huntsville.
8      THE VIDEOGRAPHER: Court reporter,
9  administer the oath.
10      MR. GRINKE: Is there anybody on the
11 phone?
12      MR. HOOD: Excuse me, no. We don't --
13 didn't need to do the phone today.
14      THE COURT REPORTER: Would you raise your
15 right hand to be sworn?
16
17      DOUG SMITH,
18      being first duly sworn,
19 was examined and testified as follows:
20
21      THE VIDEOGRAPHER: Let's proceed.
22      MR. HOOD: There are no usual
23 stipulations. I would ask that the witness read and
24 sign.
25      MR. GRIMES: And, Doug, what that means

## Page 8

1  is that when they type up the deposition, they'll
2  send a copy for you to read. You can't change your
3  substantive testimony, but if there's any errors that
4  you feel the Court Reporter did not take down
5  correctly, then you can mark that on an error sheet,
6  errata sheet, and you will sign that and return it to
7  the Court Reporter.
8      THE WITNESS: Okay.
9
10      EXAMINATION
11 BY MR. GRINKE:
12      Q. Could you state your name for the record?
13      A. Douglas Smith.
14      Q. Mr. Smith, how you currently employed?
15      A. With the City of Huntsville, electrical
16 inspector.
17      Q. And was that the position you held back
18 in September of 2010?
19      A. Yes.
20      Q. Okay. How long have you been with the
21 City of Huntsville?
22      A. Fourteen years.
23      Q. This lawsuit is with respect to a fire
24 that occurred at the Country Inn & Suites at 4880
25 University Drive, Huntsville, Alabama, back on

## Page 9

1  September 22nd, 2010. And we just wanted to ask you
2  some questions about what you saw and your
3  involvement; is that fair?
4      A. Yes.
5      Q. Have you ever given a deposition before
6  like this?
7      A. Yes.
8      Q. Okay. So you kind of understand the
9  ground rules. You're doing great so far.
10      A. Sure.
11      Q. Before we get into the fire scene, tell
12 us a little bit about your background. Where are you
13 from?
14      A. I'm from here in Huntsville, Alabama.
15      Q. Born and raised?
16      A. Yes.
17      Q. Okay. Where did you -- when did you
18 graduate from high school?
19      A. 1976.
20      Q. What high school?
21      A. Johnson High School.
22      Q. And what did you do immediately after
23 graduating from high school?
24      A. Marine Corps.
25      Q. Okay. How long were you in the service?

DOUG SMITH

## Page 10

1    A. Seven years.
2    Q. And what did you in the Marine Corps?
3    A. I was in artillery, aviation ordinance,
4  crash, fire and rescue.
5    Q. And with an honorable discharge?
6    A. Yes.
7    Q. And what did you do after you got out of
8  the military?
9    A. I went to work contracting electrical,
10  within the electrical field.
11    Q. Did you receive any training or education
12  during your time with the Marine Corps with respect
13  to electrical issues?
14    A. Basic electricity and electronics.
15    Q. So you learned that in the Marine Corps?
16    A. Yes.
17    Q. Were there certain courses that you would
18  take, or how did that work?
19    A. Went through A School in Millington,
20  Tennessee.
21    Q. Okay. After you left the Marine Corps,
22  did you take any other type of specific education or
23  training with respect to being an electrician?
24    A. Lighthouse Electrical Institute and just
25  certifications.

## Page 11

1    Q. Okay. And what did you — did you
2  receive a certificate or a degree from Lighthouse —
3    A. No.
4    Q. — electrical Service Institute?  No?
5  Okay.  And I know you know where I'm going with my
6  question, but so that the Court Reporter can take it
7  down clearly, let's try not to talk over each other.
8      So who did you go to work with after you
9  left the Marine Corps, to the best you can recollect?
10    A. Fast Electric.
11    Q. Okay. And what did you do for them?
12    A. Worked as an electrician.
13    Q. Do you carry a certain type of license?
14  Are you a journeyman electrician?
15    A. Yes.
16    Q. And were you at the time?
17    A. No.
18    Q. Okay. What — what would you have been
19  categorized at that time?
20    A. Probably — I was categorized as
21  electrician, but I was probably a helper.
22    Q. Describe for the Court, if you would,
23  just generally how does that work?  What are the
24  steps of an electrician?
25    A. You have an apprenticeship, which is

## Page 12

1  usually four years, and then you become an
2  electrician.  Of course, I went through — I was in
3  IBW, Local 558.  I got my journeyman electrical card
4  through them.
5    Q. That's a union?
6    A. Yes, sir.
7    Q. And when did that occur?
8    A. I couldn't tell you.
9    Q. Okay.  Well before September of 2010?
10    A. Well before.
11    Q. Okay.  And is there a step above being a
12  journeyman electrician?
13    A. No.
14    Q. No?  How — and I'm sorry.  How long have
15  you been with the City of Huntsville?
16    A. Fourteen years.
17    Q. And have you always been an electrician
18  with the City of Huntsville?
19    A. I've been electrical inspector with the
20  City of Huntsville.
21    Q. What are your job responsibilities and
22  duties as the electrical inspector with the City of
23  Huntsville?
24    A. I look at new construction and renovation
25  work, make sure everything is properly installed and

## Page 13

1  installed to code.
2    Q. Are you also called from time to time by
3  the fire department out to a fire scene to do some
4  inspection?
5    A. I am.
6    Q. And what would you be looking for if
7  you're called out by the fire department?
8    A. They — they call me for various reasons,
9  if they think that possibly an outlet or something
10  may have caused the fire, they just want my opinion
11  on it.
12      They call us out a lot of times just to
13  see if the building is safe once they've had a fire
14  and they've extinguished it and everything as to
15  whether the occupants can still stay in the building
16  or whether we need to cut the power off or what have
17  you.
18    Q. Is there any other training or education
19  that — classes, certifications, that you've taken
20  that I haven't asked you about?
21    A. No, sir.
22    Q. With respect to the fire at the Country
23  Inn & Suites on September 22nd, 2010, were you asked
24  to come out to the fire scene?
25    A. I was.

DOUG SMITH

**Page 14**

1     Q. Do you recall it was Officer Dan
2  Wilkerson that asked you to come out there?
3     A. Yes. Fire dispatch calls us and then
4  we're dispatched out to the scene. Dan Wilkerson was
5  the fire investigator on the scene.
6     Q. Okay. You've got a stack of documents in
7  front of you. The first one says Exhibit 1.
8        There's multiple pages. And if you turn
9  past page one, you'll see there's some little Bates-
10 stamps at the bottom. They might be a little bit out
11 of order here. Okay. There we go, Plaintiff's
12 Exhibit 1.
13       If you could turn to the page where the
14 stamp at the bottom says FBI 0000081. I'll call it
15 FBI 81.
16    A. Okay.
17    Q. Does this appear, sir, to be a
18 investigation report that you filled out and signed?
19    A. Yes, it is.
20    Q. Okay. If you can, just walk the Court
21 through your recollection of the evening of September
22 22nd, what you were called out to do, what you saw
23 and what you did.
24    A. I was called out, like I said, at
25 11:45 p.m. by the fire dispatcher. Dan Wilkerson was

**Page 15**

1  the fire investigator on scene. I put fire appeared
2  to start on the second floor balcony, which Dan
3  Wilkerson had already -- which he always does -- any
4  fire investigator, they determine the origin of the
5  fire. We -- we're not qualified to do that.
6     Q. So you would rely on Mr. Wilkerson to
7  determine the area of origin of the fire?
8     A. Absolutely. The question being basically
9  is, can we leave power in this building. And me
10 being not a building inspector but the fire had went
11 up in the attic, I had called out Skip in order to
12 make that determination as to whether we could leave
13 any parts of the hotel open or leave power on in the
14 hotel at all.
15    Q. That's Skip Stinson?
16    A. Yes.
17    Q. And then -- so you determined that you --
18 so you asked Skip to come out. And did you make any
19 calls yourself as to whether or not it was safe to
20 have electrical turned back on in the building?
21    A. I did not.
22    Q. You didn't make a determination or you
23 determined that it was not safe to turn the
24 electrical on?
25    A. I didn't make a determination.

**Page 16**

1     Q. So in your mind, when you called out Skip
2  Stinson to look at the structural issues, you're kind
3  of passing the inspection off to him?
4     A. Yes.
5     Q. Okay. So at that point, was that -- is
6  it fair to say that was the end of your involvement
7  in the inspection of the building?
8     A. I stayed there and made sure power was
9  cut off to that building from the switchgear and
10 locked out.
11    Q. Okay. What all did you inspect when you
12 came out to the building?
13    A. I really didn't inspect nothing. I just
14 looked at the building and the damage to the
15 building, and that's basically it.
16    Q. You write in your report: This is not an
17 electrical fire. What did you base that on?
18    A. Dan Wilkerson's assumption.
19    Q. Did you walk out on the balcony of Room
20 2207 and look at the area of origin, where
21 Mr. Wilkerson placed the origin of the fire?
22    A. I did walk out there, yes.
23    Q. Did you see any -- strike that.
24       Do you understand that Officer Wilkerson
25 places the origin of the fire down low as you're

**Page 17**

1  facing -- as you're outside the building facing in,
2  down low to the right-hand side of the balcony to
3  Room 2207?
4        MR. HOOD: Object to the form and
5  foundation.
6     Q. You can answer.
7     A. To the best of my recollection, yes.
8     Q. When you walked out on the balcony of
9  Room 2207 and looked in that area, did you see any
10 electrical wiring or apparatuses that might have been
11 a potential ignition source of the fire?
12    A. No.
13    Q. Again, in your report you write:
14 Probable cigarette. What did you base that belief
15 on?
16    A. That was from Dan Wilkerson's report.
17    Q. And then it says you pulled power from
18 the building?
19    A. I did.
20    Q. You did. Okay. When you inspect -- just
21 in general, when you're inspecting a property, are
22 you -- I think you said that you're making sure that
23 a property is up to code with respect to the
24 electrical aspects?
25    A. On new construction and renovations, I

DOUG SMITH

Page 18

1    am.
2        Q.  At the fire scene of the Country Inn &
3    Suites in September of 2010, out there on the balcony
4    of 2207, did you identify any electrical code
5    violations?
6        A.  No.
7        Q.  If you could, turn to FBI 119.  Take a
8    moment to review and just tell us, have you seen this
9    document before?
10       A.  I saw this document briefly at Jeff's
11   office.
12       Q.  And don't discuss any conversations you
13   had with counsel.
14       A.  Okay.
15       Q.  But so you have seen the document briefly
16   before?
17       A.  Uh-huh.
18       Q.  Did you create this document?
19       A.  No, sir.
20       Q.  I understand -- correct me if I'm wrong,
21   but I understand that document to be a list of some
22   code violations that the City of Huntsville
23   identified throughout the Country Inn & Suites
24   property -- I don't have it in front of me -- I guess
25   a couple months after this fire; is that fair?

Page 19

1        A.  It's about eight and a half months later,
2    nine months.  Yes, sir.
3        Q.  All right.  Now -- and I want you to take
4    your time if you need to, but if you could -- I guess
5    there's fifteen -- yeah, fifteen bullet point items
6    listed that are code violations.  Could you look
7    through those and tell the Court whether or not you
8    identified any of those code violations on the
9    balcony of Room 2207 at the Country Inn & Suites when
10   you went out there on the evening of the fire?
11       MR. HOOD:  Object to the form and
12   foundation.
13       Q.  You can answer.
14       A.  No.
15       Q.  Would any of those items one through
16   fifteen on FBI 119 in your mind have been a cause of
17   the fire on September 22nd?
18       MR. HOOD:  Object to the form and
19   foundation.
20       Q.  You can answer.
21       A.  No.
22       MR. GRINKE:  Thank you, sir.  I'll pass
23   the witness.
24
25       EXAMINATION

Page 20

1    BY MR. HOOD:
2        Q.  A couple questions.  Back on FBI document
3    81, the one where your report is, just to make sure,
4    is that your signature at the bottom?
5        A.  Yes, it is, sir.
6        Q.  Okay.  Back to this other report, FBI
7    119, the one you have in front of you.
8        A.  Yes, sir.
9        Q.  Those are serious code violations, are
10   they not?
11       A.  Yes, sir.
12       Q.  And just so I make sure again, your
13   mission on September 22nd, 2010 was not to look for
14   code violations, but was to simply determine whether
15   or not the power should stay on in the building?
16       A.  Yes, sir.
17       Q.  And nothing else?
18       A.  Nothing else.
19       Q.  Okay.  And again, back on this document
20   119, that does refer to building two, which is this
21   specific building, correct?
22       A.  This states building two, yes, sir.
23       Q.  Okay.  And that is, in fact, the same
24   building where this fire occurred?
25       A.  Yes, sir.

Page 21

1        Q.  And would it be also your judgment that
2    these fifteen items existed back on September the
3    22nd, 2010?
4        MR. GRINKE:  Object to the form and
5    foundation.
6        A.  I don't know.
7        MR. HOOD:  I have no further questions.
8    Just hang on.
9        Q.  (By Mr. Hood) Again, just to clarify, you
10   weren't looking for any violations that day,
11   correct?
12       A.  No, sir.
13       MR. HOOD:  All right.  I have no further
14   questions.
15
16       FURTHER EXAMINATION
17   BY MR. GRINKE:
18       Q.  Whether or not it was your mission on
19   September 22nd, 2010, to identify code violations,
20   you didn't see any code violations on the balcony of
21   Room 2207 the evening of the 22nd, did you?
22       A.  No, sir.
23       Q.  When you went out and looked at the
24   balcony of Room 2207, were there any electrical
25   appliances out there?

DOUG SMITH

Page 22

1    A. I don't recall.

2    **Q. You don't recall seeing any?**

3    A. No.

4    MR. GRINKE: That's all I have.

5    MR. HOOD: Just a second. Go off the

6  record.

7    THE VIDEOGRAPHER: Off the record at

8  10:20 a.m.

9    (A discussion was held off the record.)

10

11    MR. HOOD: No further questions. I

12  appreciate it.

13    THE VIDEOGRAPHER: This concludes the

14  video deposition of Doug Smith consisting of one

15  tape. The time is 10:21 a.m. on April 22nd, 2014.

16  We're off the record.

17

18    Deposition of DOUG SMITH

19    Concluded at 10:21 a.m.

20      April 22, 2014

21

22

23

24

25

Page 23

1    C E R T I F I C A T E

2

3

4  STATE OF ALABAMA )

5  JEFFERSON COUNTY )

6

7    I hereby certify that the above and

8  foregoing deposition was taken down by me in

9  stenotype, and the questions and answers thereto were

10  reduced to computer print under my supervision, and

11  that the foregoing represents a true and correct

12  transcript of the deposition given by said witness

13  upon said hearing.

14

15    I further certify that I am neither of

16  counsel nor of kin to any of the parties to the above

17  mentioned action, nor am I in any way interested in

18  the outcome of said cause.

19

20

21

22    _____

23    Elaine Scott, ABCR 354

24  Commission Expires October 16, 2015

25