FILED

2015 Mar-10  AM 10:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ACADIA INSURANCE CO., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-13-S-895-NE |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff, Acadia Insurance Co., as subrogee of Yedla Management Company, Inc., and Hospitality Enterprises of Huntsville, Inc., commenced this action against the United States of America.  The action presently is before the court on defendant's motion for sanctions under Federal Rule of Civil Procedure 37, based upon plaintiff's alleged spoliation of evidence.  Upon consideration, the court concludes that the motion is due to be denied.

### I.  STANDARD OF REVIEW

A district court's power to sanction a party for spoliation is derived from its "inherent power" to manage its own affairs and remedy discovery abuses.  *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005).  "Accordingly, sanctions for discovery abuses are intended to prevent unfair prejudice to litigants and to insure the integrity of the discovery process."  *Id.* (alteration supplied).

District courts have broad discretion to fashion sanctions for discovery abuses; even so, "that discretion is not unbridled." *United States v. Certain Real Property Located at Route 1, Bryant, Ala.*, 126 F.3d 1314, 1317 (11th Cir. 1997). The Eleventh Circuit has recognized three sanctions for spoliation: *i.e.*, exclusion of expert testimony; a jury instruction which raises a presumption against the spoliating party; and dismissal. *Flury*, 427 F.3d at 944. "Dismissal represents the most severe sanction available to a federal court, and therefore should only be exercised where . . . lesser sanctions will not suffice." *Id.* at 945.

## II.  SUMMARY OF FACTS

The pertinent facts in this case arose from a fire that occurred on the evening of September 22, 2010, in the "Country Inn & Suites" motel located at 4880 University Drive in Huntsville, Alabama.[1] That motel, owned by Yedla Management Company, Inc., and its wholly-owned subsidiary, Hospitality Enterprises, Inc., was insured against fire and other perils by plaintiff, Acadia Insurance Company.[2]

Michael Siegling, a special agent of the United States Federal Bureau of Investigation, occupied Room 2207 in the motel on the night of the fire.[3] In fact, Siegling had occupied that room since August 14 of that year, when he traveled from

---

[1] Doc. no. 15 (Amended Complaint); doc. no. 33-1 (Wilkerson Deposition), at 30.

[2] Doc. no. 15 (Amended Complaint), ¶ 9.

[3] *Id.* ¶¶ 11–12.

2

San Francisco, California, to Huntsville for the purpose of attending a bomb technician certification training program at Redstone Arsenal.[4]  The fire started at approximately 10:30 p.m. on September 22, 2010, in the motel building that contained Room 2207 — *i.e.*, "Building 2."  An unidentified motel guest pulled a fire alarm soon after, and the Huntsville Fire Department responded.[5]

Huntsville Fire District Chief Michael D. Dodson observed upon his arrival at the motel that the second and third floor balconies of Building 2 were engulfed in flames.[6]  Dodson and his team extinguished the fire and summoned Fire Investigator Daniel R. Wilkerson, who arrived less than one hour later.[7]  Wilkerson conducted an investigation of the premises and determined that the origin of the fire was the balcony of Room 2207.  Wilkerson found discarded "Marlboro Light" cigarettes on the ground underneath the balcony of Room 2207, as well as a pack of the same brand

---

[4] Doc. no. 26-1 (Defendant's Responses to Discovery Requests), at ECF 58, 63.  "ECF" is the acronym for "Electronic Case Filing," a system that allows parties to file and serve documents electronically.  *See Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009).  Bluebook Rule 7.1.4 *permits* citations to the "page numbers generated by the ECF header."  *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing *The Bluebook: A Uniform System of Citation* R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.*, 19th ed. 2010)).  Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination."  *Wilson*, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court will cite the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page numbers with the letters "ECF."

[5] Doc. no. 21-2 (Icove Declaration), at 20.

[6] *Id.*

[7] *Id.*

3

of cigarettes in the interior of that room.[8]  He did not collect any of the discarded cigarettes.[9]  Michael Siegling composed a written statement for Wilkerson, in which he stated that he had last smoked a cigarette on the balcony on the day before the fire and had extinguished that cigarette in a styrofoam cup filled with water.[10]  Fire Investigator Wilkerson ultimately concluded that the cause of the fire was Siegling's "careless use of smoking materials."[11] He ruled out an electrical malfunction as a potential cause of the fire because there was no electrical equipment in the immediate vicinity of what he had deemed the area of origin — *i.e.*, the balcony of Room 2207.[12]  For that reason, he did not conduct an electrical "arc mapping" of the scene.[13]

Wilkerson did not collect any physical evidence from the fire scene, but he took numerous photographs.  He explained in his deposition:

> I'm usually pretty cautious on what I disassemble and destroy, because if it's not a criminal case, then I try to leave the scene as intact as possible for whoever is coming after me.  Sometimes insurance companies will hire an investigator that will show up a couple of days after we do our investigation, and typically they're more — they have more interest in it than the City of Huntsville does.

Doc. no. 33-1 (Wilkerson Deposition), at 51–52.

---

[8] Doc. no. 33-1 (Wilkerson Deposition), at 82–83.

[9] *Id.*

[10] Doc. no. 21-7 (Written Statement of Michael K. Siegling to Dan Wilkerson), at ECF 3.

[11] Doc. no. 21-13 (Fire Department Report), at ECF 6.

[12] Doc. no. 33-1 (Wilkerson Deposition), at 66.

[13] *Id.*

4

Cook Claims Services, Inc., plaintiff's claims service, hired Rod Williams of EFI Global, Inc., to conduct an investigation into the origin and cause of the fire five days later, on September 27, 2010.[14]  Williams also concluded from his investigation that the fire began on the balcony of Room 2207, and that it was caused by "improperly discarded smoking materials."[15]  He also noted that "[s]ystematic debris removal began with the fire department during their investigation.  Some of the fire debris had been removed from the area of origin, in search of the ignition source."[16]  Williams did not collect any physical evidence during his investigation, but he took numerous photographs of the scene.[17]

On that same day, Cook Claims Services submitted a report to plaintiff stating that the Huntsville Fire Department had determined that the cause of the fire was "careless smoking of the occupant of [Room 2207], who[m] we are advised is a[n] FBI agent."[18]  The report also stated that there was "a possibility of subrogation since the origin can reportedly be determined and the individual who was smoking has been identified," and that "governmental immunity" probably would not apply to that individual.[19]

---

[14] Doc. no. 26-1 (Williams Declaration), ¶ 2, ECF 41.

[15] *Id.* ¶ 32, ECF 51.

[16] *Id.* ¶ 18, ECF 47 (alteration supplied).

[17] *Id.* ¶ 20, ECF 48.

[18] Doc. no. 21-5 (Cook Claims Services Report, Sept. 27, 2010), at 2 (alterations supplied).

[19] *Id.* at 3 (alteration supplied).

On August 1, 2012, nearly two years after the fire, plaintiff submitted a "Claim for Damage, Injury, or Death" to the FBI, claiming property damages associated with the fire "caused by Michael Siegling."[20]  That claim was submitted in accordance with the provision of the Federal Tort Claims Act that requires claims against the United States to be "presented in writing to the appropriate Federal agency within two years after such claim accrues."  28 U.S.C. 2401(b).  The FBI did not respond to plaintiff's claim within six months; thus, the claim was statutorily deemed to have been denied on February 1, 2013.[21]  *See* 28 U.S.C. § 2675(a) ("The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim").  Plaintiff filed this action three months later, on May 10, 2013.[22]

Defendant hired David J. Icove, a fire investigation expert, on October 25, 2013.[23]  Three months later, on January 24, 2014, defendant asked plaintiff to allow Icove to inspect the fire scene.  Icove conducted his inspection on February 20, 2014, and noted in his report that the fire scene already had been repaired.[24]  He explained:

> Since the fire damage to Room 2207, Room 2307, and the third floor attic space had already been repaired, the February 20, 2014 inspection

---

[20] Doc. no. 21-8 (Claim for Damage).

[21] Doc. no. 15 (Amended Complaint), ¶ 7.

[22] Doc. no. 1 (Complaint).

[23] Doc. no. 21-1 (Icove Declaration) at 4.

[24] *Id.* at 5, 36; doc. no. 26-1 (Defendant's Request for Production), ¶ 18.

6

did not produce any evidence of lead value in this case that could provide insight into the origin and cause of the fire on September 22, 2010. Also, any necessary destructive or [in]vasive internal examinations behind the walls of the electrical, plumbing, and structural conditions could also not be accomplished to confirm that the repairs had remedied deficiencies which could have served as competent and accidental ignition sources or support alternative hypotheses for the fire on September 22, 2010.

Doc. no. 21-2 (Icove Declaration), at 36 (alteration supplied). Icove also stated that "critical evidence that should have been preserved include all electrical fixtures and wiring within the area the Plaintiff's investigators believed to the be the room of fire origin," as well as the cigarette butts Daniel R. Wilkerson had identified as the cause of the fire.[25] Icove emphasized plaintiff's failure to preserve the electrical circuit panels, exterior lighting fixtures, and "electrical junction box" physically inspected by Rod Williams.[26] He concluded that:

The scene destruction, especially the removal and alteration of potentially exculpatory evidence such as improper and dangerous electrical wiring in this case, only further undermines the opportunity for a potential Defendant to understand and meaningfully participate in the investigation and to develop alternative hypotheses for the fire's origin and cause to defend itself in a subsequent legal action.
        . . .

        Photography alone does not support the notion that a scene could be processed and evaluated later by another expert who could derive the same evidentiary value from those photographs as if they had been physically present at the scene. A thorough scene examination would

---

[25] *Id.* at 43; doc. no. 21-3 (Icove Declaration), at 44.

[26] *Id.* at 44–45.

have required clearly-taken photographs of the investigative process being undertaken; the condition of electrical equipment, wiring and other utilities; and the layered processing (de-layering) of the fire debris down to discrete burn patterns. The Defendant's expert in this case was provided with only a limited number of photographs and those were not clear, nor were they sufficiently comprehensive to even approach the investigative value of having been physically present.

. . .

The Defendant's expert in this case is plainly hindered in countering the Plaintiff's allegation that the fire was caused by an improperly discarded cigarette by not having available any tangible evidence, exhibits, or definitive photographs. . . .

In summary, the evidence supports my professional conclusion that the Defendant has been deprived of an opportunity to conduct a first-hand investigation of a myriad of possible alternative ignition sources at the scene of the fire and is being forced instead to rely on an unclear and incomplete investigation conducted by Plaintiff Acadia Insurance Company's investigator in order to rebut the Plaintiff's claims in this action. The Defendant has been deprived of any opportunity to examine the original fire scene evidence *in situ*, intact and unspoiled.

Doc. no. 21-3 (Icove Declaration), at 56–59.

## III. DISCUSSION

Defendant seeks sanctions under Federal Rule of Civil Procedure 37 for plaintiff's alleged spoliation of evidence from the fire scene at the Country Inn & Suites. Defendant seeks dismissal or, in the alternative, a jury instruction that the spoliated evidence would have been unfavorable to plaintiff.[27] Such sanctions are available only when "the circumstances surrounding the [alleged spoliation or, as in

---

[27] Doc. no. 23 (Brief on Motion to Dismiss), at 19.

this case, the failure to preserve allegedly relevant evidence] indicate bad faith." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (alteration supplied); *see also Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (same). The Eleventh Circuit has defined "bad faith" in the context of a party's allegation of spoliation as constituting something more than negligence, but less than acts showing actual malice. *See, e.g.*, *Mann v. Taser International, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009) ("While this circuit does not require a showing of malice in order to find bad faith, mere negligence in losing or destroying records is not sufficient to draw an adverse inference.").

Defendant emphasizes the following facts. First, plaintiff was aware of the likelihood of a subrogation lawsuit as early as September 27, 2010, when it was informed by its claims service that there was "a possibility of subrogation since the origin can reportedly be determined and the individual who was smoking has been identified," and that "governmental immunity" probably would not apply to the FBI agent who allegedly caused the fire.[28] Second, even so, plaintiff waited almost two years to notify the FBI that it might be liable for the fire. During those intervening years, plaintiff made no effort to preserve any physical evidence of the fire, and allowed the complete repair of the structure damaged by the fire. Plaintiff, a sophisticated entity in the business of insuring against fires, was undoubtedly aware

---

[28] Doc. no. 21-5 (Cook Claims Services Report, Sept. 27, 2010), at 3.

that any potential litigant would have a strong interest in conducting a thorough physical investigation of the fire scene. Indeed, plaintiff wasted no time in retaining an expert to investigate the fire scene before any repairs had been made. Such behavior *might* indicate that plaintiff's failure to notify defendant for nearly two years was more than mere negligence. *Cf. Bashir*, 119 F.3d at 931 (holding that tampering with — or purposeful destruction of — evidence indicates bad faith); *see also Swofford v. Eslinger*, 671 F. Supp. 2d 1274, 1282 (M.D. Fla. 2009) (finding that "knowing and willful disregard for the clear obligation to preserve evidence that was solely within the possession and control of the Defendants and whose contents have no other source than that which has now been spoliated" indicated bad faith).

Even so, other factors indicate that plaintiff's conduct did not rise to the level of either malice, or bad faith. For example, defendant has produced no evidence that plaintiff failed to preserve the fire scene because it knew or suspected that it contained evidence that would harm its case. In other words, there is no evidence to "sustain an inference of consciousness of a weak case." *Bashir*, 119 F.3d at 931 (internal quotation marks omitted); *see also Silvestri v. General Motors Corp.*, 271 F.3d 583, 591–92 (4th Cir. 2001) (holding that, even though plaintiff's attorney knew of the need to preserve evidence and notify a potential litigant, his failure to do so may not have risen to the level of bad faith). Further, plaintiff granted defendant's

10

first request to inspect the fire scene — a request made *one and a half years* after plaintiff submitted its administrative claim to defendant, and more than eight months after plaintiff filed this action.  It also must be noted that, according to plaintiff's expert, Rod Williams, the Huntsville Fire Department already had removed some of the fire debris before Williams conducted his investigation on September 27, 2010.[29]

Defendant appears to have acknowledged the lack of evidence of bad faith when it argued, in a bold-face heading, that it "Does Not Need to Show That Plaintiff Acted in Bad Faith but Only That Plaintiff is Culpable."[30]  In any event, defendant has failed to show that plaintiff's conduct in failing to preserve physical evidence of the fire was predicated upon bad faith, and its motion for sanctions is due to be denied.

## IV.  CONCLUSION AND ORDER

Accordingly, it is ORDERED that the motion for sanctions filed by the United States of America is DENIED.

---

[29] Doc. no. 26-1 (Declaration of Rod Williams), ¶ 18 (ECF 47).

[30] Doc. no. 28 (Defendant's Reply Brief), at 17.  Defendant's argument that "culpability" is the appropriate standard, and its citation to Alabama law in support of that argument, ignores the Eleventh Circuit's clear holding in *Bashir* that spoliation sanctions are available *only when* "the circumstances surrounding the [spoliation] indicate *bad faith*," 119 F.3d at 931 (alteration and emphasis supplied), and the court's subsequent holding in *Flury* that federal law governs spoliation sanctions.  427 F.3d at 944; *see also Rodda v. Joy Mining Machinery*, F. Supp. 3d 1156, 1157–58 (N.D. Ala. 2014) (Blackburn, J.) (reconciling that holding in *Flury* with the court's subsequent application of Georgia law on spoliation).

**DONE** and **ORDERED** this 10th day of March, 2015.

United States District Judge