FILED

2015 Dec-09  PM 06:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## <u>NORTHEASTERN DIVISION</u>

|  |  |
|---|---|
| ACADIA INSURANCE CO., | |
| Plaintiff, | |
| v. | CIVIL ACTION NO. 5:13-CV-00895-CLS |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## <u>STATEMENT OF AGREED AND DISPUTED FACTS</u>

Plaintiff Acadia Insurance Co. (hereinafter "Plaintiff" or "Acadia") and the Defendant United States of America (hereinafter "Defendant" or "United States") hereby respectfully sbmits, for purposes of this lawsuit only, the following Agreed and Disputed Facts in accordance with the Federal Rules of Civil Procedure and the Pre-Trial Order.

## I.    AGREED STATEMENT OF FACTS

1.    Plaintiff Acadia Insurance Co. provided a property insurance policy to Yedla Management Co., Inc. and Hospitality Enterprises of Huntsville, Inc. d/b/a Country Inn & Suites for the subject hotel located at 4880 University Drive, Huntsville, Alabama, 35816, covering property contents and business interruption losses.

2.     As a result of this fire, Acadia made payments under its policy for damages to the Country Inn & Suites and lost business.

3.     As a result of the payments Acadia made under its policy, Acadia seeks recovery in subrogation from the Defendant United States of America, who it alleges was negligent in causing the fire.

4.     Officer Wilkerson, a Fire Prevention Officer/Inspector with the City of Huntsville, became a firefighter with the City of Huntsville in 2001.

5.     Officer Wilkerson received his Associate's Degree in Fire Science Management and in 2008 received his Bachelor's Degree in Fire Science from Columbia Southern in Orange Beach, Alabama.

6.     At the Alabama Fire College, Officer Wilkerson was certified in the Fire Inspector I, Fire Inspector II, and Fire Investigator courses.

7.     While training for his position as Prevention Officer/Inspector with the City of Huntsville in 2007, Officer Wilkerson would shadow senior fire investigators in during the fire cause and origin investigations in Huntsville, Alabama.

8.     Upon receipt of his fire investigator certification and adequate "shadowing" of senior fire investigators, Officer Wilkerson was able to begin to conduct independent fire investigations in late August 2007.

9.     Mr. Williams has over 35 years' experience in fire service and investigation.

10.    Mr. Williams began his career in the fire service in 1978 as a firefighter/paramedic and worked his way through the ranks to Captain.

11.    He retired from the Hoover Fire Department in 2006.

12.    Mr. Williams' position at the time of his retirement was Deputy Fire Marshal and he was performing fire investigations, business inspections and also working with many governmental agencies such as ATF, FBI, state and local law enforcement, and other agencies.

13.    Mr. Williams held this position for five years.

14.    Mr. Williams left the fire service in 2006 and began his employment with EFI Global where he is currently employed.

15.    EFI Global is a national multi-disciplined forensic engineering firm offering engineering, fire investigation, environmental, failure analysis, accident reconstruction and laboratory testing services.

16.    Mr. Williams is certified by the International Association of Arson Investigators as a Certified Fire Investigator and a Certified Vehicle Fire Investigator, by the National Association of Fire Investigators as a Certified Fire and Explosion Investigator, and is certified as a Fire Investigator as having met the

qualifications of *NFPA 1033* by the National Board of Fire Service Professional Qualifications.

17.     Mr. Siegling stated to Officer Wilkerson that he was last on the balcony outside of Room 2207 around 5 or 6:00 p.m. prior to the fire.

18.     Officer Wilkerson found a partially used package of Marlboro brand cigarettes inside room 2207 the night of the fire.

19.     The balcony to room 2207 is on the second floor and faces a secure courtyard.

20.     The balcony is separated from neighboring balconies to the right and left by permanent walls that extend from the floor to ceiling.

21.     Special Agent Siegling received pay from his employer while training in Huntsville, Alabama during this time period.

22.     Special Agent Siegling was not in Huntsville, Alabama for any reason other than the paid FBI training class.

23.     The government credit card's use is scrutinized by the financial office within Siegling's employer's division.

24.     Special Agent Siegling occupied Room 2207 of the Country Inn & Suites during the six (6) week period in order to attend the course.

25.    Plaintiff timely provided notice of its claim pursuant to the express requirement of 28 U.S.C. § 2675 and 28 C.F.R. §§ 14.2 – 14.3, and correspondence with additional documentation, in satisfaction of 28 U.S.C. § 2401(a) & (b).

## II.    DISPUTED FACTS

### PLAINTIFF'S PROPOSED STATEMENT OF ADDITIONAL FACTS (DISPUTED BY DEFENDANT)

26.    On September 22, 2010, a fire occurred in Building 2 of the Country Inn & Suites.

27.    Two qualified origin and cause experts conducted independent investigations into the cause of the fire, and came to the same conclusion: Special Agent Michael Siegling carelessly discarded smoking materials that ignited a fire on the balcony to his hotel room.

28.    Officer Dan Wilkerson of the Huntsville Fire Department concluded the fire originated on the balcony of room 2207, Agent Siegling's room, and was caused by carelessly discarded smoking materials.

29.    As a public servant, Officer Wilkerson is a completely uninterested witness to this lawsuit.

30.    After spending five (5) years as a firefighter, Officer Wilkerson took and passed the promotion test to become a Fire Prevention Officer/Investigator in 2007.

31.     Officer Wilkerson took a course in Fire Inspection while obtaining his Bachelor's Degree.

32.     After being promoted to the City of Huntsville Fire Marshal's Office, Officer Wilkerson attended and completed the Alabama Fire College presented by the State of Alabama in conjunction with Shelton State University.

33.     Additionally, in 2011, Officer Wilkerson attended a two-week course at the National Fire Academy in Emmitsburg, Maryland dealing with fire cause and origin analysis.

34.     Wilkerson is a certified fire investigator by the Alabama Association of Arson Investigators (AAAI), an affiliate of the International Association of Arson Investigators (IAAI).

35.     Wilkerson was also certified by the National Association of Fire Investigators until 2014.

36.     From the time period of 2007 to the date of Wilkerson's deposition, Officer Wilkerson had investigated approximately 274 fires.

37.     Officer Wilkerson also trains incoming candidates in the field of fire investigation for the City of Huntsville.

38.     Private fire investigator Roderick Williams likewise concluded Special Agent Siegling carelessly discarded smoking materials on the balcony of room 2007, causing the fire.

39.    Both Officer Wilkerson and Mr. Williams came to the same conclusion as to the origin and cause of the fire using the scientific method as prescribed by *NFPA 921*.

40.    Officer Wilkerson and Mr. Williams identified the problem, collected data by examining the burn patterns and physical evidence, reviewed oral and written statements of Special Agent Siegling, referred to investigations by non-retained designated experts City of Huntsville Electrical Inspector Doug Smith, and Building Inspector Skip Stinson, posed multiple hypotheses as to potential causes of the fire, tested each of those hypotheses, and came to only one conclusion.

41.    In accordance with *NFPA 921*, Officer Wilkerson and Mr. Williams examined and followed the burn patterns to the structure.

42.    Based upon the burn patterns and available evidence each expert pinpointed the specific area of origin of this fire to the lower northwest corner of the balcony of room 2207—Special Agent Siegling's room.

43.    Indeed, a clear "V-pattern" exists, stemming from the bottom northwest corner of this balcony and flowing upward and out.

44.    Officer Wilkerson and Mr. Williams searched for potential sources of ignition at the lower northwest corner of the balcony.

45.     Officer Wilkerson and Mr. Williams identified no electrical wiring or apparatus, and no fixtures in the bottom corner of the balcony.

46.     Officer Wilkerson and Mr. Williams did, however, identify the remains of smoking materials directly below the balcony, and found the same brand smoking materials inside Special Agent Siegling's room.

47.     When Officer Wilkerson interviewed Agent Siegling the night of the fire, Agent Siegling admitted to smoking cigarettes on the balcony of his room the evening of the fire.

48.     Mr. Siegling stated to Officer Wilkerson on that he used Marlboro brand cigarettes.

49.     Agent Siegling informed Officer Wilkerson that throughout his stay in room 2207, he would dispose of cigarettes in a Styrofoam cup on the balcony.

50.     Officer Wilkerson found Marlboro brand cigarette butts of the same brand and like found inside room 2207, in the area directly below the balcony of room 2207.

51.     Before reaching their independent conclusions, Officer Wilkerson and Mr. Williams systematically tested the following hypotheses as a potential cause of the fire:   (1) Arson; (2) Vandalism; (3) Electrical; (4) Defective appliance or fixture; (5) Drop-down fire patterns from an ignition source on the 3rd floor; (6) Weather; (7) Code violations; and (8) Discarded smoking materials.

52.     Officer Wilkerson and Mr. Williams tested and eliminated arson; vandalism; electrical; appliance or fixture; drop-down fire from above; weather; and code violation as a cause of the fire.

53.     Officer Wilkerson and Mr. Williams specifically excluded the outdoor porch light fixture hanging to the top left of the door to the balcony of room 2207.

54.     Officer Wilkerson and Mr. Williams eliminated the light fixture as a cause of the fire due to the lack of burn damage to the fixture itself, and because the burn patterns to the exterior wall of the building do not support a fire originating at the fixture.

55.     Officer Wilkerson and Mr. Williams reviewed each other's conclusions and agree with each other.

56.     By definition, Officer Wilkerson and Mr. Williams' independent opinions as to the fire origin and cause have been peer reviewed.

57.     Officer Wilkerson and Mr. William's opinions are based upon sound investigation, sound methodology, and they are made to a reasonable degree of scientific probability.

58.     City of Huntsville Electrical Inspector Doug Smith inspected the fire scene immediately following the fire, and determined that the fire was not caused by any electrical malfunction and/or electrical component.

59.     Mr. Smith inspected the electrical panel, electrical wiring connected to a wall-hung light fixture, and the heat plant.

60.     Mr. Smith found that no electrical component caused the fire.

61.     Mr. Smith confirmed no electrical wiring or component was located within the lower northwest corner of the balcony to room 2207.

62.     City of Huntsville Building Inspector Skip Stinson also examined the fire scene.

63.     Inspector Stinson confirmed that there were no code violations present that would start a fire on the balcony of room 2207.

64.     Following its investigation, the City of Huntsville issued no safety citation for any code violation related to the cause of the fire.

65.     The hotel rooms immediately to the right and to the left of room 2207 were not occupied at the time of the fire.

66.     The hotel room on the third floor, directly above room 2207, was not occupied at the time of the fire.

67.     The only way to access the balcony is to walk through room 2207.

68.     Special Agent Siegling reported to Officer Wilkerson that he was asleep in room 2207 at the time the fire occurred.

69.     Special Agent Siegling had exclusive, sole access to the balcony of room 2207 at the time of the fire.

70.    Having eliminated arson, electrical, appliance, defective product, weather, and any building or fire code violation, the fire that ignited on Special Agent Siegling's balcony is one that would not ordinarily occur absent his own negligence.

71.    The City of Huntsville Fire Marshal's Department and Plaintiff's retained expert, Rod Williams, met the standards of professional care in the United States required by the National Fire Protection Association (NFPA) "*Guide for Fire and Explosion Investigations*" (NFPA 921) and the "*Standard for Professional Qualifications for Fire Investigator*" (NFPA 1033).

72.    Special Agent Siegling, as an employee of the FBI, attended an HDS bomb training class at Redstone Arsenal in Huntsville from August 10 through September 24, 2010.

73.    Siegling's attendance of the bomb training class was relevant to and connected with his employment with Defendant.

74.    Agent Siegling's enrollment in and attendance of the bomb training class in Huntsville, Alabama was in furtherance of his employment with Defendant.

75.    Defendant, as Agent Siegling's employer, directly benefitted from Siegling's attendance of the bomb training class in Huntsville, Alabama.

76.     Special Agent Siegling's employer, the FBI, received a benefit by Siegling's presence at the training class.

77.     Special Agent Siegling paid for his room at the Country Inn & Suites with a credit card issued to him by his employer, Defendant.

78.     Special Agent Siegling was only permitted to use this card for authorized government travel or expenses, particularly for agents.

79.     The government credit card's usage is subject to strict rules, can be used only for government-sanctioned training events, and cannot be used for personal expenses.

80.     Special Agent Siegling was acting in the course and scope of his employment with Defendant throughout his stay at the Country Inn.

81.     Special Agent Siegling, in the course and scope of his employment with the FBI, failed to ensure that his cigarettes were discarded and fully extinguished in a reasonable manner.

82.     Special Agent Siegling, in the course and scope of his employment with the FBI, failed to use the hotel room he occupied in a safe and reasonable manner.

83.     The FBI failed to initiate and enforce adequate procedures to ensure its agents and employees did not smoke in or near buildings while in the course

and scope of their duty, or that its agents and employees properly and safely discarded smoking materials in a safe and reasonable manner.

84.     The FBI failed to ensure that the hotel room it rented was used in a reasonable and safe manner.

85.     The negligence, based on the actions of the FBI individually, and Special Agent Michael Siegling, was the proximate cause of Plaintiff's injuries.

86.     Plaintiff is entitled to damages in the amount of $ 950,000.00, exclusive of court costs and applicable interest recoverable under federal law, for damage to the subject Country Inn & Suites caused by Defendant's negligence.

### III.   DEFENDANT'S PROPOSED STATEMENT OF ADDITIONAL FACTS (DISPUTED BY PLAINTIFF)

87.     A fire occurred at approximately 10:45 p.m. on September 22, 2010, at the Country Inn and Suites, Building 2, located at 4880 University Drive, in Huntsville, Alabama.

88.     Plaintiff, along with its attorneys, adjusters, and the fire investigation firm hired to handle this major insurance loss and subsequent claim failed to provide timely notice to the United States of America, which was an "interested party" as defined in two prevailing national standards: National Fire Protection Association Guide to Fire and Explosion Investigations ("NFPA 921") and ASTM International ("ASTM E860").

Per NFPA 921 (pt. 3.3.110 and 12.3.5), interested parties should be identified, notified, and allowed to participate in an investigation to prevent or minimize spoliation of evidence.

> 3.3.110 Interested Party. Any person, entity, or organization, including their representatives, with statutory obligations or whose legal rights or interests may be affected by the investigation of a specific incident.

> 12.3.5 Spoliation of Evidence. Spoliation of evidence refers to the loss, destruction, or material alteration of an object or document that is evidence or potential evidence in a legal proceeding by one who has the responsibility for its preservation. Spoliation of evidence may occur when the movement, change, or destruction of evidence, or the alteration of the scene significantly impairs the opportunity of other interested parties to obtain the same evidentiary value from the evidence, as did any prior investigator.

89.    Defendant asserts that the opinions Plaintiff's experts offer are unreliable per Rule 702 and that they both are unqualified to render expert opinions about the origin and cause of this fire or fire and building code compliance.

Both of these investigators (Daniel Wilkerson, City of Huntsville Fire Department, and Rodrick Williams, EFI Global) demonstrated their lack of qualifications when they failed to preserve critical testimonial and physical evidence, and failed to recognize obvious pre-existing life threatening fire and electrical code violations.

Both of these fire investigators claimed to have checked for fire and building

code violations and to have documented that they found none. In fact, they failed to recognize numerous pre-existing life threatening fire and electrical code violations in Building 2 as well as in the other affected building. These failures were later documented by competent City of Huntsville Codes Officials, who determined that these violations placed the lives of the occupants and visitors to entire hotel complex at significant risk and exposed the motel to liability.

Their actions or inactions, individually and collectively, deviated from critical and accepted standards of professional care in the field of fire prevention and investigation. As a result, both of Plaintiff's experts failed to consider sufficient facts or data in reaching their conclusions, failed to employ reliable investigatory methods, and have rendered opinions based largely on speculation.

Further, Defendant's fire investigation expert, David J. Icove, has identified numerous deficiencies in Plaintiff's experts' opinions.  Dr. Icove specifically opines that the investigations conducted by Investigator Daniel Wilkerson (City of Huntsville Fire Department) and Investigator Roderick Williams (EFI Global, Inc.) are not the product of reliable scientific methods; are based upon insufficient facts or data; fail to reliably apply the proper methods of forensic fire investigation to the facts of this case; and fail to meet the generally accepted standard of care for conducting a proper and reliable scientific fire investigation as set forth in NFPA

921, NFPA 1033, and all other recognized professional standards for conducting a proper fire investigation. These deficiencies render their expert opinions unreliable and inadmissible.

90.    Investigator Wilkerson's conclusion is faulty.  He admitted that his theory of a discarded cigarette being the origin of the fire was "opinion" and "speculation."  Investigator Wilkerson also failed to interview any other nearby room occupants even though multiple brands of cigarette butts were found near the place where he alleged the fire to have started.

91.    Wilkerson is not a party to this lawsuit.  Additionally, Wilkerson has never been accepted as an expert on fire investigations in state or federal courts and has a vested interest in being so accepted.

92.    Investigator Wilkerson had been a fire investigator approximately three years at the time of the fire that is the subject of this litigation, and he had never been qualified as a fire cause and origin expert in either state or federal court.

93.    City of Huntsville Fire Investigator Dan Wilkerson could not recall taking any courses "that dealt specifically with fire investigation techniques" to obtain his bachelor's degree from Charleston Southern – an "internet-based program." Wilkerson Deposition Transcript at pp. 13-15.

94.     After being promoted to the City of Huntsville Fire Marshal's Office, Officer Wilkerson attended and completed some multi-week courses at the Alabama Fire College (in conjunction with Shelton State University) to obtain his certification as a Fire Investigator. Investigator Wilkerson had been a fire investigator approximately three years at the time of the fire that is the subject of this litigation. Wilkerson Deposition Transcript at pp. 14-17.

95.     Investigator Wilkerson indicated that he received no certification for completing the two-week Fire Cause and Origin class at the National Fire Academy in Emmitsburg, MD, in December 2011, well after the fire of September 22, 2010 (making this training irrelevant for the purposes of this lawsuit).

96.     Investigator Wilkerson is not certified by the International Association of Arson Investigators or the National Association of Fire Investigators. He was a "member of the NAFI" at some point, until he "joined the – I believe the AAAI, which" he claims "is an affiliate of the IAAI." Wilkerson Deposition Transcript at p. 79.

97.     Investigator Wilkerson stated under oath on April 21, 2014, that he had been a "member of NAFI until 'this year . . . .'" Wilkerson Deposition Transcript at pp. 13-15.

98.     From the time period of 2007 to the date of Wilkerson's deposition, Officer Wilkerson had investigated approximately 274 fires. However, he could

not provide the number of fires he had investigated from 2007 to the date of the fire on September 22, 2010. Wilkerson Deposition Transcript at p. 21.

99.   Investigator Wilkerson's training activities from 2007 to the date of the fire on September 22, 2010, might be relevant (but any training after the said fire irrelevant for the purposes of this lawsuit).

100.  As supported by an analysis by Defendant's expert, Dr. David J. Icove, the private investigators, including Williams, failed to meet basic standards of professional care expected in the field of fire investigation. Dr. Icove concluded that their investigations were unsound, failed to properly apply the methodology of the scientific method, and allowed spoliation of physical and testimonial evidence to occur.

101.  Both of these investigators (Daniel Wilkerson, City of Huntsville Fire Department, and Rodrick Williams, EFI Global) failed to collect and examine critical physical and testimonial evidence in this case. The City of Huntsville only documented an interview with one witness, Special Agent Siegling, the occupant of the second floor motel room. They claimed to have eliminated "drop down" of fire from the third floor room balcony, yet neither identified nor interviewed the occupants of that floor. In fact, they never identified or interviewed the individual who discovered the fire.

Investigator Wilkerson spent less than four hours at the fire scene. Wilkerson found no cigarette butts, of any brand, on the balcony of Special Agent Seigling's room. Seigling's balcony floor was not significantly burned. Wilkerson recorded no interviews with any hotel occupant or personnel, save for Special Agent Seigling.

Rod Williams did not inspect the scene of the fire at issue until four days after the fire.

Furthermore, both of Plaintiff's experts relied upon the opinions of City of Huntsville Electrical Inspector Doug Smith and Building Inspector Skip Stinson, who both examined the fire scene that evening to eliminate fire, electrical, and building codes as potential causes for the fire. These "expert" opinions were later nullified when follow-up City of Huntsville Codes Officials discovered numerous significant fire, electrical, and building code violations. These violations were so serious that Code officials ordered an immediate evacuation of the motel complex until the violations were remedied.

Both of these investigators (Daniel Wilkerson, City of Huntsville Fire Department, and Rodney Williams, EFI Global) failed to collect and examine physical and testimonial evidence in this case. Photographic documentation failed to adequately support the integrity of their investigation. With an emphasis on numerous individuals, including City of Huntsville Electrical Inspector Doug

Smith, Investigator Wilkerson, and Insurance Investigator Williams to examine a lighting fixture on Special Agent Siegling's exterior balcony, all of these individuals missed other nearby and numerous significant fire, electrical, and building codes violations in the ceilings, walls, and fixtures in Building 2 where they claimed the fire started, including the balcony above.

Both of these investigators (Daniel Wilkerson, City of Huntsville Fire Department, and Rodney Williams, EFI Global) had significant analytical gaps in their investigation. They failed to examine all of the plausible, competing hypotheses in this case. By prematurely limiting the focus of their investigation, they failed to conduct more than one interview, failed to properly collect and preserve evidence, and failed to recognize obvious fire, building, and electrical code violations.

Failure to recognize, document, and analyze all of the potential hypotheses in a fire investigation violates the Scientific Method and is contrary to the accepted standards of professional conduct set forth in NFPA 921 and other prevailing standards of care.  NFPA 921 states that if even two unresolved hypotheses exist, the investigator's finding of a fire's cause must be "undetermined" (NFPA 921, pt. 4.3.6).

102.   Both of these investigators (Daniel Wilkerson, City of Huntsville Fire Department, and Rodney Williams, EFI Global) failed to collect and examine

physical and testimonial evidence in this case. The City of Huntsville only documented an interview with one witness, Special Agent Siegling, the occupant of the second floor motel room. They claimed to have eliminated "drop down" of fire from the third floor room balcony, yet neither identified nor interviewed the occupant of that floor. In fact, they never identified nor interviewed the individual who discovered the fire.

Furthermore, they relied upon the opinions of City of Huntsville Electrical Inspector Doug Smith and Building Inspector Skip Stinson, who both examined the fire scene that evening to eliminate fire, electrical, and building codes as potential causes for the fire. These "expert" opinions were later nullified when follow-up City of Huntsville Codes Officials discovered numerous significant fire, electrical, and building code violations These violations were so serious that Code officials ordered an immediate evacuation of the motel complex until the violations were remedied.

Photographic documentation failed to support the integrity of their investigation. With an emphasis of numerous individuals, including City of Huntsville Electrical Inspector Doug Smith, Investigator Wilkerson, and Insurance Investigator Williams to examine a lighting fixture on Special Agent Siegling's exterior balcony, all of these individuals missed other nearby and numerous significant fire, electrical, and building codes violations in the ceilings, walls, and

fixtures in Building 2 where they claimed the fire started, including the balcony above.

Both of these investigators (Daniel Wilkerson, City of Huntsville Fire Department, and Rodney Williams, EFI Global) had significant analytical gaps in their investigation They failed to examine all of the hypotheses in this case. By prematurely limiting the focus of their investigation, they failed to conduct more than one interview, failed to properly collect and preserve evidence, and failed to recognize obvious fire, building, and electrical code violations.

Failure to recognize, document, and analyze all of the potential hypotheses in a fire investigation is in violation of the Scientific Method and contrary to the accepted standards of professional conduct as set forth in NFPA 921 and other prevailing standards of care.   NFPA 921 states that even two unresolved hypotheses exist, the investigator's finding of a fire's cause must be listed as "undetermined" (NFPA 921, pt. 4.3.6).

103.   Both of these investigators (Daniel Wilkerson, City of Huntsville Fire Department, and Rodney Williams, EFI Global) failed (as required by NFPA 921 and NFPA 1033) to adequately and correctly document, photograph, and trace the origin and development of the fire using burn patterns.

Both investigators claim that "drop down" of flaming debris from the third floor balcony to Special Agent's second floor balcony was thoroughly considered

22

and ruled out. However, no investigative documentation exists of frontal photographs, diagrams, and fire pattern vectoring diagrams (as required by NFPA 921 and NFPA 1033) showing the first, second, and third floor levels of Building 2. Such photographic documentation would demonstrate that the "drop down" hypothesis is very obvious as to the fire's origin and development from the third to the second balcony levels.

104.   Both investigators failed to eliminate "drop down" of debris from the third level balcony to the second level. Special Agent Siegling testified that that the fire was initially to his left and from above, and no fire was burning on the balcony floor.

105.   Both investigators ignore that "drop-down" of flaming fire debris could have caused this burn pattern on the corner of this second floor balcony forming a "V-pattern" as they describe.  Special Agent Siegling testified that that the fire was initially to his left and from above, and no fire was burning on the balcony floor.

106.   Both investigators failed to photographically document the integrity of this alleged examination, failed to collect and preserve any debris evidence, and failed to test for the remains of an accelerant at not only the second but also the third floor balconies.  In analyzing whether the fire allegedly started on the second level, the same effort should have been exerted at the third floor balcony.

107.   Both investigators failed to examine the wiring in the ceiling of the third floor balcony as well as the external electrical fixture. City of Huntsville Code Officials cite numerous life threatening and potential ignition sources from electrical code violations found in the electrical wiring throughout Buildings 1, 2, and 3 of the motel complex.  All of the wiring was done without the required permits.

Of concern is the extraordinary amount of time spent by Plaintiff's experts examining, destructively disassembling, and discarding the external lighting fixture on Special Agent Siegling's second floor balcony. Then the investigators justify discarding this critical evidence, declaring it outside of their area of origin. This procedure is in direct violation of the professional standards of conduct in the field of fire investigation set forth in NFPA 921 and NFPA 1033. This is considered an act of spoliation by ASTM E860 and federal case law.

108.   Both investigators failed to collect all of the smoking materials beneath the balcony and identify what other brands were found there. They also failed to identify and interview the occupants of the motel room on the third floor level above Special Agent Siegling or the second and third floor balconies to the left and right. They did not attempt to determine who used the exterior courtyard walkways near these rooms before the fire, or if smoking took place at these locations. The selective identification and lack of evidence collection shows a

predisposed "expectation bias" on the part of Plaintiff's experts to bolster their opinions accusing Special Agent Siegling for causing the fire. They wholly failed to consider abundant exculpatory evidence.

109.   Special Agent Siegling smoked Marlboro Light cigarettes and the cigarette butts below his balcony show more than Marlboro Light cigarette butts.

110.   Officer Wilkerson interviewed Agent Siegling the night of the fire and asked when he last smoked.  Wilkerson's note about the interview states that Agent Siegling told him, "I don't remember (yesterday or the day before yesterday)". Plaintiff's Exhibit 1 to the deposition of Daniel Wilkerson.

111.   Agent Siegling informed Officer Wilkerson that throughout his stay in room 2207, he would dispose of cigarettes in a Styrofoam cup, which contained water, on the balcony.

112.   Both investigators failed to collect all of the smoking materials beneath the balcony and identify what other brands existed. They also failed to identify and interview the occupants of the motel on the third floor level and the second and third floor balconies to the left and right of room 2207. They failed to determine who occupied the exterior courtyard walkways near these rooms before the fire or if smoking took place at these locations.  The selective identification and lack of evidence collection show a predisposed "expectation bias" upon the part of

Plaintiff's experts to bolster their opinion as to accusing Special Agent Siegling as responsible for the fire without considering any exculpatory evidence.

113.   Plaintiff's Rule 26 expert disclosures do not recite the preceding eight hypothesis items. Both the investigators for the first time are now trying to use the "process of elimination" to form what is referred to as a "negative corpus" case to prove their hypothesis which is not supported by physical and testimonial evidence. This approach is unaccepted as detailed by NFPA 921 (pt. 19.6.5):

> The process of determining the ignition source for a fire, by eliminating all ignition sources found, known, or believed to have been present in the area of origin, and then claiming such methodology is proof of an ignition source for which there is no supporting evidence of its existence, is referred to by some investigators as *negative corpus*. Negative corpus has typically been used in classifying fires as incendiary, although the process has also been used to characterize fires classified as accidental. *This process is not consistent with the scientific method, is inappropriate, and should not be used because it generates untestable hypotheses, and may result in incorrect determinations of the ignition source and first fuel ignited*. (Emphasis added).

114.   Both the investigators for the first time are trying to use the "process of elimination" to form what is referred to as a "negative corpus" case to prove their hypothesis which is not supported by physical and testimonial evidence. This approach is recognized by NFPA 921 (pt. 19.6.5) as inappropriate.

115.   As previously stated and supported by an analysis by Defendant's expert, Dr. David J. Icove, Plaintiff's experts failed to meet even the most basic

standards of professional care expected in the field of fire investigation. Dr. Icove concluded that their investigations were unsound, failed to properly apply the scientific method, and allowed spoliation of physical and testimonial evidence to occur.

116.   Nothing suggests that a true a peer review of these investigators' opinions has ever been undertaken.   Clear direction on peer review is given by NFPA 921 (pt. 4.6.3) which states that:

> 4.6.3 Peer Review. Peer review is a formal procedure generally employed in prepublication review of scientific or technical documents and screening of grant applications by research-sponsoring agencies. Peer review carries with it connotations of both independence and objectivity. Peer reviewers should not have any interest in the outcome of the review. The author does not select the reviewers, and reviews are often conducted anonymously. As such, the term "peer review" should not be applied to reviews of an investigator's work by coworkers, supervisors, or investigators from agencies con- ducting investigations of the same incident. Such reviews are more appropriately characterized as "technical reviews," as described above.

117.   Inspector Doug Smith failed to recognize numerous fire, electrical, and building code violations. He claimed to have found none. In reality, his failure to recognize a significant number of pre-existing life threatening fire and electrical code violations in the Building 2 as well as in the other affected building, were later determined and cited by competent City of Huntsville Codes Officials to have

placed the lives of the occupants and visitors to entire hotel complex at significant risk and liability.

118.   Mr. Smith is not qualified under NFPA 921 or NFPA 1033 to conduct fire investigations or reach expert opinions regarding these matters.

119.   Inspector Skip Stinson failed to recognize numerous fire, electrical, and building code violation. He claimed to have found none. In reality, his failure to recognize a significant number of pre-existing life threatening fire and electrical code violations in the Building 2 as well as in the other building, which were later determined and cited by competent City of Huntsville Codes Officials to have placed the lives of the occupants and visitors to entire hotel complex at significant risk and exposed the motel to liability.

120.   A significant number of pre-existing life threatening fire and electrical code violation in the Building 2 as well as in the other Buildings 1 and 3, were determined and cited by competent City of Huntsville Codes Officials to have placed the lives of the occupants and visitors to entire hotel complex at significant risk and liability.

121.   No evidence to date supports this assertion. State and local individuals also occasionally smoked on the balcony of the room next door to that of agent Siegling.

122.   Officer Wilkerson has made this assertion but no other evidence to date supports this assertion.

123.   No evidence to date supports this assertion. Furthermore, for example, a lighted cigarette could have been easily flipped onto the said balcony from the ground or balconies nearby. Thus, the word "access" is ambiguous in this context.

124.   Special Agent Siegling was asleep on the evening of September 22, 2010, when he was awakened by the fire alarm. He looked out onto his balcony and saw no flames. After a short while someone banged on his door saying that all occupants had to leave the building. Siegling again looked out the door to his balcony and saw flames up and to his left about six feet away. There was no fire on the floor of the balcony itself.

125.   No evidence to date supports this assertion. State and local individuals also occasionally smoked on the balcony of room 2207.  Furthermore, for example, a lighted cigarette could have been easily flipped onto the said balcony from the ground or balconies nearby. Thus, the word "access" is ambiguous in this context.

126.   Both the investigators used the "process of elimination" to form what is referred to as a "negative corpus" case to prove their hypothesis in which is not supported by physical and testimonial evidence. This approach is recognized by NFPA 921 (pt. 19.6.5) as inappropriate.

127.   Dr. Icove is a member of the NFPA 921 Committee and has rendered expert opinions in the past regarding a fire investigator's compliance or non-compliance with this standard of care and its companion NFPA 1033.

128.   The training was not a requirement for his employment as an FBI Special Agent, but the training was required for certification as a bomb technician. There were approximately 30 members of the bomb school training class also staying at the Country Inn & Suites. Special Agent Siegling was the only FBI agent in the training class, and there may have been an ATF agent in the class. These were the only two federal employees staying in Building 2 of the Country Inn & Suites. The remaining 28 or so individuals in the bomb class staying in Building 2 were from state and local government units, and their rooms were reimbursed by their state and local units, not the United States or its agencies. While not in training, and after their usual work day at Redstone, Special Agent Siegling and several state and local individuals in bomb class occasionally smoked cigarettes on the balcony of his hotel room, which was located on the second floor.  State and local individuals also occasionally smoked on the balcony of the room next door to Agent Siegling's room. Smoking was not relevant to or connected with his FBI employment.

129.   The training was not a requirement for his employment as an FBI Special Agent, but the training was required for certification as a bomb technician. Smoking after hours while off-duty was not a direct benefit to the FBI.

130.   No one was required to stay at the Country Inn & Suites, but they did so out of convenience because the hotel ran a shuttle bus for the class back and forth to Redstone.

131.   Special Agent Siegling was not permitted to use his government issued credit card to purchase cigarettes or smoking materials. Furthermore, Special Agent Siegling indicated that when he did smoke, he extinguished cigarettes in a Styrofoam cup containing water.

132.   Special Agent Siegling was not acting in the course and scope of his employment the night of the fire and he was not smoking.   At all times, he occupied the room in a safe and reasonable manner. There is no credible evidence of tortious conduct by the FBI's employees that proximately caused harm or damage to Plaintiff.

133.   Defendant is not liable for damages because there is no credible evidence of tortious conduct by the FBI's employees that proximately caused harm or damage to Plaintiff to support a verdict.

134.   The prevailing industry standards of care for fire investigations include the current versions of the National Fire Protection Association (NFPA)

"Guide for Fire and Explosion Investigations" ("NFPA 921"), the "Standard for Professional Qualifications for Fire Investigator" ("NFPA 1033"), and standards referenced in these publications. Both NFPA 921 and NFPA 1033 are American National Standards.

135. Plaintiff's individual and collective actions of its legal advisors, insurance and claims adjusters, and retained private fire investigation firm, prevented Defendant from pursuing an impartial and independent investigation into the fire at the Country Inn & Suites. These actions to date, include, but are not limited to:

a.  Deciding to pursue subrogation the day after the fire, yet failing to notify all potential interested parties,[1] including the Defendant, of their legal rights to conduct an impartial and independent fire investigation, including the collection and preservation of physical, photographic, video, and testimonial evident into the origin and cause of the fire.

b.  Allowing Roderick Williams, the Plaintiff's private fire investigator, access to the fire scene to examine, destructively disassemble, materially alter, then discard the electrical wiring, lighting fixture—declaring this potential evidence as outside of his area of origin, thus negating forever its evidentiary value. This is an unethical practice in fire investigations. It is unknown what other destructive disassembly occurred and what, if any, witnesses accompanied him to the scene.

_____

[1] NFPA 921, 2014 ed., pt. 29.1.5.1 defines an *interested party* as "Any person, entity, or organization, including their representatives, with statutory obligations or whose legal rights or interests may be affected by the investigation of a specific incident."

32

c.   Committing *spoliation of evidence*[2] by failing to protect and preserve *in situ* potentially exculpatory physical, photographic, video and testimonial evidence in accordance with the standards of professional conduct in fire investigation, claims processing, and legal fields  covered by NFPA 921, NFPA 1033, federal spoliation case law, and 102 A.L.R.5th 99.

d.   The failures of Plaintiff's experts to uncover the existence of obvious and extreme fire, building, and electrical code violations in all of the Country Inn & Suites buildings— violations so severe and dangerous that after the fire, the City of Huntsville Code inspectors examining the fire-damaged building declared it and others as unsafe due to numerous serious building, electrical, and fire code violations.

e.   Failing to document all hypotheses including the extreme codes violations missed and not considered by Plaintiff's investigators, electrical and building inspectors during their fleeting investigations.

f.   Improperly applying the *process of elimination* in establishing a *negative corpus* case against the Defendant, a practice deemed both improper and unethical by *NFPA 921's Guide for Fire and Explosion Investigations.*[3]

136.   Plaintiff cannot meet the burden of proof that any act or omission of

FBI Special Agent Siegling proximately caused the fire because numerous other

smokers (non-federal employees) were in the same area during the relevant period,

on floors above and adjacent to his balcony at relevant times and each could have

---

[2] NFPA 921, 2014 Edition pt. 3.3.167 defines *spoliation* as the "Loss, destruction, or material alteration of an object or document that is evidence or potential evidence in a legal proceeding by one who has the responsibility for its preservation."

[3] NFPA 921, 2014 Edition, pt. 19.6.5 states, "The process of determining the ignition source for a fire, by eliminating all ignition sources found, known, or believed to have been present in the area of origin, and then claiming such methodology is proof of an ignition source for which there is no supporting evidence of its existence, is referred to by some investigators as *negative corpus*."

likely been the source of discarded cigarettes found on the ground, assuming *arguendo* that a cigarette could have beeen the cause of the fire.

137.   Furthermore, Plaintiff's experts cannot explain the source of other brands of cigarettes found on the ground. They failed the basic tenants of investigation by failing to collect this evidence, consciously or subconsciously ignoring their evidentiary and exculpatory value.

138.   Defendant disputes the cause and origin of the fire and is of the position that Plaintiff's expert evidence of fire cause and origin is speculative and lacks credibility within the meaning of Rule 702 of the Federal Rules of Evidence.

139.   Plaintiff's attempts to rehabilitate their origin and cause experts using the *negative corpus* theory by the inappropriate use of the *process of elimination* of eight hypotheses—all without any physical evidence remaining at the scene fail. A careful examination of the alleged area and point of fire origin would have revealed the evidence of an alleged smoldering ignition of the thick wooden planks by a cigarette—evidence never proved.

140.   Ignition of the second-floor balcony by dropdown of fire debris from the third and attic levels was never thoroughly explored by Plaintiff's experts — reinforcing the age-old maxim that buildings burn down, not up.

141.   Likewise, the repeated statements that no electrical code violations existed or were found by City Fire Inspector Dan Wilkerson, Insurance

Investigator Roderick Williams, City of Huntsville Electrical Inspector Doug Smith, and City Building Inspector Skip Stinson are nullified by later City of Huntsville findings.

142.   After the fire, Huntsville City Codes Inspectors examining the fire-damaged building discovered it was unsafe due to numerous serious building, electrical, and fire code violations. The inspectors documented that the work was performed without a permit and constituted a serious threat to life, health, and safety of the building occupants.

143.   Examples of specific violations that existed, yet were overlooked by Wilkerson, Williams, Smith, and Stinson include bare electrical splices in lighting fixtures, open live electrical boxes wallpapered over, and exposed uprotected electrical cables. All of these are potential sources of ignition, overlooked by the mere *ispe dixit* statements that there were no electrical code violations.

144.   Plaintiff's experts failed to comply with the minimum standards of professional care.

145.   The investigations conducted by Investigator Daniel Wilkerson (City of Huntsville Fire Department) and Investigator Roderick Williams (EFI Global, Inc.) are not the product of reliable scientific methods; are based upon insufficient facts or data; fail to reliably apply the proper principles and methods of forensic fire investigation to the facts of this case; and fail to meet the generally accepted

standard of care for conducting a proper and reliable scientific fire investigation as set forth in *NFPA 921, NFPA 1033,* and all other recognized professional standards for conducting a proper fire investigation. These failings defeat the validity and reliability of their opinions rendered in this case.

146.   Plaintiff's experts  failed to comply with Rule 26 of the Federal Rules of Civil Procedure; and both investigators are not otherwise qualified to testify as to the origin, cause, and responsibility for the fire.

147.   Plaintiff's expert investigations demonstrate the lack of present-day job performance qualifications under *NFPA 1033* and fail to follow *NFPA 921* in that they:

- Failed to preserve exculpatory physical and documentary evidence in accordance with *NFPA 921*, *NFPA 1033*, and other related standards of care.

- Lacked sufficient experience as testifying experts.

- Contain unreliable opinions based on fundamentally flawed methodologies.

- Cannot eliminate alternate hypotheses for the origin and cause of the fire,

- Ignored obvious and dangerous fire, building, and electrical code violations that were potential sources of ignition.

- Allowed for the destruction of a lighting fixture, wiring, and potentially other exculpatory evidence which was examined, destructively disassembled, and discarded.

- Provided no testimony that would assist the trier of fact.

148. Acadia Insurance Company, EFI Global, Inc., and Cook Claims Company, the firm who gave the assignment to conduct the origin and cause investigation of the Country Inn and Suites fire, and their legal representatives were directly or indirectly responsible for committing or allowing spoliation of evidence to occur in this case.

149. Documents obtained from Acadia through discovery prove that these firms knew at *one day after the fire* that a lawsuit or legal proceeding would be sought against the U.S. Government.

150. These firms failed in their responsibilities under industry standards of care per NFPA 921, NFPA 1033, and other recognized standards, in that they:

- Had ample opportunity and time to recognize their known responsibilities to notify interested parties, to protect the fire scene, and to prevent spoliation and did not

- Could have properly preserved *in situ*, the evidence in this case so that other interested parties could share the same evidentiary value.

37

- Had the responsibility and opportunity to safeguard this evidence from further loss, destruction, or spoliation.

- Had the responsibility and opportunity to notify and invite all appropriate interested parties to all evidence inspections and sharing of data regarding the fire loss.

151. Defendant's designated expert Dr. David J. Icove is an internationally recognized fire investigation expert, educator, author, and retired Federal law enforcement agent. He is co-author of the keynote expert treatise in the field, *Kirk's Fire Investigation*. His Rule 26 expert report shows credible scientific evidence that Plaintiff's theories of cause and origin are incorrect.

152. Even if Plaintiff can prove by a preponderance of the evidence that FBI agent Siegling's smoking while off-duty caused the fire, FBI agent Siegling was outside the course and scope of his federal employment at the relevant time and place.

153. Plaintiff's proof of negligence and causation fails, and judgment for the the United States should be entered.

WHEREFORE, the parties submit same pursuant to the Pretrial Order entered by the Court. Further, the parties respectfully reserve the right to alter,

amend or modify this Statement of Facts in the event an error, omission or oversight is found and/or is inconsistent with the intentions of the parties.

Dated: December 9, 2015

Respectfully submitted,

**MCCATHERN, P.L.L.C**

By:  /s/ *Paul A. Grinke*
     Carl L. Evans
     Alabama State Bar No. 6823-A35C
     Texas State Bar No. 24056989
     cevans@mccathernlaw.com
     Paul A. Grinke
     Texas State Bar No. 24032255
     pgrinke@mccathernlaw.com
     Regency Plaza
     3710 Rawlins Street, Suite 1600
     Dallas, TX 75219
     (214) 741-2662 Telephone
     (214) 741-4717 Facsimile
     **ATTORNEYS FOR PLAINTIFF**

**JOYCE WHITE VANCE**
**UNITED STATES ATTORNEY**

By:   /s/ Jack Hood
     Jack Hood
     Assistant United States Attorney
     U.S. Attorney's Office
     State Bar No. D41J
     1801 Fourth Avenue North
     Birmingham, Alabama 35203
     (205) 244-2103
     (205) 244-2181 (fax)
     jack.hood@usdoj.gov

     **ATTORNEY FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2015, a true and correct copy of the foregoing was served upon the following counsel via e-service:

Jayme Kantor, Esq.
Assistant General Counsel
Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Suite 10140
Washington, DC 20535
Phone: 202/324-7194
Email: Jayme.Kantor@ic.fbi.gov

**ATTORNEYS FOR DEFENDANT UNITED STATES OF AMERICA**

*/s/ Paul A. Grinke*