1

IN THE UNITED STATES DISTRICT COURT

2
FOR THE NORTHERN DISTRICT OF ALABAMA

NORTHEASTERN DIVISION

3

4

ACADIA INSURANCE COMPANY,      *

5
        Plaintiff,      *   5:13-cv-00895-CLS
                      *   January 11, 2016

6
        vs.      *   Huntsville, Alabama
                      *   9:00 a.m.

7
UNITED STATES OF AMERICA,      *
        Defendant.      *

8
*****************************

9

TRANSCRIPT OF BENCH TRIAL

10
VOLUME I
BEFORE THE HONORABLE C. LYNWOOD SMITH, JR.

11
SENIOR UNITED STATES DISTRICT JUDGE

12

<u>FOR THE PLAINTIFF:</u>

13
Paul A. Grinke, Esq.
MCCATHERN MOOTY GRINKE LLP

14
3710 Rawlins Street
Suite 1600

15
Dallas, Texas 75219

16

<u>FOR THE DEFENDANT:</u>

17
Jack B. Hood, Esq.
Gary Brown, Esq.

18
Jayme Kantor
U.S. ATTORNEY'S OFFICE

19
1801 4th Avenue North
Birmingham, Alabama 35203

20

21
<u>FEDERAL OFFICIAL COURT REPORTER:</u>
Christina K. Decker, RMR, CRR

22
101 Holmes Avenue, NE, Suite 305
Huntsville, AL 35801

23

24

25

1                                    **INDEX**

2       DOUGLAS SMITH                               6
        DIRECT EXAMINATION                          6
3       MR. GRINKE
        CROSS-EXAMINATION                          11
4       BY MR. CHEEK
        REDIRECT EXAMINATION                       13
5       BY MR. GRINKE

6       DAN WILKERSON                              15
        DIRECT EXAMINATION                         15
7       BY MR. GRINKE
        CROSS-EXAMINATION                          64
8       BY MR. HOOD
        REDIRECT EXAMINATION                       82
9       BY MR. GRINKE
        RECROSS-EXAMINATION                        84
10      BY MR. HOOD
        FURTHER REDIRECT EXAMINATION               85
11      BY MR. GRINKE

12      RODERICK WILLIAMS                          90
        DIRECT EXAMINATION                         91
13      BY MR. GRINKE
        CROSS-EXAMINATION                         127
14      BY MR. CHEEK

15      MICHAEL SIEGLING                          139
        DIRECT EXAMINATION                        139
16      BY MR. GRINKE
        CROSS-EXAMINATION                         146
17      BY MR. HOOD

18      DAVID ICOVE                               151
        DIRECT EXAMINATION                        152
19      BY MR. HOOD
        CROSS-EXAMINATION                         200
20      BY MR. GRINKE

21

22

23

24

25

<u>PROCEEDINGS</u>:

1

2          THE COURT:  All right, sir.  You said you

3  would like to make a brief opening.  Go ahead.

4          MR. GRINKE:  Yes, Your Honor.  Paul Grinke

5  for the plaintiff Acadia.

6      The thing that I feel is most important for me to

7  say is that I present this case to the Court today humbly and

8  with absolute respect for Special Agent Siegling and the FBI

9  and the work that you are charged with.

10     We believe the evidence will show that Agent

11 Siegling made a simple mistake.  My client seeks

12 reimbursement for that.  And we think the preponderance of

13 the evidence will show that the carelessly discarded

14 cigarette from the balcony of 2207 caused the fire.

15     Thank you.

16         MR. HOOD:  We would waive opening

17 argument.

18     I do have a couple of things to mention to maybe

19 move the case along a little bit better.

20         THE COURT:  All right, sir.

21         MR. HOOD:  Both the plaintiff and

22 defendant have placed trial exhibit notebooks at the witness

23 stand so we don't have to run back and forth with the exhibit

24 books just to make it more convenient.

25     We have both stipulated that all those exhibits are

1    admitted.  And we would, at this time, admit ask you to admit

2    those exhibits.

3                    THE COURT:  For both parties?

4                    MR. HOOD:  Excuse me?

5                    THE COURT:  For both parties?

6                    MR. HOOD:  Yes, sir.

7                    THE COURT:  All right.  They will be

8    admitted by stipulation of counsel.

9                    MR. HOOD:  At this time, I would move,

10   under Rule 615 of the Federal Rules of Evidence, separate

11   witnesses.

12                   THE COURT:  All right.  The rule has been

13   invoked.  It will be granted.

14                   MR. HOOD:  And I would like to point out

15   to the Court that I have sitting at counsel table with me

16   Ms. Jayme Kantor, who is counsel for the FBI, out of the

17   Washington, D.C., if that's all right with Your Honor.

18                   MS. KANTOR:  Good morning, Your Honor.

19                   THE COURT:  Good morning.

20                   MR. HOOD:  I would also like to make sure

21   for the record that the stipulation from the pretrial order

22   is either read into the record at this point in time or

23   noticed into the record at Document 74, Paragraph 5(a).

24                   THE COURT:  Let me make sure I know what

25   you're talking about, counsel.

1          MR. HOOD:  It's the agreed summary on the

2     pretrial order.

3          THE COURT:  Oh.  Yes.  That will be part

4     of the record in the case without having to be read for the

5     Court Reporter.

6          MR. HOOD:  All right.  Thank you, Your

7     Honor.

8          THE COURT:  All right.  Since the rule has

9     been invoked, after the first witness is designated, all

10    other witnesses will need to wait outside until you are

11    called to testify.  And there should be no discussion among

12    any of you concerning the testimony of previous witnesses.

13         MR. HOOD:  The other agreement that

14    Mr. Grinke and I have entered into is our formal Rule 26

15    experts can sit in and listen to all the experts.

16         THE COURT:  All right.  That would be --

17    do you want to designate those individuals by name?

18         MR. GRINKE:  Plaintiff's 26(f) expert is

19    Roderick Williams who is not here yet, but I had breakfast

20    with him, so I assume he will be here shortly.

21         MR. HOOD:  The defendant's is Dr. David

22    Icove out of Knoxville, Tennessee.

23         THE COURT:  All right.  Who is your first

24    witness?

25         MR. GRINKE:  Doug Smith, Your Honor.

1                    THE COURT:  Mr. Smith, come forward.

2               Other non-expert witnesses please wait in the

3      hallway or witness room.

4                         DOUGLAS SMITH

5      having been first duly sworn by the Courtroom Deputy Clerk,

6      was examined and testified as follows:

7                    THE CLERK:  State your name for the

8      record.

9                    THE WITNESS:  Douglas Smith.

10                   THE CLERK:  And spell your first name.

11                   THE WITNESS:  D-O-U-G-L-A-S.  Smith,

12     S-M-I-T-H.

13                   THE CLERK:  In which city and state do you

14     reside?

15                   THE WITNESS:  Hazel Green, Alabama.

16                   THE CLERK:  Thank you.

17                   THE COURT:  Go ahead.

18                   MR. GRINKE:  Thank you, Your Honor.

19                       DIRECT EXAMINATION

20     MR. GRINKE:

21     Q      Good morning, Mr. Smith.

22     A      Good morning.

23     Q      How are you currently employed?

24     A      City of Huntsville electrical inspector.

25     Q      And what are your duties and responsibilities as the

1  electrical inspector for the City of Huntsville?

2  A       I inspect all new work, as far as from the ground up

3  to final inspection of all renovations here in Huntsville,

4  everything west of Jordan Lane.

5  Q       And was that also your position back in September

6  22nd of 2010?

7  A       Yes.

8  Q       And, at that time, how long had you been the

9  electrical inspector for the City of Huntsville?

10  A       At that time, that was in 2010, so I would have been

11  there ten years at that time.

12  Q       Okay.  And have you received any special education

13  or training in order to be the electrical inspector for the

14  City of Huntsville?

15  A       No.

16  Q       Tell the Court just briefly about your educational

17  background.  Where did you graduate from high school?

18  A       Johnson High School.  I went in the Marine Corps,

19  stayed in there seven years.  I went to basic electricity --

20  electronics school while in there.  I got out and I went to

21  Lighthouse Electrical Institute and became an electrical

22  inspector in May of 2000.

23  Q       And is part of your job with the City of Huntsville

24  as the electrical inspector to look for things that might be

25  a code violation, with respect to the electrical aspects?

1    A        Yes, sir.

2    Q        Do you recall being called out to the Country Inn

3    and Suites here in Huntsville on September 22nd, 2010?

4    A        Yes.

5    Q        And who asked you to come out there?

6    A        Fire dispatcher called me out.  I think it was

7    around 11:45.  Dan Wilkerson was the fire investigator on the

8    scene.

9    Q        And what -- and did you see Mr. Wilkerson when you

10   arrived at the fire scene?

11   A        Yes.

12   Q        And what did he ask you to do?

13   A        He just asked me to look at the balcony and see if

14   there was anything electrical out there that could have

15   started the fire.

16   Q        And did you go and -- and you're talking about the

17   balcony of Room 2207?

18   A        Yes.

19   Q        And did you go out on the balcony of 2207?

20   A        I did.

21   Q        And did you -- you looked at it?

22   A        Yes.

23   Q        Did you identify on the evening of September 22nd

24   any items that you believed might have been an electrical

25   cause of this fire?

1    A       No.

2    Q       Did you identify anything on the balcony of Room

3    2207 that you identified as being a code violation?

4    A       No.

5    Q       Mr. Smith, there is a white three-ring binder right

6    next to you.  These are the exhibits in the case.  If you

7    could open that and look for, I think it's -- it should be

8    Tab 6, GX-6 is the Defense Exhibit Number 6.

9            And, madam deputy, are these screens turned on?

10           All right.  Do you have Defense Exhibit 6 in front

11   of you, sir?

12   A       Yes.

13   Q       Okay.  This appears to be -- and I will represent to

14   you that these documents were produced by the defendant in

15   this case, but they were obtained from the City of Huntsville

16   under a subpoena.  And Document 6 appears to be an

17   investigation report.  Did you author this report?

18   A       I did not.  I didn't write this report.  James

19   Campbell, another electrical inspector with the City of

20   Huntsville, actually wrote this.

21   Q       Okay.

22   A       It was done, looks to me, like June the 3rd of '11.

23   Q       Okay.

24   A       The fire was in 2010.

25   Q       Okay.  So several months after the fire.

1          There are a list of 15 code violations on the first

2     page.  And I will just ask you -- and you can take your

3     time -- but if you will just peruse through those and tell

4     the Court if there are any of these listed code violations.

5     Did you identify any of these code violations on the balcony

6     of Room 2207?

7     A          I did not.

8     Q          And the same notebook, if you could flip to Tab 34,

9     Mr. Smith.  Actually, I'm just reading this.

10          34 appears to be regarding Building 1, and 35

11     appears to be regarding Building 3.  This fire, did it occur

12     in Building 2?

13     A          Building 2.

14     Q          Okay.  And so it was Exhibit 6 we were looking at,

15     the report for Building 2; is that correct?

16     A          That -- at that time, in June the 3rd of '11, that

17     building was shut down.  It wouldn't have been included in

18     this write-up.  That would have been for the other buildings.

19     Q          That would be.  Okay.  Thank you, sir.

20                    MR. GRINKE:  That's all the questions I

21     have.  I pass the witness, Your Honor.

22                    THE COURT:  Does Government Exhibit 6, the

23     one you're looking at, where on there is the -- oh, I see.

24     Date was June 3rd, 2011.  But it does not identify the

25     buildings that were being inspected in that report, is that

1    what you're telling me?

2                      THE WITNESS:  Yes, sir.

3                      MR. CHEEK:  Your Honor, if I could

4    clarify.

5                      THE COURT:  All right, sir.

6                      MR. CHEEK:  At one point on Government's

7    Exhibit 6, it does say in the summary section, it says,

8    quote, renovations under perimeter have been taking place in

9    Building Number 2.

10           So that's where the identification of Building 2 is

11   in Government Exhibit Number 6.

12                      THE COURT:  Do you want to examine this

13   witness to draw that out?

14                      MR. CHEEK:  Yes, Your Honor.

15                      THE COURT:  All right.  Thank you.

16           I say examine him.  It will be cross-examination.

17                      CROSS-EXAMINATION

18   BY MR. CHEEK:

19   Q        Good morning, Mr. Smith.

20   A        Good morning.

21   Q        You went to the scene of the fire on September 22nd,

22   2010, and you arrived there at around 11:45 p.m.?

23   A        I think that's -- yes, sir.

24   Q        And you were there to determine whether or not the

25   power should stay on in Building Number 2, isn't that

1    correct?

2    A        Yes.

3    Q        At that point in time were you looking for code

4    violations?

5    A        No.

6    Q        In fact, did you inspect the property for code

7    violations that day?

8    A        No, sir.

9    Q        Are you qualified to determine cause and origins of

10   fires?

11   A        No, sir.

12   Q        After you went to the scene and cut the power to

13   Building 2, you produced an investigation report?

14   A        I did.

15   Q        And in that report you wrote, quote, not an

16   electrical fire, probably cigarettes; isn't that correct?

17   A        It is.

18   Q        And those statements were based on Dan Wilkerson's

19   conclusions?

20   A        Yes, sir.

21   Q        They were not your own independent conclusions?

22   A        No, sir.

23   Q        Are you an expert in the inspection and valuation of

24   fire loss?

25   A        No, sir.

1   Q       Are you familiar with and trained in NFPA, Line 21

2   and 1033?

3   A       No, sir.

4                   MR. CHEEK:  I have no further questions

5   for this witness.

6           We will get into Building 1, 2, and 3 a little bit

7   later.

8                   THE COURT:  Very good.

9                   MR. GRINKE:  Just a couple on redirect,

10  please, sir.

11                  THE COURT:  Yes, sir.

12                      REDIRECT EXAMINATION

13  BY MR. GRINKE:

14  Q       You are not an expert in fire investigation, but are

15  you an expert in identifying electrical code violations in a

16  building?

17  A       Yes.

18  Q       And irrespective of the fact that you were out there

19  to determine if electric should be cut off, when you walked

20  out on there on the balcony, could you tell the Court whether

21  or not if you had seen an electrical code violation out there

22  on the balcony would you have alerted Mr. Wilkerson to that

23  fact?

24                  MR. CHEEK:  Objection, Your Honor.  These

25  are leading questions.

1          THE COURT:  I will overrule.  Go ahead.

2    You may answer the question.

3    A       I would have.

4    BY MR. GRINKE:

5    Q       Okay.

6          THE COURT:  But did you not see any?

7          THE WITNESS:  I did not, sir.

8          THE COURT:  What decision did you make

9    about leaving electricity on in the building?

10         THE WITNESS:  We called a building

11   inspector out there.  We looked at structural issues because

12   the fire had got up into the attic.  And that was the final

13   determination to cut power off to that one complex.

14         THE COURT:  That one building of the

15   three?

16         THE WITNESS:  Yes, Your Honor.

17         THE COURT:  Thank you.  Anything on

18   recross?

19         MR. CHEEK:  No, Your Honor.

20         THE COURT:  You may step down.  Thank you

21   for coming, Mr. Smith.

22         MR. HOOD:  Your Honor, can we just go

23   ahead and excuse this witness so he can go back to work?

24         THE COURT:  If there's no objection, you

25   are free to go about your business.

1          MR. GRINKE:  Thank you, sir.

2          THE COURT:  Who is your next witness?

3          MR. GRINKE:  Dan Wilkerson, Your Honor.

4          THE COURT:  Would you call him in?

5                    DAN WILKERSON,

6    having been first duly sworn by the Courtroom Deputy Clerk,

7    was examined and testified as follows:

8          THE CLERK:  Please state your name for the

9    record.

10          THE WITNESS:  Daniel Wilkerson.

11          THE CLERK:  In which city and state do you

12    reside?

13          THE WITNESS:  Huntsville, Alabama.

14          THE CLERK:  Thank you.

15                    DIRECT EXAMINATION

16    BY MR. GRINKE:

17    Q       Good morning, Mr. Wilkerson.

18    A       Good morning.

19    Q       How are you currently employed?

20    A       With the City of Huntsville as the Fire Marshal.

21    Q       And how long have you been Fire Marshal?

22    A       Since July of 2014.

23    Q       Were you employed with the Huntsville Fire

24    Department in September of 2010?

25    A       I was.

1    Q        And what was your title at that time?

2    A        Fire Prevention Investigator -- Fire Prevention

3    Investigation Officer.

4    Q        And we're here today to talk about the fire at the

5    Country Inn and Suites on September 22nd, 2010.

6             Did you conduct an investigation into that fire?

7    A        I did.

8    Q        And is that part of your official responsibilities

9    with the City of Huntsville?

10   A        It is.

11   Q        If you would, tell the Court, please, a little bit

12   about your background and education and training leading up

13   to you becoming a fire investigator.

14   A        In 2001 I was hired by the City of Huntsville as a

15   firefighter.  I was -- as a firefighter I went to rookie

16   school.  And then I was stationed at a station as a

17   firefighter.

18            And back then the standard was you had to be a

19   firefighter five years before you could be eligible to be

20   promoted into the fire prevention.

21            So in '07, I took the test to be promoted and passed

22   the test.  And I was promoted in the fire prevention in May

23   of '07.

24   Q        A test with who?  Whose test was that?

25   A        It was the City of Huntsville.  They take -- it was

1    three or four sources that they pull questions from.  So you

2    had to study these -- it was like building construction.  It

3    was a fire investigation book.  It was fire codes.  And then

4    I'm not sure about the fourth one.

5         But you had to read these.  And then they give you a

6    written test with a hundred questions.  And you had to pass

7    that test to be eligible for promotion.

8    Q      Okay.

9    A      At the time, there was three of us that took the

10   test and they promoted two.  And so I was promoted in May of

11   '07 as a Fire Prevention Investigation Officer.

12        As -- in that role, you do normal numerous tasks.

13   You do fire inspections for prevention.  You do safety

14   education for prevention.  We do plans review of any new

15   construction or remodels.  And also we do fire

16   investigations.

17        So when you get promoted you're required within a

18   certain amount of time to get certified by the State as Fire

19   Inspector 1, Fire Inspector 2 and Fire Investigator.

20        So while you're waiting to take those classes, they

21   start in-house training program where you ride along with

22   other fire prevention officers, investigation officers.

23        So during the day you learn how to do inspections,

24   and then when -- once you're promoted into that office they

25   put you on a 24-hour rotation -- well, it is not a rotation.

It's 24/7.  You respond to every fire that they have in Huntsville.

So me and the other individual that was promoted, for every fire that happened between May of '07 until about August of '07 we responded to every fire.  And we shadowed the lead investigator, assisted him.  And they did on-the-job training.

In August of '07, I went to the State Fire College and got certified as a Fire Investigator.  And then it was shortly after that that I started doing lead investigations.

So I was -- my -- during the daytime -- which our call schedule rotates as investigator.  So we have eight investigators in the office.  So we would rotate.  One person would have Monday, then the other person would have Tuesday.  And if it ever fell on a Friday, you had Friday, Saturday, and Sunday.

So the fires that you was called out to was it depended on if you was on call that day or not.  So one person would be on call.  The rest of them, the other seven would not be first on call.  But dependent on if you was -- if you was on call the next day you would be next up.

So if we got two fires at one time they would page the on-call person first.  And then the next up person would be second.

And then --

Q       Let me interrupt you and just ask you this:  I
wanted a little bit more clarification on the -- I think you
said there was some state of Alabama fire courses that you
took?

A       Yes.

Q       Or certifications you received.  Tell the Court a
little bit more about that.

A       Well, the Alabama State Fire College at the time had
a partnership with Shelton State College down in Tuscaloosa.

        And you would go down there.  And you would take a
week-long class at Alabama State Fire College, which is on
the campus, or it's right behind the campus of Shelton State.
And then once you completed that class and taken the test,
then you would get a certification in that subject that you
went down there.

        So the first three months that I was promoted I got
Fire Inspector 2, Fire Inspector 2, and Fire Investigator 1
during that time.

Q       Okay.  And you achieved those certifications?

A       I did.

Q       So, then, between 2007, 2008 up to the time of this
fire, please tell the Court about your experience in any
additional training you may have received with respect to
fire investigation.

A       Well, during that time I applied for some -- for

1    some classes at the National Fire Academy and wasn't
2    accepted.  I wasn't accepted there until I believe it was
3    January 2013.
4         But during the time of August of '07 and the fire --
5    and the September 2010, I was lead investigator on about 118
6    fires until that time.
7    Q      Okay.
8    A      So, basically, you know, during -- and we're a
9    member of associations to where we can get online training.
10   We have monthly meetings for the Fire Marshals Association of
11   Alabama where we can network and get -- you know, they'll do
12   training sessions, you know, when they're available,
13   different seminars and stuff.  But, as far as formal
14   certifications, the Investigator 1 was the only one, as far
15   as investigation, I had up to that point.
16        Now, I did finish my associates degree in that time
17   frame.  My associates degree I got from Calhoun Community
18   College.  I graduated from there in '05 with a Fire Service
19   Management degree.  And then after I was promoted into the
20   Fire Prevention -- and I keep referring Fire Prevention.
21   Some people call it Fire Marshal's office.  I guess the
22   official title is Bureau of Fire Prevention.  After I got
23   promoted in there I took some classes through -- I'm drawing
24   a blank.  Columbia Southern.  I'm sorry.
25   Q      That's all right.

1    A        And I got my bachelor's degree.  And I graduated

2    from there in '09, got my bachelor's degree in fire science.

3    Q        Now, so you are now Fire Marshal of the City of

4    Huntsville; is that correct?

5    A        That's correct.

6    Q        And so let's go from September of 2010 to the

7    present.  Can you the tell the Court briefly just about any

8    other additional certifications or training you received in

9    that time frame?

10   A        Around 2011 we had some promotions within the

11   office, and they pulled me from doing inspections in the day

12   to actually doing plans review to where one of my primary

13   duties during the day was plans review.

14            During that time, I did get accepted into National

15   Fire Academy to go to a Life Safety and Fire Plans Review

16   class.  As I previously stated, in January 2013 I went to

17   Fire Origin and Cause class, which is a two-week class up in

18   Maryland.  And I completed that class, as well.

19            And then up until July of 2014, when I got promoted

20   to Fire Marshal, my fire total was about 289, is what -- as

21   far as fire scenes that I was lead investigator on.

22   Q        And did you render an opinion as to the origin and

23   cause of the fire at the Country Inn and Suites back in

24   September of 2010?

25   A        I did.

1    Q        Is there anything in your education, training, or

2    experience since September of 2010 until today that has

3    changed your opinion as to the origin and cause of the fire?

4    A        No, sir.

5                    MR. HOOD:  Object, Your Honor.  That's not

6    relevant.

7                    THE COURT:  Overruled.

8    BY MR. GRINKE:

9    Q        I'm sorry.  Your answer was?

10   A        No, sir.

11   Q        All right.  Well, then, let's talk about your

12   opinion.

13            The opinions that you render today, are they based

14   on a reasonable degree of probability?

15   A        Yes.

16   Q        What is your opinion as to the origin and cause of

17   this fire?

18   A        The origin of the fire was on the second floor

19   balcony.  I believe it was Room 2207.  In the corner of the

20   balcony.  And that the cause was due to smoking materials.

21   Q        If you could grab that white notebook right next to

22   you.  Pull up GX-9.  Look to Tab 9.  It's Defense Exhibit 9.

23            And, Mr. Wilkerson, we have got these hard copies of

24   the photographs.  And there also should be on the screen in

25   front of you -- I don't know if the screen, the digital copy

1    might be brighter and easier to see.  Does this photograph

2    assist you in how you found or what you saw when determining

3    the origin of the fire?

4    A       Well, that's a -- that's kind of an overview of the

5    scene there.

6           The lower balcony there is 2207.  And I believe the

7    upper balcony is 2307.  And where I ruled the origin of the

8    fire was the right corner of the balcony on 2207.

9                    THE COURT:  So the lower room is Room

10   2207?

11                   THE WITNESS:  Yes, sir.

12   BY MR. GRINKE:

13   Q       And you're saying it's the lower room on the

14   left-hand side.  There's two balconies -- I guess there's

15   four balconies, but on the lower level there's two balconies?

16   A       If I remember right, the rooms on the right was 2209

17   and 2309.  And then the one -- the lower one there was 2207.

18   And then the one above it is 2307.

19          I think the second number indicated the floor and

20   then the last two digits indicated the actual room on the

21   floor.  And the first number indicated the building.

22          So this was Building 2, Floor 2, Room 7.  So it was

23   2207.

24                   THE COURT:  If I were standing outside

25   Building Number 2 of the Country Inn and Suites and was

1  looking at those four balconies, would I be facing west,

2  north, east, or south?

3                    THE WITNESS:  I believe you would be

4  facing west.

5                    THE COURT:  West.  So this -- all right.

6                    THE WITNESS:  The way I -- the position I

7  was in when I took this picture, I was facing west.

8          Now, the overview of that --

9                    THE COURT:  So your left, to my left in

10  this photograph would be north.

11                    THE WITNESS:  No.  South.

12                    THE COURT:  South?

13                    THE WITNESS:  Yes.  It's kind of the way

14  we're facing here in the courtroom.  That's west, south,

15  north.

16                    THE COURT:  Okay.  The bottom of the

17  photograph is the east.

18          All right.  Facing west.  So to your right is north

19  and to your left is south.

20                    THE WITNESS:  Yes.  East would be behind

21  me.

22                    THE COURT:  East would be behind you?

23                    THE WITNESS:  Yes, sir.

24                    THE COURT:  And your opinion is that the

25  fire originated on the balcony of Room 2207?

1              THE WITNESS:  Yes, sir.

2              THE COURT:  And that would be the -- tell

3    me what corner of that balcony.

4              THE WITNESS:  Direction wise would be

5    northwest.  It would be the right-hand side.  You see in the

6    picture the window, and the window on the right has

7    considerable more damage than the one on the left.  If you go

8    down to the corner of that balcony away from the edge of the

9    balcony that's where I ruled the origin of the fire.

10             THE COURT:  All right.  Go ahead.

11   BY MR. GRINKE:

12   Q      All right.  So the balcony -- you said the room to

13   the right of 2207 you thought was 2209?

14   A      Yes, sir.

15   Q      And you did you look in 2209 in the room itself?

16   A      I would have to look through my pictures to know

17   that.

18   Q      That brings up a good point.  If you could switch

19   notebooks to the black notebook.  Those are the plaintiff's

20   exhibits that have been pre-admitted.

21             And if you will turn to Tab 11, Plaintiff's Exhibit

22   11.

23   A      Do you want me to go back to the question you just

24   asked me?

25   Q      Yes.

A        That would be correct.

Usually when I have a multi room like an apartment or a hotel -- which this was a hotel -- I usually take a picture of the room number, and then the pictures following it will be pictures inside the room.

And one of my pictures states 2209.  And then I went out onto the balcony of 2209 and took a picture.

Q        So that we can all follow along, I will represent you to that Plaintiff's Exhibit Number 11 is a copy of photographs produced by the defendant, but I believe they were obtained under subpoena from the City of Huntsville.

Does it look like this series of photographs are the photographs you took of the fire scene or that the City took?

A        These are photographs that I took of the fire scene.

Q        Mr. Wilkerson, there -- you will see at the corner of each photograph there is a Bates number, and it says FBI, and then will have a number.  As you walk through your testimony, if there is a photograph that helps demonstrate for the Court and counsel what you're talking about, if you will just say Exhibit 11, and then give us the number, and we can all turn to it.  Is that fair enough?

A        Yes, sir.

Q        Okay.  So you looked at 2309, the neighboring balcony or the room and balcony.  Did you find any significant fire damage there?

1    A        Did you say 2309?

2    Q        2209.

3    A        2209.  No, I did not.

4    Q        What separates the balcony of 2209 from the balcony

5    of 2207?

6    A        I'm looking at Bates Number 144.

7    Q        Exhibit 11, Bates 144.  Okay.

8    A        There's a divider wall there.  It was wood

9    construction.  And had a siding material over the outside of

10   it.

11   Q        And is that a solid wall that separates the two

12   balconies?

13   A        Yes.  I didn't see any.  And you can see the 2209

14   there's -- there was no evidence that anything was

15   penetrating that wall.

16   Q        All right.  Mr. Wilkerson, if you would, then, just

17   walk the Court through how you approached reaching your

18   opinions as to the origin of the fire.  And please refer to

19   your photographs, as necessary.

20   A        We get paged out to fire scenes.  Once we arrive on

21   the scene, we check in with the incident commander.  He

22   usually gives us a status on where he is in suppression

23   efforts, what they've seen.  And then also I checked with

24   them on the safety of entering the structure, to know the

25   level of personal protective equipment that I need to be able

1    to go inside of the structure.

2            So on this particular scene, and the way I do all my

3    fires is I do exterior examination of the building to note

4    any exterior damage.  So that's why my first photographs are

5    of the exterior of the building.  And once I enter into the

6    building, I do an interior examination.

7            Typically, if suppression efforts are still ongoing,

8    I will try to document as much as I can in case something is

9    moved or damaged while they're trying to extinguish the fire

10   or check for extension.  I think in this case they have the

11   fire under control at the time.

12           I went in.  I did a quick survey of the rooms.  And

13   then once I noted what rooms was involved in the fire, then I

14   worked from least damage to greater damage to try to conclude

15   what the origin and the cause of the fire was.

16   Q       Did you conduct your investigation in accordance

17   with any published methodologies or guidelines?

18   A       Yes.  We follow the -- or we use NFPA 921 as a

19   guideline for doing fire investigations.  But the state class

20   and the national class that I attended teaches you methods

21   out of 921.

22   Q       And what is 921?

23   A       NFPA is National Fire Protection Agency.  They

24   publish a bunch of standards and codes.  And the codes that

25   you adopt you enforce in your city.  The standards that --

1    you know, different standards for different things.  Could be

2    the installation of the fire protection system.  The NFPA 921

3    is the guide to fire investigations.

4    Q       And does NFPA 921 call on you to utilize a

5    scientific method in conducting your investigation?

6    A       The scientific method is the 921.  And I do use that

7    when I'm doing fire investigation, yes.

8    Q       And did you use a scientific method in your

9    investigation of the Country Inn and Suites fire?

10   A       I did.

11   Q       We will talk about that in just a minute.

12           Plaintiff's Exhibit 13 are some excerpts from the

13   2008 edition of NFPA 921.  Do you know if the 2008 edition

14   would be the one that was in effect at the time of this fire

15   in 2010?

16   A       As far as a national standard, that would be

17   correct.  The City of Huntsville hadn't adopted code since

18   '05.  So the book that they had provided to me was an earlier

19   edition to 2008.

20           But the 2008 was published at the time of the fire,

21   yes.

22   Q       On Exhibit 13 -- let's see -- the third page, is

23   Chapter 1.  If I could point you to 1.3.2.  Do you see that?

24   A       I do.

25   Q       Could you read that for the Court, please?

1    A        As every fire and explosion incident is in some way

2    unique and different from any other, this document is not

3    designed to encompass all the necessary components of a

4    complete investigation or analysis of any one case.  The

5    scientific method, however, should be applied in every

6    instance.

7    Q        And then just quickly 1.3.3, the next one, could you

8    read that?

9    A        Not every portion of this document may be applicable

10   to every fire and explosion incident.  It is up to the

11   investigators dependent on their responsibility, as well as

12   the purpose and scope of their investigation, to apply the

13   appropriate recommended procedures in this guide to a

14   particular incident.

15   Q        And what does that mean to you as a fire

16   investigator?

17   A        Well, the 1.3.2 states that NFPA 921 does not -- is

18   not designed to be an include all.  As a matter of fact, it

19   usually references several other sources for what it is

20   written out of.  But that regardless of what you use out of

21   921 that the scientific method should be used in every

22   instant.

23            And then 1.3.3 also states that not every portion of

24   the document may be applicable and that the investigator has

25   -- investigator has the responsibility to decide what would

1   apply on what wouldn't.

2         Obviously, fire scenes can range from small to

3   enormous in size.  So you would like to use the same method

4   and process on all of them.  And we try to do that.

5         But then when you have a small scene, you know, the

6   pot that caught on fire in the kitchen, you know, it may not

7   be applicable to go and do some of the things that you would

8   do on a large scene of the fire.

9   Q      All right.  I'm going to pull up Defense Exhibit 2.

10   And you might be able to see this on the screen.  It's -- I

11   think the defense expert's chart on scientific method.  Can

12   you read that on the screen?

13   A      Yes.

14   Q      Okay.

15   A      I can read the bigger print.

16   Q      Well, if you want to look at if it's not showing up

17   well, you might look in the white notebook on Number 2.

18   A      It's kind of fuzzy.

19   Q      Okay.

20   A      It's not that it's not zoomed in.  Okay.

21   Q      Just peruse that.

22         Does that appear to be in your mind an accurate

23   depiction of what the scientific method is?

24   A      It is.

25   Q      And did you follow that -- those steps in rendering

1    your opinions in this case?

2    A        Yes, sir.

3    Q        What did you term to be the cause of this fire?

4    A        Do you have a copy of my report that I could refer

5    to?

6    Q        I do.  It is -- let's see.  I believe it's under

7    Plaintiff's Exhibit 11.  No.  I'm wrong.

8            Let's see.  It's the City of Huntsville's records.

9    It's Plaintiff's Exhibit 9.  When you get to it, I will ask

10   you is that a copy of the fire department report from the

11   City of Huntsville, with respect to this fire?

12   A        It is.  Or part of it is.

13   Q        Okay.

14   A        The entire Exhibit 9 is not my report.

15   Q        Okay.

16                    THE COURT:  Is your report included within

17   this group of documents?

18                    THE WITNESS:  Yes.

19                    THE COURT:  What pages?

20                    THE WITNESS:  My report, including the

21   witness statements, looks like Number 21 to Number 46.

22                    THE COURT:  21 through 46?

23                    THE WITNESS:  Yes, sir.

24                    THE COURT:  All right.  What was your

25   opinion of the -- where in this report was your opinion

1    stated?

2                        THE WITNESS:  It's on Bates Number 37.

3                        THE COURT:  And read what you wrote.

4                        THE WITNESS:  The last paragraph there,

5    there was two sentences.  Says, In conclusion, the point of

6    the origin was on the second floor balcony.  The cause of

7    fire was careless use of smoking materials.

8    BY MR. GRINKE:

9    Q        If you could, read into the record the paragraph

10   before that starts, During my exterior -- interior

11   examination.

12   A        During my interior examination, I noted heavy fire,

13   smoke, heat damage to a room on the third floor, 2307, that

14   extended to the attic.  In the second floor apartment, 2207,

15   there was a pack of cigarettes and a lighter on the TV table

16   just inside the door.  I requested electrical inspector Doug

17   Smith (see Doug Smith's report).  Building inspector Skip

18   Stinson also responded to the scene per Doug Smith's request.

19   Due to the fire damage, Doug Smith and Skip Stinson stated

20   that the building was unsafe to occupy.

21   Q        Okay.  And Skip Stinson, is he a structural fellow?

22   A        He's a building inspector that does look at

23   structural components.

24   Q        And then it states there I guess you interviewed the

25   occupant of 2207, Michael Siegling?

1  A        Yes.

2  Q        So that's what you have got in your report.  Just

3  walk the Court through, please, in your own words how you

4  came to the conclusion that it was carelessly disregarded

5  cigarettes that caused the fire.  And please refer to any of

6  your photographs in Exhibit 11 if it helps you.

7                      MR. HOOD:  Your Honor, that calls for a

8  narrative.  I think he needs to ask specific questions in

9  this area.  It's really of critical importance.

10                     THE COURT:  Sustained.

11  BY MR. GRINKE:

12  Q        Okay.  So I believe you testified that you put the

13  origin -- the specific origin of the fire in the northwest

14  corner on the floor area of the balcony of Room 2207.  Was

15  that your testimony?

16  A        That's correct.

17  Q        Okay.  And what is it that you saw in that area that

18  led you to believe that that was a carelessly disregarded

19  cigarette?

20  A        On looking at the fire patterns from the damage from

21  the exterior pictures I took, there appeared to be a V

22  pattern that came up from the corner and went across the

23  window.  And then if you look at Bates Number 166, this is a

24  closer picture of the balcony on 2207.  And, again, from the

25  other balconies there was a siding material on this wall

1    (indicating).  But behind that siding material was wood

2    boards, wood construction.

3            And if you look at the damage on the left-hand side

4    of the wall where the one board is -- has a mass loss over

5    half -- halfway up the board, but then also all the boards

6    that are running diagonally in that photo are burned on the

7    left-hand side, but the amount of damage that was in this

8    location and the fact that I had low burn, I placed the

9    origin of fire in that corner on that balcony.

10   Q       Okay.  Would that Defense Exhibit 9, that exterior

11   photo that looked to be a little brighter, would that help

12   you kind of describe for the Court the V pattern that you

13   just mentioned?  That was the first time I had heard you

14   mention the V pattern.

15   A       Yes.  Again, if you look at the damage on the window

16   on the balcony 2207, you can kind of see on the window on the

17   right how dark the balcony is there.  And then on the window

18   on the left how it's still light colored.  You can almost see

19   a line of demarcation that is going diagonally across that

20   window.

21   Q       Okay.  And then does the fire pattern, I guess,

22   continue on up into the balcony area of the 2307?

23   A       That's correct.  You know, in other --

24            THE COURT:  Look at the photograph in

25   Plaintiff's Exhibit 11 that bears FBI Bates stamp 166.

1                      THE WITNESS:  Yes, sir.

2                      THE COURT:  Do you have it in front of

3    you?

4                      THE WITNESS:  I do.

5                      THE COURT:  Is that the northwest corner

6    of the balcony on the second floor of that room that you're

7    speaking of?

8                      THE WITNESS:  To the wall that we're

9    looking at, we're facing north in this picture.  The

10   left-hand corner of that wall would be the northwest of the

11   balcony.

12                     THE COURT:  And that's your --

13                     THE WITNESS:  My opinion the area of

14   origin was in that corner.

15   BY MR. GRINKE:

16   Q       All right.  And then --

17                     THE COURT:  Is that balcony floor burned

18   through?

19                     THE WITNESS:  No, sir, it's not.  As a

20   matter of fact, in this picture and other pictures there's

21   still some paint on the surface of that floor away from the

22   wall.

23                     THE COURT:  Point to those photographs,

24   please, sir.

25                     THE WITNESS:  If you look at Bates Exhibit

1    172, there's a beer can on the floor.  And you can see where

2    there's still some paint there.  But then there's other

3    boards there that have burning on them.

4                    THE COURT:  That's the floor of --

5                    THE WITNESS:  That's the top of the

6    balcony 2207.

7                    THE COURT:  The top?  No.  I see a foot in

8    the lower right-hand corner.  So is that the floor of the

9    balcony of Room 2207?

10                    THE WITNESS:  Yes.

11                    THE COURT:  So the upper left-hand corner

12    of that photograph would be the area that you believe the

13    fire began in?

14                    THE WITNESS:  Yes.  Towards that area,

15    yes, sir.

16                    THE COURT:  All right.

17                    THE WITNESS:  I don't know that the actual

18    corner is in this photograph, but, yes.

19                    THE COURT:  All right.  Let's walk through

20    these photographs.  Begin with 145, FBI Bates stamped 145.

21    That's photograph 2207, the door to that room; is that

22    correct?

23                    THE WITNESS:  That's the number on the

24    wall next to the door, yes, sir.

25                    THE COURT:  All right.  Photograph 146 is

difficult to tell what that depicts.  What is that?  If you can.

THE WITNESS:  That looks like the initial photo of when I went in 2207 and I took a picture of the balcony.

THE COURT:  So that's the same balcony wall we see more clearly elsewhere?

THE WITNESS:  That's correct.

THE COURT:  But you didn't use a flash in that photograph?

THE WITNESS:  It appears that the camera -- sometimes when we use a flash it comes out dark, so we have to turn the flash off.  So it's possible that the left-hand side of the picture being bright like it is, I may have used a flash and then turned my flash off in the later photographs.

THE COURT:  147.  What does that show, if you can tell?

THE WITNESS:  That's the ceiling area of 2207 showing the wood members of the underneath the balcony 2307.

THE COURT:  148.  What does that show?

THE WITNESS:  This is -- that's the light fixture right outside the door of 2207.

Again, I took this picture to note the damage to the

1     underside of 2307.  Where the picture prior to this was

2     further away from the door, this picture is closer to the

3     door.

4                    THE COURT:  149.

5                    THE WITNESS:  149 was a picture noting the

6     location of the cigarettes and the lighter.

7                    THE COURT:  Next photograph, 150, shows

8     2209.  So these -- the next series of photographs would be

9     within that room?

10                    THE WITNESS:  That's correct, sir.

11                    THE COURT:  That's the room to the left of

12    2207 from the hallway?

13                    THE WITNESS:  That's correct.

14                    THE COURT:  But it's on the right side of

15    the exterior -- on the exterior photographs on the right side

16    of 2207.

17                    THE WITNESS:  That's correct.  It would be

18    to the north of 2207.

19                    THE COURT:  All right.  And FBI 151, what

20    does that show?

21                    THE WITNESS:  That's the balcony of 2209.

22    You can see there's some smoke heat damage to the exterior of

23    the balcony.  But other than that, there's not a lot of

24    damage to the balcony itself.

25                    THE COURT:  Is that the wall that

1   separates the balcony of 2207 and 2209?

2                   THE WITNESS:  That's correct.

3                   THE COURT:  152, what does that show?

4                   THE WITNESS:  That is showing the floor

5   area of balcony 2209.

6                   THE COURT:  Does that indicate any fire

7   damage?  There's some discoloration of the boards.  What does

8   that show?

9                   THE WITNESS:  Yeah.  There could be some

10  debris that's on the floor.  I don't know that it's actually

11  fire damage from actually coming in contact with fire, but on

12  the exterior of the building some of the trim around this

13  balcony was damaged.  And sometimes during fire suppression

14  efforts spraying water will cause debris to go up onto the

15  balcony.  And that's what it appeared in this instance.

16                  THE COURT:  Okay.  Your next photograph,

17  153, shows the Number 2307.  This would be the room above

18  2207; is that correct?

19                  THE WITNESS:  Yes, sir.

20                  THE COURT:  And then 154, what is that

21  showing?

22                  THE WITNESS:  That's the inside of room

23  2307.  You can see in this photograph that the window is no

24  longer there, which meant during the fire the window probably

25  or most definitely failed.  You can see smoke damage on both

sides of the window where heat and flames came into the window.

The ceiling joist above the two fire department personnel there doesn't appear to have a lot of smoke or heat damage, so it's indicative that the sheetrock probably was still on the ceiling when they arrived. And they may have pulled it looking for extension and possibly to extinguish the fire that rolled up into the attic.

THE COURT: That room appears to have a great deal of interior damage. Is this is the room above 2207?

THE WITNESS: That's correct.

THE COURT: Is there any burn damage shown in this photograph, or is that just smoke and water?

THE WITNESS: In my opinion, it looks like smoke and heat damage.

THE COURT: And also damage from the fire department's eradication efforts?

THE WITNESS: Correct.

THE COURT: Water and pulling sheetrock away?

THE WITNESS: Yes.

THE COURT: All right. FBI 155, the next photograph. What is that showing?

THE WITNESS: This is actually room, I

believe to be 2309.  If you look at the next photograph, I

actually realized I didn't take a picture of the number, so I

stepped back out and took a picture of the number.  And 156.

And then in photo 157 you have a similar photo to

155, where I entered back into the room to rephotograph it.

THE COURT:  I see.  What is that hook

like?  Is that a hose?

THE WITNESS:  Yes, sir.  That's the fire

hose.

THE COURT:  Is that a fire hose that's

inside the hotel or one that was brought in from the outside?

I mean, is that a fire hose from a hall fire device, or is

that something that the Huntsville Fire Department brought

into the room?

THE WITNESS:  In my opinion, it's our

hose.  We don't typically use hoses that are in buildings

because we do not know their reliability or testing.  So in

my best opinion, I would say that's a hose that the fire

department brought in.

THE COURT:  And 157 shows some numbers, a

series of numbers on a portion of the hose.  Does that help

you identify that?

THE WITNESS:  No, sir.  We get hose from

different manufacturers.  And at this time I was three years

off of a fire truck and was not very knowledgeable in what

1  hose we had.

2  THE COURT:  All right.  Photograph FBI

3  158.  What is that showing?

4  THE WITNESS:  This is the balcony of 2309.

5  You see the wall covering?  It appears to be a vinyl

6  material.  But you can see in the outer part of the balcony

7  the heat and flames, or heat and fire rolled over.  It looks

8  like the wall covering at the time, which it looks like it

9  was vinyl, has come loose from the wall and fallen down.  And

10  then behind it you see the wood diagonal boards.

11  A lot of times in fires you go to an area that's not

12  burned or hasn't been under extensive fire damage to kind of

13  get a sequence of events that happened during the fire.  And

14  in my opinion, on 2207 the wall covering came down off the

15  wall, fueled the fire, continued to burn the wood behind it,

16  and that's why the wood behind the wall was burned away.

17  THE COURT:  But this is 2309?

18  THE WITNESS:  This was 2309.  But it shows

19  the early effects of the heat and fire damage to the wall to

20  where the covering falls off the wall.

21  THE COURT:  FBI 159, what is that showing?

22  THE WITNESS:  159 is a picture from the

23  balcony up into the attic area.

24  THE COURT:  Of what room?  Again 2309?

25  THE WITNESS:  No.  I would actually say

1    this is probably --

2                         THE COURT:  Your next photograph is again

3    showing 2207.  Does that indicate you're still on 2309?

4                         THE WITNESS:  This picture here, I was

5    actually taking a picture of the attic, but it appears that I

6    went back into room -- let me see.  Because of the position

7    of the light fixture -- let me look on my other photographs.

8         Yeah.  That looks like the balcony of 2309.  Looking

9    up at the ceiling area, the attic.

10                        THE COURT:  All right.  Your next

11   photograph, FBI 160, is, again, a photograph of the number

12   2207 on the wall, so we're going back into the room?

13                        THE WITNESS:  Yes, sir.

14                        THE COURT:  161 shows what?

15                        THE WITNESS:  That was just a picture to

16   document where the money was.  Kind of the reason I took this

17   -- took a picture is similar to the reason I took the picture

18   of the cigarettes and the lighter.  Sometimes during the fire

19   efforts and rooms being unsecure (sic) things get moved

20   around.

21        So I like to document anytime there's money or

22   valuables in case there's a question of if they come up

23   missing after numerous people have went into the room.

24   Basically I took this picture to document the money.

25                        THE COURT:  162 is what, again, showing

1    cigarettes and a lighter?

2                    THE WITNESS:  Yes, sir.  Picture 162 is

3    showing the TV table that has the lighter and the open pack

4    of cigarettes on it.

5                    THE COURT:  163 is showing what?

6                    THE WITNESS:  163 is going back to the

7    balcony on 2207.  You see the TV in the right-hand side of

8    the frame to kind of reflect the distance of that table to

9    the balcony.

10                   THE COURT:  FBI 164 is showing what?

11                   THE WITNESS:  164 is at the door of the

12   balcony of 2207.  If you're standing just inside the door,

13   I'm taking a picture of the outside the door on 2207.

14                   THE COURT:  The balcony floor?

15                   THE WITNESS:  Yes, sir.

16                   THE COURT:  Showing the paint on it?

17                   THE WITNESS:  Yes, sir.

18                   THE COURT:  And then the next photograph

19   is 165.

20                   THE WITNESS:  This is stepping out on the

21   balcony at 2207 and turning to your left, photographing the

22   floor area of the balcony at 2207.

23                   THE COURT:  FBI 166 we've discussed

24   earlier.  That's the photograph that you believe shows the

25   origin of the fire.

1                    THE WITNESS:  Yes, sir.  In this

2     photograph you see the mass loss of the wall area and the

3     damage to the window.

4                    THE COURT:  167, is that showing the

5     window to the left?

6                    THE WITNESS:  That's correct.  That's to

7     document the damage to the exterior of that window.

8                    THE COURT:  168.

9                    THE WITNESS:  This is another picture of

10    the floor area at the base of the wall where I believe the

11    origin of the fire was.

12                    THE COURT:  169.

13                    THE WITNESS:  This is another picture

14    facing north on the balcony of 2207.

15                    THE COURT:  170.

16                    THE WITNESS:  170 is taken angling the

17    camera up to get a picture of the wall ceiling junction there

18    on the north end of balcony 2207.

19                    THE COURT:  171.

20                    THE WITNESS:  This is another photograph

21    showing the floor wall area and the window on 2207 and the

22    area where I believe the fire started.

23                    THE COURT:  172.  I think you have already

24    told me about that.

25                    THE WITNESS:  That's the floor balcony of

2207.  You can see the window had fell and broken out.  And also documenting the beer can there.

THE COURT:  173, please, sir.

THE WITNESS:  173 is a closer shot of the area of origin, the north end of the balcony of 2207.

THE COURT:  174.

THE WITNESS:  174 is a picture after I dug out the debris there, there was covering that floor area.  I took a picture to document what I had done.

THE COURT:  All right.  175.

THE WITNESS:  175 is another exterior picture that I took to document the damage on the exterior of the building.

THE COURT:  This is the first photograph that actually shows the first floor area of the hotel, as well; is that correct?

THE WITNESS:  Correct.

THE COURT:  177, what does that show?

THE WITNESS:  177?

THE COURT:  Yes, sir.  Appears to have some vegetation and some burned boards.

THE WITNESS:  Yeah.  If we could reference 176, you can see the balcony on the first floor.  There's a support angle support that comes out that supports the balcony.

1          THE COURT:  Uh-huh.

2          THE WITNESS:  Down at the bottom of that
3   wall you see numerous bushes.  So 177 was actually a shot of
4   the vegetation there at the bottom of the photograph of 176
5   where you can -- so on 177, you see the fire debris and
6   different things that had fallen during the fire during
7   suppression efforts.

8          THE COURT:  Do you know where the burned
9   boards came from specifically?

10         THE WITNESS:  No, sir, I do not.

11         THE COURT:  178.  What does that show,
12  sir?

13         THE WITNESS:  That's the underneath of the
14  balcony on 2207.  That's that northwest corner where you can
15  see the fire actually burned down.  And it's also showing the
16  gaps in the boards.

17         THE COURT:  And, again, I guess, as you
18  said earlier, that the fire did not burn completely through
19  the floor except in that -- apparently in that one small area
20  of the northwest corner?

21         THE WITNESS:  Correct.

22         THE COURT:  All right.  179, what does
23  that show?

24         THE WITNESS:  That's showing the ground
25  area underneath the previous photo.  If you see against the

1    wall there's some burn damage, and that's indicative right

2    below where the corner was above it.  That was burned

3    through.

                         THE COURT:  180.

5                        THE WITNESS:  180 is a closer shot to that

6    burn area.  That's also notated in the cigarette butts on top

7    of the burn areas.

8                        THE COURT:  181.

9                        THE WITNESS:  181's a closer picture of

10   the cigarette butts and the fire debris.

11                       THE COURT:  182.

12                       THE WITNESS:  182, I attempted to pick a

13   cigarette butt up and take a picture of it, but you could see

14   the focus was not clear.

15                       THE COURT:  Not good.

16          183, is that the same?

17                       THE WITNESS:  Yes, sir.  I attempted the

18   same thing in 183.

19                       THE COURT:  184.

20                       THE WITNESS:  184 is another shot of the

21   underneath of the floor above it.  That northwest corner

22   underneath where I had placed the origin of the fire.

23                       THE COURT:  185.

24                       THE WITNESS:  185, we're looking back down

25   at the ground at the damage to the wall where that corner

1    material would have fallen down.  And then also showing the

2    cigarette butts in the area and the other fire debris.

3                THE COURT:  And, finally, 186.  I believe

4    that's the last photograph.

5                THE WITNESS:  186 is a lighter angle of

6    that.  Sometimes when we're documenting things on the scenes

7    we'll start from a distance and take pictures getting closer

8    to it.  And then sometimes we'll take pictures coming back

9    from it.  So this was just for reference of where those items

10   were located.

11               THE COURT:  All right, counsel.  Go ahead.

12               MR. GRINKE:  Thank you, Your Honor.

13   BY MR. GRINKE:

14   Q      What physical evidence do you rely on to say that

15   the cause of the fire was carelessly discarded cigarettes?

16   A      Well, the physical evidence would be the cigarettes

17   that I found on the ground underneath balcony 2207.

18   Q      And you have a photograph of some cigarettes inside

19   the room of 2207.  Can you tell the Court whether or not

20   those appear to be the same type of cigarette?

21   A      They were consistent to be the same brand, yes.

22   Q      Did you conduct any interviews in order to determine

23   the cause of the fire?

24   A      I did.  The scene this night was kind of hard to

25   because it was a hotel.  People was there that normally don't

1   live there.  So when they evacuated the building I had a

2   large number of people that were in the lobby area.

3           And during my investigation, I had to address the

4   fact of, you know, if we wasn't going to allow the building

5   to be occupied, the hotel staff was going to have to make

6   provisions to relocate or these people was going to have to

7   be able to come get their belongings and either go to another

8   hotel or another building within the site.

9           So at one point I went to the lobby and there was a

10  large number of people.  And I had individuals coming up to

11  me stating that they knew that the occupant of 2207 had been

12  smoking on his balcony.  And then when I tried to locate him

13  they advised me that he would be hard to locate because he

14  knew he would get in trouble for the fire.

15          So later on in my investigation, I was able to

16  locate him and I did interview him in regards to the fire.

17  Q       You're talking about interviewing the occupant of

18  Room 2207?

19  A       Correct.

20  Q       And was that Michael Siegling?

21  A       That's correct.

22  Q       And what did you learn in your interview with

23  Mr. Siegling?

24  A       If I could report or reference --

25  Q       Yes.

1    A          -- Tab 9.

2    Q          Exhibit 9, Plaintiff's Exhibit 9?

3    A          At Number 45.

4              What I remember of the night is when I interviewed

5    Mr. Siegling I was already pre warned by other people that

6    was in class with him that he wouldn't give me a statement.

7    So --

8                        MR. HOOD:  Objection, Your Honor.

9    Hearsay.

10                        THE COURT:  Sustained.

11   BY MR. GRINKE:

12   Q          Go ahead.

13   A          So I went to interview him.  I asked him a series of

14   questions.  And then I went to take a statement from the

15   occupant of 2207.  And in his statement he wrote down, "I,

16   Michael K. Siegling, was awakened by a fire alarm at the

17   hotel at approximately 10:40 p.m.  I went to the hallway and

18   did not smell smoke nor see anyone vacating the building.

19   Approximately five minutes later another hotel guest knocked

20   on my door and informed me there was a fire in our building.

21   I then opened my balcony door, looked to the left and

22   observed a flame to the left of my balcony."  End of

23   statement.

24             He drew a diagonal line.  Looks like it says

25   initials.  And then at the bottom I wrote, "Statement taken

by Daniel Wilkerson," and I signed it.

Q       And the date on that is 22 September 2010?

A       That's correct.  And Bates Number 46.

I attempted to get more documentation from Mr. Siegling on what he verbally had told me that he did not write down.  So I wrote a series of questions and asked him. And I had asked him to write the answers down and he refused to write anything else down.

So on this page I wrote the questions.  I verbally asked the questions.  He verbally gave me an answer and I wrote down his answers.  And then at the bottom of the page, I asked for his name, address and phone number to verify that that was him that was answering the questions.

So the questions I asked him was, "When was the last time you smoked cigarettes on the balcony?"  He said he don't -- "I don't remember.  Yesterday or day before yesterday."

Q       And let me interrupt you there.  So you asked that question, when was the last time.  Is it fair to say, then, though, that Mr. Siegling did admit to you that he had smoked cigarettes on his balcony?

A       That was my perception is when he told me "I don't remember," and then he followed that up with "yesterday or day before yesterday," then my perception was he had smoked cigarettes on the balcony.

Q       Okay.  Then the next question that you wrote down

1    was, "How did you extinguish the cigarettes when you were

2    done?"

3    A        That's correct.  And he stated "a styrofoam cup of

4    water."

5    Q        And then the next question you asked him was,

6    "Before the fire when was the last time you was on the

7    balcony?"  What did he answer?

8    A        He said, "Around 5:00 or 6:00 today."

9    Q        And "What was on the balcony when you last -- when

10   you were last on the balcony?"

11   A        And he stated "a beer can."

12   Q        All right.  Did you conduct any other interviews

13   that night or during the course of your investigation?

14   A        Not a formal interview.

15           When I went to the lobby and met with the manager

16   and some of the other occupants or classmates of Michael

17   Siegling, you know, they brought information to me.  It

18   wasn't an interview setting, it was just gathering

19   information.

20           I did ask for a statement, but they refused.  They

21   said they didn't want to get involved.  They didn't want to

22   write a statement.  They didn't want to give me their names,

23   but they said they knew he had smoked on the balcony.

24               MR. HOOD:  Objection, Your Honor, hearsay.

25   BY MR. GRINKE:

1    Q        I won't ask you about anyone's statements than

2    Mr. Siegling's, but let me ask you this:  Room 2307 is the

3    room on the third floor above 2207, correct?

4    A        Correct.

5    Q        In your investigation, did you learn whether or not

6    Room 2307 was occupied at the time of the fire?

7                        MR. HOOD:  Leading, Your Honor.

8                        THE COURT:  Overruled.  You can answer

9    that question yes or no.  Did you learn whether it was

10   occupied or not?

11                       THE WITNESS:  Management told me it was

12   unoccupied.

13                       MR. HOOD:  That would be hearsay, Your

14   Honor.

15                       THE COURT:  It would.  Sustained.

16                       MR. GRINKE:  As an expert, Your Honor, I

17   think the expert is entitled to, and a qualified expert is

18   entitled to rely on conversations even if it's hearsay in his

19   investigation to reach his conclusions.

20                       MR. HOOD:  That was never contained in his

21   expert report.  The first time we have heard of it is today.

22                       MR. GRINKE:  It was in his deposition.

23   And is a not a 26 expert.  He is a non-retained expert.

24                       THE COURT:  All right.  I will take all of

25   that into account.  Go ahead.

1    BY MR. GRINKE:

2    Q        We talked about the physical evidence.  We have

3    talked about the interviews.  And we have talked about the

4    burn patterns.

5              Now, you went through your series of photographs,

6    and there appeared to be some damage inside the room of 2307.

7    Did anything about the burn damage inside 2307 give you cause

8    to believe that the fire may have originated up there?

9    A        No, it did not.

10   Q        Did anything on the balcony of Room 2307 give you

11   cause to believe that the fire had originated on that

12   balcony?

13   A        It was something I did consider during my

14   investigation, but it did not.

15   Q        Did you consider in your investigation whether arson

16   may have been a cause of the fire?

17   A        When I'm called to a fire scene as City of

18   Huntsville employee, I have two purposes for being there:

19   One is to look to see if it's arson, and see if I need to

20   proceed getting Huntsville Police Department involved and

21   working as a criminal case.  The other is to gather fire

22   prevention information as to what caused the fire to where we

23   can prevent these fires in the future.

24             So, yes, I did consider, as I do on all fires.  I go

25   in with an open mind to try to look at the scene and decide

1    -- and determine what the origin of the fire and the cause

2    was.  And nothing about this fire led me to believe that it

3    was arson fire.

4    Q       Okay.  Did you consider in your investigation

5    whether the cause of the fire may have been electrical?

6    A       Again, on most fire scenes I go to, electrical is in

7    every building that you go to, so it's always a potential

8    suspect on a fire scene.  But due to where the origin of the

9    fire was and the lack of electrical in that area, you know, I

10   did call Doug Smith out there to for his opinion.  But in my

11   opinion, an electrical was not a cause of the fire.

12   Q       Did you see any masses of damaged electrical wiring

13   where the insulation was all burned away?

14   A       No, I did not.

15   Q       Did you see any masses of such type of damaged

16   wiring where you see arcing or beading that maybe an

17   electrical engineer might need to look at it?

18   A       No.  The only wiring that was visible to me was in

19   the attic.  And it didn't appear to have damage because it

20   was in the lower portions of the attic.  And most of the heat

21   and fire damage -- or heat and smoke was in the upper part of

22   the attic.

23           On the balcony the only electrical that I saw was a

24   light fixture.  And it appeared that the fire was on the

25   exterior of the light fixture.  And, again, it was not in my

1    area of origin.  So there was no need for me to take it down.

2          And, you know, a lot of times when we work fire

3    scenes, we know that there's an insurance investigator coming

4    after us.  We know that there's other parties involved that

5    need to look at this stuff.  So if it's not something that's

6    pertinent to my investigation, then I try to leave the scene

7    as intact as possible until other ones are allowed to see it.

8          If it's not arson, and I have a good determination

9    on what caused the fire, then I allow them individuals the

10   opportunity to see the scene as intact as I saw the scene.

11         Now, many times when insurance investigators come to

12   town, they will contact us and ask us if we would like to go

13   back to the scene.  And if I felt a need to take the light

14   fixture down then I could have had the opportunity to go with

15   him to look at the light fixture.  But, again, in this case,

16   I didn't see that need.

17   Q       Fair enough.  And while we're talking about

18   electrical, Exhibit 11, your paragraph 154.

19   A       Yes, sir.

20   Q       And am I correct this is inside Room 2307?

21   A       That is correct.

22   Q       And you're looking up into the attic space of 2307?

23   A       That's correct.

24   Q       And there's kind of a white line draping across the

25   rafters there.  What does that appear to be to you?

1   A        Some sort of an electrical wire.

2   Q        And does it appear to have any type of burn damage

3   at all?

4   A        No.

5   Q        Okay.

6   A        No.  As you can look at the wood members there, the

7   smoke and heat damage --

8                    MR. HOOD:  Your Honor, I have given up my

9   exhibit book so the witness can testify and been relying upon

10  his assistant to put these things on the screen.  And I'm not

11  being able to see these things.

12                   THE COURT:  If you will put 154 up,

13  counsel, please.

14                   MS. KANTOR:  I think unfortunately the

15  screen went out, ma'am.

16                   MR. HOOD:  Here you go.

17  BY MR. GRINKE:

18  Q        So I think -- let me re-ask the question because we

19  got interrupted.

20           But does that wiring appear to have any burn damage

21  on it at all?

22  A        No, it does not.

23  Q        You gave a deposition in this case.  Do you recall

24  that?

25  A        Yes, I did.

1    Q        In your deposition we talked about whether or not

2    you considered whether drop-down from a fire that originated

3    above caused the burn patterns you see on the balcony of

4    2207.  Did you consider that?

5    A        You're referring to balcony 2207?

6    Q        Yes.  Let me make sure my question is clear.

7             Did you consider whether a drop-down, a fire

8    originated somewhere up above either on the balcony of 2307

9    or in the attic or inside the room of 2307 and spread out and

10   dropped down to the balcony of 2207?  Did you consider that?

11   A        Yes.  Looking at a fire scene and looking at burn

12   patterns and the scene itself and materials that are present,

13   I tried to look at every possibility of what could have

14   occurred.

15            And with the way the balconies are constructed, I

16   just -- I didn't see that it was plausible that something

17   that fell down and started the fire on 2207.

18   Q        Okay.  And did you not identify any code violations

19   on the balcony of 2207 that may have caused a fire?

20   A        I did not.

21            But, again, when I do a fire investigation, I'm

22   there to do an investigation.  I'm not there to necessarily

23   do an inspection.  But I did not note any code violations on

24   the balcony of 2207.

25   Q        I want to talk just very briefly about just kind of

1     general patterns of fire flow.

2              In Exhibit 13, it's selected excerpts from NFPA 921,

3     the 2008 edition.

4              And I am -- it should be on the screen, as well.  I

5     am looking at Figures 5.10.2.1.  And this is five pages in

6     on -- in the notebook.  But, and 5 -- Figure 5.10.2.3.  Now,

7     this is, to be fair, this is kind of a diagram and a

8     depiction of an interior fire, but I believe there's

9     provision in 921 that says that the general fire flow may be

10    similar for an exterior fire, am I accurate about that?

11    A     It can be similar, but fire patterns can be driven

12    by different things:  The location of the fire to a wall, or

13    something simple as ventilation or air to the fire can have

14    effects on that.

15    Q     Okay.  Well, do these two pictures in NFPA 921 that

16    I have pointed to assist the Court in any way in seeing

17    generally how a fire flame is going to flow and spread?

18    A     Well, during a fire you have hot gases and

19    byproducts that rise naturally due to a fire.  And in fire

20    investigation classes, they always tell us that fires burn

21    up, buildings burn down.

22             So the rate at which a fire grows upward is

23    significantly faster than the rate that it would burn

24    downward.  To where in this case we have some fire that

25    burned down and dropped down to the ground, but most of the

1    fire damage went up.

2         In regards to the exhibit that is before me, you can

3    see as the smoke and the heat and the byproducts of the fire

4    are going up usually there's a line of demarcation to where

5    you have a dark area and a lighter area.  And you can see

6    that line.  And typically that line will produce a V pattern.

7    Sometimes they can be lighter, sometimes they can be very

8    narrow, depending on the fire itself.

9         But in this fire, because it was in the corner down

10   low on the wall, you have heat that's radiating back and

11   forth.  And then the wall is involved in the fire itself,

12   which suffered a mass loss.

13        But on the window side of the fire, as I pointed out

14   before, you could see there was a line of demarcation and the

15   line went diagonally up the wall across the window.

16   Q    And I did find it.  It's in the 2014 edition that

17   the defendant relies on.

18        5.6.4.6.7, "Outdoor fires it should be noted that

19   similar effects to those described for indoor fires will also

20   be observed for outdoor fires."  That's what I was referring

21   to.

22        So is it fair for us to look at these diagrams for

23   an interior fire to just understand the basic science of a

24   fire flow?

25   A    Yes.  I mean, it doesn't matter where the fire is.

1    The heat and the byproducts and the gases are going to rise.

2    Q        Going to rise.  Okay.

3             Did you consider whether someone may have been on

4    the out -- exterior ground floor and flicked a cigarette up

5    onto the balcony to cause this fire?

6    A        That was a possibility.  You know, the walkway --

7    and I wish I had a better photograph.  But I could see the

8    bushes that was at the base of the building.  The walkway did

9    not go against the building.

10            And, again, I mean, it was a possibility, but I

11   didn't really think that it was plausible that somebody would

12   walk by and flick a cigarette up on the second floor of the

13   balcony.

14   Q        And the -- did the room -- did Room 2207 face into a

15   courtyard?

16   A        It did.

17   Q        And was that courtyard secure, or could anybody walk

18   in?

19   A        No.  It was secured.

20   Q        Did you have trouble with that aspect the night of

21   the fire?

22   A        I did.  They had -- between the buildings they had a

23   metal fence that you had to have access to.  So if we didn't

24   have somebody at the gate and we walked out, then it was --

25   we had to wait to be able to gain entrance back into the

1    courtyard.

2    Q        Did you consider whether someone was on that

3    neighboring balcony, 2209, and reached around that solid wall

4    and flicked a cigarette onto the balcony of 2207?

5    A        Well, to be fair, not necessarily a cigarette, but

6    anything --

7    Q        Fair enough.

8    A        -- in my investigation.

9             I mean, you know, when you determine where the

10   origin is, you try to account for any cause that could have

11   caused the fire.  And, you know, again, to me, that wasn't

12   plausible.

13   Q        When you were speaking to Michael Siegling the night

14   of the fire and asking about smoking on the balcony, did he

15   give you the name of any individual who he said was on the

16   balcony with him smoking cigarettes the night of the fire?

17   A        No, sir, he did not.

18                     MR. GRINKE:  Thank you, sir.  I will pass

19   the witness.

20                     THE COURT:  Do you want to recess here or

21   go straight ahead?

22                     MR. HOOD:  If it's okay with you.  May I

23   approach the witness briefly, Your Honor?

24                     THE COURT:  Yes.

25                          CROSS-EXAMINATION

BY MR. HOOD:

Q        Officer Wilkerson, we met one time before on April 21st, 2014, when I took your deposition, correct?

A        That's correct.

Q        You might need to refer to that during the course of my examination.

                    MR. GRINKE:  That's his deposition transcript?

                    MR. HOOD:  Yeah.

BY MR. HOOD:

Q        Are you ready, sir?  Officer Wilkerson?

A        Yes.

Q        You are not a licensed engineer in the state of Alabama, are you?

A        No, sir, I am not.

Q        And you're not certified by the National Association of Fire Investigators, are you, sir?

A        I was a member at one time, but I'm not certified by them, no, sir.

Q        You've never been certified by them?

A        That's correct.

Q        And you're not certified by the International Association of Arson Investigators either, are you?

A        That's correct.  I'm currently a member of the organization, but I am not certified by them.

1    Q       You have no direct evidence that a Marlboro Light

2    cigarette from FBI agent Michael Siegling caused this fire,

3    are you?

4    A       That is correct.

5            As far as your statement, I would have to refer to

6    my pictures, but I don't believe it was a Marlboro Light.  I

7    think it was a Marlboro cigarette.

8    Q       You've had to make a series of inferences to reach

9    your opinion, though, that one of his Marlboro Light or

10   Marlboro cigarettes caused this fire, correct?

11   A       Well, you know, the evidence that the cigarettes was

12   below the balcony, and I did have evidence that the cigarette

13   butts was present.

14           And when you look at the ground, the cigarettes were

15   laying on top of the fire debris, which means they would had

16   to have got there either along with the debris or after the

17   debris.  And since we secured the area during the fire

18   suppression efforts, I determined that the cigarettes had

19   came from the balcony above it.

20   Q       Well, you spent less than four hours at the fire

21   scene starting on the evening of September 22nd, 2010,

22   correct?

23   A       I would have to refer to my report on that.  Or

24   actually I believe that's in the deposition.  If I could

25   refer to the Plaintiff Exhibit Tab 9, Bates Number 32.

1    Q        Exhibit 9 what?

2    A        Bates Number 32.

3    Q        Okay.

4    A        My number designates to me that the time was 1:20,

5    says I arrived on the scene at 2311, and that I cleared the

6    scene at 244.

7    Q        So how much time is that?

8    A        I believe it's approximately three-and-a-half hours.

9    Q        So it's less than four hours?

10   A        Correct.

11   Q        Okay.  You never interviewed or found out who

12   reported this fire, correct?

13   A        That's correct.

14   Q        In fact, you made no effort to seek out, identify,

15   or interview all of the witnesses who discovered, reported,

16   or watched the fire's progress, that's correct, too, isn't

17   it?

18   A        That's correct.

19   Q        You cannot eliminate arson as a hypothesis without

20   interviewing the person who reported the fire, isn't that

21   true?

22   A        I don't believe it is, sir.

23   Q        Isn't it true that in most and many instances the

24   person that reports the fire is the arsonist?

25   A        Not in the cases that I've worked, sir.

1  Q        You have never inspected the scene in the daylight,

2  did you, sir?

3  A        No, I did not.

4  Q        You never interviewed all the smokers in Building 2

5  the night of the fire, did you, sir?

6  A        I did not.

7  Q        Did you know that Marlboro Light cigarettes and

8  Marlboro cigarettes were manufactured to be

9  self-extinguishing beginning in 2007 with the placement of

10 asbestos rings along the paper areas?

11 A        As far as Marlboro specifically, I do not.  But I do

12 know that most cigarettes nowadays are self-extinguishing,

13 but there's been research to show that they still cause

14 fires.

15 Q        And the photograph you showed us of the cigarette

16 pack in Agent Siegling's room was a pack of Marlboro Lights,

17 was it not?

18 A        If I could refer to Plaintiff's Exhibit Number 11,

19 Bates 149 again.  It says Marlboro on the package.  I don't

20 see where it says Light, if it's a Marlboro Light or a

21 Marlboro.

22 Q        And where is the other picture that you took of the

23 cigarette pack?

24 A        Bates Number 162.

25                    MR. HOOD:  I'd ask the Court to take

1   judicial notice that that's a pack of Marlboro Lights.

2               THE COURT:  I can't tell.  The 149, FBI

3   Bates stamped Number 149 is the best photograph of the front

4   of the package, and it says simply Marlboro.

5               MR. HOOD:  I suggest to Your Honor, I

6   don't know if you're familiar with cigarettes, but Marlboro

7   Lights always had a white filter.  The Marlboro reds always

8   had a red filter.

9               THE COURT:  You have got me there, having

10   never smoked a Marlboro.  I can't take judicial knowledge of

11   something I've never seen.

12               MR. GRINKE:  I will stipulate they're

13   Marlboro Lights from my own personal experience.  Long time

14   ago.

15               MR. HOOD:  Same here.  Long time ago.

16               THE COURT:  They are?

17               THE CLERK:  They are.

18               THE COURT:  My courtroom deputy says they

19   are.  Is that what you smoke, Lisa?

20       So those, even though they say simply Marlboro,

21   counsel are stipulating that's a Marlboro Light?

22               MR. HOOD:  Correct.

23               MR. GRINKE:  Yes.

24               THE COURT:  Is that significant?

25               MR. HOOD:  I think it is.

BY MR. HOOD:

Q        My next question is, did you know that the Marlboro
Light cigarette has been tested under the new Fire Safety Act
of Congress regulations to make sure it's self-extinguishing,
and will only burn 5 percent of the cigarette once it's
discarded and lit?  Did you know that?

A        No, I did not.

              MR. GRINKE:  I would object to that on the
basis there's no timeline given to this.  This happened in
2010.

         We don't know the age of the cigarettes that were
being smoked at that time and when this study occurred.

              THE COURT:  Sustained.  You need to bring
that in through another witness.

              MR. HOOD:  Okay.

BY MR. HOOD:

Q        But you cannot tell us which persons, if any, in
Building 2 smoked these cigarettes, even the ones that can be
identified as Marlboro Lights, correct?

A        I identified the cigarettes in Room 2207.  Michael
Siegling was staying in Room 2207.  And it was my opinion
that the cigarettes that was underneath the balcony came off
the balcony at 2207, and they was the same type of cigarettes
that was in the room of 2207.

Q        That's not what I asked you.

1      You cannot tell us which persons, if any, in

2  Building 2 smoked these cigarettes, even the ones you saw the

3  butts of below the balcony of 2207, correct?

4  A      That's correct.

5  Q      All right.  During your inspection, did you find or

6  notice cigarette butts or brands of other Marlboro Light

7  cigarettes as exemplified in Government Exhibit Number 31, if

8  you will turn to the Government exhibit book, please.

9                  THE COURT:  What --

10  BY MR. HOOD:

11  Q      There are some white cigarette butts, which I would

12  presume may be Marlboro Light filters.  But if you will look

13  down near the Government sticker where it says GX-31, that

14  appears to be a Winston.  And I will be glad to give anybody

15  a magnifying glass here --

16                  THE COURT:  No.  I see it very clearly.

17  It has a different color filter.

18      Do you see what he is referring to?

19                  THE WITNESS:  Yes, Your Honor, I do.

20                  THE COURT:  It's in the lower left-hand

21  corner just above the Government exhibit sticker.  It appears

22  to be a khaki-colored filter.  How many other cigarettes like

23  that did you detect on the ground?

24                  THE WITNESS:  Your Honor, if I could go to

25  Plaintiff Exhibit 11 at 179.  Kind of references where this

1    picture was located.

2           It was my belief that that debris was from the

3    exterior of the balcony with the trim piece.  But when you go

4    to Bates 180, I went closer to the wall to where the Marlboro

5    cigarette was directly underneath the balcony.  And it again

6    was further away from the walkway of the public.

7                      MR. HOOD:  And, Your Honor, if you will

8    look back at 179 at top dead center, that looks to be a dark

9    filtered cigarette in that picture.

10                     MR. GRINKE:  Object.  Is that a question

11   to the witness?

12   BY MR. HOOD:

13   Q      Is that a dark filter cigarette in the top dead

14   center of this picture of 179, sir?

15                     THE COURT:  I think it's on the right

16   side, is it not?

17                     MR. HOOD:  No.  Right --

18                     THE COURT:  Put --

19                     MR. HOOD:  About an inch right below the

20   center of the top middle.

21                     THE WITNESS:  If you look at 180, it has a

22   closer picture of the top dead center of the picture.  And I

23   do not believe that is a cigarette.

24                     MR. HOOD:  Maybe we're not looking at the

25   same thing.

THE COURT:  Put FBI 179 up on the screen, ma'am.

MR. HOOD:  May I approach the witness?

THE WITNESS:  Yes, sir.

BY MR. HOOD:

Q      Look at it through a magnifying glass.

A      You're talking about right here (indicating)?

Q      No.  Talking about right there (indicating).

A      Oh.  I thought you meant top dead.

Q      Top center of photograph the way it comes up on my screen.

A      The right-hand side of the photograph middle of the page does appear to be a different type cigarette.  But, again, that's away from the balcony towards the edge of the balcony.

Bates Number 180 is a picture of the other side of the bushes, and those cigarettes was Marlboro.

Q      During your inspection did you find or notice the disposable plastic cigar tips exemplified in Government Exhibit 15?

A      I did not.

Q      And if my memory serves me correctly that's a Tiparillo tip of a cigar.  That was one of your photographs found in the same area, right?

A      I don't recognize that photograph.

1    Q        Okay.  My point is, you didn't identify or interview

2    the person responsible for these non Marlboro Light smoking

3    materials, did you, sir?

4    A        I'm sorry.  Could you restate?

5    Q        Yeah.  You didn't identify and interview the persons

6    responsible for these non Marlboro Light smoking materials?

7    A        That's correct.

8    Q        During your inspection did you inspect the balcony

9    lighting fixtures as exemplified in Exhibit 9, which shows

10   the balcony room of 2209?

11   A        I was -- can you restate that?  I thought --

12   Q        Have a look at Government Exhibit 9.

13   A        Okay.

14   Q        There's a lighting fixture in the lower corner with

15   its exterior lamp fixture.  Can you see that in that

16   photograph?

17   A        Yes, sir.

18   Q        Please look at Government Exhibit Number 30, which I

19   suggest to you is a closer-up photograph of that light

20   fixture from 2209 and typical of the light fixtures found

21   throughout Building 2.  Do you see that?

22   A        Yes, sir.

23   Q        Did you see similar lighting fixtures during your

24   investigation?

25   A        I noted the light fixture on 2207.  I can't remember

1    if I noted on the other balconies or not.

2    Q        Did you note that these lighting fixtures had

3    compact fluorescent lamps inside them pointing downward?

4    A        No, I did not note that.

5    Q        Did you know or make note that some of these compact

6    fluorescent lights were the subject of recalls ordered by the

7    Consumer Products Safety Commission due to these lamps being

8    installed downward being serious fire hazards?

9                    MR. GRINKE:  Object to the fact not in

10   evidence.

11   BY MR. HOOD:

12   Q        Did you know about that?

13                   THE COURT:  Did you have knowledge of any

14   such thing?

15                   THE WITNESS:  I did have knowledge that

16   some light bulbs had been recalled, yes.

17   BY MR. HOOD:

18   Q        This specific type?

19   A        Well, I don't know what this specific brand is on

20   that.

21   Q        But that's not -- but you didn't consider this as

22   part of your report?

23   A        No, because the light fixture wasn't in the area

24   where I deemed to be the origin of the fire.

25   Q        Well, then, please look at Government Exhibit 9,

1    again.  It shows the four balconies we referred to several

2    times.

3              I want you to look at that, and then we're going to

4    look at some photographs from 2307, okay?  And that's the

5    room right above 2207.  And to do that I want you to look at

6    Exhibits 26 and 27.

7              I direct your specific attention to the burnt

8    railings of this particular room above Agent Siegling's room.

9    Do you see that?

10   A       Yes, sir.

11   Q       All the green paint is burned completely off, is it

12   not?

13   A       Well, it's not there, whether it was from heat or

14   fire, yes, sir.

15   Q       I believe that was fire, don't you, sir?  Yes?  No?

16   A       That would be an accurate statement.

17   Q       Yes.  Okay.  Have a look, now, and compare the

18   railings from Agent Siegling's Room 2207, as contained in

19   Exhibits 19 and 29.

20   A       19 and?

21   Q       29.

22   A       Okay.

23   Q       The green paint is still on the railings of the

24   balcony of his room, is it not?

25   A       It is.

1   Q        And if you will look closely on Exhibit Number 29,

2   Government Exhibit Number 29, look at the very top of the

3   green railing.

4   A        Okay.

5   Q        Fire has burnt off the top of that railing, has it

6   not?

7   A        It looks like it has fire damage.

8   Q        That means the fire came from above, doesn't it?

9   A        Not necessarily.  It is my opinion that the fire

10  started in the corner and extended upward.  And you can see

11  on that wall where it extended upward and across the window

12  and that the heat and the gases built up underneath the

13  balcony of 2309, rolled over the balcony of 2309 causing the

14  damage on balcony 2309.

15  Q        But if the fire has started in Agent Siegling's

16  room, wouldn't the -- there be damage to those railings like

17  we see in the room above?

18  A        No, sir.  I do not believe so.

19  Q        Look, then, at Government Exhibit Number 7.  That's

20  the doorway leading out to the area of Agent Siegling's room

21  balcony; is that correct?

22  A        I did not take that picture.  I'm not sure where

23  that is.

24  Q        Well, assume for the moment that that's what that

25  is, all right?

1    A        Okay.

2    Q        The burn pattern up at the very top is rounded,

3    which means the fire was burning down into that area; is that

4    not correct?

5    A        Again, it was my opinion it started in the corner,

6    extended up to the ceiling, and when it spread along the

7    ceiling, yes, it could have came down as it -- the heat and

8    the gas built up, but the fire followed the fuel upward onto

9    the balcony of 2309.

10   Q        Do you see the drop-down debris there on the right,

11   all that melted plastic vinyl?

12   A        I do.

13   Q        And we see there in quite a few of these pictures of

14   where it's dropped down from above onto Agent Siegling's

15   balcony and other places, do we not?

16   A        That's correct.

17   Q        And that hot vinyl can burst into flame because it's

18   made out of hydrocarbons, correct?

19   A        Correct.

20   Q        And with that amount of drop-down and lack of paint

21   being burned off his railings that indicates that fire

22   started above and not on his balcony, correct?

23   A        I do not believe so.

24   Q        National Fire Protection Association 921 requires

25   you not only to consider other hypotheses for the cause of

1  the fire, but also to document each hypothesis in your

2  report, isn't that true?

3  A       If you can give me the reference of 921, I will look

4  at it.

5  Q       You don't believe that to be true?

6  A       Not to my knowledge.

7  Q       Assume that it is true.  You didn't do that in your

8  report, did you, sir?

9  A       I did not note another hypothesis in my report,

10  correct.

11  Q       In fact, you didn't document in your report whether

12  electrical malfunction of an external light fixture,

13  drop-down fire patterns from ignition source on the third

14  floor, or, as you mentioned in your depo, a "Molotov

15  cocktail," correct?

16  A       That's correct.

17  Q       And your theory to that, a Marlboro Light cigarette

18  from FBI Agent Siegling caused this fire, is based on

19  speculation, correct?

20  A       I believe it's based on the evidence of the

21  cigarettes on the scene.

22  Q       Please turn to Page 90 and line 10 through Page 91

23  line 7.

24  A       Page 90 of?

25  Q       Excuse me?

1                    THE COURT:  Starting on Page 90?

2    BY MR. HOOD:

3    Q       Yeah.  I'm referring to your deposition.  I'm sorry.

4    A       Oh.

5    Q       Page 90, starting at line 10.

6    A       Okay.

7    Q       I asked you the following questions and you gave the

8    following answers.  Please read along with me.

9            "Question:  In your theory of what happened here,

10   how would a discarded cigarette cause fire on what is

11   essentially two-by-fours, or wood?

12           "Answer:  My belief that is that there was in the

13   investigation that I've done involving cigarettes that

14   usually you have a less dense material there, whether it be

15   trash that was discarded in that cup he claimed he was using,

16   or some kind of dry vegetation that may have fallen on the

17   balcony itself.  But we show no evidence of a dry vegetation

18   or any other on any other balconies.  Since there was

19   discarded beer cans, my hypothesis was there was some trash

20   there, and he discarded his cigarette into some trash.

21           "Question:  That's speculation, isn't it?

22           "Answer:  Well, I mean, that's -- it's my opinion,

23   yes, sir."

24           Did I read the questions and answers correctly?

25   A       You did.

1    Q       Please look at Government Exhibit 32 -- I'm sorry.

2    You have already read that.

3            When you interviewed Agent Siegling he answered all

4    of your questions that you asked, isn't that true?

5    A       I don't recall.

6    Q       You said that you didn't notice any other code

7    violations on the balcony of 2207.  Didn't you even attempt

8    to locate any other code violations in the rest of Building

9    2?

10   A       No, I did not.

11                   MR. HOOD:  I have no further questions.

12                   THE COURT:  Anything --

13                   MR. GRINKE:  If the Court would like to

14   take a break?

15                   THE COURT:  Yeah.  Let's take ten minutes

16   here.

17                   (Recess.)

18                   MR. HOOD:  Your Honor, I have one quick

19   question.  I missed my note that I would like to ask this

20   gentleman before --

21                   THE COURT:  All right, what is that?

22   BY MR. HOOD:

23   Q       Officer Wilkerson, after you determined that

24   Mr. Siegling could have been the cause of this fire, did you

25   contact Agent Siegling to notify him that that was in your

1    report or contact the FBI to notify them of that?

2    A        No, I did not.

3                    MR. HOOD:  That's all I have.

4                    MR. GRINKE:  A few questions on redirect,

5    Your Honor.  I will be quick.

6                    THE COURT:  Okay.

7                    REDIRECT EXAMINATION

8    BY MR. GRINKE:

9    Q        Can you pull up Plaintiff's Exhibit 15, NFPA 921 the

10   2014 edition, 19.4.4.3.  You got it up?

11       Mr. Wilkerson, you were asked questions by counsel

12   for the defendant about he suggested you had no physical

13   evidence of the ignition source.  Could you read the

14   highlighted portion of 19.4.4.3?

15                   THE COURT:  Was this -- this edition is

16   after the fire in question?

17                   MR. GRINKE:  It is.

18                   THE COURT:  What does the edition say that

19   was in force and effect on the date of the fire?

20                   MR. GRINKE:  Your Honor, this paragraph

21   was not included in the 2008 edition.  However, counsel for

22   the defendant and I have agreed to utilize the current

23   version that talks, for various purposes, that just talk

24   about how you can develop a theory.

25       I agree that someone wouldn't be bound by something

from five years later, but just as far as you -- what you're

allowed to consider, I think we agreed it was fair game.

MR. HOOD:  I said you could argue anything

you wanted.

MR. GRINKE:  He has 2014 listed as an

exhibit and so do I.

BY MR. GRINKE:

Q       Could you read that highlighted portion, sir?

A       "There are times when there is no physical evidence

of the ignition source found at the origin, but where an

ignition sequence can be logically be inferred using other

data.  Any determination of fire cause should be based on

evidence rather than on the absence of evidence; however,

there are limited circumstances when the ignition source

cannot be identified, but the ignition sequence can logically

be inferred.  This inference may be arrived at through the

testing of alternate hypothesis involving potential ignition

sequences, provided that the conclusion regarding the

remaining ignition sequence is consistent with all known

facts."

Q       And I realize that this version wasn't in existence

at 2008, but can you tell the Court whether or not this is

generally how you reached your conclusions in this case?

A       Well, I do not think that this is the way I've

reached my conclusion because I felt like I had the physical

1    evidence of the cigarette under the balcony.  And I do think

2    it was logical that it was part of the ignition sequence of

3    the event.

4    Q      In your mind, how did the fire grow from its initial

5    stage?

6    A      It's my belief that the origin of the fire was on

7    the northwest corner of 2207 with the wall covering and the

8    wood.  The fire, with the heat and everything going upward,

9    continued to follow the fuel upward.

10         The heat and the gases accumulated underneath the

11   ceiling of balcony 2207, rolling over onto the balcony of

12   2307.  And then the same occurrence happening on 2307 with

13   the collecting of the heat and the gases and with the fuel

14   package that was up there.

15         And I felt like that's why you have more of a

16   uniform pattern on 2307, is because the heat and everything

17   rolled over uniformly versus just having one ignition origin

18   or one origin that extended upward.  Once it spread along the

19   ceiling of 2207's balcony, then it rolled over onto 2309.

20                    MR. GRINKE:  Thank you.  Pass the witness.

21                    RECROSS-EXAMINATION

22   BY MR. HOOD:

23   Q      Under the current version of 921, the use of a

24   negative corpus approach to fire causing origin is outlawed,

25   correct?

1    A      I would have to see a copy of the 921, but I don't

2    believe the term outlawed is correct.

3    Q      It says it's not to be used.  And I'm sorry.  I

4    should not have used the word outlawed.

5    A      Again, I would have to refer to -- if you have got a

6    copy of 921 I can look at I can answer that question.

7    Q      You don't know this, then, about the use of negative

8    corpus under 921, then, sir, do you?

9    A      I am familiar with it and it references a -- the 921

10    references an article about negative corpus, and I believe in

11    some instances it is allowed.

12    Q      Well, it specifically says, does it not, that

13    speculative information cannot, and I mean cannot be used in

14    that type of analysis; isn't that true?

15    A      Again, without having the 921 in front of me, I

16    can't answer that question.

17    Q      Okay.

18               MR. HOOD:  That's all.

19               MR. GRINKE:  Apologies, Your Honor.

20    That's important.  Can I just address negative corpus?

21               THE COURT:  Yes.  Redirect.

22           FURTHER REDIRECT EXAMINATION

23    BY MR. GRINKE:

24    Q      This is, Mr. Wilkerson, Plaintiff's Exhibit 15 NFPA

25    921 the 2014 version that discusses negative corpus, and,

1    again, it's not in the 2008 version, but 19.6.5?

2                    MR. HOOD:  Can we look at the entire

3    section?

4                    MR. GRINKE:  It's on an exhibit.  I need

5    it this big so he can read it on the screen.

6                    MR. HOOD:  Which exhibit?

7                    MR. GRINKE:  15.

8    BY MR. GRINKE:

9    Q        19.6.5, appropriate use.  The process of elimination

10   is an integral part of the scientific method.  Alternative

11   hypotheses should be considered and challenged against the

12   fact.  Elimination of a testable hypothesis by disproving the

13   hypothesis with reliable evidence is a fundamental part of

14   the scientific method.  However, the process of elimination

15   can be used inappropriately.  The process of determining the

16   ignition source for a fire, by eliminating all ignition

17   sources found, known, or believed to have been present in the

18   area of origin, and then claiming such a methodology is proof

19   of an ignition source for which there is no supporting

20   evidence of its existence, is referred to as negative corpus.

21        Mr. Wilkerson, did you reach your opinion by

22   eliminating all other potential sources of ignition and then

23   determined that it must be cigarettes with no supporting

24   evidence of their existence?

25                    MR. HOOD:  Object to this question, Your

Honor, because he didn't read the entire section which ends

with, speculative information cannot be included in the

analysis.  Then he also stopped and didn't read this process

is not consistent with the scientific method.  And,

furthermore, he's leading.

MR. GRINKE:  Your Honor, counsel started

out reading only a portion of this section on negative

corpus, and I'm reading the whole --

THE COURT:  Gentlemen, I'm not here for

you to argue.  I will take control of this, now.  Sit down,

counsel.

Read along with me, sir.

"The process of elimination is an integral part of

the scientific method."  Do you agree with that?

THE WITNESS:  Yes, sir, I do.

THE COURT:  "Alternative hypotheses should

be considered and challenged against the facts."  Do you

agree with that?

THE WITNESS:  Yes, sir.

THE COURT:  "Elimination of a testable

hypothesis by disproving the hypothesis with reliable

evidence is a fundamental part of the scientific method.

However, the process of elimination can be used

inappropriately.  The process of determining the ignition

source for a fire, by eliminating all ignition sources found,

known, or believed to have been present in the area of
origin, and then claiming such methodology is proof of an
ignition source for which there is no supporting evidence of
its existence, is referred to by some investigators as
negative corpus.  Negative corpus has typically been used in
classifying fires as incendiary, although the process has
also been used to characterize fires classified as
accidental.  This process is not consistent with the
scientific method is inappropriate and should not be used
because it generates untestable hypotheses and may result in
incorrect determinations of the ignition source and first
fuel ignite.

"Any hypothesis formulated for the causal factors
(e.g. first fuel, ignition source, and ignition sequence)
must be based on the analysis of facts.  Those facts are
derived from evidence, observations, calculations,
experience, and the laws of science.  Speculative information
cannot be included in the analysis."

That's the entire section, which did not exist on
the date that you analyzed this fire.  But taking that into
account now, is there anything in that language that causes
you to change your opinion about the cause of this fire?

THE WITNESS:  No, sir, it does not.

THE COURT:  And why is that?

THE WITNESS:  I felt I had evidence in

1    this fire.  And for negative corpus, it's usually with the

2    absence of evidence.

3                    THE COURT:  What evidence are you relying

4    upon here?

5                    THE WITNESS:  I'm relying on the verbal

6    communications that was given to me where people knew Michael

7    Siegling had smoked on the balcony.

8                    MR. HOOD:  Object, Your Honor.  That's

9    hearsay.

10                   THE COURT:  You can't take the hearsay

11   into account.

12                   THE WITNESS:  The evidence of the

13   cigarettes in Room 2207, that Michael Siegling was staying in

14   Room 2207, the smoke, discarded cigarette butts that was

15   underneath the balcony in 2207 on top of the burn debris, and

16   also the fire patterns of the fire itself is how I determined

17   my origin and cause.

18                   THE COURT:  All right.  Anything further

19   for counsel for plaintiff?

20                   MR. GRINKE:  No, Your Honor.

21                   THE COURT:  Anything further --

22                   MR. HOOD:  No, Your Honor.

23                   THE COURT:  All right.  May this witness

24   be excused?

25                   MR. HOOD:  Yes.

1           THE COURT:  You are released from your

2   subpoena.  You can go back to your normal duties.

3           THE WITNESS:  Judge, if it's okay, I would

4   like to attend.  Is that all right or --

5           THE COURT:  Do either of you intend to

6   re-call this witness?

7           MR. GRINKE:  I don't.

8           MR. HOOD:  No.

9           THE COURT:  If he stays in the courtroom,

10  he will not be subject to re-call.

11          MR. HOOD:  Correct.

12          THE COURT:  All right.  You may.

13          THE WITNESS:  Thank you, Your Honor.

14          THE COURT:  Who is your next witness?

15          MR. GRINKE:  Roderick Williams, Your

16  Honor.

17                  RODERICK WILLIAMS

18  having been first duly sworn by the Courtroom Deputy Clerk,

19  was examined and testified as follows:

20          THE CLERK:  State your name for the

21  record.

22          THE WITNESS:  Roderick Samuel Williams.

23          THE CLERK:  In which city and state do you

24  reside?

25          THE WITNESS:  Hoover, Alabama.

DIRECT EXAMINATION

BY MR. GRINKE:

Q        Mr. Williams, how are you currently employed?

A        I am employed by EFI Global.

Q        And what do you do for EFI Global?

A        I'm a private fire investigator.

Q        Okay.  And was that your position on September 22nd

of 2010, or thereabouts?

A        It was.

Q        What are your duties and responsibilities as a

private fire investigator?

A        I'm what is normally called an origin-and-cause

investigator.  My job is to determine the origin and cause of

fires.

Q        Are you an electrical engineer?

A        I am not.

Q        Were you retained to examine the Country Inn and

Suites fire that occurred here Huntsville on September 22nd

2010?

A        I was.

Q        Who retained you?

A        I don't recall.  I would have to look back at my --

Q        Okay.  But it was a private party, not the

Government?

A        Not the Government, no.  It was an insurance entity.

1    Q        Please walk the Court through, if you would, your

2    background and experience that qualifies you as a

3    cause-and-origin expert.

4    A        Well, 30 years in the fire service.  I'm a certified

5    fire investigator through the State Fire College here in

6    Alabama.  Also I'm a certified investigator through NAFI and

7    IAAI.

8    Q        How long have you held the state of Alabama fire

9    certification?

10   A        I believe it's since 2001.

11   Q        And then the second certification you stated?

12   A        NAFI, National Association of Fire Investigators.  I

13   believe 2006.

14   Q        And prior to the Country Inn and Suites fire, how

15   about how many fires have you investigated?

16   A        Well, that's hard to say.  I average roughly about

17   135 to 160 fires a year.  I would say roughly about that

18   many.

19   Q        Okay.  Any other part of your education, training,

20   or experience that the Court should be aware of, with respect

21   to your qualifications to render an opinion in this case?

22   A        Well, I just, you know, we currently go through your

23   normal yearly continuing education credits, and so I'm

24   continuously updating my education throughout the year.

25   Q        You rendered your opinions in this case some years

1   ago.  Is there anything about continuing education or

2   anything else you've learned since that time that would

3   change your opinions as to the origin and cause of this fire?

4   A       No.

5   Q       And did you render an opinion as to the origin and

6   cause of the fire at the Country Inn and Suites?

7   A       I did.

8   Q       And did you render that opinion based upon a

9   reasonable degree of probability?

10  A       I did.

11  Q       And what is your opinion?

12  A       My opinion is that this fire was started by

13  improperly discarded smoking materials.

14  Q       And where did the fire originate?

15  A       I determined that the fire originated in the

16  northwest corner of the balcony of Room 2207.

17  Q       And then the fire originated there.  And then how

18  did it -- once it initiated, in your opinion, how did it

19  grow?

20  A       The fire -- typically fire spreads, burns up and

21  out.  And in igniting the fuels ahead of the flame spread.

22  So the fire burned in that northwest corner and spread in a V

23  pattern motion upward until it hit the underside of the

24  balcony of 2307 above, and then spread around the top of that

25  under the bottom of that across the top, and then also

1    through the floor itself.

2    Q        And so then it spread up to the balcony of 2307?

3    A        2307, yes.  And then subsequently into the roof

4    overhang and into the attic.

5    Q        Was there anything about this fire that led you to

6    believe that the fire was an interior fire, something that

7    occurred inside the building?

8    A        No, sir.

9    Q        In the black notebook there, the Plaintiff's

10   exhibits, Exhibit Number 5, I will ask you to take a look at.

11   I believe these are your photographs.

12                    MR. GRINKE:  And, Your Honor, in the

13   interest of time, he's got significantly more photographs.

14   If the Court wishes, I'm happy to let him walk through like

15   we did with Wilkerson, but I might just have if the Court --

16   otherwise I can just kind of have him point out the ones that

17   he thinks are important for the Court to see.

18                    THE COURT:  Refer to the photographs in

19   the lower right-hand corner of each of your photographs.

20   There's a Bates stamp number Yedla.

21                    THE WITNESS:  Yes, sir.

22                    THE COURT:  And a sequence of numbers.

23        I'm looking at 2993.  Just use those the last

24   numbers of 2993 and following, and point out photographs that

25   you think shows something significant.

1              THE WITNESS:  2993 is an entrance from the

2    lower portion of a courtyard to the upper level of these

3    different room units.

4              If you will go to 2994, this is a view into the

5    courtyard.  And if you will notice the plastic tarp on the

6    building to the left, that is, Building 2, and the tarp is

7    covering the roof and the balconies of 2307 and 2207.

8              2995 is just a different angle coming from the

9    breezeway in the courtyard.  Back towards the balconies of

10   2207 and 2307.  But it also includes the two rooms, the units

11   to the north side of the room -- of 23 and 2207.

12             2996 refers to the door leading into the lower

13   breezeway, the lower hallway of -- on the first floor of

14   Building 2 from the courtyard.

15             2997 is just a closer view of the tarp showing the

16   tarp covering the burned areas of the structure.

17             2998 is just another wider view of the tarp showing

18   the -- covering the burned areas of the structure.

19             2999 just shows the rooms to the south side where

20   smoke -- just showing some evidence of some smoke from the

21   balconies of 2307.

22             3000 is a view of the underside of balcony 2207,

23   shows a light fixture.

24             THE COURT:  We don't have to identify all

25   of these, Mr. Williams.  Let's just go to the ones that show

1   something significant.

2           What are you showing in 3002?

3                   THE WITNESS:  3002 is just some fire

4   debris from the fall down, what I consider was fall down from

5   roofing materials and other portions of the building.

6                   THE COURT:  But that photograph doesn't

7   tell us what portion of the building that fell to, does it?

8                   THE WITNESS:  Well, no, sir, it doesn't,

9   in this particular photograph.  But it's below the balcony of

10  2207.

11                  THE COURT:  3003, what is that photograph

12  of?

13                  THE WITNESS:  That is a photograph of the

14  northwest -- the underside of the northwest corner of the

15  balcony for 2207.

16                  THE COURT:  And the same is shown in 3004.

17                  THE WITNESS:  Yes, sir.  Just a closer

18  view.

19                  THE COURT:  And what does that tell you,

20  if anything?

21                  THE WITNESS:  It shows where the fire did

22  penetrate the decking boards in that area.  And that is the

23  particular where -- in particular where I had determined the

24  area of origin to be.

25                  THE COURT:  3005.

1                    THE WITNESS:  3005 depicts some different

2    discarded smoking materials in the debris under balcony 2207.

3                    THE COURT:  Is that also true of 3006?

4                    THE WITNESS:  Yes, sir.  That's a closer

5    view.

6                    THE COURT:  And 3007?

7                    THE WITNESS:  3007, as well.  Just another

8    example of a discarded cigarette butt in that area.

9                    THE COURT:  And 3008.

10                    THE WITNESS:  Yes, sir.

11                    THE COURT:  Is the closest view yet.

12          What is that showing, and what is that filter?  Can

13    you tell from the photograph of the filter what kind of

14    cigarette?

15                    THE WITNESS:  I believe it's a Marlboro,

16    but I am not a smoker, but I don't know, but just from -- it

17    appears to be a Marlboro from -- just from the writing on

18    there is similar to other writing that I've seen on Marlboro

19    cigarette butts.

20                    THE COURT:  3009.

21                    THE WITNESS:  3009 is a discarded cigar

22    tip.

23                    THE COURT:  3010?

24                    THE WITNESS:  3010 is a -- if you read

25    closely you can determine the word "boro" on the end of this

1 markings here, so I am assuming that's a Marlboro cigarette

2 butt.

3      THE COURT:  3011, it's difficult to see

4 the number.  It's between the 10 and 12.

5      THE WITNESS:  Yes, sir.  3011.  That's

6 another just a closer view of the cigarette butt, and it

7 appears to be a Marlboro.

8      THE COURT:  Writing appears to be part of

9 Marlboro?

10      THE WITNESS:  The writing is similar to

11 the other writing on the other -- on the other discarded

12 butts.  It looks similar to me.

13      THE COURT:  3012 shows some burn.  Is that

14 plastic PVC material?

15      THE WITNESS:  Yes, sir.  That's the vinyl

16 siding that was consistent with the exterior of this

17 building.

18   And if you will look just below that, there is a

19 cigarette butt in the debris just below that, in the burned

20 area of the vinyl siding.

21      THE COURT:  3013, that's looking up at the

22 ceiling of the balcony of what room?  2207?

23      THE WITNESS:  Yes, sir.  That's looking up

24 from the ground level to the underside of the balcony floor

25 of 2307.

1          THE COURT:  Uh-huh.

2          THE WITNESS:  Which is above 2207, yes.

3          THE COURT:  And it appears the entire

4   bottom of that balcony is charred; is that correct?  Was it

5   charred from north to south?

6          THE WITNESS:  Yes, sir.  It -- there's

7   heavy, heavy charring there on the floor joists, which run

8   from -- which are running from east to west.  And then the

9   decking boards are running from north to south.  And there is

10  heavy, heavy intense charring at the north end over what I

11  have determined to be the area of origin.

12         THE COURT:  Do you have a photograph that

13  shows this -- the underside of the balcony that separates the

14  flooring, that separates the balcony of 2207 from 2309?  Do

15  you have any photograph that shows the entire width or

16  breadth of that balcony from north to south and east to west?

17         THE WITNESS:  I don't recall that, Your

18  Honor.  I don't recall those being in my photographs, no,

19  sir.

20         THE COURT:  3014 is showing the metal

21  railing outside 2207.  That does not -- that green paint on

22  that railing was not burned away like is shown in some of the

23  photographs above in the balcony above.  Why does that -- how

24  does that affect your opinion as to the origin of this fire?

25         THE WITNESS:  The heat flux from the

1    burning material down below, from the vinyl siding, is going

2    to be significant, more significant as the heat progresses up

3    the wall, the exterior wall from the balcony here in this

4    corner, the northwest corner.

5         So as this fire progresses up the wall, the exterior

6    wall, it's going to continue to get hotter and hotter, and

7    it's going to cause the material to -- the vinyl siding to

8    grip and fall down.  But as that heat is -- as I stated, the

9    heat is more so moving upward than it is outward at the

10   point.  And that's why you still have the paint upon the

11   handrail.

12        And the paint is gone basically from the handrail of

13   2307 because once the fire plume hits the bottom side of the

14   deck for 2307, it has nowhere else to go but to roll out

15   horizontally and laterally, and then it's going to lap on the

16   outside of the outside of the deck, and then it's going to go

17   upwards from there.

18        So that would explain the heavy discoloration of the

19   paint on the handrail of 2307.

20             THE COURT:  I'm still in this same

21   photograph here of 3014.  It appears that that is the porch

22   light lying on the floor of the decking; is that correct?

23             THE WITNESS:  Yes, sir, it is.  It's what

24   I determined that this porch light was mounted to the wall

25   next to the door on the right side if you're facing the door

1    from the exterior on the right side of the door up there on

2    this balcony.  And it's consistent with the other light

3    fixtures on the other balconies.

4                    THE COURT:  Why is that not affixed to the

5    wall?  Why is it lying on the floor of the deck?

6                    THE WITNESS:  I have no idea.  I don't --

7    I don't know why it's down.

8                    THE COURT:  You made these photographs on

9    what day?  The day after the fire or some later day?

10                   THE WITNESS:  I'd have to refer back to my

11   report, Your Honor.  I don't think it was the next day after

12   the fire.  I think it was several days later.

13                   MR. GRINKE:  Plaintiff's Exhibit Number 2

14   contains his report, if that helps you, Mr. Williams.

15                   THE WITNESS:  In this same book?

16                   MR. GRINKE:  Yes.

17                   THE COURT:  Your report is dated October

18   12, 2010, but that's not necessarily the date you went to the

19   scene and made these photographs.

20                   THE WITNESS:  My examination was conducted

21   on September the 27th.

22                   THE COURT:  And the fire occurred --

23                   THE WITNESS:  And the fire occurred on

24   September the 22nd, so that was five days later, yes, sir.

25                   THE COURT:  All right.  Photograph 3015,

1    what does that show?

2                    THE WITNESS:  This is just another view

3    from the underside of balcony 2207 looking at the underside

4    of balcony 2309, and it's more so the view is more towards

5    the south end of that balcony on 2307.

6                    THE COURT:  Leaf through the following

7    photographs and pause at any you think show something

8    significant and give us their numbers.

9                    THE WITNESS:  3016 just shows a view at

10   basically floor level looking onto the -- from the outside of

11   balcony 2207 towards the northwest corner of 2307.

12         I apologize for this next photo.  The lighting is

13   very bad on it.  But it's just a view towards the upper --

14   towards the ceiling area on the underside of the balcony of

15   2307.  And this is in the northwest corner.

16         3018 is just looking further up between the tarp and

17   the handrail of -- towards 2307.

18         19 is just another photograph in that same

19   direction, as well as 20.

20         3021 is just a closer view of floor level towards

21   the northwest corner of the balcony on 2207.

22         3022 just shows the beer can that was laying on the

23   -- that I found on the floor of balcony 2207.

24         22 is just a closer view of the top.  And I think

25   what I attempted to do here was to see if there was any

1    evidence of maybe cigarette butts being deposited inside the

2    can, and I did not notice any.

3         3024 is from the breezeway going down the hallway

4    towards the -- on the second floor towards the rooms -- room

5    of origin.

6         3025 is the same, more of the same.

7         3026, this is actually the door going into Room

8    2207.  It's -- you can't read the numbers on the door.

9         3027 is the view from the hallway in the door to

10   Room 2207.  And it shows the doorway going to the balcony.

11        3028 is just a view of the kitchen area.

12        3029 is a view into the bedroom.  Another view.  Bed

13   on the left side in the bedroom.

14        This is just a view towards the closet and the door

15   going back into the living room.  These next are just --

16   that's the bathroom, another photo inside the bathroom.

17        3034 is the door coming from the bedroom back

18   towards the door leading to the hallway.

19        3035 is shows some fire damage to the curtains on

20   the inside of the windows there coming from the northwest

21   corner of the balcony.

22             THE COURT:  Is that heat damage?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  Or fire damage?  Could you

25   tell?

1            THE WITNESS:  Well, the fire did later on

2     breach the windows there, but I think that was later into the

3     fire scene.  But that is mostly heat damage.

4            3036 just shows a view going out onto the balcony

5     from the door.

6            There's a picture of the door as closed.

7            Okay.  Here's a -- 3038 shows the -- a view of the

8     window and the screen there in the northwest.  That would be

9     the north -- northwest corner of the balcony.

10           3039 is a view of the window glass shows sooting

11     from the outside.

12               THE COURT:  Do you know how that glass was

13     broken?  Did firefighters do it, or was it broken in some

14     other manner?

15               THE WITNESS:  It appeared to be thermal

16     damage, Your Honor, from my opinion.

17           3040 is another view of the window glass, the

18     window.

19           41 is just some heat damage from the rise of the

20     heat on the curtains up above that window.

21           3042 was just -- I just took a photo here of just

22     some of the power cords plugged into the outlet behind the

23     sofa showing no damage to those.

24           3043, no damage to the outlet along that wall or the

25     power cords.

3044, no damage to the TV, the power cords, or the cable coax on that wall, which is just inside the door from the balcony.

3045 is another -- is just a closer view of the power cord for the TV and the cable coax and the TV.

46, backside of the TV.  I see they hadn't gotten to flat screen TV's yet, I guess.

3047 shows the smoke detector.  It's on the ceiling inside the room.  And there's no indication of smoke deposition to the external horn on this, which indicates most likely that it did not activate because the fire was not in that area.  So the smoke did not reach that detector at that time.

All right.  We're getting into the photographs more so on the balcony.  This is from the door going onto the balcony of 2207.  You note the melted vinyl siding there.  This is showing the line of demarcation from the heat going across the over across the top of the door.

3050, I can't read that one.  I think it's 3050, but that's a darker photo here.  And I apologize.  But it's just showing the fire debris on the balcony of 2207, and, as you can see, you can see the light fixture there on the floor.  It's hard to tell much about it at this point.

3051, I'm not sure what that photograph was.  I'm sure it was in that same area, but --

1          THE COURT:  It appears to have been a

2  close-up of the light fixture, but it's too dark to see.

3          Move on to the next photograph.

4          THE WITNESS:  3052 is a close-up of the

5  light fixture itself.  When I visualized the light fixture, I

6  saw no indication that the fire would have originated at this

7  light fixture.  The bulb was still pretty much intact inside.

8  And the glass blazing on the outside of the lens cover there

9  was cracked, shows thermal damage, but not anything to

10  indicate that the fire originated in the area of the light

11  fixture.

12          MR. GRINKE:  Your Honor, may I ask him one

13  question for clarification on this?

14          THE COURT:  Yes, sir.

15  BY MR. GRINKE:

16  Q      Did you remove the light fixture from the wall?

17  A      No, I did not.  It was there on the floor at the

18  time of my examination.

19  Q      Okay.

20          THE COURT:  It does not appear that the

21  entire bulb was intact there.  If the bulb in that fixture

22  was similar to or identical to those that the bulb that's

23  shown in the fixture on the wall of 2209, it was one of those

24  -- oh, how would you describe it?  Swirl fluorescent fixture?

25          THE WITNESS:  Compact fluorescent bulb.

1          MR. HOOD:  CFC.

2          THE COURT:  But you know what I'm talking

3    about, it's not your normal incandescent bulb.

4          THE WITNESS:  No, sir.  It's not one of

5    the normal CFA or CFI.

6          THE COURT:  And it does not appear that

7    all of the bulb is intact there.  If I'm incorrect in that,

8    why don't you point it out to me?

9          THE WITNESS:  You can't tell from this

10   vantage point here, Your Honor, but I don't recall there

11   being any -- any breakage on that element on the filament or

12   the element coming out from the base of the bulb.  You can

13   see that it still does have a portion of it.  You can see a

14   portion of it at the base of the bulb there, but the lower

15   portion is not very visible, no, sir.

16         THE COURT:  The next photograph appears to

17   be the electrical box to which that fixture was attached; is

18   that correct?

19         THE WITNESS:  I assume so, yes, sir.  And,

20   again, it was removed before my examination.  And by who, I

21   don't know.

22         THE COURT:  So you did not cut the wires

23   that are shown in that photograph.

24         THE WITNESS:  No, sir, I did not.

25         THE COURT:  Did you leave that electrical

1    box at the scene of the fire?

2                    THE WITNESS:  Yes, sir, I did.

3                    THE COURT:  All right.

4                    THE WITNESS:  The other end of the wires

5    coming out from the front part of the fixture or the junction

6    box there is your power wires coming in that would be -- that

7    would supply power to the light fixture itself.  And there's

8    no indication of any kind of arcing or melting of the

9    conductors on that.

10                    THE COURT:  Your next photograph, which is

11   not very clear, you might want to skip to the one after that,

12   which is a much clearer photograph, that -- what is that

13   number?  3055?

14                    THE WITNESS:  Yes, sir.

15                    THE COURT:  That shows the wires inside

16   the junction box.

17                    THE WITNESS:  It does.  And, again,

18   there's no indication that there was fire inside this box for

19   the fire to have originated from the box.

20        All of your -- all of your conductors still have

21   insulation on the wiring, which is significant because if

22   fire had have impinged more heavily on that area, or if the

23   fire would have originated in there, you wouldn't have the --

24   more than likely the insulation would have melted off of

25   those conductors.

1          THE COURT:  All right.  The two that are

2    twisted together in the upper portion of the junction box

3    shown in this photograph, they're white in color.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  And then the two wires that

6    are in the lower right-hand corner of the junction box are

7    black in color.  Is that black -- was that the original color

8    of insulation, or does that show fire damage?

9          THE WITNESS:  That is the original color

10   of the insulation.  Usually you will have -- in Rolmex wiring

11   you will have a black wire and a white wire and sometimes a

12   ground wire, which would be a different color, either brown,

13   or green, or another color.  But it's typically a ground

14   wire.

15        But one of these is hot and one of these is commonly

16   what you would -- which would supply power to the light

17   fixture.  And the reason there's two wires, you have got one

18   wire coming in for the light fixture itself supplying power,

19   and then the other is going back to the light switch itself

20   inside the room.

21          THE COURT:  I see.

22        Okay.  What is your next photograph?

23          THE WITNESS:  3056 is -- I am assuming

24   that whoever cut this box off of the -- this was in the

25   location of where the light fixture would have been mounted

1      above the door.  And I am assuming that --

2                      THE COURT:  Is that the exterior cover

3      plate for the junction box we have been looking at?

4                      THE WITNESS:  That's another junction box.

5      It was the metal box was replaced with a plastic box and this

6      cover plate was put over it.

7                      THE COURT:  So this is not something that

8      was present on the day of the fire or the night of the fire.

9                      THE WITNESS:  No, sir.

10                     THE COURT:  Okay.

11                     THE WITNESS:  If this was here at the time

12     of the fire, it would be -- this particular would show

13     melting and smoke deposition and all.  And there's nothing to

14     indicate that.

15                     THE COURT:  The next three four, five, and

16     six photographs appear to be too dark to discern anything,

17     but if you see something, let me know.

18                     THE WITNESS:  No, sir.  They're hard to

19     depict on there, but 30 --

20                     THE COURT:  That's a beer can.

21                     THE WITNESS:  Yes, sir.  I was trying to

22     get the number.  I couldn't read the number off of it.

23          But after that photograph is just the fire debris on

24     the balcony of -- on the floor of the balcony of 2207.

25                     THE COURT:  Is that debris that fell from

1    above, or is that debris caused by a fire on the floor of the

2    balcony?

3                      THE WITNESS:  Most of that is debris from

4    up above.  And it could be falling from the underside of the

5    wood decking from the balcony of 2307, as well as there is

6    some in that debris -- melted vinyl siding and some of that

7    would be the wood panel boards, the wood boards that were

8    underneath the vinyl siding from the -- I am assuming from

9    original construction.  And at some point this vinyl siding

10   was added to the exterior of the building.

11                     THE COURT:  The photograph after this

12   one -- and I think it's 3065 -- shows the top of the

13   handrail --

14                     THE WITNESS:  Yes, sir.

15                     THE COURT:  -- on the balcony of 2207.  It

16   has been burned.

17                     THE WITNESS:  Yes, sir, it has.

18        This also shows the area of origin, what I had

19   determined the area of origin to be.  And based on the extent

20   of damage in this corner here, and the extent of damage to

21   the wood siding material that was underneath the vinyl

22   siding, and as I stated earlier, as this -- as the materials

23   ignite above -- ahead of the flame, that heat is going to

24   increase and it's going to start rolling out laterally upward

25   and laterally.  And this heat damage to the top side and

1    the -- I am going to call this the back side of the handrail
2    is due to this increase in heat banking down from above.
3                    THE COURT:  3066.  What is that showing?
4    Is that the area of the -- that you have stated was the point
5    of origin?
6                    THE WITNESS:  Yes, sir.  This is before I
7    removed any debris.  This is what I visualized before I
8    removed any of the fire debris.  And this is the northwest
9    corner of the balcony of 2207.
10                    THE COURT:  3067 is an interior photograph
11   of the area between the beds; is that correct?
12                    THE WITNESS:  Yes, sir.  This is in the
13   bedroom of 2207.  And I did notice what appeared to be a
14   cigarette burn on the floor there.
15        3068 is just a closer view of that burn pattern,
16   which is consistent with a cigarette burn.
17                    THE COURT:  Is this 3069?
18                    THE WITNESS:  3069, as well, yes, sir.
19                    THE COURT:  3070.  Where are we?
20                    THE WITNESS:  We're on the third floor
21   here.  I went up to look on the third floor.  And this is
22   outside the hallway of, as you can see the numbers, 2307 and
23   2306.
24        3071 is just visualizing into Room 2306.  When I
25   looked into this room I saw no indication of the fire

originating in that room.  It appeared to have a lot of water
damage, and some smoke damage from the fire spread, water
damage from extinguishment, from the extinguishment from the
fire department.

3072 and 73 are just looking down the hallway at the
ceiling where you can see there was a considerable amount of
smoke damage to those ceiling joists above the ceiling there.

3074 is looking from the hallway into Room 2307.

THE COURT:  Which is directly above.

THE WITNESS:  Directly above 2207, yes,
sir.

THE COURT:  It appears to have smoke or
fire damage in the upper left-hand corner of that entry door
facing.

THE WITNESS:  Yes, sir.

If you will notice this door, there's physical
damage to the door, as well, where apparently the fire
department forced entry.  I am assuming, just going back on
what my years in the fire department, I'm assuming they had
to force entry into this room, which to my knowledge is
unoccupied.  And in this living room area in this room, I'm
sure apparently it became pretty heavy charged with heavy
smoke.  And those smoke patterns could have come after the
fire department opened that door.  But it could have also
come out from around the cracks around the edge of the door

1    as it was closed.

2            3075 is just a view into the room.  And as you note

3    the ceiling material, sheetrock on the floor, insulation is

4    from the ceiling above in 2307.

5            This is in room -- I think this is back to Room

6    2306.

7                    THE COURT:  You're talking about 3076

8    photograph.

9                    THE WITNESS:  Well, I mean, the room

10   itself -- yes, sir, on 3076, I believe goes back to Room

11   2306.

12                   THE COURT:  The room across the hall.

13                   THE WITNESS:  Yes, sir.

14                   THE COURT:  3077 is showing some ceiling

15   joists.

16                   THE WITNESS:  Yes, sir.  That's in the

17   room.  That's in the -- looking up in the ceiling there in

18   the living room of 2307.  And that's showing the ceiling

19   joists.  It's hard to see in that picture, that particular

20   photograph.

21           And the line going that you see kind of going

22   perpendicular to the ceiling joists there is electrical

23   wiring, which I didn't -- I didn't note any damage to that.

24                   THE COURT:  Skip to the photograph after

25   that one, next one after this.  That would be 3079.

                    THE WITNESS:  Yes, sir.  This is a view of
some of the furniture inside the living room area of 2307.
And that's -- it shows the ceiling material that -- it
appears that the fire department had pulled that down during
-- during extinguishment and overhaul phase to check for
extension into the attic.

                    THE COURT:  Pull up the next photographs,
series of photographs after this one, they appear to show
debris in areas of Room 2307; is that correct?

      Skip all the way over to 3088.  It's difficult to
see your numbers.

                    MR. GRINKE:  I apologize for that, Your
Honor.

                    THE COURT:  3088.  There.  That
photograph.  That is showing the door into the bathroom of
Room 2307; is that correct?

                    THE WITNESS:  Yes, sir, it is.

                    THE COURT:  And all of that discoloration
on the wall, that's smoke damage or fire?

                    THE WITNESS:  That is smoke damage, yes,
sir.  That is -- I would classify that as heavy smoke damage,
yes.

      The heat did not get -- as you can see, there's a
lot of plastics on the wall.  If you will look at the picture
frames, most of that's plastic.

1         You have got a -- the top of this lamp, wall-mounted

2    lamp, the hood over that is plastic and cloth, and it's not

3    melted.  It's not damaged.

4         So you did get a considerable amount of smoke.

5         Now, if you will look in the bathroom, there's a

6    plastic lens over the mirror for the fluorescent light

7    fixture that was over that wall there.  It did get a

8    significant amount of heat in that area, but that's from --

9    that's all high heat banking down.

10             THE COURT:  Skip over to 3092.  It's

11   showing some heavy charring on roof rafters.  Is that above

12   2307?

13             THE WITNESS:  Yes, sir.  That is the roof

14   over the balcony of 2307.  And it does show heavy intense

15   heat and charring, which the fire spread through that area

16   and into the attic from the exterior.

17             THE COURT:  3093.  Is that the northwest

18   corner of the balcony of Room 2307?

19             THE WITNESS:  Well, it's actually the

20   north wall of the balcony, yes, sir.  That's the partition

21   wall between the two balconies there.  And, as you can see,

22   it did not -- it did not penetrate into the adjacent balcony,

23   but you do have heavy damage to the wood siding and

24   everything there.

25             THE COURT:  It appears that more of the

1   wood siding of the north wall of the balcony of Room 2307 was

2   consumed by fire than the wall below.  How is that consistent

3   with your opinion that the fire originated in the northwest

4   corner of the balcony below this?

5                     THE WITNESS:  Well, as I stated before,

6   the way heat rises and the flame in front of the material

7   that's burning is going to continue to increase in

8   temperature.  And as it gets hotter it's going to spread

9   faster.  And your hotter temperatures are going to be up more

10  so with the upper levels.

11          So that's how you can account for that damage at the

12  upper level on that balcony.

13                     THE COURT:  And, again, it's -- we see

14  here in 3093 that all of the paint on the hand railing of

15  that balcony has been consumed.

16                     THE WITNESS:  Yes, sir.  And I can account

17  that as just from the intense heat that built up once the

18  fire got to that level and spread to that level and caused

19  that damage to the balcony.

20                     THE COURT:  3094, what is that showing,

21  the opposite south wall of the balcony of 2307?

22                     THE WITNESS:  Yes, sir.  That would be

23  the -- yes, sir.  That would be the south wall of the -- of

24  2307.

25                     THE COURT:  And is that true of --

1                    THE WITNESS:  Looks like --

2                    THE COURT:  -- 3095?

3                    THE WITNESS:  -- a lot of this material

4    had been -- appeared to have been pulled off the boards, had

5    been pulled away instead of burned away from this area, as

6    you can see on the lower portion of this some of those boards

7    have been pulled away rather than burned away, although they

8    did have significant burn damage.

9                    THE COURT:  3096 is showing north wall

10   again?

11                   THE WITNESS:  Yes, sir.

12                   THE COURT:  3097 is showing the roof

13   joists above the north wall.

14                   THE WITNESS:  Yes, sir.  And that's going

15   to be in the -- yes, sir, the northwest -- the north wall,

16   yes, sir.

17                   THE COURT:  3098, what is that showing?

18                   THE WITNESS:  That is the area where the

19   light fixture would have been mounted on that balcony, which

20   would have been the same location as the light fixture below

21   on 2207.

22                   THE COURT:  The door facing is badly

23   burned there.

24                   THE WITNESS:  Yes, sir, it is.  But if

25   you'll recall, this had a -- this had a ceiling on it, a

1    plywood ceiling on the underneath side, which the heat is

2    going to bank down once it gets to that -- to that ceiling

3    level it's going to start spreading, laterally what we call

4    mushrooming.  And it's going to spread laterally until it

5    meets another obstruction and it starts banking down from

6    there.

7            So you did have a considerable amount of heat at

8    that ceiling level there.

9                    THE COURT:  Skip to 30 -- I can't tell.

10   Go to the next photograph.

11                   THE WITNESS:  I'm sorry, sir?

12                   THE COURT:  30 -- I can't read these black

13   numbers against black spaces, but the photograph after the

14   one that's shown on the screen now.  What is that?

15                   THE WITNESS:  99?

16                   THE COURT:  That one.  That's -- I think

17   that's --

18                   THE WITNESS:  That's the inside -- or the

19   outside of the door.

20                   THE COURT:  And window?  Is that a window?

21                   THE WITNESS:  Yes, sir.  To the right of

22   that is the window, but that is the heavy damage to the

23   exterior of the metal door there, going into 2307.

24           3100 is basically just an upper view of that, that

25   same area.

1           THE COURT:  I'm skipping over to 3105.  It
2  appears that's fire damage to the back of the chair.
3           THE WITNESS:  Yes, sir.  That chair would
4  have been in the area of the window, over next to the window
5  of the balcony.  And it -- that's due to flames spread
6  through -- once the fire breached the window on the balcony
7  of 2307, it spread to that chair.
8           THE COURT:  3106, what is that showing?
9           THE WITNESS:  That's looking from the
10 balcony into Room 2307.  And you can see the sofa to the
11 right and some other items, contents to the left.
12      You can also see the ceiling in that room, these --
13 the ceiling joists in that room and the electrical wiring
14 running across the -- horizontally across those ceiling
15 joists.  And does not -- did not exhibit any kind of fire
16 damage.
17           THE COURT:  3107 shows the photograph of
18 the wall number 2309, so I assume the next series of
19 photographs are the interior of that room; is that correct?
20           THE WITNESS:  Yes, sir.
21           THE COURT:  Just leaf through those.  If
22 you see anything of significance, bring it to our attention
23 by the photograph number.
24           THE WITNESS:  There's really no
25 significance in here, except just to signify that there was

1  no indication that the fire started in this area.

2          Okay.  We're back to 3111.  We're back to the

3  balcony of --

4                    THE COURT:  2309?

5                    THE WITNESS:  Yes, sir.  This is showing

6  another photo.  I don't know how that got mixed in here.

7          But, anyway, that's just another view of the header,

8  the outside header here over the supporting the roof

9  structure, the roof overhang coming out over 2307, yes, sir.

10                    THE COURT:  It might be 2309, might it

11  not?

12                    THE WITNESS:  No, sir.  I think this is

13  2307.  Well, it might be 2309, yes, sir.  I think you're

14  right, Your Honor.  Yes, sir, that's correct, because as we

15  get into the next photograph, that's some -- 3112 indicates

16  fall down and melting of the vinyl siding on the balcony

17  there on the room next to 2307.

18                    THE COURT:  I'm leafing through all of

19  your subsequent photographs.  They're either too dark, or

20  they show exterior views that don't appear to be significant.

21          I'm pausing on 3125.  Tell me if there's anything in

22  between 3111 and 3125 that you find significant.

23                    THE WITNESS:  3125 is a review of after I

24  removed the fire debris in that northwest corner of the

25  balcony floor of 2207.

And, as you can see, there is a, what you could in essence call a V pattern on the floor there between the floor boards where the fire had burned through this, the floor decking boards in that area, and also charred the wall board underneath it supporting the rafter underneath that, as well. So this is just a closer view of the area of origin.

And in that area I did not, after removal of the fire debris, I did not find any evidence of any ignition sources at this point in my area of origin.

THE COURT:  Would that include testing any of the debris for the presence of accelerants?

THE WITNESS:  No, sir, I did not.  I did not feel at this point that laboratory testing for accelerants was needed.  There was no indication to me that this would indicate that -- there was no indication to me that there was a possibility of being an incendiary fire. But I did not take samples, fire debris samples for testing, no, sir.

THE COURT:  3126, what does that show? Same area, just a darker photograph?

THE WITNESS:  Yes, sir.  It's just a closer view of the inside of the -- actually, the inside of the wall, the partition wall between the two balconies of 2207 and 2209.

THE COURT:  Photograph 3127.

1                    THE WITNESS:  That's just a wider view,

2      not so close of an angle showing where I have determined to

3      be the area of origin.

4           Also, if you notice it, to the left, the bottom

5      portion of a wall stud coming down the bottom portion of that

6      stud is totally burned away, as well.

7                    THE COURT:  Does the right-hand -- lower

8      right-hand corner of that photograph show anything of

9      interest?  The area, unburned area above the number Yedla

10     3127?

11                   THE WITNESS:  Well, it's almost like it

12     was a protected area, that something may have been sitting

13     there.  But it could have also been vinyl siding that melted

14     to that point and just hadn't consumed, hadn't ignited, but

15     it did melt and kind of left a -- maybe have left a partially

16     protected area there.

17                   THE COURT:  Do any of the following

18     photographs show anything significant?

19                   THE WITNESS:  If you will go to 3129.

20     This is a closer view of the underside of the floor of the

21     balcony for 2307.  If you will note, there is significant

22     heavy charring at the north, northern portion of this, along

23     that northern wall.  The two closest floor joists from the

24     north are heading, coming back to the south have heavy

25     charring.  The underside of the roof of the floor decking is

1    heavy charred.

2         If this had have been -- there's no way that this

3    damage could have occurred from fall down from a fire

4    originating on the upper balcony.  You would not have this

5    significant of burning here.

6         In my opinion, this damage here is more significant

7    than the roof, actually, the roof part on the balcony of

8    2307.  So which indicates longer burning here in this

9    particular area than it would have been on the upper balcony.

10        3131 -- I skipped one there, but you can see, it's a

11   closer view of this intense heat and heavy charring.  As you

12   can see, the underside of those deck boards there are heavy,

13   heavy charring, which is due from intense heat and long,

14   long, long burn time.

15        Now, to get an idea of how long of burn time we're

16   talking about, it's going to be hard to do because of depth

17   of char, really, is -- is a hard gauge to use to determine

18   burn time, although it is used in some cases.  But you have

19   to take into a lot of consideration, such as the species of

20   the wood, the moisture content of the wood, the shape of the

21   grain, the nature of the grain.  All of those things have to

22   be taken into consideration before you can actually use a

23   depth of char calculation as for burn time, length of burn

24   time.

25        But this was one of my strongest points to point

towards to me indicators that this fire originated on the

balcony of 2207 was this heavy, heavy charring on the

underside of the balcony above it.

THE COURT:  Skip to photograph 3133.  It

shows an electric box, a panel box, with breaker switches.

THE WITNESS:  Yes, sir.  This is one of

the breaker panels that's in that building.  And I just

photographed it just to document the breaker panel.  But

there was nothing to indicate that we had a fire here in any

of these panels.

THE COURT:  If the fire had originated

from an electrical source, what would you have expected to

see in this breaker panel?

THE WITNESS:  Typically, electrical fires

will trip breakers if the breakers function properly as they

are designed.  They can trip for various reasons.  They can

trip, number one, because of adverse electrical activity,

which would cause the -- an overload on the circuit and cause

it to trip.  It can trip because of thermal fire impingement

onto electrical circuits.  Branch circuits can cause breakers

to trip.  Also, breakers trip if fire is impinging on a

breaker panel itself, which can cause the breakers to trip if

they're in an on position can cause them to trip, so a trip

position.

But we didn't have this.  And I -- most of those

breakers were in the off position, had been tripped or put in

the off position by someone after the fire.  And I can only

assume that it would have been the fire department or the

management.

THE COURT:  That appears to be true of all

the photographs through 3141.

THE WITNESS:  Yes, sir, that's correct.

THE COURT:  3142 is showing -- again is

showing the bedroom of Room 2207, the burn pattern on the rug

between the beds.

THE WITNESS:  Yes, sir.

THE COURT:  3140 is showing the photograph

of a door facing.  Excuse me.  That's 3148.  Appears that the

door was kicked in.

THE WITNESS:  Yes, sir, that's correct.

That's the interior safety latch on the inside of the door to

Room 2207.

THE COURT:  Photographs 3154 and 55, what

are they showing?

THE WITNESS:  This is the balconies across

the breezeway directly across from Building 2.  I don't

recall what building number this was.  But you can see the

radiant heat damage on the vinyl siding caused from Building

2.  And it also is a mirror image of how the rooms are set up

on Building 2.

1          If you would look at the room on the lower or on the

2     second floor there on the left would be --

3                         THE COURT:  Same arrangement of 2207?

4                         THE WITNESS:  Yes, sir.

5                         THE COURT:  All right.  Okay.  I'm looking

6     through to the end of your photographs.  It doesn't appear

7     that there's anything else of significance; is that correct?

8                         THE WITNESS:  No, sir.

9                         THE COURT:  All right.  Anything further

10    on direct?

11                        MR. GRINKE:  If I can check my notes real

12    quick, Your Honor.

13          No, Your Honor.  I believe I will pass the witness.

14                        THE COURT:  Why don't we take a recess for

15    lunch here?

16                        MR. HOOD:  We have a really short cross on

17    this witness, Judge.  I think it would advance things along.

18                        THE COURT:  Very good.  Go ahead.

19                        MR. CHEEK:  Thank you, Your Honor.

20                         CROSS-EXAMINATION

21    BY MR. CHEEK:

22    Q      Good morning, Mr. Williams.  I assume it's still

23    morning.

24                        THE COURT:  No.  It's actually afternoon.

25    BY MR. CHEEK:

1    Q        I apologize.  Good afternoon, then.

2             You drafted a Rule 26 report in this case, didn't

3    you?

4    A        Yes, sir, I did.

5    Q        And you're familiar with its contents?

6    A        Yes, sir.  I'd have to refer to it, though, to be --

7    if you are going to ask me questions from it, I would have to

8    refer to it.

9    Q        Well, I will ask you the question.  If you need to

10   refer to it, we can do that, then.

11            In your Rule 26(f) report, you don't specifically

12   say that FBI Agent Siegling caused the fire?

13   A        No, sir.

14   Q        You previously testified that you first got to the

15   scene to conduct your inspection about five days after the

16   fire itself occurred; is that correct?

17   A        Yes, sir.

18   Q        Isn't it important to arrive at the scene within 48

19   hours of a fire when you're conducting an inspection?

20   A        Yes, sir, it is.

21   Q        Now, in your inspection you specifically noted that,

22   quote, there were no safety code violations noted; is that

23   correct?

24   A        None that I could identify myself, no, sir.

25   Q        Okay.  But it's fair to say that your report says

1    specifically there were no safety code violations noted, end

2    quote?

3    A       If you take it like it says, yes, sir.

4    Q       Okay.  So I am going to show you, if you will flip

5    to Government's Exhibit Number 6 in the white binder.  This

6    is a copy of the Huntsville Inspection Department's

7    investigation report.  And as where he previously referred,

8    it pertains only to Building 2.

9            You're aware that the City of Huntsville Inspection

10   Department inspected this property in June 2011; is that

11   correct?

12   A       I was not aware of that at the time when I conducted

13   my investigation.

14   Q       Sure.  That's fair because your investigation was

15   several months before; is that accurate?

16   A       Yes.

17   Q       But are you aware that the City of Huntsville

18   conducted an inspection of this apartment, this building in

19   June of 2011?

20   A       Well, I see here that they did, yes.

21   Q       The fire in question occurred in Building 2,

22   correct?

23   A       That's correct.

24   Q       Are you aware that the City of Huntsville Inspection

25   Department found work in Building 2 that posed, quote, a

1    serious threat to life, health, and safety of the building's

2    occupants, end quote?

3    A      I haven't read that.  I'm not familiar with that,

4    no.

5    Q      Well, if you will refer to the summary section in

6    Government's Exhibit 6, I'm looking at the last sentence in

7    that paragraph.  And I will read aloud.

8          It says, quote, records verification identified the

9    work that was performed without permit or inspection and was

10    a serious threat to life, health, and safety of the building

11    occupants.

12    A      I'm sorry.  I don't see that.  Where are we looking?

13                 MR. CHEEK:  May I approach, Your Honor?

14                 THE COURT:  Yes.

15    BY MR. CHEEK:

16    Q      Government's Exhibit 6, a summary section.

17    A      Okay.  I got it.

18    Q      Would you like me to read that sentence one more

19    time?

20    A      I don't think that's necessary.  I can see it.

21    Q      Did I read it accurately?

22    A      Yes, sir.

23    Q      I want to direct your attention to the section of

24    this report labeled "Code Violations," okay?  Can you please

25    read aloud Code Violation Number 5 for the Court?

1    A        It says, "open electrical splices in corridors at

2    light fixture."

3    Q        Thank you.  Can you please read aloud Code Violation

4    Number 6 for the Court?

5    A        "Open electrical splices in walls of all occupant

6    rooms."

7    Q        Thank you.  Can you please read aloud Code Violation

8    Number 7 for the Court?

9    A        "Open live electrical boxes wallpapered over in

10   bathrooms of various rooms."

11   Q        Do these code violations constitute fire hazards?

12   A        They do, but they have nothing to do with the cause

13   of this fire.

14   Q        Okay.  If you will flip with me to Government's

15   Exhibit Number 34.  It's in the same binder.

16            THE COURT:  Before you go from that, I

17   know that the Government places great weight on this, but

18   there is nothing in this exhibit, unless you are going to

19   bring me a witness to the contrary, that indicates that any

20   of these code violations existed on the date of this fire.

21   It begins with the statement, "Renovations under permit have

22   been taking place on Building Number 2 due to a fire that

23   occurred in September of 2010."

24            Now, I read this report as a finding of violations

25   for work that was done to renovate this building after the

1    fire.

2                      MR. CHEEK:  I hope we will be able to add

3    some clarity.

4                      THE COURT:  I'm telling you, you are going

5    to have to, otherwise this report is not going to be worth

6    the paper it's printed on.

7                      MR. CHEEK:  And I'm getting right there,

8    Your Honor.

9    Q       I am going to show you Government Exhibit 34.

10          Now, this is a copy of the City of Huntsville's

11   Inspection Department investigation report of Building Number

12   1.  If you will look to the street address or location.  Are

13   you with me, Mr. Williams?

14   A       Yes.

15                     THE COURT:  You said 4?

16                     MR. CHEEK:  34, Your Honor.

17   Q       On the street address and location it has Building

18   Number 1 listed there; is that correct?

19   A       Yes, sir.

20   Q       Are you aware that the City of Huntsville Inspection

21   Department found work in Building 1 that constituted numerous

22   code violations?

23   A       No, sir, I'm not.

24   Q       I want to direct your attention to the section of

25   this report labeled "Electrical" under the violations

1    section.

2              THE COURT:  Electrical system must meet

3    city electrical code as determined by the City of Huntsville

4    Inspection Department?

5              MR. CHEEK:  There's a violation section in

6    bold, and then down below that electrical is in all caps, and

7    it lists numerous violations that we'll get into.

8              THE COURT:  Now, this concerns a different

9    building, counsel.  What value is this?

10             MR. CHEEK:  The value is that --

11             THE COURT:  You want me to speculate that

12   these violations in Building 1 also existed in Building 2?

13             MR. CHEEK:  Well --

14             THE COURT:  Is that what you're asking me

15   to do?

16             MR. CHEEK:  The evidence will show that

17   the same exact violations appeared in this building and the

18   other buildings as were present in Building 2.

19             THE COURT:  Where is that evidence going

20   to come from?

21             MR. CHEEK:  These records that the parties

22   have stipulated to in terms of --

23             THE COURT:  These records come from, let's

24   see.  What is this?  What date?  This inspection occurred on

25   June 3rd, 2011.

1                        MR. CHEEK:  All of them were June 3rd,

2        2011, yes.

3                        THE COURT:  And this fire occurred in

4        2010.

5                        MR. CHEEK:  Right.

6                        THE COURT:  So, again, please help me

7        understand how these violations are relevant to the fire that

8        I'm being asked to examine here.

9                        MR. CHEEK:  Well, one of the theories in

10       the plaintiff's case is that these violations -- there's no

11       indication that these violations were present at the time of

12       the fire.  We have evidence showing that these violations

13       were present.  Granted, it's in June of 2011, but these same

14       exact violations, they're verbatim, were present not only in

15       Building 2, but also in Buildings 1 and 3.

16                       THE COURT:  But is there any evidence in

17       this case that the fire in question originated from any of

18       these electrical sources?  Yes or no.

19            Now, I have been all through this on your motion for

20       summary judgment, and I have not previously seen any evidence

21       that indicates this fire originated from an electrical

22       source.  Are you going to present evidence to that effect, or

23       are you just asking me to speculate that it could have

24       because these violations were determined to be in existence a

25       year later?

1          MR. CHEEK:  I think our expert will

2    testify a little bit more extensively on this.

3          THE COURT:  Well, why don't we hear from

4    him?

5          MR. CHEEK:  Okay.

6    BY MR. CHEEK:

7    Q       As part of your Rule 26(f) report, you reviewed

8    Mr. Wilkerson's report?

9    A       Yes.

10   Q       And you reviewed the statements that Mr. Wilkerson

11   obtained?

12   A       Yes, I did.

13   Q       Mr. Wilkerson concluded that the origin of the fire

14   was on the balcony of Room 2207?

15   A       That's correct.

16   Q       And he concluded that the cause of the fire was

17   careless use of smoking materials?

18   A       I don't know exactly how he worded it, but, yes,

19   something like that, yes, sir.

20   Q       And you reached the same conclusions as

21   Mr. Wilkerson?

22   A       I did.

23   Q       As part of your investigation, did you speak to any

24   of the occupants of the hotel at the time of the fire?

25   A       No, because all those occupants had gone after when

1    I got there to do my examination.  It was five days later,

2    so...

3    Q        At any point did you interview FBI Agent Siegling?

4    A        No, I did not.

5    Q        Your report specifically states, quote, the patron

6    staying in the room of origin was not present in the room at

7    the inception of the fire.  How do you know that to be true?

8    A        I'd have to look at that and see.  Which exhibit are

9    we on?

10   Q        We're in Plaintiff's Exhibit Number 6, I believe it

11   is, which is a copy of your report.  I'm sorry.  Exhibit 7.

12   It should be in the black binder.

13                       MR. CHEEK:  May I approach, Your Honor?

14                       THE COURT:  Yes.  Plaintiff Exhibit 2,

15   isn't it?

16                       MR. GRINKE:  Yes, Your Honor.

17   BY MR. CHEEK:

18   Q        So Plaintiff Exhibit 2, I believe, is the initial

19   investigation that Mr. Williams did, and then 7 is the Rule

20   26(f) disclosure.  Plaintiff's Exhibit Number 7, please.

21                       THE COURT:  What page?

22                       MR. CHEEK:  We're on Yedla 3166.  We're in

23   the second paragraph on that page, third sentence.

24                       THE COURT:  "The patron staying in the

25   room of origin was not present in the room at the inception

1   of the fire."  Counsel's question is:  Where did you obtain

2   that information?

3                THE WITNESS:  I don't recall, Your Honor.

4                THE COURT:  Is it -- did you speculate

5   that to be the fact from the next sentence, that there was

6   evidence of forced entry at the door to Room 2207, which is

7   the room of origin?

8                THE WITNESS:  Yes, sir.

9        Well, that -- the forced entry to there would -- the

10  reason for the forced entry would be from the fire department

11  was my assumption.  And according to -- according to Fire

12  Marshal Wilkerson, the fire department did have to force

13  entry into some of the rooms.

14  BY MR. CHEEK:

15  Q     Mr. Williams, I'm mostly interested in where that

16  statement came from.  I mean, you testified you don't recall,

17  I take it?

18  A     I don't recall where that came from.  I'm sorry.

19  Q     I want to direct your attention to a declaration

20  that you completed in April of 2014 in this case.  It's in

21  the docket at ECF 26-1.

22             MR. CHEEK:  I'm sorry.  May I approach?

23  Q     If you would flip to the last page -- the second to

24  last page for me, please.  Is that your signature there?

25  A     That is.

1    Q        And paragraph 13 of this declaration says, quote,

2    the patron staying in the room of origin was not present in

3    the room at the inception of the fire; is that correct?

4    A        And I can only assume or -- I can only state that

5    that came from my original report and that's why it's in

6    here.

7    Q        Okay.  So two times we've seen that statement?

8    A        Yes.

9    Q        Mr. Williams, I want to direct your attention to a

10   declaration you completed in June of 2014.

11              MR. CHEEK:  May I approach, Your Honor?

12              THE COURT:  Yes.

13   BY MR. CHEEK:

14   Q        If you will turn to the last page.  Is that your

15   signature there?

16   A        It is.

17   Q        Paragraph 13 of this declaration says, "person

18   staying in the room of origin was not present in the room at

19   the inception of the fire;" is that correct?

20   A        Yes, sir.  That's what it says.

21   Q        Thank you.

22              MR. CHEEK:  I have no further questions.

23              MR. GRINKE:  No further questions, Your

24   Honor.

25              THE COURT:  All right.  Let's take a

1    recess of an hour for lunch here.

2                              (Lunch recess.)

3                              THE COURT:  Who is the next witness?

4                              MR. GRINKE:  Michael Siegling, Your Honor.

5                                 MICHAEL SIEGLING

6    having been first duly sworn by the Courtroom Deputy Clerk,

7    was examined and testified as follows:

8                              THE CLERK:  State your name for the

9    record.

10                             THE WITNESS:  Michael Siegling.

11                             THE CLERK:  In which city and state do you

12   reside?

13                             THE WITNESS:  Oakland, California.

14                             THE CLERK:  Thank you.

15                             MR. GRINKE:  May I proceed, Your Honor?

16                             THE COURT:  Yes.

17                                DIRECT EXAMINATION

18   BY MR. GRINKE:

19   Q        Good afternoon, Mr. Siegling.

20   A        Good afternoon.

21   Q        How are you currently employed?

22   A        With the FBI.

23   Q        And do you have a job title with the FBI, or

24   department, or how would you tell somebody what you do?

25   A        I'm a special agent.

1    Q        Were you a special agent with the FBI back on

2    September 22nd of 2010?

3    A        I was.

4    Q        And you were -- at that time period you were staying

5    at the Country Inn and Suites here in Huntsville.  Do you

6    recall that?

7    A        Correct.

8    Q        And you were here for about a six-week period of

9    time to take a training course; is that right?

10   A        That's correct.

11   Q        What training course was it?

12   A        The Hazardous Devices School basic course.

13   Q        And I understand that that was not something that

14   the FBI required you to do, but it was something that you

15   were allowed to do in furtherance of your employment with the

16   FBI?

17   A        Correct.

18   Q        And while you were here for that training course you

19   stayed at the Country Inn and Suites?

20   A        I did.

21   Q        And the U.S. Government paid for the hotel room that

22   you were staying in?

23   A        They did.  They reimbursed my lodging.

24   Q        And did they reimburse your food while you were

25   here?

1    A        And that, as well.

2    Q        What about transportation?  Did you have a rental

3    car or --

4    A        I did not have a rental car.

5    Q        How did you get around?

6    A        Typically, I would be relying upon classmates if I

7    needed to go to a store, or restaurant, or something to that

8    effect.

9    Q        And Plaintiff's Exhibit 8, sir, if you wouldn't

10   mind, there is a -- should be a black notebook.  It might be

11   up there on the ledge.

12   A        Yeah.

13   Q        If you could look at Tab Number 8?

14   A        8.

15   Q        And you can -- in fact, you can move that one down,

16   move one out of the way, whatever is helpful to you.

17            And if I could ask you to take a look at that, I

18   will represent these were documents that were produced by the

19   Government in this lawsuit.  Do these appear to be a true and

20   correct copy of the travel documents that you submitted for

21   reimbursement with respect to your trip to Huntsville?

22   A        They do.

23   Q        Thank you, sir.  There was no other reason for you

24   to be in Huntsville on September 22nd, 2010, other than to be

25   present for the training course you were involved in?

1   A       Correct.

2   Q       And do you remember giving a deposition in this

3   case?

4   A       I do.

5   Q       In your deposition, and if we need to pull it out, I

6   don't want to trick you, we will get you a copy and we will

7   look at it.  But just in general, I believe you testified

8   that throughout your stay at the Country Inn and Suites

9   during that six-week period there were times when you would

10  have fellow agents or other folks that were staying at the

11  hotel come on the balcony with you, do you recall that?

12  A       True.

13  Q       And that sometimes they might have a beer or smoke a

14  cigarette out on the balcony with you, as well?

15  A       That's correct.

16  Q       The night of the fire, September 22nd, there wasn't

17  anybody else out there on the balcony with you?

18  A       I do not recall.

19  Q       Okay.  And you recall speaking with Dan Wilkerson of

20  the Huntsville Fire Department that evening?

21  A       I do.

22  Q       And you recall giving him a written statement?

23  A       Yes.

24  Q       And you did not write in your written statement that

25  someone else had been out there on the balcony with you?

1    A        I don't believe I did.

2    Q        I don't want to trick you.

3              THE COURT:  It will speak for itself.

4    Move on.

5    BY MR. GRINKE:

6    Q        It will.  Okay.  And, likewise, the defendant has

7    answered some discovery in this case Plaintiff's Exhibit 9,

8    if you could turn to that.  I'm sorry.  Make it 12.  9 was

9    the fire department statement, but we have already covered

10   that.

11             Plaintiff's Exhibit 12.  And if you will go to Page

12   8 of that document.  These are the Government's responses to

13   our discovery request where we ask for certain information.

14             Question Number 6 or Interrogatory Number 6 asks to

15   identify each person or entity other than you or the

16   plaintiff who you contend caused or contributed to the cause

17   of the fire, and the answer doesn't really answer anything.

18   It just says discovery is ongoing.

19             But you have never provided the Government or the

20   lawyers for the Government with a name or the identification

21   of anybody else who might have been on the balcony with you

22   on September 22nd; is that fair?

23   A        Okay.  Say that again.

24   Q        That was a long one.  I said a lot there.  I said a

25   mouthful.

1           Okay.  So have you ever provided the U.S. Government
2   or your employer or the lawyers with the identity or the name
3   of another individual who was out on the balcony with you the
4   night of September 22nd?
5                     MR. HOOD:  Lacks foundation, Your Honor.
6   I don't think that's a proper foundation for that question.
7   I don't -- it's ambiguous.
8                     THE COURT:  Well, I overrule.
9           Have you ever told anyone that there was another
10  person on the balcony with you the night that the fire
11  occurred?
12                    THE WITNESS:  I don't recall specifically
13  if I said that there was someone the particular night when
14  the fire occurred that they were on a balcony with me.  I
15  know there were people on occasion who were on my balcony and
16  we would smoke cigarettes together.  I don't recall if, in
17  fact, someone was with me that particular night.  Nor do I
18  recall if I gave previous folks asking about this, to include
19  Fire Investigator Wilkerson, the names or identities of any
20  of these folks.
21          Does that answer your question?
22  BY MR. GRINKE:
23  Q       Fair enough.
24  A       Okay.
25  Q       I'll take it.

1          Now, with respect to some of these other folks or

2     one of these other people that may have smoked cigarettes on

3     your balcony, in your deposition you mentioned that one of

4     the people might smoke a Winston.  Do you recall that?

5     A          I do not recall that.

6     Q          You don't?  Okay.  Well, I'll give you my copy.

7                     MR. GRINKE:  And this is Mr. Siegling's

8     deposition, Page 15.  May I approach the witness, Your Honor?

9                     THE COURT:  Yes, sir.

10    BY MR. GRINKE:

11    Q          And just lines 1 through 11.

12    A          Okay.

13    Q          I will let you read it real quick, and then I will

14    ask you a question.

15    A          Okay.  Then apparently I did.  I didn't remember

16    that.

17    Q          That's okay.  Okay.  So you might have had in your

18    mind when you gave your deposition that someone else out

19    there on the balcony during that six-week period might smoke

20    some Winstons?

21    A          And the deposition was two or three years ago.  This

22    incident occurred over five years ago, so I don't recall.

23    Q          Okay.  Fair enough.  Thank you.

24              You don't recall anyone else being in your room the

25    night of September 22nd?

1  A       I do not.

2              MR. GRINKE:  Thank you, Your Honor.  I

3  will pass the witness.  Thank you, sir.

4                      CROSS-EXAMINATION

5  BY MR. HOOD:

6  Q       Mr. Siegling, approximately how many members of your

7  training class were there altogether, if you recall?

8  A       Approximately 30.

9  Q       And out of those 30, approximately how many of those

10  would be from a non-federal agency; in other words, state and

11  local people going through the course?

12  A       In the vast majority of them.  I know for certain I

13  was the only FBI agent going through this course.  I believe

14  there was another federal agent.  So outside of the two, I

15  would say 28, then, were state and local officers.

16  Q       All right.

17              THE COURT:  Was the other federal agent

18  from ATF?

19              THE WITNESS:  Yes, sir, I believe so.

20  BY MR. GRINKE:

21  Q       And how did you extinguish your cigarettes when you

22  did smoke?

23  A       When I did smoke on occasion on the balcony I would

24  extinguish my cigarettes with the white styrofoam cup that

25  was provided inside my room that I would take out there

1  approximately half filled with water.  I would do that

2  consistently every time I smoked.

3  Q        And how often did you smoke on your balcony?

4  A        No particular pattern, maybe every day, every fourth

5  day.

6  Q        Describe for us what you remember about the alarm

7  and the fire.

8  A        These training days were very, very early days, so I

9  would go to bed early, probably 8:00 or 9:00 on most typical

10  week days.  What I remember about the night of the fire was

11  being awoken from a deep sleep with a very loud fire alarm.

12  Q        What happened next?

13  A        I got up, I looked around the inside of my room.

14  And it was -- adjacent to the bedroom was the kind of living

15  area with the kitchenette.  I looked out the window to my

16  balcony.  I saw no flames, no evidence of fire, nor did I

17  smell any kind of smoke.

18          And so it -- the thought process was, well, it could

19  be, you know, false alarm, somebody could have pulled the

20  alarm, not sure, but I still might have to get out of the

21  room.  And the thought was, I probably will go out on the

22  balcony or go out into the hallway -- correction -- and see

23  if I need to leave my room.

24  Q        What happened next?

25  A        Then probably within about five or ten minutes --

and this is a guesstimation on the time -- a loud knock on

the door.  It was one of my classmates.  We were all staying

on the second wing there.

He said, hey, there's been a fire and we need to

evacuate the building.  Okay.  I went back in, was there

anything I needed to take with me?  I think I only just put

on sweats.  I had a t-shirt and underwear on.  And then I

also went back out this time onto the balcony itself.

Q       You opened the door?

A       I opened the door.  I saw no fire on the base of the

floor of this balcony.  I saw a beer can.  I looked to my

left and approximately 6 feet away slightly above eye level

they were in deep flames confirming there had been a fire, I

needed to evacuate.

Q       So what did you do?

A       At that point, I went out.  There was two classmates

who were standing directly across from me in the hallway and

one I believe adjacent to them.  I knocked on their doors,

ensure their safety, making sure they were getting out.  And

people were sure enough getting out.

At that point, I went down one set of stairs.  And

the opposite side of where the fire was on this building was

a -- the driveway opposite the Waffle House where everyone

who had been evacuated in this building were congregating and

assembling.

1        A very short time thereafter, the fire department

2   came, put out the fire.  And then we were told to all

3   assemble inside a large conference room where the hotel staff

4   would address us regarding the fire.

5   Q       On a typical class day, what time would you go to

6   class and what time would you return?

7   A       Like I said, there were early morning days, so I

8   think 4:45 approximately.  There was a bus that would pick us

9   up from the hotel, about a 30-minute shuttle to Redstone

10  Arsenal where the HDS schoolhouse is located.

11       Every day was different according to the training

12  schedule.  And we would return approximately 4:00 to 5:00 in

13  the evening.

14  Q       When you returned to the Country Inn and Suites, to

15  what extent were you under the control and supervision of

16  your home office when you were there at the hotel?

17  A       When I was at the home -- I mean, I never fell under

18  the supervision of my home office, which would be San

19  Francisco division of the FBI.

20       There is, you know, their chain of command rests now

21  -- since it's a TDY when assigned as a student would be the

22  HDS faculty.  But it typically, at the end of the day, I

23  considered myself off duty with the expectation I was

24  studying for the numerous exams that were held throughout the

25  course.

1    Q        And how many exams would that be?

2    A        Probably every two or three days there was some kind

3    of quiz or hands-on practical application of what you learned

4    that you had to demonstrate competency of.

5    Q        To what extent, if any, were you allowed to use your

6    Government credit card to purchase cigarettes?

7    A        Huh-uh.  You're not allowed to do that.

8    Q        To what extent, if any, did you smoke inside your

9    room?

10   A        I never -- there was a -- there was an ashtray

11   inside the room, but I never smoked inside the room.  Only on

12   the balcony.

13   Q        To what extent did you frequent the -- your balcony

14   without smoking?

15   A        Pretty much every day.  I would either, you know,

16   like I said about the smoking, every one to four days, but as

17   far as everything I would go out there to get fresh air.  So

18   pretty consistently every day.

19                  MR. HOOD:  I think that's all I have.

20   Just a moment, Judge.

21   Q        The Country Inn and Suites -- and this is just for

22   the record -- was in no sense of the word federal property or

23   leased by the federal government or any of those kind of

24   relationships, was it?

25   A        No.  It was my understanding there was a contract

1    that they would use this hotel to make it convenient for the

2    buses to get the students to where they needed to be.

3                    MR. HOOD:  I have no further questions,

4    Judge.

5                    MR. GRINKE:  Nothing further, Your Honor.

6                    THE COURT:  Thank you.

7                    MR. HOOD:  May this witness be excused?

8                    THE COURT:  Yes, sir.

9                    MR. HOOD:  Thank you.

10                    MR. GRINKE:  Your Honor, the plaintiff

11    rests.

12                    MR. CHEEK:  Your Honor, at this time, we

13    would make a motion under Rule 52(c).  I have a paper copy

14    that I will submit to your deputy, if that's acceptable.

15        And very briefly, just to give Your Honor a brief

16    overview, we would argue that Agent Siegling was not within

17    the scope of employment, and that plaintiffs have not proven

18    their case by a preponderance of the evidence.  But we'll

19    incorporate our arguments --

20                    THE COURT:  All right.

21                    MR. CHEEK:  -- contained in the brief.

22                    THE COURT:  I will overrule that at this

23    juncture.  Let me hear your witnesses.

24                    MR. HOOD:  At this time, we would call

25    Dr. David Icove.

1                     DAVID ICOVE

2    having been first duly sworn by the Courtroom Deputy Clerk,

3    was examined and testified as follows:

4                     MR. HOOD:  Your Honor, is it okay if

5    Mr. Siegling is allowed to stay in the courtroom at this time

6    with the proceedings?

7                     THE COURT:  That's fine.

8                     MR. GRINKE:  No objection.

9                     THE CLERK:  Please state your name for the

10   record.

11                    THE WITNESS:  David Icove.

12                    THE CLERK:  In which city and state do you

13   reside?

14                    THE WITNESS:  Knoxville, Tennessee.

15                    THE COURT:  Spell your last name for the

16   Court Reporter, please, sir.

17                    THE WITNESS:  I-C-O-V-E.

18                    DIRECT EXAMINATION

19   BY MR. HOOD:

20   Q       What is your profession or occupation, sir?

21   A       I'm presently in an endowed chair at the University

22   of Tennessee.  I'm the underwriter's laboratory professor of

23   practice in the college of engineering.

24   Q       And that means you're a professor of engineering at

25   the University of Tennessee, then?

1    A       Yes, sir.

2    Q       Are you a member of any national engineering

3    academies?

4    A       Yes.  I'm a board certified forensic engineer with

5    the National Academy of Forensic Engineers.

6    Q       And what is -- in what forensic engineering field do

7    you specialize?

8    A       I specialize in the reconstruction of fires and

9    explosions.

10    Q       Do you possess any certifications in the field of

11    fire and explosion investigations?

12    A       Yes, sir.  I'm a certified fire and explosion

13    investigator through the National Association of Fire

14    Investigators.  I'm also a certified fire protection

15    specialist with the National Association -- National Fire

16    Protection Association.

17    Q       And what professional licenses in Alabama do you

18    hold, if any?

19    A       Since 2010, I have been a registered professional

20    engineer in the state of Alabama.

21    Q       And is that still active?

22    A       Yes, sir.

23    Q       Briefly describe for us your educational background.

24    A       I have four degrees in engineering, two in

25    electrical engineering, one in fire protection engineering,

and a doctorate in engineering science and mechanics.

Q        And briefly describe for us your professional history.

A        I have been a professional law enforcement officer at the federal, state, and local levels throughout a majority of my career specializing in fire and explosion investigations.  I've worked for the Tennessee and Ohio state fire marshals' office.  For four years I worked for the City of Knoxville Police Department.  And my last three years there was the supervisor of their Arson Task Force.

From 1984 to 1993, I served with the Federal Bureau of Investigation as a criminal profiler in their behavioral science unit, and eventually ended up running what is known as their arson and bombing investigative services sub unit. That sub unit was responsible for conducting and performing what they call criminal investigative analyses or profiles of serial arsonists and bombers.  And we tracked every arsonist and bomber we could find across the United States, and, in some cases, internationally.

One of the cases that I was first assigned when I arrived at the FBI was the unibomb case.  And I authored the profile that was used in that.

Q        When -- I believe you retired in 2005.  What job did you have at that time?

A        I had transferred from the FBI.  There was a group

of us from the FBI that went to work for the U.S. Tennessee

Valley Authority.  Some went to the Inspector General's

Office.  I went to the TVA police.  I retired as the

assistant chief of police for the criminal investigations

division.

Q       Now, briefly describe for us your publications, and

show those to the Court.

A       I have three expert treatises.  Excuse me.  Make

sure I speak in the mic.

I've published three expert treatises in the field

of fire and arson investigation.  The first is *Kirk's Fire

Investigation* by myself and Dr. John DeHaan.  It's the

international textbook on the basics of conducting fire and

explosion investigations.  And it's been accepted in numerous

courts.

The second textbook is entitled, *Forensic Fire Scene

Reconstruction*, and both myself and Dr. DeHaan and Gerald

Haynes authored that.  And that has to do specifically with

the application of the scientific method to assess and

reconstruct the scenes of fires and explosions.

The third textbook was written earlier in my career

prior to coming to work for the FBI.  It's entitled *Combating

Arson For Profit*.  And it was written as a handbook for FBI

agents, as well as United States attorneys, in how to handle

RICO arson investigations.

1  Q       Briefly describe now for us your teaching of fire

2  origin and cause courses.

3  A       Since 1976, I've participated in the instruction and

4  the development of courses for fire and explosion

5  investigators.  And those were done at the state, local,

6  federal, and international levels.  And these courses

7  specialize in my area in the area of forensic fire scene

8  reconstruction.  I also do a lot of instruction in the area

9  of expert report writing.

10  Q       Do you have an area of specialty in these courses

11  also?

12  A       Yes.  The four courses -- and I neglected to mention

13  it.  At the University of Tennessee, I oversee their graduate

14  program, which is a master's and a Ph.D. program in fire

15  protection engineering.  And in this program, we teach

16  forensic engineering, specifically looking at the issues

17  involving reconstruction of any type of fires or explosions

18  or hazardous assessment work.

19          One of the courses I teach is in enclosure fire

20  dynamics, which is the pinnacle of the field, basically

21  understanding the science of the development and progression

22  of fires.

23  Q       Do you also teach courses for state and local police

24  and fire units?

25  A       I do, sir.  And when I teach those courses, over the

last five years, I have adopted the -- as I've gotten older,

the attitude that I should give back to folks on my way down

that helped me on the way up.

And I give free courses at no charge to any entity

that asks for -- any public entity that asks for assistance

in doing fire and explosion investigation training.  And I

try to do approximately one every other month throughout the

country.

Q        Describe your role on the NFPA 921 and 1033

committees for the Court.

A        Okay.  The NFPA 921 is the -- basically the guide

for fire and explosion investigations.  I've been on that

committee starting in 1992 just right after they published

the first edition.  And I've been reappointed to that

committee through today and maintain an active membership.

The NFPA 1033 basically oversees the job performance

requirements for fire investigators.  They cross reference a

lot of the work that we do on the 921 committee, as well as

the publishers of the textbooks that we use require that the

1033 and 921 sites be there.

I'm also a member of the fire testing committee, as

well as the Forensic Engineering and Forensic Science

Committees for the American Society For Testing and

Materials.  And those standards are cross referenced very

frequently within our textbooks, as well as through NFPA and

1     921.

2     Q       And you're also the chairman of the committee on

3     fire reporting; is that correct?

4     A       I am.  That's the NFPA 901.

5             For example, the fire investigation report -- the

6     fire incident report that appears from Huntsville Fire

7     Department or through any department throughout the nation,

8     the design and the establishment and the standards of that

9     reporting belong to the committee that I'm the chairman of.

10    Q       What is your role with respect to what is called the

11    Texas Criminal Justice Project?

12    A       I'm on -- I will be going into my fourth year as

13    appointment to the Texas State Fire Marshal's Office Science

14    Advisory Workgroup.  That workgroup was established just

15    after the new state fire marshal arrived or took his oath in

16    the state of Texas.

17            He was very concerned because there was a case in

18    which the misreading of fire patterns, the misreading of fire

19    dynamics, and the use of negative corpus ended up in the --

20    what was determined to be later is the execution of a man who

21    really didn't commit that crime.  And the state fire marshal

22    was concerned.  He established this committee.

23            We review every innocence project case that is

24    presented before us.  We've done that for the last three

25    years.  We've also done and started a retroactive review of

1    every arson conviction in the state of Texas that was done by

2    the state fire marshal's office.  And we've also now started

3    to do cold case reviews in which cases that may be

4    approaching their statute of limitations are brought before

5    this panel, and the investigators ask for our advice for one

6    final shot, as far as leads.

7           We also serve in that capacity to make sure that

8    there's good science involved.  If there's cases presented

9    before us and we say there's no science to support your case,

10   we recommend that it not even be pursued.  So we act sort of

11   as a pier review panel in that aspect.

12   Q      What is the oldest fire site that you have ever

13   investigated?

14   A      Well, thank you for asking that.  I'm very proud of

15   the fact that every year I go to the United Kingdom to

16   participate in a field school.  And the school looks at Roman

17   sites throughout the country.

18          And the oldest fire case in which I've been involved

19   in that was in 330 A.D., which was a villa in a bathhouse

20   that was -- that was constructed there.

21          My role -- and I've been there -- this would be my

22   14th year going over.  My role is to assess the impact of

23   fire on those structures.  Some of the structures we think

24   were burned down by the locals after the Romans moved out.

25   And so they're very concerned about how did this happen,

where may the fire have originated, and trying to determine

origin and cause.  So I've done that.

          And also I've been under contract and done contract

work for the University of --

Q          Did you receive a certification for that type of

historical work?

A          I did.

Q          What was that?

A          I received a certificate and completion of course in

archeological scene investigations.

Q          How many fire origin and cause reports

investigations have you participated in and/or reviewed in

your career?

A          Thousands.

Q          How many times have you testified as an expert on

fire origin and cause in state or and federal courts in your

career?

A          To my best estimate -- and this is an estimate

because of the number of times that when I ran the arson

squad that we appeared in preliminary hearings.  But I would

say in cases that I was directly involved in, that I handled

from start to finish approximately 40 times I've testified.

Q          Okay.

A          As an expert.

Q          Are all of your opinions that you plan to express

1    today based upon a reasonable degree of forensic engineering,

2    along with fire origin and cause expert certainty, and in all

3    probability?

4    A        Yes, sir.

5    Q        Are your opinions based upon facts, data, and

6    methodologies that are recognized by experts in your field of

7    forensic engineering and fire origin, and cause expertise

8    that reasonably rely -- reasonably rely upon in forming their

9    expert opinions?

10   A        They do.

11   Q        Are your opinions based upon the expert reports,

12   depositions, discovery to date, and the facts and testimonies

13   presented here in open court at trial today?

14   A        They do.

15   Q        All right.

16                    THE COURT:  Are you at the point you are

17   going to ask him questions?

18            May I see your treatises, please?  Not to be

19   introduced into evidence, but just to -- I'm sure these cost

20   more than I can afford.

21                    THE WITNESS:  We have a contribution

22   system we normally do for the law libraries.

23            We have a lot of agencies that ask for copies and we

24   provide them gratis.

25                    THE COURT:  Court Reporter, one of the

authors is Vernon B. Wherry, W-H-E-R-R-Y, and J. David

Schroeder, S-C-H-R-O-E-D-E-R.

         And then this is the one that I'm most interested

in, John DeHaan.

         Will any of your testimony today draw on material

that's in any one or more of your published works?

                    THE WITNESS:  Yes, Your Honor.

                    THE COURT:  Okay.  You might want to

substitute Xerox copies of relevant pages in that case.

                    MR. HOOD:  Yes, sir, we can do that.

                    THE COURT:  If he cites a page.

                    MR. HOOD:  Right.

                    THE COURT:  All right.  Thank you.

                    MR. HOOD:  He might even donate copies to

the law library here.

                    THE COURT:  No.  I wouldn't want him to do

that.

                    THE WITNESS:  Thank you, Your Honor.

                    THE COURT:  Thank you.  Go ahead.

                    MR. HOOD:  All right.

BY MR. HOOD:

Q       Dr. Icove, in your Rule 26 formal expert report,

which is Government Exhibit 38, you have criticized the

investigation reports of both Fire Investigator Wilkerson and

plaintiff's expert Williams.  What are your concerns about

Wilkerson first, and then your concerns about Williams?

A        My concerns basically fit both of the investigators.

         My concerns are that the area of origin for the fire was wrong, that it did not occur on the second balcony, but it started on the third balcony.

Q        And why do you think they missed the fire's origin?

A        NFPA 921 has a specific chapter where there's a four-prong test on determining area of origin.  And the there's the four prongs consist of witness interviews, fire burn patterns, fire dynamics, and arc fault mapping.

Q        Explain what arc fault mapping is to the Court.

A        Arc fault mapping is a technique in which investigators trace the wiring within structures, or they could be vehicles.  It could be outdoor pavilions.

         And as the fire impinges upon these conductors, they may cause the wires to short.  The shorting is, in some cases, not enough to trip the breakers, but it's enough to produce physical evidence of shorting.

         We use that material, that information, to trace the development, and, in a large number of cases, the origin of the fire.  So it turns out to be a very helpful and scientifically based technique for fire investigators, especially in the area of determining origin for a fire.

Q        What are your specific concerns regarding their understanding of the fire dynamics?

1    A        Fire dynamics -- and I brought one more expert

2    treatise I did not write.  But there's an entire textbook on

3    fire dynamics.  And it is complex to the point where you have

4    to have a good appreciation of the science.  You have to have

5    a good underpinning of fire investigation to apply the issues

6    regarding fire dynamics.

7            And the dynamics basically -- do you need to see

8    this copy, Your Honor?

9                    THE COURT:  No.  Go ahead.

10                   THE WITNESS:  Basically, the -- what

11   they've described V patterns, fire plumes, all of such that

12   they've described today and previously in the reports may be

13   applicable, but I believe they've got the origin wrong in

14   this case.

15           And the fire dynamics becomes a crucial element in

16   understanding the origin and development of any fire.

17   BY MR. HOOD:

18   Q        So how do you -- do you apply the concept of fire

19   dynamics of the evidence that you have seen concerning this

20   fire?

21   A        I look at a large number of factors, which include

22   estimation of burn times, estimations of -- as far as the

23   damage caused by the fire, as well as areas of travel in

24   which the fire initiates and progresses.

25   Q        Would it be fair to summarize this area by saying

1    that their investigation's failed to recognize the fire on

2    the third level developed and then propagated to the second

3    level through the heat transfer and a drop-down on the

4    burning vinyl?

5    A        That would be a good approximation.  That's exactly

6    what happened in this case.

7             They missed the fact that the fire originated on the

8    third balcony and progressed through penetrations, as well as

9    through drop-down of flaming and ignited vinyl materials, as

10   well as penetrations through the walls from the third level

11   to the second level.

12   Q        What concerns do you have regarding their

13   understanding of fire patterns?

14   A        They -- and one of the areas that I teach is in fire

15   pattern analysis.  They may have grasped the issues regarding

16   the patterns, but the patterns they're looking at become

17   basically a secondary fire.

18            This is a fire that's very young in the progression

19   of what happened in this case.  The original fire -- and it's

20   my opinion started on the balcony of the third level, burned

21   for quite a period of time, and then penetrated.

22   Q        And how much time would that be in your estimation?

23   A        Well, it's more than -- it would be hard.  I would

24   say at least 20 minutes that it burned.  And it would be a

25   situation in which more engineering analysis would have to be

done.  But it burned for a good period of time until the fire
progressed to drop down onto the second balcony level.

         And then -- and then also contemporaneous to whoever
it was that discovered the fire, which we don't know, at that
point, the alarm is turned in, and then there's a period of
time -- from the witness observations, there's a period of
time until it's actually basically propagated down to the
second level.

Q        I understand that you may have had some concerns
concerning their understanding of some serious code
violations, but I think we've already covered that in some of
the evidence.

         I would ask you this:  What concerns do you have
regarding the additional testimony today with all --
including all the evidence that you have reviewed?

A        My concerns are that -- and that they failed to meet
the standards of care for what would be expected in a fire
investigation.

Q        All right.  And what specific concerns do you have
about the compact fluorescent light bulbs being used in the
fixtures that we have seen in some of the photographs today?

A        I have got grave concerns regarding the fact that
compact fluorescent lights were basically used in the
complex.  My concerns were that the existence of these lights
were not documented and that any of the fire investigation

reports, whether it be Mr. Wilkerson's or Mr. Williams's

report, there's no mention regarding the compact fluorescent

lights and CFLs, as they're called, have been subject to

recalls, especially the ones that are appear to be the same

design.  But since nobody documented that, we'll never know

if that was in the series of --

Q       Explain to the Court why the installation of them in

a downward fashion makes such a big difference.

A       I brought with me some compact fluorescent lamps.

And I did check.  These were not subject to recall.  This

model.  But it's very similar to the model that was there.

There's two reasons:  One is in -- documented in

*Kirk's Fire Investigation*, we felt that -- and this was -- we

published this -- I have to -- in 2012.  The compact

fluorescent lights had just started to be noticed by the --

by fire investigators.  So we put a section in here regarding

the cautioning of these lights.

What happens is if the light -- and it's designed

for the base to be an upright light to be in this thing

because all of the electronics, the ballasts, and everything

else, is in the bottom section.

When you turn it around like this (indicating), the

heat that's emanated from the globe passes back up through

and exposes that surface, especially if you have an enclosed

fixture that doesn't have a lot of ventilation.  From that,

1    we have seen studies and have documented it within our text

2    that that basically accelerates the life expectancy or

3    decreases the life expectancy of the bulb, and may, in

4    certain cases, cause the bulb to fail and start a fire.

5                    MR. GRINKE:  Your Honor, I have been

6    waiting for a good spot.  I didn't want to interrupt.

7          I need to object.  I don't believe any of this was

8    discussed in his 26(f) report.

9                    MR. HOOD:  Well --

10                   THE COURT:  Was it addressed?

11                   MR. HOOD:  It came up during the trial

12   today, Judge, and I've asked him to address it because it was

13   in his book.

14         If that's a problem, I apologize to the Court.  But

15   it seemed to be important, and I --

16                   THE COURT:  All right.  I will allow it.

17   Go ahead.

18   BY MR. HOOD:

19   Q       What is your -- moving on, Dr. Icove.

20         What is your opinion as to whether the documentation

21   in plaintiff's investigations met the standards of

22   professional care contained in NFPA 921 and 1033?

23   A       Both the fire investigators in this case woefully

24   disregarded or did not apply the standards of care for

25   documentation as would be necessary for a competent fire

1    investigation.

2    Q        Did they adequately document witness interviews?

3    A        No, they did not.

4    Q        Explain that.

5    A        Witness interviews, as I testified earlier, in

6    origin determination, the number one factor of the four-prong

7    test are witness interviews.  Witnesses can give you the best

8    information regarding the initiation of a fire, its

9    development, and its impact.

10           Also -- and I have had cases in which I've reviewed

11   where apartment complexes or hotels were investigated and

12   that it turned out that the mosaic of the interviews, the

13   interlocking independent interviews of the witnesses in a lot

14   of cases provided a very good roadmap to the origin of the

15   fire, as well as to its development.

16           So and in a case like this, it would have been very

17   important not only to identify who discovered the fire, but

18   also interview other potential witnesses.

19           Also there's a problem with, in some cases, not in

20   all, but individuals who report fires in some cases may have

21   set them.  And that's the major concern that we have here.

22           The final part was is that I was disappointed that

23   the 911 emergency call records were not preserved in this

24   case or at least were not presented in the initial file.

25   Those are normally the first thing that in a fire

1    investigation that we go after, especially with the richness

2    of the voice that may be at the end of the line that may or

3    may not be able to be identified, but at least we know in

4    context what happened.

5            So it's very important to get the witness interviews

6    as early as possible.

7    Q       Was the fire scene here adequately photographed

8    along with scene diagrams and photograph logs, as required by

9    the prevailing standards in 921?

10   A       No, they were not.  And that bothered me to the

11   point where I was confused as much as anybody else.

12           For example, photographs that are taken, NFPA 921

13   requires a photo log.  So you can take 50 photographs, but if

14   you don't have a log that tells not only the description of

15   what you've taken, but also the vantage point in which that

16   photograph was captured from is of little or no value.

17           I spent countless hours going through and matching

18   up photographs in this case to put back together what could

19   have been easily handled by a simple photographic log.

20   Q       Did the fire investigators in this case identify,

21   protect, and preserve critical testimony and documentary

22   evidence?

23   A       No, they did not.

24   Q       How so?

25   A       Just by not even capturing the first witness besides

1    Agent Siegling to this case.

2            The first witness who identified the fact that there

3    was a fire, that pulled the alarm or identified the alarm and

4    that notified folks that there was a fire at that facility.

5            That would have been the richest information

6    possible in this case.  And that was always -- NFPA 921 has a

7    data collection form.  It's the bottom of the form on the

8    first page who discovered the fire.  And that are the

9    identity and how they could be located again for that --

10   Q       Okay.

11   A       -- to be preventive.

12   Q       Was there any evidence of any destructive

13   examinations of evidence?

14   A       Yes, there was.

15   Q       What was that?

16   A       I was very concerned about the light fixture.  In

17   this case, more people, Mr. Wilkerson, as Mr. Williams was,

18   they were concerned about that light fixture.  And everybody

19   handled it or looked at it, examined it.  And then it's

20   apparently disassembled or examined and lost.

21           And that would have been, especially from what we

22   know today in the photographs about the compact fluorescent,

23   the CFL being in that lamp would have been crucial for us to

24   be able to take a look at it, especially with the history of

25   those lamps.

1           Whether or not that it started the fire, we'll never
2    know.  But it's a situation in which all potential hypotheses
3    have to be captured and eliminated and documented in an
4    investigation, so if that information came up in the future.
5           The bottom line is for documentation.  The test for
6    a peer review of any fire investigation or explosion
7    investigation that is done is whether or not that the
8    investigation is documented to the point in which it captures
9    all hypotheses, captures the witness interviews, patterns,
10   dynamics, all the things that were necessary for that so that
11   if an independent peer reviewer or another expert reviewed
12   that case file and he or she would have sufficient
13   information to arrive at a similar if not the same conclusion
14   as the original investigation.
15   Q      Please define for the Court what the NFPA 921
16   defines as a, quote, interested party in a fire and explosion
17   investigation.
18   A      NFPA 921 in Section 3. -- 3.3.110 defines an
19   interested party.
20          An interested party is any person, entity, or
21   organization, including their representatives, with statutory
22   obligations, or whose legal rights or interests may be
23   affected by the investigation of a specific incident.
24   Q      In your professional opinion under this 921
25   definition, who should have been considered as an interested

1   party in this fire investigation?

2   A       Well, there is a series of individuals or entities

3   that I would have considered had I been in Mr. Wilkerson's

4   shoes.  One would have been the United States Government.

5           The second would have been the previous or existing

6   contractors, whether they be subcontractors or companies who

7   renovated that structure or who had built it.

8           The third would have been any architects, engineers,

9   engineering firms, or designers that participated at the

10  building of the structure or its renovations.

11  Q       If the United States Government had been notified

12  early in this investigation as being a, quote, interested

13  party, what activities would you or any other retained fire

14  investigator have -- should have performed?

15  A       There's a list that I have taken a look at from

16  reviewing my notes.  It's not inclusive, but I believe that

17  it drives home the point.

18          If the U.S. Government was notified and I was

19  retained or a competent fire investigator was retained, they

20  would have conducted first a scene safety assessment.  They

21  would have determined whether or not it was safe to go onto

22  the scene, whether or not personal protective equipment would

23  be necessary, whether or not asbestos was present or not.

24          Also, they would look at code violations to see if

25  the structure is structurally sound, whether or not the

1    investigators could easily assess the scene safely.

2         After that, of course, contemporaneous at the same

3    time were to secure the scene, would have made sure that the

4    integrity of the investigation was protected; that is, an

5    inner and outer perimeter, basically sign-in sign-out logs.

6    It would have been the situation where that would have to be

7    done.

8         Also, interested parties can notify other interested

9    parties.  It's not uncommon in the investigation to come

10   across an appliance, piece of equipment, something in which

11   the interested parties say, we haven't notified these people

12   yet.  We think we better do it.  And they stop and curtail

13   the investigation and then make notice.  And it's the

14   responsibility of not only the owner or the person running

15   the investigation, but also one of the other interested

16   parties can also put another interested party on notice.

17        So, basically, it levels the playing field and it

18   makes it -- it makes it -- it preserves the integrity of the

19   investigation that everybody is involved at the same time.

20        From that, if other experts are needed you go out

21   and get them.  For example, if you need an electrical

22   engineer, need a fire protection engineer, structural

23   engineer, anybody that might be able to aid or provide

24   additional value to the investigation you can go ahead and

25   basically recommend.  In a lot of cases that's done.

Then identification of key witnesses becomes important.  And the -- in that the value of the key witnesses is not just one or two of the interested parties have access to that witness, but group -- on a group basis they have representatives just like a press pool that is able to identify these experts or identify these witnesses, take their statements, make sure that they're thorough and that they're recorded appropriately for the consideration.

Q      Well, Investigator Wilkerson indicated that he spent less than four hours out there investigating this fire scene. If you had been in charge, what is your estimate of an appropriate amount of time it would take to properly investigate a fire of this magnitude?

A      If all the interested parties had been notified, approximately one week.

Q      At this time, I would ask you to take a moment and use Government's Exhibits Number 1 and Number 14 and summarize and evaluate for us the Wilkerson and Williams' investigations and reports.

Your Honor, would you give him a moment to do that for us?

THE COURT:  Uh-huh.

THE WITNESS:  (Reviews documents.)  This says Investigator Wilkerson's analysis.

BY MR. HOOD:

1    Q        I would like to label this and mark this as

2    Government's Exhibit 37.

3                      THE COURT:  Wait a minute.  Is that a

4    revision one of you've already introduced?

5                      MR. HOOD:  Yes.

6                      THE COURT:  What was the original number?

7                      MR. HOOD:  The original was Government

8    Exhibit Number 1.

9                      THE COURT:  Why don't we call that 1-A?

10                      MR. HOOD:  Okay.

11                      THE COURT:  1-A.

12                      MR. HOOD:  Your Honor, I am going to put

13    this on the Elmo.  I am afraid of electronic things, so bear

14    with me.

15                      THE COURT:  You may have to slide it down

16    some.  Lisa, why don't you help him?

17                      MR. HOOD:  And this will be 14 --

18                      THE CLERK:  14-A.

19                      MR. HOOD:  And, at this time, I offer into

20    evidence as Government's Exhibits 1-A and 14-A Dr. Icove's

21    evaluations, which are summarized on these sheets.

22                      THE COURT:  All right.  They're admitted.

23                      MR. HOOD:  We're going to come back to

24    these so I can move this along a little bit quicker.

25    BY MR. HOOD:

Q        What theoretical approach did both Wilkerson and
Williams have in this case?

A        Their approach was basically a methodology called
the negative corpus.

Q        Okay.  Now, what is the negative corpus?

A        A negative corpus is the misuse of the process of
elimination while at the same time lacking any credible
physical knowledge, physical evidence of the fire scene.

Q        Okay.  And give us a brief history of the negative
corpus issue.  I know you know a lot about this topic, but
give us just a brief history of it.

A        Negative corpus, like I indicated in these other
cases throughout the country, negative corpus had been abused
by investigators who were trained on the technique or who
adopted this technique to arrive at conclusions that had
expectation bias, where they had a bias where they thought
that they knew what started the fire, or they grasped at the
first hypothesis that came to mind and said, I think this is
going to fit.  And they ended up cherry picking evidence or
ignoring evidence that might be able to support their area.

         Again, it's an unreliable methodology and has -- the
NFPA 921 committee, since its inception, struggled with it.
And as the issues -- as the new editions were released,
stronger and stronger language was put in, finally to the
point where they said this is an inappropriate technique to

1    be using in fire and explosion investigations.

2    Q       Now, what specific research have you done in this

3    area?

4    A       One of the areas that I looked at was in developing

5    a protocol such as the one that we've just placed.

6              MR. GRINKE:  I'm sorry.  Objection, Your

7    Honor.  None of this is in his 26(f) report.  This is all new

8    to me.

9              MR. HOOD:  It's generated here in open

10   court after he's heard all the evidence.

11             THE COURT:  The negative hypothesis,

12   negative corpus issue was raised in the testimony of prior

13   witnesses, so I will let him speak to it.  I think you raised

14   it.

15             MR. GRINKE:  Thank you, Judge.

16             THE COURT:  Go ahead.

17             THE WITNESS:  Myself and General Haynes,

18   who is the co-author with me on *Forensic Fire Scene*

19   *Reconstruction,* were very concerned after the unfortunate

20   case in Texas where a man was executed in a case in which a

21   case was improper, and non-science-related techniques were

22   used for his conviction.

23             We got concerned about it.  And we realized that

24   somebody had to come up with a protocol for use in conducting

25   complex fire investigations.  And, that is, investigations

such as these were large amount of damages done, issues that
are not just common, not a day-to-day fire investigation,
needed to be done.

So in looking for that, we looked at a specific case
-- and I used to work for the Navy department years ago as a
fire protection engineer, and remembered the USS Maine
incident basically from 1898.

In the USS Maine, there have been four
investigations that were done, and we thought that the
application of and the development of a protocol would assist
anybody in thrashing out the best investigation or the best
technique that was used.

So, like I said, the -- it was an unimportant
incident.  And the USS Maine was first thought to be, or at
least some people interpreted that it was an intentional act,
and we ended up going to war over this.

However, the Rickover investigation revealed the
fact that this was an -- after looking at the loss histories,
after looking at all of the damage assessments that they had
done, that this was not an intentional act of war, but this
was an accidental fire and explosion that occurred on that
class of ship that were shared with other classes of ships
that were occurring during that time period.

And so we went ahead and used that as our entry into
developing this protocol.

BY MR. HOOD:

Q        And is that protocol reflected in Government
Exhibits 1 and 14?

A        They are, sir.

Q        So -- and I don't think we need to get into this too
far, but you wrote an article and you used the four
investigations about the battleship Maine to exemplify what
needed to be done, in terms of fire investigations and
explosions; is that correct?

A        I did, sir.

THE COURT:  Was the Maine ultimately
determined to be a boiler explosion?

THE WITNESS:  It was -- through the
Rickover investigation, it was an internal explosion due to
coal, a special type of coal was being used at the time, so
it was determined to be an accident.

And what knowledge Rickover had, it was fascinating.
But what knowledge he had was he knew the loss histories.  He
knew the other types of incidents that had occurred during
the same time period.  He knew the type of coal, as well as
he had a lot more knowledge about the World War II
experiences of mines causing damage to the ships.

And all of that, the totality of the circumstances
he was able to arrive scientifically at a point to make that
determination.

1           THE COURT:  But we didn't get Cuba or the
2    Philippines back.
3           MR. HOOD:  I think that's a political
4    issue, Judge.
5           (Laughter.)
6    BY MR. HOOD:
7    Q       Okay, look.  How is the negative corpus issue
8    relative in these proceedings?  I mean, how did the
9    plaintiff's experts do this, or what did they do, okay?
10   A       They basically fit their theory and their hypothesis
11   to what happened with their observations.  And these may be
12   one of these situations where adequate training or
13   documentation in this case may have or some peer review may
14   have indicated to them that this is really not what happened.
15          For example, the worst issue in this case is the
16   exterior documentation of this structure.  We have one
17   photograph taken by Investigator Wilkerson of the exterior.
18   We have no other exterior photographs.
19          So when Mr. Williams came to the scene, had that
20   tarp been removed from that building, it would have been very
21   obvious to him or to other investigators what really did
22   happen in this case.  Especially the progression of the fire
23   from the third balcony to the second.
24   Q       And it's absolutely currently mandatory under 921
25   when it's dealing with negative corpus that you cannot use

1    speculative information in any part of the analysis, is that

2    a fair statement?

3    A        That's exactly right.  And NFPA 921, that's the last

4    sentence, but the most important sentence to that advice.

5    Q        What is your professional opinion as to plaintiff's

6    use of negative corpus to the facts in this case?

7    A        It produced unreliable results.  It resulted in

8    determining the wrong area of origin for the fire.  It also

9    resulted in the loss of critical evidence in this case.  In

10   defining too closely their area of origin, they used that

11   mantra to exclude anything out of that area of origin, which

12   could have been valuable in this case to determine what

13   really did start this fire.  And, basically, they resulted in

14   an incorrect allegation regarding the responsibility for this

15   fire.

16   Q        At this time, please take plaintiff's exhibit book,

17   Exhibits 1 through 38, and evaluate those exhibits bringing

18   forth your views as to origin and cause as contrasted to the

19   plaintiff's contentions that we've heard today.  Yeah.

20                MR. HOOD:  And I believe, Judge, he's

21   blown up a few of these because you can see the detail a

22   little bit better with some of the blowups.  We didn't blow

23   up everything, it's just, anyhow, he may be referring to some

24   of those from time to time to let you know.

25                THE WITNESS:  Your Honor, I have these

foam backboards.  What is the easiest way to display this for
the Court here, as well as for you?

                    THE COURT:  Well, we have those -- that's
Plaintiff's Exhibit 1 and 14?

                    THE WITNESS:  Yes.

                    THE COURT:  So we can look at that as you
talk through it.

BY MR. HOOD:

Q       But I think for right now let's go through the -- I
think we've covered that.  I'm trying to move this along.

        Let's go to the photographs.

A       Okay.  The first exhibit is GX-9, and that is an
enlargement of Mr. Wilkerson's photograph.  It appears to be
the only photograph of the nature that shows the true
development of the fire, as well as its expansion.

        What's happened is -- and is this mic still working
at this point?

                    THE COURT:  Yeah.  You're fine.  The Court
Reporter will let you know if she can't hear you.

                    THE WITNESS:  Okay.

        What's happened in this case is that it is very
obvious through the interpretation of the insult of the fire
on the structure the fire definitely occurred on the third
level here.

        What's not described and shown well enough in here

is the fact that it penetrated through the side area here,
communicated from that level to this level, because vinyl
siding is placed on that area and it is compromised.

So as the burning siding comes -- and we've got
another photograph that shows it very well -- it compromises
it.  And the siding ignites and drops down into that area
here (indicating).  So it's a pretty simple explanation of
what happened.

Also, as Your Honor noticed, the extreme damage to
this upper railing here could only be caused by a fire that
started and developed for a long period of time, as well as
the fact that it actually got up into the -- into the upper
structure here and burned.

Why the alarm system didn't pick this up, I don't
know.  I don't know about the integrity of the system of
whether or not that they had smoke, heat, or fire alarms
within the attic space that would have notified something
from that.

So this is the overall view.  Also, we can see the
positioning of the original light fixture on this side, as
well as we can't see it over here what happened to that, that
lighting fixture.  We do see the other one over here
(indicating).

THE COURT:  They were always to the side
of the door.

1                    THE WITNESS:  They were.  They were.  So

2    this -- and we have to thank Investigator Wilkerson for at

3    least providing this.

4         However, after that point, after that evening, the

5    assembly is tarp.  And unless you remove that tarp, you are

6    not going to get the information and the understanding about

7    the origination of the fire and its movement and the fire

8    dynamics to it.

9    BY MR. HOOD:

10   Q       And we do not have, do we, any photographs taken in

11   the daylight of the entire area?

12   A       We do not.  And in a case like this, in

13   investigations that I have been involved in and continue to

14   be involved in, usually get a cherry picker up there and you

15   get somebody at a higher vantage point to be able to help

16   document some of this evidence that you normally couldn't get

17   from other vantage points.

18        Also, an exhibit like this is very important for

19   conducting witness interviews.  When you have a witness that

20   says, I saw the fire start right here (indicating), this is

21   where the first flicker, and then you have the second

22   witness, the third witness, the fourth witness, and you have

23   a constellation of witnesses that the mosaic that

24   independently they point to the same area, that is one of the

25   factors in origin determination.  It also -- and there's been

1   some recent articles on this, peer-reviewed articles that it

2   meets the requirements for the scientific method of basically

3   taking the collage of witness interviews and applying that to

4   making an origin determination, or at least adding the value

5   to it to what is going on.

6          So we thought this is a very important photograph.

7   But, unfortunately, this is the only photograph that exists

8   from that.  And had it been taken during the daytime, we

9   could have gotten a lot more -- a thousand percent more

10  investigative value from this.

11  Q        Okay.  What is your next photograph?

12  A        The next photograph is GX-18.  And this is after the

13  facility was tarped.  Someone was able to get up underneath

14  it.  And I assume it was Investigator Williams was able to

15  take this photograph.

16         It shows basically looking upwards from the second

17  level to the underside of the third.  And from that it's very

18  apparent that the drop-down of material has occurred here.

19         So we've got other information along this that helps

20  us out with that.  We still also have the green paint.  And

21  until other photographs have -- that have surfaced we weren't

22  aware of the fact of the value of that green paint,

23  especially from its inside, to be able to look at.

24         You can see in this paragraph here where the

25  penetration is, that when the fire from the level above this

1    allowed the fire to transfer and to propagate down they

2    compromised this vinyl and it dropped down into the corner.

3    How we know this is from a companion photograph that exists,

4    a set of companions GX-20.

5        And GX-7 basically show us looking out the door of

6    2207.  And there's some significant information that comes

7    about from that.

8        When Investigator Williams testified, he said he

9    thought he saw a horizon; basically, the upper layer of heat

10   as it's extended down provides a horizon across there.  What

11   we realize is that's a shadow from the flash from the light

12   because we see in this photograph, which is GX-7, the impact

13   of the fire on the third level as it's penetrated through the

14   platform or basically the third level.  And it's actually

15   started to progress down.  And this circular pattern here is

16   from radiation from above.

17       Not only did the radiation occur, but you can also

18   see where the vinyl siding has fallen off the wall.  And it's

19   puddled down in the corner very similar to the puddle on the

20   other side where the investigators originally saw what they

21   thought to be the area of origin.

22       Another tale -- and I call these things tales --

23   about drop-down is that in GX-20 here's a piece of vinyl

24   hanging on the railing.  So that definitely shows that from

25   above vinyl, molten vinyl, ignited vinyl has dropped down

from the third floor to the second floor during that fire

development before the fire is actually even -- wrests to

this point.

The next set of photos, and the best way to compare

the second balcony to the third balcony is to look at this is

the first balcony after it was cleaned, this is GX-29.  There

are several pictures in different stages.

This is GX-27.  GX-29 shows basically the fire as

the investigators thought were where it had originated in the

corner.

GX-27 is the -- is its twin up on the upper level.

And just the comparisons of the paint.  And in this -- on the

second level balcony you can see the absence of any amount of

the paint being burned off the surfaces with the exception of

the upper railing.

Had their hypothesis been true and a fire started in

that area, the fire would have -- and especially that being

the initial start of the fire, we'd been expecting the same

amount of damage as we saw up on the third level.  That's

what the second level should have looked like.

There's not even at this point here -- and it shows

you how young this fire is -- there's hardly even any damage

to the green paint along the surface.  So what this tells me

is, is that the -- this is a secondary fire due to what they

call drop-down of materials.  And the drop-down is from here

1   (indicating).

2            Also, as Your Honor saw before and you picked up, is

3   that the loss of material is greater in this area than it is

4   in here.  And it's been compromised.  So a competent and

5   thorough investigation on the third level would have revealed

6   how this penetration occurred down to this area.  And it

7   would have been very, very important in this investigation.

8            THE COURT:  I think the previous witnesses

9   explained the differences in those two photographs, if I

10  understood their testimony correctly, to be that the fire

11  started on the lower level, 2207, and it goes up the wall, it

12  reaches the bottom of the decking of the third level balcony,

13  it mushrooms out and around, and it goes then to the third

14  level.  And it's that mushrooming that took the paint off of

15  the hand railing and railing of the third level balcony.

16       What do you have to say about that hypothesis?

17            THE WITNESS:  That doesn't hold true to

18  the basic physics and science in engineering that goes for

19  this.

20       I do a lot of work in plume theory.  And this is

21  opposite.  Their approach would be opposite to what any

22  scientific established method would be in interpreting

23  plumes.

24            THE COURT:  How do you interpret the

25  differences between the two, the conditions of the two

1    handrails, which is stark?

2                        THE WITNESS:  One of the things that tells

3    is the top of the railing.

4                        THE COURT:  On the second level?

5                        THE WITNESS:  On the second level.  There

6    is some -- there's another photograph on the interior and

7    there's also one in the book.  If you can give me a second.

8                        MR. HOOD:  Try 20.

9                        THE COURT:  20 is of the interior of the

10   room.

11                       MR. HOOD:  Oh, I'm sorry.  19.  I misread.

12   I apologize, Your Honor.

13                       THE COURT:  Well, the thing that struck me

14   that I'd like Dr. Icove to speak to is comparing Government's

15   Exhibits 27, which is the third level balcony, and 29, which

16   is the second level balcony.

17                       MR. HOOD:  Correct.

18                       THE COURT:  Not only are the -- is there a

19   stark difference between the handrails on the two levels,

20   metal handrails, but a great deal more material has been

21   burned off of the north wall of the third level than has been

22   consumed by the second -- on the second level.

23                       THE WITNESS:  Right.  And, Your Honor,

24   this morning --

25                       THE COURT:  Which would indicate to me --

and I am a layperson -- which would indicate to me that the
fire had burned longer on the third level than the second
level.

THE WITNESS:  Your Honor also picked up on
the subtlety of this regarding the painted surfaces of the
flooring here.

If you go by the hypothesis that the fire originated
here and burned for 20 minutes, 25 minutes, you would have
expected those surfaces and that -- those plankings to be
compromised, and it would look like that (indicating), but it
doesn't.

And so this is an unfortunate incident in which fall
down of materials -- and we saw it in some of the other areas
where the entire decking is coated with materials from above
that we're seeing.

So there's also other indicators.  And I've
examined -- there's some of the thousand or so photographs.
I've examined the windows along here (indicating).
Everything is from heat or radiation from above is doing that
damage to those areas there.

It's not as obvious here, but --

THE COURT:  Except for one photograph,
which shows the interior of the Room 2207 and the window
appears to have exploded into the room.  And here's one.
This is Government's Exhibit 21.  It is in the lower

1    left-hand corner of the window closest to the north exterior

2    walls.

3                     MR. HOOD:  That's it, yeah.

4                     THE WITNESS:  Yeah.  And that is damage

5    from initial -- from the secondary fire that has dropped

6    down, just the localized heat in that area caused that window

7    to compromise.  You can actually calculate the temperatures

8    for that.

9          If that fire had developed to the period of time

10   that they would have to have it, the 25-minute window, for

11   example, it would -- that window would look like that on the

12   third level (indicating).  This window is directly above it.

13   It's completely --

14                     MR. HOOD:  Give the exhibit number.

15                     THE WITNESS:  That's GX-25.  That window

16   is gone.  And --

17                     THE COURT:  The entire window?

18                     THE WITNESS:  Entire windowpane is out.

19   And I don't know if the fire service did that during some of

20   their overhaul work, but a window of this construction

21   exposed to a fire of that duration would be compromised and

22   I'm sure would fail from that.

23                     THE COURT:  Some of the photographs that

24   the plaintiff produced in the book are actually clearer that

25   are in the Government's exhibit book, and I want to direct

1    your attention to one or two.

2            Pick up the plaintiff's trial exhibit notebook.

3    Turn to Tab 5.  And in the lower right-hand corner of each of

4    the photographs there's a Bates stamp of Yedla, that being

5    the Indian family that owned this hotel management, managed

6    it, Yedla and some four digit number.  And the photograph I'm

7    looking at is Yedla 3021.

8            Now, the best way to find it is to find Yedla 3019,

9    and then go two beyond that.  Tell me when you've found it.

10                   MR. HOOD:  Which number again, Judge?

11                   THE COURT:  Yedla 3021.

12                   MR. HOOD:  Okay.  I've got it.

13                   THE COURT:  Maybe this young lady will put

14   it up on the screen for us.  I think that's what she's been

15   employed to do here.

16                   THE WITNESS:  It's this one, Your Honor.

17                   THE COURT:  That's it.  All right.  Now,

18   look.  This is something that's intrigued me.

19            I've been told that this is a photograph of the

20   northeast corner where the fire originated.  Excuse me.

21   Northwest corner of the balcony on the second level.  But

22   right to the left there is some wall covering removed, and

23   you can see the two-by-four studs of the exterior wall have

24   no burn on them whatsoever.

25            What's your explanation of the lack of any burning

1   to those two-by-four stubs where, as we see a great deal of

2   penetration of the fire on the third level into the interior

3   walls?

4                    THE WITNESS:  Right.  This -- the reason

5   that they're bare -- and I'm only assuming this is because

6   that during the overhaul, as well as during the

7   investigation, somebody may have removed the wall panelling

8   from that place which protected those elements to check for

9   extensions of the fire, to check to make sure that the -- it

10  was not a rekindle of the fire.

11       So what's been removed here has protected the studs

12  from that.

13  BY MR. HOOD:

14  Q       Wouldn't you expect if the fire had started in that

15  corner that those wooden studs would have been burned?

16  A       I would have expected it.

17                   THE COURT:  Yeah.  There's another

18  photograph, and I can't tell the number on it.  I will have

19  to go forward and come back.

20       All right.  Here, let's go to Yedla 3066.  Throw

21  that up on the screen for us.

22                   MS. KANTOR:  Yes, sir.

23                   THE COURT:  All right.  Here, Yedla 3066,

24  we see this.  If you will look at your screen.  Here on the

25  left side under the window and to the side of the window are

the studs that I just mentioned to you.  You will see that
there is some exterior burning on this two-by-four up right
here (indicating), and then to the right is the wall that
separated the two balconies on the second level.  Notice the
marked difference in the burn on this wall as compared to
that wall.  And what's your explanation for that difference
if the fire did, in fact, originate here in the northwest
corner where I'm pointing my pencil eraser?

              THE WITNESS:  If the fire did occur in
that northwest corner, then you would have expected similar
if not the same damage --

              THE COURT:  It would have been similar
damage to these two walls?

              THE WITNESS:  Right.

       What I expected was is that those contained within
those walls was how the fire progressed, one of the methods
that it progressed from the third level down to the second
level.  And then as it came down through there it actually
was compromised.

       Also, you have to remember that the melted flaming
vinyl on those walls and those surfaces were distributed
throughout that -- throughout that porch on the second level.

              THE COURT:  Okay.  You can only ride a
Court Reporter as far as a horse will go.  Let's take a
ten-minute recess here.

1              MR. HOOD:  All right.  I'm almost done.

2              (Recess.)

3  BY MR. HOOD:

4  Q       Couple of cleanup items.

5       Dr. Icove, very briefly describe what you know about

6  self-extinguishing cigarettes, and, in general, Marlboro

7  Lights, in particular, in this regard.

8  A       I'm aware that based upon the Fire Safe Cigarette

9  Act of 1990 that cigarettes were mandated after that time

10 period to reduce their propensity for continuing to burn if

11 they're left unattended.

12      Specifically, I identified a research paper, a

13 peer-reviewed paper that was published in tobacco control in

14 2005 on the effect of the New York State Cigarette Fire

15 Safety Standard on ignition propensity, smoke constituents,

16 and the consumer market.

17      I was impressed by the study by the fact that they

18 just didn't take the Government at their word, and conducted

19 their own investigation and test.  And, in particular, they

20 looked at the several brands, including the Marlboro Lights.

21      They used a test that was mandated by the American

22 Society of Testing Materials that was set aside for doing

23 those tests.  And as a result of them, they looked at -- in

24 their test of the percentage of the full length burn that you

25 would expect from these different cigarettes.

1        A Marlboro Light cigarette left by itself will only

2    burn 5 percent of its total length.

3    Q        And that's due to the asbestos rings?

4    A        Yes.

5    Q        And that testing was done on mattress materials and

6    not wood?

7    A        It was done on a simulation for what mattress

8    materials would be.  It was on filter paper.

9                        MR. GRINKE:  I will object as to

10   foundation.  I don't believe that was before 2010.

11                       THE COURT:  I think you said it was.

12                       THE WITNESS:  This study is published in

13   2005.

14                       THE COURT:  2005.  That's what I thought I

15   understood him to say.  Overruled.

16   BY MR. HOOD:

17   Q        And, for the record, I'd like to hand you what I

18   have previously labeled and marked as Government's Exhibit

19   Number 37.

20                       MR. HOOD:  Let the record reflect I have

21   shown a copy to opposing counsel.  May I approach the

22   witness, Your Honor?

23                       THE COURT:  Yes, sir.

24   BY MR. HOOD:

25   Q        I hand you what's previously been previously labeled

1    and marked as Exhibit 37.  Can you identify that for the

2    Court for us?

3    A       That is Page 446 out of the textbook *Kirk's Fire*

4    *Investigation, Sixth Edition.*

5    Q       And what does this section reference?

6    A       It references different lamps and lights that could

7    potentially be causes of fires.

8    Q       And you're responsible for this publication?

9    A       I am, sir.

10   Q       And that's in your current edition of your book?

11   A       Yes, sir.

12                   MR. HOOD:  Okay.  I would offer that as

13   Government Exhibit 37.

14                   THE COURT:  Admitted.

15   BY MR. HOOD:

16   Q       In conclusion, is a cigarette on the balcony of

17   Agent Siegling's room 2207 the likely origin and cause of the

18   fire in your opinion?

19   A       No, sir.

20   Q       Is there any evidence in your view as a forensic

21   engineer evidence to support this allegation?

22   A       Yes.  There is no underpinning in the area of fire

23   dynamics to support a cigarette like this igniting a plank on

24   a balcony.

25   Q       To a reasonable degree of forensic certainty, what's

1 the most likely area of origin of this fire?

2 A  The third floor exterior balcony.

3 Q  And what, in your opinion, is the most likely cause

4 of the fire, if any?

5 A  The cause in this fire should have been listed and

6 should be listed as undetermined.

7 Q  And why do you say that?

8 A  NFPA 921 and the 2014 edition addresses cause

9 undetermined, and it states, basically, in the circumstance

10 where all hypothesized fire causes have been eliminated and

11 the investigator is left with no hypothesis that is evidenced

12 by the facts of the investigation the only choice for the

13 investigator is to conclude that the fire cause or specific

14 causal factors remains undetermined.

15   So, and it also indicates in that section -- this is

16 Section 19.6.5.1 -- that it's improper to base hypotheses on

17 the absence of any supportive evidence.  And it also

18 concludes that it is improper to opine on the specific fire

19 cause ignition source, fuel, or cause classification that has

20 no evidence to support it even though all other hypothesized

21 elements were eliminated.

22 Q  In your opinion as a forensic engineer expert in the

23 field of fire and explosion and investigations, did the fire

24 investigations of Wilkerson and Williams meet the present day

25 accepted standards of care?

1    A        No, sir, Judge, they did not.

2    Q        Please answer the questions the plaintiff's counsel

3    may have at this time.

4                         CROSS-EXAMINATION

5    BY MR. GRINKE:

6    Q        Did you work nine years for the FBI?

7    A        Yes, sir, I did.

8    Q        Company man.

9             All right.  Have you investigated previously fires

10   that were found to have originated on a balcony?

11   A        I have seen incident reports and reviewed reports of

12   fires on balconies, but I personally cannot remember a case

13   where I've investigated a fire on a balcony, but I have

14   reviewed other cases in which that has happened.

15   Q        If I were to tell you hypothetically -- I gave you a

16   clean picture of the side of this hotel, no fire, and I said

17   assume with me that a fire originated from a discarded

18   cigarette on the northwest corner of the second story balcony

19   and draw me a picture of what the burn pattern would look

20   like under basic fire sciences and flame spread theories, it

21   was up and out, wouldn't you draw this exact same fire

22   pattern?

23   A        If I didn't know about the preexisting fire above

24   it.  And this is a secondary fire --

25   Q        Well, now, wait a minute.  If you will answer my

1    question.  If my hypothetical -- I'm not talking about a

2    preexisting fire.  Wouldn't this fire look exactly like it

3    does now?

4                   MR. HOOD:  Objection.  Not relevant.  That

5    hypothetical has nothing to do with the facts of this case,

6    Judge.

7                   THE COURT:  Well, it is a relevant

8    question, but his hypothetical is not including all of the

9    facts.  You have to take into account in your hypothetical

10   burn pattern of the third floor, as well.  So...

11   BY MR. GRINKE:

12   Q       Yes.  If I could clarify my question, then.

13           I do want you to consider -- set aside your opinion

14   from a hypothetical that a fire started on the third floor.

15           But if I told you that a fire originated on the

16   second floor, and all other things being equal -- the

17   weather, the occupancy of the hotel, the fact that the third

18   floor is empty, and all of that -- and you were just to draw

19   a picture of burn patterns on the exterior of the hotel

20   building, wouldn't it look just like the burn pattern we have

21   here?

22   A       No.  I would have to have more information in

23   order -- what you're talking about is plume theory.  And

24   plume theory has so many different factors that are involved

25   that is not easy to come up with a generic, even though NFPA

1    921 likes to make generic figures, no -- and as you brought

2    up originally, in the introduction to NFPA 921, no two fires

3    are the same.

4    Q        Okay.  And, in fact, in your 26(f) report, you

5    utilized at least one of these 921 -- I'm sorry, Your

6    Honor -- at least one of these -- I was trying to get to

7    where you could see me.  At least one of these 921 diagrams

8    on fire spread.

9    A        Can you refer to the page that you're speaking of?

10   Q        You don't recall it in your report?

11   A        It's in the end section, but just to refresh

12   everybody in the courtroom.

13   Q        So you did find it?

14   A        I am.

15                    THE COURT:  What's the plaintiff exhibit

16   number you're referring to?

17                    MR. GRINKE:  It would be Defendant's

18   Exhibit 36, Your Honor.

19                    THE WITNESS:  I used on Page 63 of 96,

20   it's Document 27 -- 21-3, which is labeled at the top 21 of

21   26.

22   BY MR. GRINKE:

23   Q        It's also in Defendant's Exhibit 36, Page 63.

24   A        That is not the identical --

25   Q        You're right.

1    A        What this is -- do you want me to answer, or do you

2    have a question?

3    Q        Well, my question was, I know you say, well, NFPA

4    921 is just basic, but you even thought fit to put one of

5    their examples in your report.

6    A        I did.

7    Q        Okay.  And even though the NFPA 9212 basic flame

8    theory is that you will have a small plume at the originating

9    place that spreads upwards and outwards.  You want to turn

10   that on its head in this case and say that a massive fire

11   started up above, and then funneled down like a tornado to a

12   very narrow area down below.

13   A        Let me respond to what the intent was of Figure 9.

14           What you're describing as a two-dimensional

15   representation of a fire plume or a fire development, Figure

16   9 is a lot more advanced than what a simple stick figure as

17   you're describing.

18           This is describing three-dimensional explanation for

19   the origin and development of a fire.  And it also includes a

20   heat and flame factoring to describe the direction of the

21   fire.  So this is -- has what more fire dynamics in it than

22   just an up and out photograph that you're -- or a diagram

23   that you're talking about.

24   Q        Okay.  It has all that other information, but two of

25   the fixtures in this diagram show a very narrowed down low

1    fire that spreads upward and outward, correct?

2    A        Originating from a couch.

3    Q        Okay.

4    A        Which is different from a different material,

5    different heat release rate, a whole other different set of

6    variables than what we're talking about of a balcony, of an

7    apartment or a motel.

8    Q        Where in 921 does it provide information different

9    than what you have cited if you have an interior fire from a

10   piece of furniture moved outside on a balcony to a specific

11   place?  Where is the different standard in diagrams?

12   A        There are no general set of universal diagrams to

13   describe every separate scenario that could ever happen at a

14   fire.

15   Q        Defense Exhibit Number 2 is your -- this is from

16   your book, is it not, the kind of list and study of the

17   scientific method to be used in a fire investigation?

18   A        It is.

19   Q        And the very last on step Number 6, the last bullet

20   point, what does that say?

21   A        Eliminate other fire causes if possible.

22   Q        And, in fact, NFPA 921, even at the area that calls

23   for or talks about a negative corpus, starts out by saying

24   that elimination of other potential courses of ignition is an

25   integral part of the investigation, doesn't it?

1    A        Can you point that out to me?

2    Q        Sure.

3    A        Which -- what you're referring to in that.

4    Q        Let me get to it in here.  2014 edition, which is

5    relied upon by you in this case, Page 921-203.

6    A        Under appropriate use?

7    Q        Yes.

8    A        19.6.5.

9    Q        Yes, sir.  And it says the process of elimination is

10   an integral part of the scientific method.  Alternative

11   hypotheses should be considered and challenged against the

12   facts.

13           Isn't that, in fact, exactly what Mr. Wilkerson and

14   Mr. Williams did in this case?

15   A        No, they did not.

16   Q        Okay.  And I know you have testified that you

17   believe that they just backed into their opinions with no

18   evidence whatsoever to support it, but you want to ignore

19   their testimony that they relied upon the burn patterns, the

20   physical evidence of cigarettes that were found directly

21   below the area of origin, the statements by Mr. Siegling that

22   he smoked on his balcony, the fact that the hotel room above

23   2207 was vacant and not occupied, and the lack of burning to

24   any of the neighboring rooms or balconies.

25           You want to ignore those items that they relied on

1 and say they relied on nothing at all?

2 A        Let me describe to you the intent of NFPA 921 and

3 its relationship to the expert treatises that we have.

4        NFPA 921 is three to five years behind the expert

5 treatises that are published.  And the reason they're behind

6 is for the general acceptance and for the inability to push

7 concepts through.

8        What should have been done by the investigators is

9 to use what we call and we addressed the appropriate use

10 section of the process of elimination.  What's been

11 substituted has gained general acceptance in the community is

12 the use of the Bilancia Matrix, in which compares and

13 contrasts all of the ignition sources and potential fuel

14 packages.  And that's contained in *Kirk's Fire Investigation*,

15 and I believe we also have it in the *Forensic Fire and*

16 *Reconstruction*.

17 Q        Sir -- I'm so sorry.  I don't want to be rude.  I'm

18 sure your counsel will have an opportunity to ask you direct

19 questions on that, but my question is --

20                MR. HOOD:  You are being rude.  Let the

21 witness answer the question.

22                THE COURT:  Just a second.  The Court

23 Reporter can't take two down.  What's your objection?

24                MR. HOOD:  My objection is he's

25 interrupted the witness's response.

1            THE COURT:  Let the witness finish and you

2    can come back.

3            THE WITNESS:  The committee, in struggling

4    with the process of elimination, couldn't get it resolved to

5    the point that we did.

6            And not the process of elimination where you, as an

7    exhaustive approach of looking at every potential hypothesis,

8    the answer to the question is the use of the Bilancia Matrix,

9    which every single fuel package, as well as every single

10   potential ignition source, is cross-compared.

11           And the problem with your case, with the plaintiff's

12   case, is the -- you too narrowly defined the area of origin.

13   And what you did was you ignored outside of that region.

14           And that may have been done consciously or

15   subconsciously or unconsciously.  But that approach is not

16   the way to go.

17           The approach that's been accepted in the community

18   is the Bilancia Matrix approach, in which for that entire

19   first floor, second floor, third floor, that building, all

20   the potential ignition sources and the fuel packages are

21   examined and exhaustively thrashed out to make that

22   determination.

23           So if you're asking have I adopted what NFPA 921 has

24   said as gospel, what I am saying is that we have extended and

25   we're able to explain what the proper methodology.  And now

1    the matrix is now included in -- for example, there's a

2    publication called *Rite in the Rain*, which is the notepads

3    for fire investigators in the community.  It's the foldout

4    center page, the ignition matrix.  That's what should have

5    been done.

6         And, like I said, I don't -- I don't buy into the

7    concept of what was done for the plaintiff's view of the

8    origin causing development for this fire because of the two

9    narrowly defined area of origin.

10   BY MR. GRINKE:

11   Q        You finished?

12   A        Yes.

13   Q        Okay.  All right.  So I'm trying to understand this.

14        Now, so you used in your report and in your

15   testimony today portions of NFPA 921.  To be fair, in 2010

16   the 2014 version wasn't out yet, was it?

17   A        No.

18   Q        So when they conducted this investigation they're

19   working off the 2008 NFPA 921, correct?

20   A        That's correct.

21   Q        Okay.  And then a couple of weeks before trial your

22   lawyers for the first time file a document with the Court

23   accusing these experts, and plaintiff's experts, of not

24   following NFPA 921 2014 version with the citing the negative

25   corpus.

1          And if I follow you, you are now saying, well, okay,

2     yes, I see that the negative corpus paragraph says you still

3     have to eliminate other potential sources of ignition, but

4     you're saying, I don't even really want to use the 2014

5     version of NFPA version, I want to go to my book, which was

6     also not in existence, or this edition, at the time they did

7     their investigation?

8     A          What they did --

9                         MR. HOOD:  Hold it.  What's the question?

10                        THE WITNESS:  What's the question?

11    BY MR. GRINKE:

12    Q          Is my understanding correct?

13    A          My understanding is that that the Rule 26 report, as

14    well as the affidavits and the testimony today, should have

15    met the NFPA 921 2014 edition.  And the testimony should have

16    met or exceeded those requirements.  And that the use of the

17    2008 edition would be inappropriate in this case on this

18    date.

19    Q          Okay.

20                        THE COURT:  Well, they had to use the 2008

21    edition on this date because the '14 wasn't in print.

22                        THE WITNESS:  Yes, Your Honor.  But in

23    their testimony now they would have to use today's edition.

24    And let me give you -- let me give the Court an example.

25                    If you're a psychiatrist or psychologist, and you

have seen a patient back in the year 2000, and you used the

PDR or used the D.S.M. that was in effect at that time, the

Diagnostic and Statistical Manual, and you diagnose somebody

of having a certain personality disorder, and then that

individual came to court today and was to testify about that

personality disorder, he or she would have to use the version

of the D.S.M. that's in play on this date.  And that was

what -- how I'm trying to respond to this situation.

THE COURT:  What you're trying to say is

exactly what your attorney argued in brief.  And I agree with

you that an expert, on the date that the expert testifies,

the expert has to take into account all of the knowledge

that's been acquired by that expert over the period of time

prior to the date he or she gives his testimony in open

court.

THE WITNESS:  Right.  My mantra in life is

every day is test day.  And these are the situations that

come about.

BY MR. GRINKE:

Q      All right.  Let's -- okay.  So you may disagree with

Mr. Wilkerson and Mr. Williams's reading of the burn patterns

on the balconies of 2207 and 2307, but is it really fair,

after listening to their testimony this morning -- you were

here, right?

A      Yes, sir.

Q        Okay.  Is it really fair to say that they ignored all of the burn patterns in -- I mean, you heard all their testimony where they read them and discussed them.

A        Are you asking me did -- in answer to your question, yes, they did ignore the burn patterns because they didn't consider in total the entire structure.  They zeroed in on one floor.

And, yes, if you had blinders on and forgot about the rest of the structure, you effectively could come up with a scenario in which a fire started there which, in fact, through fall-down did.  But, in this case, you cannot ignore the burn patterns and the fire dynamics and the witness statements.

The most compelling issue here is the witness statement of Special Agent Siegling who basically says, I hear the alarm, I look out the window.  He hears the alarm.  Somebody has seen this fire already.  They've reported it.  He looks out the window.  He doesn't see anything.  And he goes back in his room.  And he testifies, I don't know if this is a false alarm or what it is.  Five to ten minutes later there's a bang on his door.  Then he looks out, looks to his left and he sees from above this fire progressing down.

It fits.  It fits the entire scenario.  And there's nothing that can be disproved about what his testimony was.

1    And it fully supports the factor that the fire originated on

2    the third balcony and progressed down.

3    Q        Okay.  Your opinion that the fire originated on the

4    third floor balcony is not in your 26(f) report, is it?

5    A        It's referred to.

6    Q        It's referred to.

7             Now, today you're rendering an opinion that the fire

8    started on the third floor balcony?

9    A        Let me just summarize to you where I've referred to

10   the -- this alternative origin I covered in my report was

11   covered in my original report and it was followed up in a

12   file memorandum, Document 45.  Which basically on my expert

13   opinion -- and I repeatedly stated regarding the alternative

14   hypothesis, for example, on my disclosure from March 19th,

15   2014, Page 23.

16                    THE COURT:  Are we in your --

17                    THE WITNESS:  We're back in my --

18                    THE COURT:  Your declaration.

19                    THE WITNESS:  My declaration.

20                    THE COURT:  Government 336?  What page?

21                    THE WITNESS:  Page 23 of the original

22   report.

23                    THE COURT:  All right.

24                    THE WITNESS:  Page 23, basically, the fire

25   chief arrives.  And I will paraphrase this.  He says that he

1   was in command, served the balconies of the second and third

2   floors, that one of the buildings was completely engulfed in

3   flames.  That's his words.

4          So we have two separate areas to take a look at.  So

5   when you are looking for alternative hypotheses you have to

6   consider both.  Is it on the second level or the third?

7          Page 29 on October 21st, 2010, in a report of Bill

8   Yarbrough, Union Standard Insurance, Jim Brower of Quick

9   Claim Service mentioned the existence of wiring not compliant

10  with the electrical code which was found damaged on the third

11  floor.

12  BY MR. GRINKE:

13  Q       We have been through those -- no.  Wait a minute.

14  I'm reading with you, and I guess you're still going to get

15  to the part where you render an opinion that the fire started

16  on the third floor balcony?

17  A       What I did was I indicated there were hypothesis,

18  alternative hypotheses in this case.  I did mention on

19  page -- directly in response to that question, Page 70, a

20  potential hypothesis is the fire started in the concealed

21  ceiling of the third floor, and falling debris ignited the

22  second floor balcony of Room 2207.

23          On Page 39, other hypotheses -- and I'm quoting from

24  my own report -- included the possibility that the fire

25  originated on the higher balcony or attic overhang, and

dropping debris made it appear that the fire start on the

second floor balcony.  No eyewitness testimony exists to

support or deny the fact.  That Chief Dodson's (phonetic)

observation upon arrival of the balconies of the second and

third floors were completely engulfed in flames at the time.

No observation on the conditions prior to the arrival of

Chief Dodson.

        If witness interviews had been taken, these factors

may be known.

        In the defendant's memorandum on June 26th, 2014 --

Q        Where is that?

A        That is Document 45.

                THE COURT:  I don't have a Document 45.

                MR. GRINKE:  I don't have a 45.

                MR. HOOD:  I think he's referring to the

Court's Document 45.

BY MR. GRINKE:

Q        Do you have a tab from a notebook for an exhibit?

A        I do not.  I don't have it.  And I've got it packed

in my -- but basically I said that.

                THE COURT:  I don't have it.  Are you

talking about a court document?  I don't have it.  Move

along, counsel.

BY MR. GRINKE:

Q        I appreciate --

A        I have numerous -- to summarize my response, sir,

numerous times I have mentioned in my report, as well as in

court filings, as that the fact that alternative hypotheses

exists in this case.

        And on the -- in Document 21, two hypotheses are

mentioned -- a fire originating on the deck, as you proposed,

on Room 2207, or the fire originating on the third level

outside the room of 2307 and propagating down.

        So those two hypotheses have been produced in the

past, but -- and you could have explored them, but nobody

ever deposed me.

                THE COURT:  All right.  Here's what you're

referring to is Document Number 45 filed in this case on June

26th of 2014, Page 16, is Dr. Icove's opinions regarding

causation.

        There's one hypothesis on Page 16.  Hypothesis

Number 2 on Page 17 that the fire originated on the third

level outside of Room 2307 and then propagated the second one

outside of Room 2207.

        So it's been in the case since last year.

BY MR. GRINKE:

Q        Maybe I'm not being clear with my questions, and

that's my fault.

        I took your testimony here earlier today that it

wasn't just a hypothesis to you that the fire may have

1    started on the third floor and dropped down, that that was

2    your opinion.  Today in court it's your opinion, not a

3    hypothesis, I believe the fire started on the third floor

4    balcony and dropped down to the second floor.  Did I

5    misunderstand your testimony?

6    A        In my testimony, that is correct.  My testimony

7    today is based on facts and circumstances produced in my Rule

8    26 report, as well as testimony I've heard today, which has

9    really filled in the gaps.

10           And not only do I have a better understanding from

11   the case, but have a firmer and more passionate understanding

12   and opinion that the fire originated on the third floor

13   balcony.

14   Q        Okay.

15                THE COURT:  I think you previously

16   testified on direct, did you not, that the cause of the fire

17   should have been listed as undetermined.

18                THE WITNESS:  That's correct, Your Honor.

19   BY MR. GRINKE:

20   Q        Well, let's talk about a fire on the third floor

21   balcony and drop-down.  Do you have 3156?  And this would be

22   Exhibit Number -- Plaintiff's Exhibit 3156.

23           This, from the previous testimony, is just kind of a

24   picture of the mirror image across the courtyard.  But what I

25   want to look at in this photograph, sir, is up underneath the

1    second floor balcony, or you can say the top of the first

2    floor there -- I misspoke.

3         The top of the second floor balcony those rafters up

4    there, do you see that (indicating)?

5    A       Yes, sir.

6    Q       That's solid wood construction?

7    A       That is.

8    Q       There's nothing there on that solid wood

9    construction that would drop down and cause a drop-down fire,

10   is there?

11   A       There's vinyl siding there.

12   Q       There's vinyl siding on the wooding rafters on the

13   underneath I will call the ceiling of the balcony of 2207?

14               THE COURT:  I don't think that he is

15   saying that the vinyl siding on the vertical walls is what

16   dropped down.  There's nothing under the -- there's nothing

17   in the floor joists.

18               MR. GRINKE:  Right.  My first step was the

19   floor joists.  Then I will get to the siding.

20   Q       But there's nothing -- there's no vinyl siding or

21   anything under the floor joists that would have dropped down

22   and started a fire?

23   A       In that specific area?

24   Q       On our balcony.

25   A       It's pretty obvious from y'all's photographs that

1    drop-down did occur from the third level to the second level,

2    and it's scattered throughout that level, as well as hanging

3    on the balcony.  How do you explain that?

4    Q     Well, the photograph where there's vinyl hanging on

5    the balcony, there was also vinyl just leaning up against the

6    wall right by the door that could be vinyl from the second

7    floor balcony, right?  That all melted.

8    A     On the second floor?

9    Q     Yes.

10    A     It did.

11    Q     Okay.  So you can't say whether -- you can't say

12    that it was vinyl siding, which, by the way, would have had

13    to have melted, fall outside over the rail of the third floor

14    balcony, drop down to the second floor balcony, and go back

15    in and land on the railing?

16    A     No.  What you missed was, is that the heat transfer

17    compromised the siding on the left-hand side there as it

18    passes through.  And that was documented in the photographs

19    right outside the door of Room 2207.

20    Q     Okay.

21    A     The heat transfer allowed that to pass through there

22    so it didn't have to go around the side of the balcony.  It

23    actually passed along that wall.

24    Q     It passed -- isn't there a T plate in between the --

25    each balcony, like a two-by-four that would be a bar for

1   vinyl siding from sliding down in between?

2   A       It doesn't appear in this photograph.

3   Q       Okay.  If vinyl siding was dropping down and burning

4   from the third floor onto the second floor railing, wouldn't

5   you see a lot more burn patterns on the second floor railing

6   that is still green?

7   A       Well, the problem you have with your investigation

8   is there was sufficient -- insufficient number of photographs

9   in detail to document any of that.  We just happened to find

10  some anecdotal photographs in the collection that support

11  that.

12                  MR. GRINKE:  I will object as

13  nonresponsive.  I keep asking a question, then I get a

14  different -- that's not an answer to my question.

15                  THE COURT:  What was the question, Court

16  Reporter?

17                  (Whereupon, the Court Reporter read back

18  the pending question.)

19                  THE COURT:  That was the question.

20                  THE WITNESS:  Okay.  I believe in the --

21  there were insufficient number of photographs taken.

22       We do have at least one in which a piece of vinyl is

23  caught on the siding directly outside the door of 2207.  But,

24  no, there was not -- based on your photographs, there's

25  insufficient information there to support the question that

1    you're asking.

2    BY MR. GRINKE:

3    Q       Okay.  If a fire starts on the third floor balcony,

4    are the flames going to spread up?

5    A       Is this a hypothetical question, or are you talking

6    about this case?

7    Q       We'll talk about this case.  Did the flames spread

8    up?

9    A       I would have to know more information about what

10   you're asking.

11          I can demonstrate.  I can look at your photographs

12   and show you what's happened.

13   Q       Well --

14   A       You have a photograph you want to show it to me, go

15   ahead.

16   Q       Well, I want to know, did the fire, in your opinion,

17   if the fire started on the third floor balcony, did flame

18   impingement go up into the attic space?

19   A       It appears that it compromised the plywood or

20   whatever finish was up there, and it did extend into the

21   attic space.

22   Q       I want to show you what's in defense exhibit -- I'm

23   sorry -- Plaintiff's Exhibit 9, FBI 154.

24                      THE COURT:  FBI what?

25                      MR. GRINKE:  154, Your Honor.

1                    THE COURT:  What exhibit are you?

2                    MR. GRINKE:  I've just been informed that

3    it's actually Plaintiff's Exhibit 11, 154.

4                    THE COURT:  All right.  It's on the screen

5    in front of you.

6                    MR. GRINKE:  It's on the screen, as well.

7    BY MR. GRINKE:

8    Q        Do you have that in front of you, sir?

9    A        I do, sir.

10   Q        Okay.  So your hypothesis and now opinion today is

11   that the fire started on the third floor balcony and burned

12   for a good 20 minutes before it spread down to the second

13   floor balcony?

14   A        Approximately.

15   Q        Okay.  Then why in this picture are the joists in

16   the attic in such good shape if we had a fire that started on

17   the third floor and spread up into the balcony for 20 minutes

18   before it dropped down and caused so much damage on the

19   second floor balcony?

20   A        Well, two things.  One is that the testimony today I

21   believe we heard that exactly what I had to say that fire did

22   compromise and extended through the plywood, but it was on

23   the balcony side, not on the interior side.

24           So I do believe -- I believe Investigator Wilkerson

25   testified that today that there was an extension that he

1   believed that extended into the space there.

2   Q        Do you see in that photograph, do you see an

3   extension that goes up beyond the interior wall all the way

4   up to the roof?  It's probably the clearest on the screen in

5   front of you.

6   A        I think the better photograph would be to look at

7   GX-28.

8   Q        And to you that shows a solid wall partition going

9   all the way up above the interior of the room up into the

10  attic space?

11  A        This is the exterior above the -- where the light

12  fixture would have been is GX-28.  And the extensive amount

13  of charring, as well as I believe that that exterior roofing

14  material or not roofing, but the exterior ceiling has been

15  compromised at that point.  And that's on GX-28.

16           And, like I said, I believe today that Investigator

17  Wilkerson did testify that the -- and correct me if I'm wrong

18  -- that there was a penetration into the attic space.

19  Q        Okay.  And it may have been a penetration, but

20  according to this picture, it wasn't very great, was it?

21  A        Well, that's -- that's not a very good perspective

22  from what that shows in comparison to GX-28 shows a superb

23  example to the penetration into that attic space there was

24  sufficient damage to the upper roof structure.

25  Q        Yeah.  Upper roof structure on the exterior of the

1    building, correct?

2    A        Yes.

3    Q        If a fire -- I will go back to my original question,

4    then, though.

5             Wouldn't you expect if a fire originated on the

6    balcony of 2307, and knowing basic fire science that fire

7    burns up and seeks for fuel, that you would have a bigger

8    attic fire?

9    A        Well, what's happened here is from the time of the

10   notification of the alarm, and five minutes the fire

11   department was there on the site, and within minutes had it

12   extinguished.  So it wouldn't have had a chance to develop

13   the way that you would like to have seen it develop in this

14   case.

15   Q        Well, okay, but then in all fairness, the underside

16   but -- did it have enough time -- the fire that originated on

17   the balcony of 2307 did have enough time to drop down to

18   2207, crawl all the way back up and do this kind of damage

19   underneath 2307?

20   A        Some of that damage is from above.  Some of that

21   charring is from above where the gaps in the wood allowed

22   ventilation to come from above and below.

23            So if you're assuming that a five-minute response

24   time, you would have to evaluate how much damage could have

25   been done in that time period.

1      However, nothing equates to the damage, again, that
2  we see on the third level.
3  Q      If I'm -- if I light a match, a wooden match, and
4  I'm holding it like this (indicating), and I hold a piece of
5  paper or any flammable material above it, and it -- the flame
6  from the match, it goes up, right?  It doesn't go down.  It
7  might creep down, but it may go out, but the entire piece of
8  paper may be consumed, won't it?
9  A      It depends.  It depends on, just as Investigator
10  Williams responded, it depends if the paper is thermally thin
11  or thermally thick.  It depends on the humidity, the
12  composition.  There's too many variables involved just to
13  oversimplify an example like that.
14  Q      I appreciate that you have a science mind, and I
15  appreciate that.
16      But for a layman like me, if I light a match and I
17  catch a piece of paper on fire, and the match goes out, and
18  half the match might still be good clean wood, but the entire
19  piece of paper may burn up if I just stand here and hold it
20  like that; fair?
21  A      It may or may not.  And here's the problem.  This is
22  the problem with the layman's approach to fire investigation.
23      Right now this is a science that's emerging so
24  quickly that, like I said, one entire area just of the four
25  prongs in origin determination there's entire textbooks with

1    formulas that would put you to sleep, but it's a situation

2    this is a science now.

3          This is not just a laboratory demonstration of an

4    ignited match and a piece of paper.  We're talking about some

5    serious science in doing these evaluations.

6    Q       Okay.  Arc mapping.  You're critical of these

7    experts for not calling somebody in to arc map.  What were

8    they supposed to arc map?  Where is the burned up wiring?

9    A       Well, hey, let's take a look again GX-28.  There is

10   -- where is that white exterior lighting fixture from that?

11   It just didn't disintegrate at that level.  There's a wire

12   hanging from it.

13         There would have been sufficient information to do

14   arc fault mapping to trace the wiring to that lamp fixture,

15   as well as any other wiring that could have been in the

16   vicinity of that wire.

17         Arc fault mapping is a very valuable tool, and it's

18   underutilized especially in this case.

19   Q       It doesn't have to be used in every case, does it?

20   A       The standard of care now says you should make an

21   attempt to use it in every case.

22   Q       If you have a pot that overflows and catches a fire

23   on a stovetop and is limited to the kitchen wall, are you

24   supposed to do arc mapping?

25   A       Right now the standard of care is to place as much

emphasis and thoroughness in every fire, whether it be a pot on the stove or a multi-million dollar structure fire.

The same standards of care, as far as to documentation of -- we stated in *Kirk's Fire Investigation* says every scene should be approached and documented as if it was a criminal act.  And you can't skimp on interviews, you can't skimp on photographs.  You can't skimp on documentation.  And you can't skimp on the applications, the two applications -- fire pattern analysis, fire dynamics and arc fault mapping.

So to answer your question, you exert the same level of effort on a fire, whether it be small or large.

Q       Okay.

A       And that's the standard of care today.

Q       What do you think the potential sources were of ignition on the balcony of 2307?

A       I don't know at this time.

The potential -- one of the questions we have is, where did this light fixture go?  Where is it?  Where is the other light fixture?

And this issue of the compact fluorescent light fixtures, where are they?  Have they had problems?

One of the things that we looked at in the scientific methods is loss histories.  Did anybody ask this complex, did you have problems with these light bulbs?

1   Q       Okay.  So in Defendant's Exhibit 9, let's talk about

2   that light up there, then.

3           So for the burn pattern, if the light, the exterior

4   light on the third floor balcony, 2307 which is right above

5   the door, is going to start a fire, is it going to start a

6   fire exterior to the building or interior to the wall?

7   A       We don't know.  We don't have the evidence.

8   Q       Well, just based on your knowledge of basic

9   construction, would it?

10  A       We don't know at this time.  This is a situation

11  where collection and preservation of evidence is so

12  important.  You can't tell from a mere picture of what

13  happened.  Plus, you have insufficient photographs were

14  taken, that the logs weren't there and the evidence is gone.

15  Q       Okay.  So if that light caused a fire on the third

16  floor balcony, then in order to get the drop-down patterns we

17  have on 2207, the fire has to spread horizontally and down,

18  correct?

19  A       No.  That's not how the fire spread --

20  Q       What is the --

21  A       -- all the methods on how the fire is spread in this

22  case.  There are multiple ways that that fire is spread.

23  Q       Okay.  But when you walk out the door to 2207,

24  there's much less burn damage right there where that light

25  fixture is right up above you, one floor up?

A        Well, I'm not saying that that's where it started,
but we do know it appears to be centrally located.

Q        Okay.

A        But if you go back to GX-9 -- this is a very poor
rendition -- but you can see there is some impact on that
railing, but we'll never know because nobody ever evaluated
and photographed that.

         If there was -- if as many photographs were taken of
the third balcony as of the second we would probably have the
answer to that question.

Q        May I borrow that photo?  It will make it easier
than me trying to find it.

         Okay.  So this is what I was getting at, though.
Here's the doorway on 2307, the light fixture would be right
about here (indicating), right?  If that light caused the
fire, then with the burn pattern everything over here on
2207, we have drop-down, wouldn't you expect the drop-down to
be more on this side, because this is where you're going to
have the longest burning?  Instead it had to go that way and
that way.  That's your testimony.

A        We don't know how it went.  All we know is if you're
asking for area of origin, the area of origin is on the third
level balcony.

         There's insufficient information to give me a cause.
You're asking for a cause.  And in this case, the cause

1    should be undetermined at this time because there's too many

2    hypotheses.

3    Q        Okay.  What about Mr. Wilkerson and Mr. Williams's

4    testimony today, did you just learn for the first time that

5    made you render now an opinion that that's where the fire

6    started versus it just being a hypothesis?

7    A        I have said all along that I believe that the fire

8    did not start on the second level.  That has been my

9    contentions all along in my Rule 26 reports, as well as in my

10   testimony, and in the filings in this case.

11   Q        In fairness, don't all of your statements say they

12   should have considered other things, it doesn't say the fire

13   never started on the second floor?

14   A        I believe we've said that.

15   Q        Okay.

16   A        I believe that in every single filing, and in

17   this -- in my Rule 26 report, that I've always rejected the

18   hypothesis of the fire originating on the second floor

19   balcony.

20   Q        Okay.  So we've got a second floor balcony where we

21   do have evidence of human involvement.  And directly below

22   that balcony in the same area we have physical evidence of

23   cigarette smoking.  And we have burn and flame pattern that

24   are consistent with that.  But you want us to go on the third

25   floor where we have no evidence of human involvement, no

1   evidence of electrical fire, no evidence of a spread, or a

2   tentative theory that fire would spread downwards instead of

3   upwards?

4   A       What you have in this case is Mr. Wilkerson's only

5   interview and only witness, who is credible, and the facts,

6   the circumstances, and the scenario fit in this case.

7           He hears the alarm, there's got to be -- he looks

8   out the window.  There's no fire on the second floor balcony.

9   What he doesn't realize is there's a fire above him.

10  Q       Okay.  That brings up a good point.  You don't

11  think -- I guess this makes sense -- you don't think that the

12  light fixture on the second floor balcony caused the fire?

13  A       We will never know.

14  Q       Wait a minute.  You are rendering now it's on the

15  third floor.

16                  THE COURT:  No, sir.  You have ceased to

17  question the witness on cross-examination, and argue with

18  him.

19                  MR. GRINKE:  I apologize, Your Honor.

20                  THE COURT:  You're just arguing with him.

21  You are not going to get him to adopt your point of view, so

22  you need to give up on that.

23          Now, he has said repeatedly that the cause of this

24  fire should have been listed as undetermined.  It is his

25  opinion, and he has stated it consistently in his pretrial

reports, that it originated somewhere on the third level and
spread to the second.  So that's where you are.

Now, if you have got specific questions that you
want to ask him that undermine the credibility of that
hypothesis, opinion, of how it spread, then go ahead.  But
don't just argue with him.

MR. GRINKE:  Okay.  And I apologize if
I've become rude.  I get fired up.

THE COURT:  I'm not talking about
rudeness.  You're just arguing.

MR. GRINKE:  What I am trying to do is
undermine the credibility of a theory that it started up on
the third floor versus the second floor.

THE COURT:  Let me ask you this:  You said
that every scene should be approached, investigated and
documented as if it were a criminal act, and in doing that,
the collection and preservation of evidence is important.

You've also testified that in addition to the
failure of the initial investigators to identify any -- the
person who first noticed the fire, the person who called in
the fire, and other people who may have seen the fire from
the exterior of the building, there was no investigation of
the potential that one of those people, the person who called
the fire, could have been an arsonist, vandalism or arson; is
that correct?

1                  THE WITNESS:  Yes, Your Honor.

2                  THE COURT:  Now, if you are going to

3    investigate arson, what, in addition, would you have done?

4    Would you have collected char evidence of the wood?  Put it

5    in sealed containers for laboratory analysis for the

6    preservation for the presence of accelerants?

7                  THE WITNESS:  I would have.

8                  THE COURT:  What about the cigarettes?

9    Should they have been collected?

10                 THE WITNESS:  Yes.  With the advent of

11   DNA, we know now that just the mere puffing one time or two

12   times on a cigarette that you could be linked by DNA.

13        Other things that would be effective would be the

14   same areas on the chart that I have.  One of the -- with

15   everybody with a cell phone now taking pictures, with the

16   number of security cameras that we have, and ATM machines,

17   this is a video world, and just asking to see if somebody has

18   a photograph would be very, very essential in this case.

19        But the fact that they did not sample for an

20   accelerant on that balcony, as well as other balconies, is

21   just fraught with problems.  And the best example we can have

22   with that is that work with the state fire marshal's office

23   in Florida.  They required in every kitchen fire a sample be

24   taken or multiple samples be taken, and within six months

25   developed one of the largest arson for profit rings in the

history of the state of public adjustors and clients ripping off insurance companies setting fires in kitchens, making them look accidental.  And if it had not been for the state fire marshal's office adopting that procedure of approaching and looking at all fires as criminal, and using the same documentation techniques and evidence gathering techniques, they would never have known about this.

So, yes, your question is right.  There is no chance anymore for second guessing of fire thinking that it's just a simple one.  You have to use -- now the standard of care is to use every aspect and every integral documentation technique you have got to do it.

The public expects this.  And that's who the real -- the real people are that -- that they deserve this level of service.

THE COURT:  You didn't find any evidence in all of the materials that you examined of identification of a person who first saw the fire?

THE WITNESS:  No, sir.  I could not find anything in those records.

THE COURT:  Okay.  I think those are all the questions I have.

Do you have any further questions, counsel?

MR. GRINKE:  A few more, Your Honor.

BY MR. GRINKE:

Q       With respect to an arson investigation, you say it's the standard of care.  In the 2008 edition of NFPA 921, does it say that a sample arson sample must be taken in every fire investigation?

A       No.  But in the Department of Justice guidelines, it does.  There's a set of Department of Justice guidelines in the year 2000 that addressed arson and fire scene examinations recommended in every case samples be taken.

Q       Okay.  So -- and but not in NFPA 921?

A       NFPA 921 -- I tell you who does require it is NFPA 1033.  Under NFPA 1033 4.4.1, 4.4.2, as well as a whole series of other standards -- ASTM A620, ASTM E860, 1188 require the physical electronic and digital evidence be identified, preserved, and collected.  That's a job performance requirement for a fire investigator.

Q       Okay.  I didn't hear that to sound like taking samples for arson for accelerants.

A       You're asking evidence.  We're talking about evidence in this case.

Q       I'm asking you specifically about taking a sample for accelerants.

        Let me ask you this:  Is it your understanding that where the fire occurred exterior to this building actually faced into a secure courtyard?

A       Yes.

Q        And you heard Mr. Wilkerson's testimony that he
actually had trouble getting in and out, or to get out, but
he couldn't get in without letting somebody with a card to
let him in?

A        Yes, sir.

Q        You are not suggesting Special Agent Siegling
purposely set a fire on his balcony?

A        No.  You are.

Q        I'm not.

A        Or the contention is that, as was suggested earlier
by some of the examination of your witnesses, that somebody
reached over from another area, that flipped something in
from the courtyard.  All of those scenarios are hypotheses
that you provided.

Q        Right.  And I guess my question, then, is are those
plausible and reasonable enough if you have got an empty room
up above that's vacant, was it so unreasonable for
Mr. Wilkerson not to or choose not to take samples and send
them off to the arson lab --

A        He should have taken --

Q        -- in that set of facts?

A        He should have taken samples.

         Let me put it this way:  From the debris field, from
the debris that I saw on that deck, there is minimal burning
that if the appropriate sifting and examination techniques

1    were used, which could have taken a day or two, if a

2    cigarette had been the ignition source and the materials that

3    he allege came together with a cigarette would have been

4    found.

5         I had a car where a guy unfortunately killed his

6    girlfriend, choked her to death, put her in the back seat of

7    a car and set the car on fire with available materials, some

8    newspaper.  Used a pack of matches.  During the fire the

9    glass windshield fell in and perfectly protected all the

10   evidence in that case.  And, but it took two days just to

11   process that scene and to recover that pack of matches.

12        So if you don't think that in a scene even as

13   volatile as a burning vehicle that you can find evidence, you

14   can.  And it takes a matter -- it takes sweat equity to do

15   it.

16   Q      In the books that you've cited and that are cited in

17   this case that you rely on, in one of your books you state

18   that cigars, like cigarettes, even though they can be

19   self-extinguishing can still cause fires?

20   A      Yes.

21             MR. GRINKE:  Okay.  Just checking my

22   notes.  I think I'm done, Your Honor.

23             THE COURT:  Here's a question that

24   prompted my previous questions.

25             I'm looking at the timeline that you begin on Page

20 of your written report, Government's Exhibit 36.  You say
that at 3:00 p.m. on September 23rd Investigator Wilkerson
returned to inspect the fire scene.  He interviewed Wanda
Morgan, an employee who had received a suspicious telephone
call that morning.

Is there anywhere in the materials you reviewed that
showed what Wanda Morgan said to Investigator Wilkerson?
What is the nature of the suspicious telephone call?

THE WITNESS:  Your Honor, my understanding
is, is that an individual who was pretending to be a fire
marshal -- and you would have to ask Investigator Wilkerson
more on the details -- called the office asking for
information regarding that fire.  And that was the substance
of that probe that he had.

THE COURT:  All right.

MR. GRINKE:  And did you just refer to the
written statement that Mr. Wilkerson took from Mr. Morgan?

THE COURT:  Where is that statement?
That's what I am asking for.  Is it in evidence?

MR. GRINKE:  You said where is it?  It's
in the City of Huntsville documents.  I believe it's going to
be Plaintiff's Exhibit 9.

THE WITNESS:  It's at Page FBI 00044.

MR. GRINKE:  Yes.  And FBI 0043.

THE COURT:  Yes.  Thank you.

1   BY MR. GRINKE:

2   Q        Did you take any part in the investigation into the

3   fire in Birmingham on August 15th of 2015, where it was

4   determined that a cigarette caused the fire on a third floor

5   balcony and spread to the attic space?

6   A        You would have to give me --

7                      MR. HOOD:  Objection.  Lack of foundation.

8                      THE COURT:  I'm sorry.  I was reading the

9   statement.  What was the question?

10                     (Whereupon, the Court Reporter read back

11  the pending question.)

12                     THE COURT:  Overruled.  You can answer

13  that question.

14                     THE WITNESS:  I don't have any information

15  regarding that case.

16  BY MR. GRINKE:

17  Q        Did you take part in the investigation in Austin,

18  Texas on a November 24, 2015, fire where the fire department

19  determined that a cigarette caused the fire on a second floor

20  balcony of a second floor apartment complex and spread to the

21  attic?

22                     MR. HOOD:  Again.  Object, Your Honor.

23  Lack of foundation.

24                     THE COURT:  Sustained.  Have you brought

25  these up in this case anytime before --

1              MR. GRINKE:  I haven't, Your Honor.

2              THE COURT:  All right.  I sustained.

3              MR. GRINKE:  Your Honor, what I would like

4    to offer, then, and I obtained these Saturday from the

5    various fire departments --

6              THE COURT:  No, sir.  It's too late.

7              MR. GRINKE:  I was asking to offer for

8    impeachment.

9              THE COURT:  Did you take part in the

10   investigation?

11             THE WITNESS:  No, sir, I did not.

12             THE COURT:  Not impeachment value.

13             MR. GRINKE:  Okay.  Fair enough.  I will

14   pass the witness, Your Honor.

15             MR. HOOD:  We have no further questions,

16   Your Honor.  We stand on the direct testimony.

17             THE COURT:  All right.  You may step down.

18             THE WITNESS:  Thank you, sir.

19             MR. CHEEK:  Your Honor, at this time we

20   would renew our motion for judgment under Rule 52 for all the

21   reasons stated in our previously filed --

22             THE COURT:  I'll take that under

23   advisement.

24         Do either of you want to make any closing arguments?

25             MR. CHEEK:  Thank you, Your Honor.

1          MR. HOOD:  Defendant does not.

2          MR. GRINKE:  I think the dead horse is

3  sufficiently beaten, Your Honor.

4          THE COURT:  Yeah.

5      I will read your written motion, and I will give

6  y'all a written opinion.  If I have questions I will bring

7  you back for oral argument in the nature of closing

8  arguments.

9      But, otherwise, I thank you for coming, and we'll

10 take the case as submitted for a decision.

11         MR. GRINKE:  Your Honor, I haven't read

12 it.  I don't know might I need an opportunity to respond in

13 writing to the motion they filed?

14         THE COURT:  You may.

15         MR. GRINKE:  Okay.  When would you like me

16 to file it by, Your Honor?

17         THE COURT:  Would Friday be too soon, or

18 do you want until Monday?

19         MR. GRINKE:  Friday is great.  I can do it

20 by Friday.

21         THE COURT:  Okay.  Very good.

22     Anything else, Amy?

23         MS. HALL:  No, sir.

24         THE COURT:  All right, gentlemen.  Thank

25 you for coming up.  Drive carefully going home.  I don't know

1    what the weather conditions are outside.

2            And good luck tonight.

3                        (Whereupon, the above proceedings were

4    concluded at 4:39 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____                05-05-16

Christina K. Decker, RMR, CRR                    Date

Federal Official Court Reporter

ACCR#:  255